**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CYNTHIA PARLIN, Individually, and in her Capacities as Surviving Spouse of Samuel Parlin, And As Executrix of the Estate of Samuel Parlin, Deceased, | : : : : : | Civil Action No. |
| Plaintiffs, | : : | |
| v. | : : | Jury of 12 Demanded |
| DYNCORP INTERNATIONAL INC., *et al.*, | : : : | |
| Defendants. | : | |

<u>**NOTICE OF REMOVAL**</u>

**PLEASE TAKE NOTICE** that named Defendants DynCorp International Inc. and DynCorp International LLC (hereinafter collectively referred to as "Defendants"), by and through their attorneys, Smith, Katzenstein & Furlow LLP, hereby remove the above-captioned matter to this Honorable Court pursuant to 28 U.S.C. §§ 1441 and 1442(a)(1) and submit this Notice of Removal pursuant to 28 U.S.C. § 1446. In support of this removal, Defendants state the following:

1.    On or about January 16, 2008, Plaintiff Cynthia Parlin, individually and in her capacities as surviving spouse of Samuel Parlin and executrix of the estate of Samuel Parlin, Deceased, filed a Complaint in the Superior Court of the State of Delaware, In and For New Castle County, captioned *Parlin v. DynCorp International, Inc., et al.*, Civil Action No. 08C-01-136 FSS. *See* Exhibits A and B (copies of Service of Process on defendants DynCorp International Inc. and DynCorp International LLC) (hereinafter referred to as the "Complaints").

2.    In the Complaints, Plaintiff alleges Survival and Wrongful Death Actions against Defendants.

3.    This action arises out of the death of Samuel Parlin, who allegedly died on January 16, 2006, as a result of injuries sustained from an Improvised Explosive Devise ("IED") while traveling in Baghdad, Iraq.  Complaints, ¶ 1.  It is further alleged that Mr. Parlin was working as an International Police Liaison Officer ("IPLO") at Baghdad International Airport and the Baghdad Police Academy in support of the United States Department of State Civilian Police ("CIVPOL") mission in Iraq.  *Id.*

4.    It is alleged that Defendants contracted with the U.S. Department of State "to provide services, including to recruit, select, equip, and deploy civilian police officers in support of a CIVPOL mission to help the government of Iraq develop a modern, indigenous police force to maintain peace and stability."  Complaints, ¶ 6.

5.    It is alleged that Defendants and Does 1 through 10 subcontracted with DynCorp International FZ-LLC ("DI-FZ") "to hire personnel and provide service in support of the CIVPOL contract."  Complaints, ¶ 8.

6.    It is alleged that Mr. Parlin was employed at all times relevant by DI-FZ. Complaints, ¶ 9.

7.    It is alleged that DI-FZ properly secured coverage for Mr. Parlin under the Defense Base Act ("DBA"), 42 U.S.C. § 1651, and that therefore, Defendants do not have "the immunities of an employer under the DBA or [the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 904(a)]."  Complaints, ¶¶ 10-11.

8.    It is alleged that Defendants presented cost proposals to the U.S. Department of State "for security purchases and personnel below what they knew or should have known would be required for adequate security."  Complaints, ¶ 21.  It is further alleged that "such misrepresentation

regarding security purchases and personnel was intentionally made to induce the [U.S.] Department of State to award defendants DYNCORP, DI LLC, and DOES the CIVPOL contracts on defendants' mistaken belief the DBA would shield them and their subcontractor from liability for any harm which resulted from intentionally providing inadequate security and/or directing individuals such as Samuel Parlin to perform dangerous acts, such as travel through Baghdad." Complaints, ¶ 22.

9.    It is alleged that Defendants supplied Mr. Parlin with "inadequate resources and personnel," "maintained a culture of indifference to the security of IPLOs and other individuals," and "frequently under-equipped and under-manned the 'SHARK' teams charged with travel security." Complaints, ¶¶ 23-24.

10.    It is alleged that "travel through any area of Baghdad was extremely dangerous," that "Defendants routinely failed to evaluate thoroughly the risk/benefit of proposed travel throughout Iraq," and that "Defendants routinely ordered travel even when wholly unrelated to mission success." Complaints, ¶¶ 26-27.

11.    It is alleged that after Mr. Parlin's death, the U.S. Army investigated Defendants' management and security practices. Complaints, ¶ 39.

## I.    REMOVAL BASED UPON FEDERAL QUESTION JURISDICTION

12.    28 U.S.C. § 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdictional, may be removed by the defendant or the defendants, to the district court of the United States for the district . . . embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded."

A.    **To The Extent Plaintiff's Claims Are Justiciable, The Interpretation And Application Of Federal Statutes Will Determine The Viability Of Plaintiff's Claims; Thus, Federal Question Jurisdiction Is Appropriate**

13.    28 U.S.C. § 1441(b) provides that "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties."

14.    Plaintiff's Complaint clearly demonstrates that the application and interpretation of two federal statutes—the DBA, 42 U.S.C. §§ 1651 *et seq.*, and the LHWCA, 33 U.S.C. §§ 901 *et seq.*—will be of paramount importance in this case.  Consequently, because the viability of Plaintiff's claims depends upon the interpretation and application of federal statutes, federal question jurisdiction is entirely appropriate in this case and removal pursuant to 28 U.S.C. §§ 1441(a) and (b) is proper.  *See Nauert v. Ace Props. & Cas. Ins. Co.*, 2005 WL 2085544, at *3 (D. Colo.) (holding that the DBA and LHWVA pre-empt state law) (Ex. F).

B.    **To The Extent Plaintiff's Claims Are Justiciable, Controlling Authority For Plaintiff's Claims Is Most Likely To Be Found In Federal U.S., International Treaties And/Or Conventions, And/Or Iraqi Laws; Thus, Federal Question Jurisdiction Is Appropriate**

15.    Drawing parallels from the recent promulgation of federal criminal liability standards for private security contractors like Mr. Parlin, the adjudication of Plaintiff's civil claims should rest upon the interpretation and application of U.S. law, international treaties or conventions, and/or Iraqi law.  Thus, removal pursuant to 28 U.S.C. §§ 1441(a) and (b) is proper.

16.    There is no basis for applying Delaware state law to this case.  For tort claims, Delaware courts follow "the principle of *lex loci delicti*, and [have] appl[ied] the law of the place of the injury."  *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 379 (D. Del. 1990) (citation omitted).  As alleged in the Complaints, Mr. Parlin, a resident of the State of Georgia, died in Iraq

while he was working as a contractor to the U.S. Department of State in support of the U.S. Government's CIVPOL mission. Applying the principle observed by Delaware state courts, the law of Iraq would apply to Plaintiff's tort claims.

17.    It is public knowledge that there is international, Iraqi, and U.S. government oversight of private contractors working in Iraq in support of U.S. and coalition military and reconstruction efforts. Accordingly, it has been suggested, particularly with respect to criminal liability, that private contractors "to the coalition forces in Iraq operate under three levels of legal authority: (1) the international order of the laws and usages of war and resolutions of the United Nations Security Council;[1] (2) U.S. law; and (3) Iraqi law, including orders of the CPA that have not been superceded."[2] Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues*, Order Code RL32419, at 11 (July 2007). The CRS does not provide clear guidance as to the legal authority applicable to civil lawsuits for personal injuries for private contractors working for the United States Government in Iraq. However, in light of the recent promulgation of federal criminal liability standards for private contractors in Iraq, it is reasonable to conclude that federal standards should likewise govern civil liability. To that end, as demonstrated below, there have been recent federal efforts to promulgate standards to address the

---

[1]    For example, the international law of armed conflict and non-international armed conflict may be relevant in Iraq. The applicable international law will also depend upon whether the private contractors are "combatants" or "mercenaries." Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues*, Order Code RL32419, at 12-15 (July 2007).

[2]    Iraqi law includes orders issued by the Coalition Provisional Authority ("CPA") "prior to the hand-over of sovereignty to the Iraqi Interim Government that have not been rescinded or superceded." Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues*, Order Code RL32419 at 15-17 (July 2007). Pursuant to CPA Order Number 17 (revised as of June 27, 2004), "[c]ontractors shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their Contracts." *Id.*

issues raised in this lawsuit, which signify that federal (which may include treaties and/or other international conventions), rather than state, law should be applied to this case.

C.    **Plaintiff's Allegations Raise "Uniquely Federal Interests"; Thus, To The Extent Her Claims Are Justiciable And In The Absence Of Federal Statutes Or Regulations, Federal Common Law Should Be Developed And Applied To Plaintiff's Claims**

18.    This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims are based upon substantial questions of federal law and implicates significant federal issues. *See Grable & Sons Metals Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).

19.    It is obvious that there are no state or federal standards by which this Court could evaluate Plaintiff's claims that Defendants, *inter alia*, allegedly failed to provide basic security to IPLOs; failed to purchase, maintain and make available adequate weaponry, armor vehicles, and other supplies; and failed to establish and/or to abide by reasonable precautions to minimize travel in Iraq during enemy hostilities. *See* Complaints, ¶ 40. However, because the events underlying this lawsuit occurred in Iraq while Mr. Parlin was working as a contractor for the U.S. Department of State in support of its international CIVPOL program, Plaintiff has clearly raised issues that implicate "uniquely federal interests." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).

20.    The "uniquely federal interests" implicated by this case are articulated by Plaintiff's own allegations. To that end, the Complaints makes allegations regarding the integrity of the federal procurement process (*see* Complaints, ¶¶ 19-22); expenditures of federal taxpayer money on contractors by the U.S. Government (*see* Complaints, ¶¶ 1, 5, 13-18); the relationship between private contractors and the U.S. Military (*see* Complaints, ¶¶ 1, 27, 39); the level of protection and security provided to private contractors working in Iraq (*see* Complaints, ¶¶ 1, 13-25); and the dangerous conditions in Iraq (*see* Complaints, ¶¶ 26-27, 30, 32, 37, 38).

21.    In addition, the "uniquely federal interest" is demonstrated by the intent of the U.S. Departments of Defense and State to develop laws and promulgate regulations addressing some or all of the issues raised in this Complaints, as well as their agency oversight and deployment of private contractors.  In a "Memorandum of Agreement (MOA) between the Department of Defense and the Department of State on USG Private Security Contractors"[3] that was executed on December 5, 2007 (a copy of which is attached hereto as Exhibit C), the U.S. Departments of Defense and State agreed to "jointly develop, implement, and follow core standards, policies, and procedures for the accountability, oversight, and discipline of [private security contractors]," which will include a "clear legal basis for holding [U.S. Government] private security contractors accountable under U[.]S[.] law."  *See* Exhibit C at 1.  This MOA indicates that the two federal executive agencies will develop and implement federal standards in Iraq covering their private security contractors regarding unity of effort, rules for the use of force, authority to process and carry firearms, movement coordination and control, serious incident response and investigation, contract management and language, and legal accountability (under U.S. law).  *See* Exhibit C, Annex A.  If there is a clear legal basis for determining liability here, then it clearly implicates the same federal interest the U.S. Departments of Defense and State are evaluating as part of the MOA.

22.    The "uniquely federal interests" at issue in this matter is also demonstrated by the number of bills recently introduced by congressional members to establish federal standards and oversight of contractors in Iraq and other locations.  For instance, on February 16, 2007, Senator Barack Obama (D-IL) introduced the Transparency and Accountability in Military and Security

---

3        A copy of this MOA can be found at http://www.defenselink.mil/pubs/pdfs/Signed%20MOA%20Dec%205%202007.pdf.

Contracting Act of 2007, which directs the Chairman of the Joint Chiefs of Staff to issues rules of engagement for contractor personnel, to establish hiring, training and equipment standards to private contractors,[4] and to coordinate communications between U.S. Armed Forces and contractor personnel.[5] *See* Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong., § 6 (2007) (attached hereto as Exhibit D).  A similar bill, sponsored by Representative David Price (D-NC), was introduced in the House of Representatives on January 10, 2007, and has been referred to the House Subcommittee on Crime, Terrorism, and Homeland Security.  *See* Transparency and Accountability in Security Contracting Act of 2007, H.R. 369, 100th Cong., § 3 (2007) (attached hereto as Exhibit E).  *See also* MEJA Expansion and Enforcement Act of 2007, H.R. 2740, 100th Cong., § 2 (2007) (proposing to extend the Military Extraterritorial Jurisdiction Act to contractors employed abroad to hold them criminally liable for certain acts); Security Contractor Accountability Act of 2007, S. 2147, 110th Cong., § 2 (2007) (same).

23.     The "uniquely federal interests" can also be found in the investigatory committee hearings by the Committee on Oversight and Government Reform of the U.S. House of Representatives. These hearing have discussed and investigated some or all of the issues raised in this Complaints, including, among other issues, the level of security and protective equipment issued to contractors, the necessity of traveling in Iraq, and the threats faced by contractors while performing their duties in Iraq.  *See Hearings on Blackwater USA*: Hearing Before the H. Comm.

---

[4]     Senator Obama's bill specifically provides: "The head of each agency awarding a covered contract shall issue guidance (appropriate for the agency) on equipment used for private security functions under covered contracts with the agency, including appropriate uniforms and levels of body armor and equipment armor, and a recommended list of re-armorers and weapons and armor manufacturers for complying with such guidelines." Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong. § 6(b)(2) (2007).

[5]     Section 6(c)(2)(F) of Senator Obama's bill provides that the Theater Security Contract Coordinating Officer must, among other things, "as appropriate, communicate up-to-date information about the security environment that may be relevant to contractor personnel."  *Id.* at § 6(c)(2)(F).

on Oversight and Government Reform, 110th Cong. 3-9 (Preliminary Transcript October 2, 2007) (statement of Rep. Waxman, Chairman); *Iraqi Reconstruction: Reliance on Private Military Contractors and Status Report*; Hearing Before the H. Comm. on Oversight and Government Reform, 110th Cong. 1-9 (February 7, 2007) (statement of Rep. Waxman, Chairman).

24.     In summary, based upon the overwhelming federal interest in the issues raised in this lawsuit, it is evident that this Court should defer to federal, rather than state, interests when reviewing this case. However, to the extent that Plaintiff's claims are justiciable, there are currently no federal or state laws or regulations specifically governing the allegations in this case, including the appropriate amount of protection to be afforded private contractors in Iraq or when travel in Iraq is permissible. Assuming that this case is justiciable, this Court should conclude that the overwhelming federal interest tips the balance of equities clearly in favor of developing and applying a federal common law.

25.     Accordingly, Defendants submit that removal pursuant to 28 U.S.C. § 1441 is proper in this case. *See Grable & Sons Metals Prods.*, 545 U.S. at 312.

## II.     REMOVAL BASED UPON FEDERAL OFFICER REMOVAL STATUTE

26.     The Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1442(a)(1), which provides that a civil action originally filed in a State court may be removed if it is against the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." As recognized by the Court of Appeals for the Third Circuit and this District Court, the federal officer removal statute is to be broadly construed. *Megill v.*

*Worthington Pump, Inc.,* 1999 WL 191565, at *2 (D. Del.) (citing *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)) (Ex. G).

27.    Defendants satisfy the criteria necessary for federal officer removal. *See Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998).   In applying the criteria, Defendants are not required to establish "an airtight case on the merits in order to show the required causal connection." *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999) (holding that such a high threshold would defeat the purpose of the removal statute and accepting the "theory of the case" as an "adequate threshold showing that the suit is for an act under color of office") (quotations and citations omitted).   Moreover, if Defendants have "sufficiently put in issue the questions of official justification and immunity[,] the validity of their defenses should be determined in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 409 (1969) (holding that "[t]his is exactly what the removal statute was designed to accomplish").

28.    Defendants are "persons" acting under an officer of the United States or an agency thereof sued in an official or individual capacity for any act under color of such office. *Megill*, 1999 WL 191565, at *3 (citation omitted).   Defendants are being sued because they were acting under federal authority and direction in accordance with their contracts with the U.S. Department of State.

29.    Plaintiff's Complaint demonstrates that her claims are based upon Defendant's conduct acting under a federal office.   The Complaints allege that Defendants entered into contractual agreements with the U.S. Department of State that "included requirements provided by the Department of State for defendants to follow as they recruited, selected, equipped, and deployed civilian police officers from the United States" and "included provisions relating to employee safety, including, but not limited to, requirements that the general contractor and any subcontractors

maintain a minimal standard of security described by the contract, and requirement that such contractors take all steps necessary to ensure the safety of IPLOs."  Complaints, ¶¶ 15-16.

30.    Defendants will raise colorable federal defenses, including the Government Contractor Defense established in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-505 (1988).  In *Boyle*, the United States Supreme Court held that tort liabilities arising out of the performance of a federal government contract and "the civil liability of federal officials for actions taken in the course of their duty" are areas of "uniquely federal interests" that are "so committed by the Constitution and laws of the United States to federal control that state law is pre-empted" and replaced by federal common law.  Defendants are entitled to immunity with respect to the tort claim alleged in this case because: (1) the U.S. Government and/or the U.S. Armed Forces established the criteria for recruiting, selecting, and equipping IPLOs, and established a minimum standard of security (*see* Complaints, ¶¶ 14, 16); (2) Defendants complied with the U.S. Government and/or the U.S. Armed Forces' requirements; and (3) Defendants were not aware of dangers posed by the criteria issued by the U.S. Government and/or U.S. Armed Forces for recruitment or the provision of security.

31.    Defendants also intend to raise the political question doctrine as a federal defense. The issues raised in the Complaints involve a textually demonstrable constitutional commitment of the issues to the other branches of government, as demonstrated by recent legislative bills directing the establishment of standards to regulate private contractors, congressional hearings searching for standards by which to measure federal government oversight of private contractors, and the MOA between the U.S. Departments of Defense and State memorializing the executive agencies' intent to promulgate regulations and standards regarding private contractors.  *See supra* ¶¶ 21-23.  In

addition, as made evident by the congressional hearings and various government reports, there are no judicially discoverable and manageable standards to guide the Court's adjudication of this survival and wrongful death claim.  In that regard, Plaintiff is asking this Court to decide, among other things, the amount of protection Defendants should have provided Mr. Parlin as he carried out his duties as an IPLO, whether Mr. Parlin should have been traveling in Baghdad, the amount of danger or threat that would have been acceptable to permit travel in Baghdad, and whether there was sufficient coordination between Defendants and the U.S. military regarding safety on the roads.  Recognizing the extraordinary complexity of the situation, Congress and the U.S. Departments of Defense and State are reviewing these issues in a still unrealized attempt to establish manageable standards.

32.    Defendants will assert a federal defense based upon two federal statutes—the exclusivity of remedies as established by the DBA, 42 U.S.C. § 1651, *et seq.*, and the LHWCA, 33 U.S.C. §§ 901, *et seq.*

33.    There is a causal connection between Plaintiff's claim and Defendant's actions performed under color of federal office.  As alleged in the Complaints, Defendants were acting in furtherance of their contractual obligations with the U.S. Government and/or U.S. Armed Forces to recruit civilian police officers in support of the U.S. CIVPOL mission in Iraq when Mr. Parlin was killed by an IED.

34.    Accordingly, because Defendants have satisfied all of the criteria set forth in *Feidt*, removal pursuant to the federal removal statute is proper.

III.    **DEFENDANTS HAVE PROPERLY REMOVED THIS ACTION PURSUANT TO 28 U.S.C. § 1446**

35.    All named Defendants, DynCorp International Inc. and DynCorp International LLC, have been served in this action.

36.    All named Defendants consent to this removal.

37.    None of the named Defendants has filed a responsive pleading in this matter.

38.    Copies of all process, pleadings, and orders served on Defendants are attached to this Notice of Removal and undersigned counsel certifies that a copy of this Notice of Removal will be served promptly on Plaintiff and filed with the Clerk of the Superior Court of the State of Delaware in and for New Castle County.

**WHEREFORE**, Defendants DynCorp International Inc. and DynCorp International LLC hereby remove the above-captioned action from the Superior Court of the State of Delaware, In and For New Castle County, to the U.S. District Court for the District of Delaware.

<table>
<tr><td></td><td>SMITH, KATZENSTEIN & FURLOW LLP</td></tr>
<tr><td>*Of Counsel*:</td><td></td></tr>
<tr><td>Robert B. Wallace</td><td>   /s/   *Robert K. Beste*          </td></tr>
<tr><td>Kevin P. Farrell</td><td>Robert K. Beste, III (No. 3931)</td></tr>
<tr><td>Yoora Pak</td><td>Post Office Box 410</td></tr>
<tr><td>WILSON, ELSER, MOSKOWITZ,</td><td>Wilmington, Delaware 19899</td></tr>
<tr><td>EDELMAN & DICKER LLP</td><td>(302) 652-8400</td></tr>
<tr><td>The Colorado Building</td><td>(302) 652-8405 (facsimile)</td></tr>
<tr><td>1341 G Street, N.W., 5th Floor</td><td>rkb@skfdelaware.com</td></tr>
<tr><td>Washington, DC 20005</td><td></td></tr>
<tr><td>(202) 626-7660</td><td></td></tr>
<tr><td>(202) 628-3606 (facsimile)</td><td></td></tr>
<tr><td></td><td>*Attorneys for Defendants,*</td></tr>
<tr><td></td><td>*DynCorp International Inc., and*</td></tr>
<tr><td></td><td>*DynCorp International* LLC</td></tr>
<tr><td>February 19, 2008</td><td></td></tr>
</table>

# EXHIBIT A

**Service of Process
Transmittal**
01/29/2008
CT Log Number 513025279

**TO:**   Curtis Schehr, Senior VP and General Counsel
DynCorp International LLC
3190 Fairview Park Drive, Suite 700
Falls Church, VA 22042

**RE:**   **Process Served in Delaware**

**FOR:**   DynCorp International Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Cynthia Parlin, Individually, and in her capacities as surviving spouse of Samuel Parlin, and as Executrix of the estate of Samuel Parlin, Deceased, Pltf. vs. Dyncorp International, Incorporated, etc., et al., Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Information Statement, Instructions, Complaint, Certification, Answers, Responses |
| **COURT/AGENCY:** | New Castle County: Superior Court, DE Case # 08C-01-136 |
| **NATURE OF ACTION:** | Employee Litigation - Fatal Injury/Wrongful Death - Failure to purchase, maintain, and make available adequate weaponry, armor, vehicles, and other supplies for their subcontractors' employees |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/29/2008 at 10:30 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Neilli Mullen Walsh Young Conaway Stargatt & Taylor, LLP 1000 West Street, 17th Floor Wilmington, DE 19899-0391 302-571-6603/6618 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 798861785478 Image SOP - Page(s): 22 Email Notification, H. Montgomery Hougen monty.hougen@dyn-intl.com Email Notification, Larry Grayer larry.grayer@dyn-intl.com Email Notification, Sandra Pressley Sandra.Pressley@dyn-intl.com Email Notification, Curtis Schehr curtis.schehr@dyn-intl.com Email Notification, Angel Lewis angel.lewis@dyn-intl.com |
| **SIGNED:** **PER:** **ADDRESS:** **TELEPHONE:** | The Corporation Trust Company Scott LaScala 1209 Orange Street Wilmington, DE 19801 302-658-7581 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EFiled: Jan 16 2008 12:44 EST
Transaction ID 18085969
Case No. 08C-01-136 FSS

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| CYNTHIA PARLIN, Individually, and in her<br>Capacities as Surviving Spouse of Samuel Parlin, And<br>As Executrix of the Estate of Samuel Parlin, Deceased,<br><br>      Plaintiffs,<br><br>     v.<br><br>DYNCORP INTERNATIONAL, INCORPORATED,<br>a Delaware Corporation, Parent of the co-defendant<br>DYNCORP entities, formerly known as<br>DI Acquisition Corp; DYNCORP INTERNATIONAL<br>LLC, a Delaware Limited Liability Corporation; and<br>DOE ENTITIES 1-10,<br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>C.A. No.<br><br>NON-ARBITRATION CASE<br><br>TRIAL BY JURY DEMANDED |

## **COMPLAINT**

### NATURE OF THE CASE

1.    Plaintiffs' decedent, Samuel Parlin, was a former civilian police officer

killed by an Improvised Explosive Device ("IED") while traveling through Baghdad, Iraq, at the

behest of the Defendants, to interview for a position that Defendants knew had already been

filled. At the time of his death, Samuel Parlin was finishing his second year of service as an

International Police Liaison Officer ("IPLO") at the Baghdad International Airport ("BIAP") and

the Baghdad Police Academy in support of the United States Department of State Civilian Police

("CIVPOL") mission in Iraq. Plaintiffs assert these claims against the general contractors to the

CIVPOL mission, Defendants DYNCORP International, Incorporated ("DYNCORP"),

DYNCORP International LLC ("DI LLC"), and related and/or subsidiary entities DOE

ENTITIES 1-10 ("DOES") regarding the protection, supervision and direction Samuel Parlin

received while in Iraq, protection, supervision and direction so poor that his death prompted the

                                                             900003.0004

U.S. Military to intervene directly in Defendants' conduct to ensure the safety of other IPLOs. Plaintiffs seek compensatory and punitive damages for the injuries, damages, and losses she and her decedent suffered as a proximate result of defendants' negligent, intentional, reckless, and willful and wanton conduct.

PARTIES

2.    Plaintiff Cynthia Parlin is a resident of the State of Georgia. She is the surviving spouse and Executrix of the Estate of decedent Samuel Parlin. Samuel Parlin was killed on January 16, 2006 in Baghdad, Iraq, while performing employment duties derived from a subcontract with respect to a contract awarded by the Department of State in support of the CIVPOL mission in Iraq. Plaintiff Samuel Parlin was traveling *en route* to an interview with employees and/or agents of DYNCORP at the Baghdad Hotel when an IED was detonated in close proximity to his vehicle. Plaintiff Samuel Parlin survived the initial blast, with severe injuries, and was conscious as he was transported to a combat support hospital and emergently operated on, where he ultimately succumbed to his wounds.

3.    Defendant DYNCORP, formerly known as DI Acquisition Corp., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Reston, Virginia. "DYNCORP" refers to DYNCORP International, Inc. and to "DI Acquisition Corp." DYNCORP'S agent for service of process is The Corporation Trust Company.

4.    Defendant DI LLC is a limited liability corporation organized and existing under the laws of the State of Delaware. DI LLC is wholly owned by defendant DYNCORP, and has its principal place of business in Fort Worth, Texas. Defendant DI LLC's Registered Agent for service of process is The Corporation Trust Company.

2

5.    Defendants DOE ENTITIES 1-10 are various DynCorp-related entities involved in the CIVPOL contract. Such pleading of DOE entities is unavoidable here because, as of the date of this Complaint, the State Department has refused to produce copies of the actual contracts for the Iraqi CIVPOL mission or otherwise publicly identify the entities involved in such mission, even when specifically requested by Congress. *See Letter of Congressman Henry A. Waxman to Secretary of State Condoleezza Rice, October 23, 2007.* Upon information and belief, Defendants utilize a number of subsidiary or related corporations, including, for example, "DynCorp International Services LLC," "Services International Limited LLC," "Worldwide Humanitarian Services LLC," and "Dyncorp International Private Limited."

6.    Defendants DYNCORP, DI LLC, and DOES contracted with the Department of State to provide services, including to recruit, select, equip, and deploy civilian police officers in support of a CIVPOL mission to help the government of Iraq develop a modern, indigenous police force to maintain peace and stability.

7.    Defendants DYNCORP, DI LLC, and DOES were, at all times relevant hereto, the general contractors with regard to the CIVPOL contract.

8.    Defendants DYNCORP, DI LLC, and DOES subcontracted with a Dubai corporation, DynCorp International FZ-LLC (hereinafter "FZ-LLC Dubai") to hire personnel and provide services in support of the CIVPOL contract.

9.    At all times relevant hereto, FZ-LLC Dubai was the employer of decedent Samuel Parlin.

10.    Pursuant to 42 U.S.C. § 1651(a)(4) of the Defense Base Act ("DBA"), which applies 33 U.S.C. § 904(a) of the Longshore and Harbor Workers' Compensation Act ("LHWCA") to any employment under a contract (or subcontract with respect to such contract)

3

900003.0004

entered into by the United States for engaging in public works abroad, subcontractor employer

FZ-LLC Dubai secured DBA coverage for its employee, Samuel Parlin.

11.    Pursuant to 33 U.S.C. § 905(a) of the LHWCA, because subcontractor

employer FZ-LLC Dubai did not fail to secure DBA coverage, general contractor defendants

DYNCORP, DI LLC, and DOES cannot be deemed the employers of Samuel Parlin. Thus,

pursuant to 33 U.S.C. § 904(a), defendants DYNCORP, DI LLC, and DOES have none of the

immunities of an employer under the DBA or LHWCA.

12.    Each and every defendant is liable for the acts of its agents, servants,

and/or employees, such as Tom Austin, Gary Foster, Walter Merrick, Ed Delk, Paul

Middlemore, Steve Avery, and Lelend Cauley, who, at all times relevant hereto, were acting in

the course and scope of their employment and/or agency.

## FACTS

A.    Defendants' CIVPOL Contract And the Use Of Foreign Company
      FZ-LLC Dubai For Liability, Tax, And Business Purposes.

13.    Defendants DYNCORP, DI LLC and DOES were awarded contracts with

the Department of State in support of the CIVPOL mission to assist the government of Iraq in

developing a modern, indigenous police force to maintain peace and stability.

14.    Upon information and belief, the CIVPOL contracts included

requirements provided by the Department of State for defendants to follow as they recruited,

selected, equipped, and deployed civilian police officers from the United States.

15.    Upon information and belief, the CIVPOL contract included provisions

relating to employment agreements, including, but not limited to, requirements that subcontractor

employers secure Defense Base Act coverage for their employees. Upon information and belief,

the CIVPOL contract explicitly paid for such coverage.

4

16.    Upon information and belief, said contract also included provisions relating to employee safety, including, but not limited to, requirements that the general contractor and any subcontractors maintain a minimal standard of security described by the contract, and requirements that such contractors take all steps necessary to ensure the safety of IPLOs.

17.    Upon information and belief, the general contractor defendants DYNCORP, DI LLC, and DOES transferred some or all of the duties under the CIVPOL contract to subcontractor FZ-LLC Dubai for liability, tax, and business purposes.

18.    In support of said contract, Defendants conducted a nationwide recruitment effort to hire experienced civilian police officers in the United States for work in support of the CIVPOL contract.  The recruitment materials represented that FZ-LLC Dubai would be the employer, that United States federal income taxes did not apply, that the work was of a civilian nature, and that FZ-LLC Dubai would supply housing, logistics support, supervision, protection and direction in a reasonable and safe manner.

B.    Defendants' Improper Bidding Of Security Costs For The CIVPOL Contract And Subsequent Intentional Failure To Provide Adequate Security.

19.    Defendants were awarded an initial CIVPOL contract by the Department of State contract in April 2003 through "other than full and open competition" by submitting a bid with a "significantly lower proposed cost" than a similar private military firm, SAIC.

20.    Upon information and belief, the relevant CIVPOL contracts (to which Defendants were general contractors, under which Plaintiffs' decedent Samuel Parlin was employed by a subcontractor) were a continuation and/or renegotiation and/or reauthorization of such CIVPOL contract.

21.    Upon information and belief, defendants DYNCORP, DI LLC, and DOES, when negotiating for the contracts with the Department of State, represented to the Department of State a cost for security purchases and personnel below what they knew or should have known would be required for adequate security.

22.    Upon information and belief, such misrepresentation regarding security purchases and personnel was intentionally made to induce the Department of State to award defendants DYNCORP, DI LLC, and DOES the CIVPOL contracts on defendants' mistaken belief the DBA would shield them and their subcontractor from liability for any harm which resulted from intentionally providing inadequate security and/or directing individuals such as Samuel Parlin to perform dangerous acts, such as travel through Baghdad.

23.    Defendants intentionally, knowingly, recklessly and/or negligently supplied IPLOs like Samuel Parlin and other individuals with inadequate resources and personnel. By way of example, Defendants routinely supplied IPLOs with obsolete and/or otherwise dangerous weapons, such as AK-47s obtained locally with no provision made to ensure their working order, decades-old rifles with no history of maintenance or ballistics testing, and weapons obtained through suspected or known illegal means.

24.    Defendants intentionally, knowingly, recklessly and/or negligently maintained a culture of indifference to the security of IPLOs and other individuals. By way of example, Defendants' supervisors and managers routinely ordered their subordinates to travel unnecessarily (and at extreme danger) through Baghdad and Iraq to run personal errands for said superiors and routinely hoarded the only available safety equipment (such as armored vehicles) for themselves even when they were exposed to minimal danger and their subordinates were carrying out missions in the most dangerous areas in Iraq.

6

25.    Compounding the danger, Defendants frequently under-equipped and under-manned the "SHARK" teams charged with travel security.

C.    Defendants' Disregard for Samuel Parlin's Safety by Directing Him to Travel Unnecessarily Through a Route of Known Extreme Danger.

26.    At all relevant times, travel through any area of Baghdad was extremely dangerous. All persons affiliated with the United States in any fashion faced a high risk of attack any time they traveled through Baghdad. By January 2006, several thousand United States military and civilian personnel had been injured or killed in Baghdad or other urban areas of Iraq by attacks upon their vehicles.

27.    Upon information and belief, despite Defendants' own protocols and protocols established by the Department of State and/or U.S. Military (whether under contract or otherwise), Defendants routinely failed to evaluate thoroughly the risk/benefit of proposed travel throughout Iraq and to direct IPLOs to travel only when essential to mission success. Instead, Defendants routinely ordered travel even when wholly unrelated to mission success.

28.    Samuel Parlin was an IPLO stationed at BIAP.

29.    IPLOs were not permitted to serve in that capacity for more than two (2) years continuously. Samuel Parlin began his service on February 29, 2004, and was due to end his mission on February 28, 2006. If personnel wanted to stay after the termination of their two-year contract, they were required to submit a written request for further service before such termination. Upon information and belief, Samuel Parlin submitted such request.

30.    By January 2006, it was well known to Defendants that all travel through Baghdad – particularly travel across bridges, which were frequently attacked – was extremely dangerous.

7

31.     Prior to January 16, 2006, Samuel Parlin was directed by the Defendants to travel from BIAP to the Baghdad Hotel for an employment interview.

32.     BIAP is West of Baghdad and the Baghdad Hotel is located more than ten miles away, on the East bank of the Tigris River. Thus, travel from BIAP to the Baghdad Hotel requires driving through the heart of Baghdad and, by necessity, crossing at least one of the bridges on the Tigris River.

33.     Prior January 16, 2006, Defendants had in place sufficient communication systems (including telephone / VOIP systems) to perform the interview without travel.

34.     Prior to January 16, 2006, Defendants and/or their agents had already assigned and/or selected another individual to fill the position for which Samuel Parlin was scheduled to interview in person at Baghdad Hotel.

35.     Samuel Parlin was unaware another individual had been selected to fill the position.

36.     Prior to Samuel Parlin's departure on January 16, 2006, the assignment and/or selection of another individual for the position was known to the following individuals, all agents of the Defendants with positions superior to Samuel Parlin:

    a.    Tom Austin;

    b.    Gary Foster;

    c.    Walter Merrick;

    d.    Ed Delk;

    e.    Paul Middlemore;

    f.    Steve Avery; and,

    g.    Lelend Cauley

8

37.    Despite such awareness of the extreme danger of travel through Baghdad and the absence of any legitimate reason for such travel, Defendants chose to conduct the in-person interviews, and chose to order Samuel Parlin to travel to the Baghdad Hotel, to create the appearance of a competitive selection process.

38.    Samuel Parlin was killed by an IED *en route* to the Baghdad Hotel to interview for a position Defendants had already assigned to another individual.

39.    Soon after Samuel Parlin's death, U.S. Army Maj. Gen. Joseph Peterson, who commanded all police training in Iraq, determined Defendants' management and security practices were so inadequate that the Army needed to intervene directly to ensure the safety of IPLOs in the future.

E.    Allegations Of Wrongdoing On The Part Of Defendants.

40.    The severe injuries and death of decedent Samuel Parlin was the direct and proximate result of the negligent, intentional, willful, wanton, and reckless conduct of defendants DYNCORP, DI LLC, and DOES, which acted negligently, intentionally, willfully, wantonly, and recklessly, in that they:

DB02:6505339.1

900003.0004

a.    Failed to provide basic security to IPLOs;

b.    Failed to purchase, maintain, and make available adequate weaponry, armor, vehicles, and other supplies for their subcontractors' employees;

c.    Failed to establish and/or to abide by a reasonable precautions to minimize the travel of individuals and to ensure their safety during such travel;

d.    Unreasonably ordered Samuel Parlin to travel across Baghdad to attend an interview that could have been conducted remotely;

e.    Unreasonably ordered Samuel Parlin to enter into extreme danger to "interview" for a position that had already been filled; and,

f.    Failed to provide adequate security for Samuel Parlin as he traveled through Baghdad, including failing to provide adequate weaponry, armor, and/or personnel.

## SURVIVAL AND WRONGFUL DEATH ACTIONS
## ON BEHALF OF PLAINTIFF PARLIN

41.    Plaintiffs incorporate by reference all allegations of this Complaint as though fully set forth herein.

42.    A claim for damages sufficient to compensate decedent Samuel Parlin for his pain and suffering, medical expenses, and pecuniary losses, has survived to plaintiff Cynthia Parlin, as Surviving Spouse and Executrix of the Estate of Samuel Parlin, pursuant to 10 Del. C. § § 3701 and 3704.

43.    Plaintiff Cynthia Parlin has suffered a loss of her husband, by means of his wrongful death, and, as a consequence, has experienced, and will continue to experience, severe mental and emotional distress, deprivation of expectation of pecuniary benefits to her that would have resulted from decedent's continued life, loss of spousal and household services, and the loss

10

of reasonable funeral expenses, and has incurred, and will in the future incur, other losses and expenses, pursuant to 10 Del. C. § 3722(a) and 3724 (a),(c), and (d).

44.　　WHEREFORE, plaintiff Cynthia Parlin, individually, and in her capacities as Surviving Spouse, and Executrix of the Estate of Samuel Parlin, demands judgment against defendants individually, jointly and severally, for general, special, and punitive damages, in such amount as justice and the nature of the case require, together with interest, costs, and such other relief as the Court deems just and proper.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

By _____

Neilli Mullen Walsh (2707)
Ben T. Castle (520)
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
(302) 571-6603/6618

Dionysios G. Rassias (2829)
The Beasley Firm
1125 Walnut Street
Philadelphia, PA 19103
(215) 592-1000

Dated: 1/16/08

Attorneys for Plaintiffs

11

CERTIFICATION OF VALUE

I hereby certify in good faith at this time in my opinion that the sum of damages of the plaintiffs is in excess of $100,000, exclusive of interest and costs.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Neilli Mullen Walsh (2707)
Ben T. Castle (520)
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
(302) 571-6603/6618
Attorneys for Plaintiffs

Dated:  1/16/08

12

# EXHIBIT B

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
01/29/2008
CT Log Number 513025505

| TO: | Curtis Schehr, Senior VP and General Counsel
DynCorp International LLC
3190 Fairview Park Drive, Suite 700
Falls Church, VA 22042 |

| RE: | **Process Served in Delaware** |

| FOR: | DynCorp International LLC (Domestic State: DE) |

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| TITLE OF ACTION: | Cynthia Parlin, Individually, and in her capacities as surviving spouse of Samuel Parlin, and as Executrix of the estate of Samuel Parlin, Deceased, Pltf. vs. Dyncorp International, Incorporated, etc. and Dyncorp International LLC, etc., Dfts. |
| DOCUMENT(S) SERVED: | Summons, Information Statement, Instructions, Complaint, Certification, Answers, Responses |
| COURT/AGENCY: | New Castle County: Superior Court, DE
Case # 08C-01-136 |
| NATURE OF ACTION: | Employee Litigation - Fatal Injury/Wrongful Death - Failure to purchase, maintain, and make available adequate weaponry, armor, vehicles, and other supplies for their subcontractors' employees |
| ON WHOM PROCESS WAS SERVED: | The Corporation Trust Company, Wilmington, DE |
| DATE AND HOUR OF SERVICE: | By Process Server on 01/29/2008 at 10:30 |
| APPEARANCE OR ANSWER DUE: | Within 20 days, exclusive of the day of service |
| ATTORNEY(S) / SENDER(S): | Neilli Mullen Walsh
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
302-571-6603/6618 |
| ACTION ITEMS: | SOP Papers with Transmittal, via Fed Ex 2 Day , 798861785478
Image SOP - Page(s): 22
Email Notification, H. Montgomery Hougen monty.hougen@dyn-intl.com
Email Notification, Larry Grayer larry.grayer@dyn-intl.com
Email Notification, Sandra Pressley Sandra.Pressley@dyn-intl.com
Email Notification, Curtis Schehr curtis.schehr@dyn-intl.com
Email Notification, Angel Lewis angel.lewis@dyn-intl.com |
| SIGNED:
PER:
ADDRESS:

TELEPHONE: | The Corporation Trust Company
Scott LeScala
1209 Orange Street
Wilmington, DE 19801
302-658-7581 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EFiled: Jan 16 2008 12:44 EST
Transaction ID 18085969
Case No. 08C-01-136 FSS

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| CYNTHIA PARLIN, Individually, and in her Capacities as Surviving Spouse of Samuel Parlin, And As Executrix of the Estate of Samuel Parlin, Deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. |
| DYNCORP INTERNATIONAL, INCORPORATED, a Delaware Corporation, Parent of the co-defendant DYNCORP entities, formerly known as DI Acquisition Corp; DYNCORP INTERNATIONAL LLC, a Delaware Limited Liability Corporation; and DOE ENTITIES 1-10, | ) ) ) ) ) ) ) | NON-ARBITRATION CASE

TRIAL BY JURY DEMANDED |
| Defendants. | ) ) | |

## **COMPLAINT**

### NATURE OF THE CASE

1.　　Plaintiffs' decedent, Samuel Parlin, was a former civilian police officer

killed by an Improvised Explosive Device ("IED") while traveling through Baghdad, Iraq, at the

behest of the Defendants, to interview for a position that Defendants knew had already been

filled. At the time of his death, Samuel Parlin was finishing his second year of service as an

International Police Liaison Officer ("IPLO") at the Baghdad International Airport ("BIAP") and

the Baghdad Police Academy in support of the United States Department of State Civilian Police

("CIVPOL") mission in Iraq.  Plaintiffs assert these claims against the general contractors to the

CIVPOL mission, Defendants DYNCORP International, Incorporated ("DYNCORP"),

DYNCORP International LLC ("DI LLC"), and related and/or subsidiary entities DOE

ENTITIES 1-10 ("DOES") regarding the protection, supervision and direction Samuel Parlin

received while in Iraq, protection, supervision and direction so poor that his death prompted the

U.S. Military to intervene directly in Defendants' conduct to ensure the safety of other IPLOs.

Plaintiffs seek compensatory and punitive damages for the injuries, damages, and losses she and

her decedent suffered as a proximate result of defendants' negligent, intentional, reckless, and

willful and wanton conduct.

PARTIES

2.      Plaintiff Cynthia Parlin is a resident of the State of Georgia. She is the

surviving spouse and Executrix of the Estate of decedent Samuel Parlin. Samuel Parlin was

killed on January 16, 2006 in Baghdad, Iraq, while performing employment duties derived from

a subcontract with respect to a contract awarded by the Department of State in support of the

CIVPOL mission in Iraq. Plaintiff Samuel Parlin was traveling *en route* to an interview with

employees and/or agents of DYNCORP at the Baghdad Hotel when an IED was detonated in

close proximity to his vehicle. Plaintiff Samuel Parlin survived the initial blast, with severe

injuries, and was conscious as he was transported to a combat support hospital and emergently

operated on, where he ultimately succumbed to his wounds.

3.      Defendant DYNCORP, formerly known as DI Acquisition Corp., is a

corporation organized and existing under the laws of the State of Delaware, with its principal

place of business located in Reston, Virginia. "DYNCORP" refers to DYNCORP International,

Inc. and to "DI Acquisition Corp." DYNCORP'S agent for service of process is The

Corporation Trust Company.

4.      Defendant DI LLC is a limited liability corporation organized and existing

under the laws of the State of Delaware. DI LLC is wholly owned by defendant DYNCORP,

and has its principal place of business in Fort Worth, Texas. Defendant DI LLC's Registered

Agent for service of process is The Corporation Trust Company.

2

5.    Defendants DOE ENTITIES 1-10 are various DynCorp-related entities involved in the CIVPOL contract. Such pleading of DOE entities is unavoidable here because, as of the date of this Complaint, the State Department has refused to produce copies of the actual contracts for the Iraqi CIVPOL mission or otherwise publicly identify the entities involved in such mission, even when specifically requested by Congress. *See Letter of Congressman Henry A. Waxman to Secretary of State Condoleezza Rice, October 23, 2007.* Upon information and belief, Defendants utilize a number of subsidiary or related corporations, including, for example, "DynCorp International Services LLC," "Services International Limited LLC," "Worldwide Humanitarian Services LLC," and "Dyncorp International Private Limited."

6.    Defendants DYNCORP, DI LLC, and DOES contracted with the Department of State to provide services, including to recruit, select, equip, and deploy civilian police officers in support of a CIVPOL mission to help the government of Iraq develop a modern, indigenous police force to maintain peace and stability.

7.    Defendants DYNCORP, DI LLC, and DOES were, at all times relevant hereto, the general contractors with regard to the CIVPOL contract.

8.    Defendants DYNCORP, DI LLC, and DOES subcontracted with a Dubai corporation, DynCorp International FZ-LLC (hereinafter "FZ-LLC Dubai") to hire personnel and provide services in support of the CIVPOL contract.

9.    At all times relevant hereto, FZ-LLC Dubai was the employer of decedent Samuel Parlin.

10.    Pursuant to 42 U.S.C. § 1651(a)(4) of the Defense Base Act ("DBA"), which applies 33 U.S.C. § 904(a) of the Longshore and Harbor Workers' Compensation Act ("LHWCA") to any employment under a contract (or subcontract with respect to such contract)

DB02:6505339.1    900003.0004

entered into by the United States for engaging in public works abroad, subcontractor employer FZ-LLC Dubai secured DBA coverage for its employee, Samuel Parlin.

11.    Pursuant to 33 U.S.C. § 905(a) of the LHWCA, because subcontractor employer FZ-LLC Dubai did not fail to secure DBA coverage, general contractor defendants DYNCORP, DI LLC, and DOES cannot be deemed the employers of Samuel Parlin. Thus, pursuant to 33 U.S.C. § 904(a), defendants DYNCORP, DI LLC, and DOES have none of the immunities of an employer under the DBA or LHWCA.

12.    Each and every defendant is liable for the acts of its agents, servants, and/or employees, such as Tom Austin, Gary Foster, Walter Merrick, Ed Delk, Paul Middlemore, Steve Avery, and Lelend Cauley, who, at all times relevant hereto, were acting in the course and scope of their employment and/or agency.

FACTS

A.    Defendants' CIVPOL Contract And the Use Of Foreign Company
FZ-LLC Dubai For Liability, Tax, And Business Purposes.

13.    Defendants DYNCORP, DI LLC and DOES were awarded contracts with the Department of State in support of the CIVPOL mission to assist the government of Iraq in developing a modern, indigenous police force to maintain peace and stability.

14.    Upon information and belief, the CIVPOL contracts included requirements provided by the Department of State for defendants to follow as they recruited, selected, equipped, and deployed civilian police officers from the United States.

15.    Upon information and belief, the CIVPOL contract included provisions relating to employment agreements, including, but not limited to, requirements that subcontractor employers secure Defense Base Act coverage for their employees. Upon information and belief, the CIVPOL contract explicitly paid for such coverage.

4

16.    Upon information and belief, said contract also included provisions relating to employee safety, including, but not limited to, requirements that the general contractor and any subcontractors maintain a minimal standard of security described by the contract, and requirements that such contractors take all steps necessary to ensure the safety of IPLOs.

17.    Upon information and belief, the general contractor defendants DYNCORP, DI LLC, and DOES transferred some or all of the duties under the CIVPOL contract to subcontractor FZ-LLC Dubai for liability, tax, and business purposes.

18.    In support of said contract, Defendants conducted a nationwide recruitment effort to hire experienced civilian police officers in the United States for work in support of the CIVPOL contract. The recruitment materials represented that FZ-LLC Dubai would be the employer, that United States federal income taxes did not apply, that the work was of a civilian nature, and that FZ-LLC Dubai would supply housing, logistics support, supervision, protection and direction in a reasonable and safe manner.

B.    Defendants' Improper Bidding Of Security Costs For The CIVPOL Contract And Subsequent Intentional Failure To Provide Adequate Security.

19.    Defendants were awarded an initial CIVPOL contract by the Department of State contract in April 2003 through "other than full and open competition" by submitting a bid with a "significantly lower proposed cost" than a similar private military firm, SAIC.

20.    Upon information and belief, the relevant CIVPOL contracts (to which Defendants were general contractors, under which Plaintiffs' decedent Samuel Parlin was employed by a subcontractor) were a continuation and/or renegotiation and/or reauthorization of such CIVPOL contract.

5

21.    Upon information and belief, defendants DYNCORP, DI LLC, and DOES, when negotiating for the contracts with the Department of State, represented to the Department of State a cost for security purchases and personnel below what they knew or should have known would be required for adequate security.

22.    Upon information and belief, such misrepresentation regarding security purchases and personnel was intentionally made to induce the Department of State to award defendants DYNCORP, DI LLC, and DOES the CIVPOL contracts on defendants' mistaken belief the DBA would shield them and their subcontractor from liability for any harm which resulted from intentionally providing inadequate security and/or directing individuals such as Samuel Parlin to perform dangerous acts, such as travel through Baghdad.

23.    Defendants intentionally, knowingly, recklessly and/or negligently supplied IPLOs like Samuel Parlin and other individuals with inadequate resources and personnel. By way of example, Defendants routinely supplied IPLOs with obsolete and/or otherwise dangerous weapons, such as AK-47s obtained locally with no provision made to ensure their working order, decades-old rifles with no history of maintenance or ballistics testing, and weapons obtained through suspected or known illegal means.

24.    Defendants intentionally, knowingly, recklessly and/or negligently maintained a culture of indifference to the security of IPLOs and other individuals. By way of example, Defendants' supervisors and managers routinely ordered their subordinates to travel unnecessarily (and at extreme danger) through Baghdad and Iraq to run personal errands for said superiors and routinely hoarded the only available safety equipment (such as armored vehicles) for themselves even when they were exposed to minimal danger and their subordinates were carrying out missions in the most dangerous areas in Iraq.

6

25.    Compounding the danger, Defendants frequently under-equipped and under-manned the "SHARK" teams charged with travel security.

C.    Defendants' Disregard for Samuel Parlin's Safety by Directing Him to Travel Unnecessarily Through a Route of Known Extreme Danger.

26.    At all relevant times, travel through any area of Baghdad was extremely dangerous. All persons affiliated with the United States in any fashion faced a high risk of attack any time they traveled through Baghdad. By January 2006, several thousand United States military and civilian personnel had been injured or killed in Baghdad or other urban areas of Iraq by attacks upon their vehicles.

27.    Upon information and belief, despite Defendants' own protocols and protocols established by the Department of State and/or U.S. Military (whether under contract or otherwise), Defendants routinely failed to evaluate thoroughly the risk/benefit of proposed travel throughout Iraq and to direct IPLOs to travel only when essential to mission success. Instead, Defendants routinely ordered travel even when wholly unrelated to mission success.

28.    Samuel Parlin was an IPLO stationed at BIAP.

29.    IPLOs were not permitted to serve in that capacity for more than two (2) years continuously. Samuel Parlin began his service on February 29, 2004, and was due to end his mission on February 28, 2006. If personnel wanted to stay after the termination of their two-year contract, they were required to submit a written request for further service before such termination. Upon information and belief, Samuel Parlin submitted such request.

30.    By January 2006, it was well known to Defendants that all travel through Baghdad – particularly travel across bridges, which were frequently attacked – was extremely dangerous.

7

31.    Prior to January 16, 2006, Samuel Parlin was directed by the Defendants to travel from BIAP to the Baghdad Hotel for an employment interview.

32.    BIAP is West of Baghdad and the Baghdad Hotel is located more than ten miles away, on the East bank of the Tigris River. Thus, travel from BIAP to the Baghdad Hotel requires driving through the heart of Baghdad and, by necessity, crossing at least one of the bridges on the Tigris River.

33.    Prior January 16, 2006, Defendants had in place sufficient communication systems (including telephone / VOIP systems) to perform the interview without travel.

34.    Prior to January 16, 2006, Defendants and/or their agents had already assigned and/or selected another individual to fill the position for which Samuel Parlin was scheduled to interview in person at Baghdad Hotel.

35.    Samuel Parlin was unaware another individual had been selected to fill the position.

36.    Prior to Samuel Parlin's departure on January 16, 2006, the assignment and/or selection of another individual for the position was known to the following individuals, all agents of the Defendants with positions superior to Samuel Parlin:

      a.    Tom Austin;

      b.    Gary Foster;

      c.    Walter Merrick;

      d.    Ed Delk;

      e.    Paul Middlemore;

      f.    Steve Avery; and,

      g.    Lelend Cauley

8

37.    Despite such awareness of the extreme danger of travel through Baghdad and the absence of any legitimate reason for such travel, Defendants chose to conduct the in-person interviews, and chose to order Samuel Parlin to travel to the Baghdad Hotel, to create the appearance of a competitive selection process.

38.    Samuel Parlin was killed by an IED *en route* to the Baghdad Hotel to interview for a position Defendants had already assigned to another individual.

39.    Soon after Samuel Parlin's death, U.S. Army Maj. Gen. Joseph Peterson, who commanded all police training in Iraq, determined Defendants' management and security practices were so inadequate that the Army needed to intervene directly to ensure the safety of IPLOs in the future.

E.    Allegations Of Wrongdoing On The Part Of Defendants.

40.    The severe injuries and death of decedent Samuel Parlin was the direct and proximate result of the negligent, intentional, willful, wanton, and reckless conduct of defendants DYNCORP, DI LLC, and DOES, which acted negligently, intentionally, willfully, wantonly, and recklessly, in that they:

a.   Failed to provide basic security to IPLOs;

b.   Failed to purchase, maintain, and make available adequate weaponry, armor, vehicles, and other supplies for their subcontractors' employees;

c.   Failed to establish and/or to abide by a reasonable precautions to minimize the travel of individuals and to ensure their safety during such travel;

d.   Unreasonably ordered Samuel Parlin to travel across Baghdad to attend an interview that could have been conducted remotely;

e.   Unreasonably ordered Samuel Parlin to enter into extreme danger to "interview" for a position that had already been filled; and,

f.   Failed to provide adequate security for Samuel Parlin as he traveled through Baghdad, including failing to provide adequate weaponry, armor, and/or personnel.

## SURVIVAL AND WRONGFUL DEATH ACTIONS ON BEHALF OF PLAINTIFF PARLIN

41.   Plaintiffs incorporate by reference all allegations of this Complaint as though fully set forth herein.

42.   A claim for damages sufficient to compensate decedent Samuel Parlin for his pain and suffering, medical expenses, and pecuniary losses, has survived to plaintiff Cynthia Parlin, as Surviving Spouse and Executrix of the Estate of Samuel Parlin, pursuant to 10 Del. C. § § 3701 and 3704.

43.   Plaintiff Cynthia Parlin has suffered a loss of her husband, by means of his wrongful death, and, as a consequence, has experienced, and will continue to experience, severe mental and emotional distress, deprivation of expectation of pecuniary benefits to her that would have resulted from decedent's continued life, loss of spousal and household services, and the loss

10

of reasonable funeral expenses, and has incurred, and will in the future incur, other losses and expenses, pursuant to 10 Del. C. § 3722(a) and 3724 (a),(c), and (d).

44.     WHEREFORE, plaintiff Cynthia Parlin, individually, and in her capacities as Surviving Spouse, and Executrix of the Estate of Samuel Parlin, demands judgment against defendants individually, jointly and severally, for general, special, and punitive damages, in such amount as justice and the nature of the case require, together with interest, costs, and such other relief as the Court deems just and proper.

YOUNG CONAWAY STARGATT & TAYLOR, LLP


Neilli Mullen Walsh (2707)
Ben T. Castle (520)
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
(302) 571-6603/6618

Dionysios G. Rassias (2829)
The Beasley Firm
1125 Walnut Street
Philadelphia, PA 19103
(215) 592-1000

Dated:  1/16/08         Attorneys for Plaintiffs

11

CERTIFICATION OF VALUE

I hereby certify in good faith at this time in my opinion that the sum of damages of the plaintiffs is in excess of $100,000, exclusive of interest and costs.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Neilli Mullen Walsh (2707)
Ben T. Castle (520)
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
(302) 571-6603/6618
Attorneys for Plaintiffs

Dated: 1/16/08

12

# EXHIBIT C

## MEMORANDUM OF AGREEMENT (MOA) BETWEEN
## THE DEPARTMENT OF DEFENSE AND THE DEPARTMENT OF STATE
## ON USG PRIVATE SECURITY CONTRACTORS

### I. Purpose

The purpose of this MOA is to clearly define the authority and responsibility for the accountability and operations of USG Private Security Contractors (PSCs) in Iraq.

### II. Country Covered by this MOA

The country covered by this MOA is Iraq.

### III. Responsibility

A. Pursuant to 10 U.S.C. § 164 and 22 U.S.C. § 4802, the Secretary of Defense and the Combatant Commander (COCOM) are responsible for the security of all DOD elements and personnel under the operational control of the COCOM.

B. Pursuant to 22 U.S.C. § 4802, the Secretary of State is responsible for developing and implementing policies and programs to provide for the security of U.S. Government personnel on official duty in country other than those under the command of an area military commander.

C. Pursuant to this MOA the Secretary of State and the Secretary of Defense have agreed that they will jointly develop, implement, and follow core standards, policies, and procedures for the accountability, oversight, and discipline of PSCs.

### IV. Standards

A. The Secretary of Defense and the Secretary of State shall jointly develop and implement core PSC standards which will include at a minimum:

- The management of USG PSC personnel.
- The coordination of USG PSC operations outside secure bases and U.S. diplomatic properties.
- A clear legal basis for holding USG private security contractors accountable under US law.
- Recognition of investigative jurisdictions and coordination for joint investigations where conduct of USG PSC personnel are to be investigated.

B. The COM and the COCOM shall make every effort to consult and coordinate responses to common threats.

### V. Implementation, Coordination, and Dispute Resolution

A. In Iraq, the COM and the COCOM, acting when appropriate through their designated representatives, shall serve as the primary delegates of the Secretary of State and the Secretary of Defense, respectively, for implementation and coordination under this MOA.

　　　1. The intent of this MOA is for the DOS and DOD to ensure that personnel working under contracts with other federal agencies or as subcontractors on DOS or DOD contracts are to be covered by the policies and procedures developed under this MOA. The DOD and DOS will identify those USG agencies and organizations and contractors having contractual arrangements for private security and ensure, to the maximum extent possible, that these agencies and their PSCs adhere to the core procedures and process required by this MOA.

　　　2. In the event that issues arise under this MOA that the COM and COCOM are unable to resolve, they shall promptly refer such issues to the Washington representatives designated by the Secretary of State and the Secretary of Defense for resolution.

B. The Secretary of State and the Secretary of Defense shall designate Washington representatives to meet as frequently as necessary, but no less often than quarterly, for the purpose of reviewing the implementation of this MOA.

　　　1. In the event that the Secretaries' Washington representatives are unable to resolve any such difference, or any other issue that may arise under this MOA, they shall promptly refer the matter to the Under Secretary of State for Management and the Deputy Under Secretary of Defense for Logistics and Material Readiness for resolution.

　　　2. In the event that any matter cannot be resolved under the procedures specified above, it shall be referred to the Secretary of State and the Secretary of Defense for resolution

## VI. Authorities

Nothing in this MOA shall otherwise affect the authorities of the Secretary of State, the Secretary of Defense, and the Chief of Mission or the COCOM.

## VII Other Agreements and Arrangements

All existing agreements and arrangements, however styled, between DOS and DOD shall remain in force to the extent that they do not conflict with the provisions of this MOA.

## VIII Annex:

　　　The Parties further agree to ANNEX A: Deliverables. These deliverables are to be jointly developed by U.S. Embassy Baghdad and Multi-National Force – Iraq (MNF-I), and can be modified in writing upon mutual agreement by MNF-I and U.S. Embassy Baghdad.

## IX. Implementation and Termination

To the extent this MOA (or the deliverables) developed hereunder are inconsistent with the MOA between DOS and DOD "*Regarding Physical Security, Equipment and Personal Protective Services,* dated 10 June 2004, this MOA shall govern. This MOA shall remain in force until terminated.

Signed:                                    Signed:


Deputy Secretary of State            Deputy Secretary of Defense

Date:  *12-5-07*                      Date:  *12-5-07*

### ANNEX A: DELIVERABLES

**I.    Executive Summary:**

The following deliverables, jointly developed under the terms of this MOA by U.S. Embassy Baghdad and Multi-National Force – Iraq (MNF-I), are intended to improve coordination and accountability of their respective private security contractor operations in Iraq. These deliverables can be modified in writing upon mutual agreement by MNF-I and U.S. Embassy Baghdad.

**II.    Definitions**

**Private Security Contractor (PSC):** A private company, and/or its personnel, that provides physical protection to or security for persons, places, buildings, facilities, supplies, or means of transportation.

**U.S. Embassy Baghdad PSC:** Refers to a Department of State (DOS)--affiliated PSC.

**MNF-I PSC:** Refers to a Department of Defense (DOD)--affiliated PSCs.

**Personal Security Detail (PSD):** A team of PSC personnel that provides physical protective services for the movement of protected persons and/or property.

**Battlespace:.** The Area of Operations assigned to the Commander, MNF-I by the Commander, US CENTCOM for the purpose of military operations. This currently includes the air, land, sea, and space contained within the borders of Iraq.

**MNC-I:** Multi-National Corps – Iraq. The action-arm of MNF-I. MNC-I is the operational headquarters for the battlespace.

**CF:** Coalition Forces. The forces of two or more nations working for a common action. All forces working with the Multi-National Force – Iraq are coalition forces.

**Serious incident:** Any incident involving the use of deadly force, the discharge of a weapon (other than in training), or that resulted in death, serious injury, and/or significant property damage.

**Coalition Operating Locations:** Locations under the effective control of either MNF-I or Chief of Mission (COM), including the International Zone, CF Forward Operating Bases, Regional Embassy Offices, etc.

**Contracting Officer:** Refers to contracting officers as well as contracting officer representatives where appropriate.

1

### III.    Unity of Effort:

U.S. Embassy Baghdad and MNF-I together have the responsibility to safeguard USG and Coalition Force (CF) personnel conducting official business throughout Iraq. U.S. Embassy Baghdad and MNF-I are committed to reducing the number and strategic impact of serious incidents involving PSCs by thorough and impartial investigations of these incidents, transparent information and intelligence sharing, close coordination of PSD operations, and joint engagement with the Government of Iraq (GOI).

### IV.    Rules for the use of Force:

All USG PSC operations in Iraq will abide by the following common principles on the Rules for the Use of Force (RUF). U.S. Embassy Baghdad and MNF-I specific policies may be more, but not less, restrictive than these common principles. A PSC can only implement policies more restrictive than these RUF with the approval of its contracting officer, as well as either MNF-I or U.S. Embassy Baghdad as appropriate.

#### Policy/Definitions

**a. Defense of Self or Others.** PSCs always retain the inherent right to exercise self-defense in response to a hostile act or demonstrated hostile intent. PSCs are permitted to use deadly force in defense of others when there is a reasonable belief of imminent risk of death or serious bodily harm. Details regarding this authorization will be provided by the appropriate USG agency, and within the terms and conditions governing the PSC's contractual relationship with that agency.

**b. Imminent Threat.** The determination of whether the danger of death or serious bodily harm is imminent will be based on an assessment of all facts and circumstances known to the PSC at the time (i.e. totality of the circumstances), and should not be assessed with the benefit of hindsight. Imminent does not necessarily mean immediate or instantaneous. Individuals with the capability to inflict death or serious bodily harm and who demonstrate intent to do so may be considered an imminent threat.

**c. Hostile Act.** An attack or other use of force against the PSC, or designated persons or property. It also includes force used directly to preclude or impede the mission and/or duties of the PSC.

**d. Hostile Intent.** The imminent threat of the use of force against the PSC, or designated persons or property. It also includes the threat of force to preclude or impede the mission and/or duties of the PSC.

2

e. **Assets Vital to National Security.** For the purposes of MNF-I PSC operations in Iraq, defined as President-designated non-DOD and/or DOD property, the actual theft or sabotage of which the President determines would seriously jeopardize the fulfillment of a national defense mission and would create an imminent threat of death or serious bodily harm. Examples may include, but are not limited to, designated restricted areas containing strategic operational assets, sensitive codes or special access programs.

f. **Inherently Dangerous Property.** For the purposes of MNF-I PSC operations in Iraq, property is considered inherently dangerous if, in the hands of an unauthorized individual, it would create an imminent threat of death or serious bodily harm. Examples may include, but are not limited to: portable missiles, rockets, arms, ammunition, explosives, and chemical agents. On-scene DOD commanders are authorized to classify property as inherently dangerous. PSCs are not authorized to make such designations.

g. **Mission essential and U.S. National Security Equipment/Property.** For the purposes of MNF-I PSC operations in Iraq, PSC personnel can be specifically authorized to protect designated mission essential or U.S. national security equipment/property with force, including deadly force. Details regarding this authorization will be provided by appropriate USG agency, and within the terms and conditions governing the PSC's contractual relationship with that agency.

**Procedures**

a. **De-Escalation**.

(1) Whenever time and circumstances permit, the threatening individual/force should be warned and given the opportunity to withdraw or cease threatening actions.

(2) U.S. Embassy Baghdad and MNF-I will work to establish common graduated force methods and procedures for use by PSCs, including common signaling devices to be used by all USG PSCs operating in Iraq. The goal is to ensure that the Iraqis have a common expectation with respect to the visual and aural warnings used by PSCs operating in Iraq. U.S. Embassy Baghdad and MNF-I will work to develop a strategic engagement plan for educating the populace on these signals.

b. **Use of Non-Deadly Force**

(1) The use of force must be reasonable in intensity, duration and magnitude based on the totality of circumstances to counter the threat. If force is required, non-deadly force is authorized and may be used to control a situation and accomplish the mission, or to provide self-defense or in defense of the protected property, when doing so is reasonable under the circumstances.

(2) Agency-approved non-lethal weapons are authorized.

3

(3) Warnings shots may be authorized for DOD contractor personnel by the contracting officer, but only as part of their graduated force response and for no other purpose. Current DOS policies prohibit the use of warning shots by their PSCs.

c. **Use of Deadly Force.** Deadly force is authorized only under the following circumstances:

(1) Inherent Right of Self-Defense. Deadly force is authorized when a PSC reasonably believes that a person has committed a hostile act or demonstrated hostile intent and poses an imminent threat of death or serious bodily harm to the PSC.

(2) Defense of Others. Deadly force is authorized when a PSC reasonably believes that a person poses an imminent threat of death or serious bodily harm to the protectee(s) or other innocent persons in the vicinity.

(3) Assets Vital to National Security. For the purposes of MNF-I PSC operations in Iraq, deadly force is authorized when deadly force reasonably appears to be necessary to prevent the actual theft or sabotage of assets vital to national security. PSCs will be notified in their contract if they are employed to protect assets vital to national security.

(4) Inherently Dangerous Property. For the purposes of MNF-I PSC operations in Iraq, deadly force is authorized when deadly force reasonably appears to be necessary to prevent the actual theft or sabotage of inherently dangerous property. PSCs will be notified in their contract if they are employed to protect inherently dangerous property.

(5) If a PSC must fire a weapon as a means of deadly force, he/she must use only well-aimed shots with due regard for the safety of innocent bystander, and must immediately notify the appropriate operation center and request assistance as needed.

(6) PSC personnel, whether armed for personal protection or serving as contract security/PSC, shall not engage in offensive combat operations, alone or in conjunction with U.S., Coalition or host nation forces.

V.    **Authority to Possess and Carry Firearms**:

U.S. Embassy Baghdad or MNF-I will grant PSCs authority to possess and carry firearms in accordance with their respective departmental policies. Additionally U.S. Embassy Baghdad and MNF-I will individually ensure that their respective PSCs maintain accurate inventories of weapons and ammunition.

The core standards for U.S. Embassy Baghdad or MNF-I authorizing personnel to possess and carry firearms are background checks, security clearances, training, qualifications,

4

and proficiency standards for individual assigned weapons.

**Background Checks**. The following sources can be used for accomplishing background checks: Interpol, FBI, Country of Origin Criminal Records, Country of Origin U.S. Embassy Information Request, CIA records, and /or any other records available.

**Security clearances**. Security clearance requirements will be established by the RSO or MNF-I based on the company or individual's position.

**Training.** Mandatory training for PSCs prior to operating in Iraq will include review of relevant USG and Iraqi laws, Rules for the Use of Force, Law of Armed Conflict, Graduated Force Procedures, and those relevant COM, CENTCOM, and/or MNF-I rules and regulations applicable to their contracts, as well as scenario-based training on a standard set of Use-of-Force vignettes kept up to date by MNF-I STRATOPS and RSO based on recent incidents and threat reporting. Refresher training will occur annually. PSCs are responsible for maintaining training documentation. A failure to maintain training qualifications will generally result in revocation of firearms authorization for the individual. Any PSC individual without firearms authorization will immediately surrender their weapon to the PSC and will remain unarmed until such time as they are retrained and the contracting officer determines that their training is sufficient.

**Qualifications.** Contractors will meet either the U.S. Army weapons qualification standards, or RSO standards, unless another standard of qualification is used that substantially meets the requirement and is agreed to in advance (e.g. for AK-47s). Ongoing weapons proficiency training will occur in accordance with the respective agency requirements and the PSC will maintain documentation records.

**Authorized Weapons and Ammunition Types**. All USG PSCs will only use those weapon types and ammunition specifically authorized by DOS or DOD as appropriate. U.S. Embassy Baghdad and MNF-I will notify each other of the specific weapon types and ammunition authorized for their respective PSC operations in Iraq, and will update each other with any changes to such authorizations. Any disagreements regarding weapons types and/or ammunition should be resolved between MNF-I and US Embassy Baghdad, if possible; if not, the issue will be forward to the Department of State and Department of Defense for final determination.

## VI.    **Movement Coordination and Control**:

All USG PSDs will coordinate their movements with either MNF-I or U.S. Embassy Baghdad operations centers.

In order to maximize CF support for USG PSD and helicopter operations and deconflict friendly forces, RSO Tactical Operations Center (TOC) and the Multi-National Corps Iraq

(MNC-I) Contractor Operations Cell (CONOC) will provide movement details (of both PSDs and helicopters) to MNC-I in advance of their respective movements outside of Coalition operating locations, to include time, route, destination, and convoy composition. Such notification should normally occur a minimum of 24 hours in advance or as soon as possible if short-notice missions are required.

MNC-I and RSO will exchange LNOs in their respective operation centers, will conduct planning using linked Command Post of the Future (CPOF) terminals, and will monitor all U.S. Embassy Baghdad PSD, MNF-I PSD, and CF movements outside Coalition operating locations real-time using shared electronic monitoring systems data. MNC-I will limit distribution of COM personnel movements, or other movements as designated by U.S. Embassy Baghdad, to only U.S. personnel with a need to know, and will coordinate with RSO to ensure such information is compartmentalized.

MNC-I will review all USG PSD movements and provide recommendations to the RSO TOC or CONOC, as appropriate, as to whether the movement should be altered or cancelled based on the threat levels along that route or disposition of Coalition Forces.

The RSO TOC and CONOC will generally honor MNC-I recommendations to alter or cancel missions. Any disagreements between MNC-I and U.S. Embassy Baghdad regarding PSD movements will be resolved by the DCS, MNF-I Strategic Operations (STRATOPS) and the DCM, U.S. Embassy Baghdad. Final movement authority for U.S. Embassy Baghdad rests with the COM.

If MNC-I battle space owners determine and articulate a substantial increase in the threat to USG PSDs during movements outside Coalition operating locations, such PSDs will comply with MNC-I recommendations to alter routes or abort missions.

MNC-I LNO will coordinate with RSO TOC and MNC-I on QRF, MEDEVAC, and/or Intelligence, Surveillance, and Reconnaissance (ISR) support as needed, as well as convoy closure reports.

As soon as possible after notification of USG PSD movements, and updating as needed, MNF-I will make RSO TOC and/or CONOC aware of any known checkpoints manned by CF or Iraqi Security Forces (ISF), as well as the proper near and far recognition procedures. USG PSDs will comply with all CF checkpoints and should avoid other checkpoints as possible. However, USG PSDs will be prepared to display appropriate audio and/or visual recognition procedures at CF or legitimate ISF checkpoints (i.e. verified in advance by MNF-I or during movement) should they be encountered.

U.S. Embassy Baghdad will liaise with MNF-I STRATOPS on PSC-related incidents and will be prepared to attend the STRATOPS evening battlefield update assessments at the request of MNF-I STRATOPS.

6

MNF-I and U.S. Embassy Baghdad will share all intelligence that may affect security operations.

## VII.    Serious Incident Response & Investigation:

To the maximum extent possible, MNF-I and the U.S. Embassy will closely coordinate the immediate response to any serious incident (as defined above) involving a USG PSC.

The U.S. Embassy Baghdad, through the RSO TOC, will notify MNC-I and MNF-I STRATOPS of any serious incident involving a PSC in its jurisdiction as soon as possible. CONOC will notify MNF-I and RSO of any serious incident involving a PSC in its jurisdiction as soon as possible. U.S. Embassy Baghdad and MNF-I will coordinate in the notification of the GOI as soon as possible after a serious incident occurs.

All USG PSCs involved in a serious incident will, to the extent permitted by the mission and the security situation, stop and render assistance as needed, including coordinating medical assistance, requesting support, and/or providing claim forms/information.

Should MNC-I respond to an incident involving a USG PSC, every attempt should be made to establish radio communication in order for situational awareness to be enhanced prior to QRF arrival at the scene. Upon MNC-I QRF arrival and with a positive and verified handoff (radio or visual), the MNC-I QRF element will assume command of the scene with the primary purpose being the safe extraction of the USG PSC.

In coordination with RSO where appropriate, MNC-I will take the lead on the immediate securing of a scene where a serious incident occurred, to the extent the security situation permits, in order to start identifying any injuries, fatalities, and property damage, and to preserve the ability to collect evidence.

RSO will request support from MNF-I STRATOPS for CF support to revisit the scene of a serious incident in order to conduct an investigation. MNF-I STRATOPS will coordinate with MNC-I, which will in turn facilitate the movement request with the closest battle space owner.

MNC-I will assist U.S. Embassy Baghdad in seeking Iraqi personnel who were witnesses to facilitate investigations and evidence collection. Additionally, CF personnel will assist U.S. Embassy Baghdad as requested with their distribution of timely and appropriate condolence payments. Such payments will be based on Iraqi cultural norms and will not be viewed as an admission of guilt.

U.S. Embassy Baghdad will have the lead responsibility for investigating a serious incident involving a U.S. Embassy Baghdad PSC, and MNF-I will have the lead responsibility for investigating a serious incident involving an MNF-I PSC. The entity conducting the investigation can request investigative assistance or relevant information from the other entity, which will be provided or shared to the greatest extent possible. While one entity is conducting

7

an investigation into a serious incident within its jurisdiction, the other entity will not deliberately take any action that may prejudice, impede, or negatively impact that investigation (e.g., interviewing witnesses or collecting evidence) without the consent of the lead investigating entity.

Where either U.S. Embassy Baghdad or MNF-I, based on a legitimate interest in a serious incident within the other's jurisdiction, requests that a joint investigation be conducted into the incident, the investigation will be conducted jointly by RSO and the relevant military criminal investigative authority. The lead for such an investigation will be determined in accordance with the above paragraph or by mutual agreement.

MNF-I STRATOPS will serve as the focal point for CF inquiries into RSO-related, serious incidents. Individual CF units will not call directly to the RSO TOC except to coordinate actions with the CF LNOs.

U.S. Embassy Baghdad and MNF-I will engage in transparent sharing of information with each other during the course of an investigation, to the extent that it will not compromise the investigation or potential criminal prosecution, and in consultation with a prosecutorial authority where one is involved. U.S. Embassy Baghdad and MNF-I will coordinate in the sharing of information regarding any serious incident with the GOI, and will follow a consistent approach to public affairs associated with any serious incident.

MNF-I and RSO will coordinate in advance regarding the arrest or detention of any PSC personnel in accordance with proper arrest authority, except in exigent circumstances, in which case notification will occur as soon as possible.

U.S. Embassy Baghdad and MNF-I will share results of their investigations in order to develop lessons learned and improve tactics, techniques, and procedures used by PSCs. The RSO and MNF-I STRATOPS Chief, Contractor Policy and Oversight Division, shall co-chair a Joint Incident Review Board on a quarterly basis to determine trends, and make recommendations for improvements in PSC operations. Other invitees could include representatives from DOD and DOS PSCs, and Major Subordinate Commands. Minutes of the board will be forwarded to DCS, MNF-I STRATOPS and DCM, U.S. Embassy Baghdad for their review and action as required.

MNF-I and U.S. Embassy Baghdad should jointly engage the GOI in discussions related to PSC operations.

## VIII.    Contract Management & Language:

DOD and DOS will work towards developing a mutually agreeable common database (such as DoD's SPOT) for the purpose of increasing PSC accountability and visibility.

DOS and DOD will ensure that their respective PSC contracts and subcontracts contain common language, through contract modifications if necessary, implementing relevant provisions of this MOA, including but not limited to RUF, communication systems, incident response and reporting, authorized weapons and ammunition, and penalties for violations of MNF-I and/or U.S. Embassy Baghdad policies and procedures.

Respective DOS and DOD contracting officers will reconcile contract language interpretation of Department of State Acquisition Regulations (DoSAR) and Defense Federal Acquisition Regulations (DFAR) through the current Federal Acquisition Regulations.

## IX. Legal Accountability:

U.S. Embassy Baghdad and MNF-I will not tolerate misconduct by their respective PSCs and will enforce contractual obligations. Where there is evidence of criminal misconduct, U.S. Embassy Baghdad and MNF-I will make referrals to the appropriate prosecutorial authority.

DOD and DOS will continue to work together to expedite the enactment of legislation to establish a clear legal basis for holding USG PSCs in Iraq accountable under U.S. law.

# EXHIBIT D

II

110TH CONGRESS
1ST SESSION

# S. 674

To require accountability and enhanced congressional oversight for personnel performing private security functions under Federal contracts, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 16, 2007

Mr. OBAMA introduced the following bill; which was read twice and referred to the Committee on Armed Services

---

# A BILL

To require accountability and enhanced congressional oversight for personnel performing private security functions under Federal contracts, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5  "Transparency and Accountability in Military and Secu-

6  rity Contracting Act of 2007".

7    (b) TABLE OF CONTENTS.—The table of contents for

8  this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Findings.

2

Sec. 3. Reports on Iraq and Afghanistan contracts.
Sec. 4. Department of Defense report on strategy for and appropriateness of
         activities of contractors under Department of Defense con-
         tracts in Iraq, Afghanistan, and the global war on terror.
Sec. 5. Requirements related to personnel performing private security functions
         under Federal contracts during contingency operations.
Sec. 6. Improved coordination between the Armed Forces and contractors per-
         forming private security functions in contingency operations.
Sec. 7. Legal status of contract personnel.
Sec. 8. Federal Bureau of Investigation investigative unit for contingency oper-
         ations.
Sec. 9. Definitions.
Sec. 10. Effective date.

1    **SEC. 2. FINDINGS.**

2        Congress makes the following findings:

3            (1) United States Government agencies, includ-

4        ing the Department of Defense, the Department of

5        State, the Department of the Interior, the United

6        States Agency for International Development, and

7        the intelligence community of the United States

8        Government, are increasingly relying on private con-

9        tractors to perform duties, including the provision of

10        security and other traditionally military and govern-

11        mental functions, in Iraq, Afghanistan, and other

12        contingency operations.

13            (2) Estimates of the number of contract per-

14        sonnel in Iraq, including private security contrac-

15        tors, vary widely. The United States Central Com-

16        mand estimated the number to be 100,000 in 2006,

17        and the Government Accountability Office concluded

18        in 2005 that "the Department of Defense (DOD)

19        estimated at least 60 private security providers were

3

1    working in Iraq with perhaps as many as 25,000

2    employees. In March 2006, the Director of the Pri-

3    vate Security Company Association of Iraq estimated

4    that approximately 181 private security companies

5    were working in Iraq with just over 48,000 employ-

6    ees''.

7    (3) The various functions carried out by these

8    personnel have entailed great danger to these per-

9    sonnel, but exact numbers of casualties are un-

10    known. Estimates suggest that some 770 contractors

11    have died, and thousands more have been wounded,

12    in Iraq since 2003.

13    (4) The multinational character of private secu-

14    rity contracting poses oversight and accountability

15    challenges. In addition to Iraqi and United States

16    security contractors working in Iraq, contractors

17    also included citizens from Australia, Chile, Colom-

18    bia, Croatia, Fiji, India, Nepal, New Zealand, Nica-

19    ragua, Russia, Serbia, South Africa, Sri Lanka, and

20    the United Kingdom, among other countries.

21    (5) In June 2006, the Government Account-

22    ability Office reported that "private security pro-

23    viders continue to enter the battle space without co-

24    ordinating with the U.S. military, putting both the

4

1    military and security providers at a greater risk for

2    injury".

3        (6) According to published accounts and gov-

4    ernment studies, the assignments being given private

5    security contractors are often sensitive, including the

6    protection of United States military bases, interroga-

7    tion of detainees, maintenance and technical assist-

8    ance to weapons systems, logistics and base oper-

9    ations functions, escort of United States convoys,

10   and protection of key United States Government

11   personnel.

12       (7) A recent report by the Congressional Re-

13   search Service found that "new [Department of De-

14   fense] contracts have characteristics that make over-

15   sight difficult".

16       (8) Contractors are playing an expanded role in

17   the national security operations of the United States

18   and the manner in which the United States supports

19   its troops in the field, especially in contingency oper-

20   ations, and therefore contracting practices and poli-

21   cies must be subject to improved and transparent

22   oversight and management.

23 **SEC. 3. REPORTS ON IRAQ AND AFGHANISTAN CONTRACTS.**

24       (a) REPORTS REQUIRED.—Not later than 90 days

25   after the date of the enactment of this Act, the Secretary

5

1 of Defense, the Secretary of State, the Secretary of the

2 Interior, the Administrator of the United States Agency

3 for International Development, and the Director of Na-

4 tional Intelligence shall each submit to Congress a report

5 that contains the information, current as of the date of

6 the enactment of this Act, as follows:

7   (1) The number of persons performing work in

8   Iraq and Afghanistan under contracts (and sub-

9   contracts at any tier) entered into by departments

10   and agencies of the United States Government, in-

11   cluding the Department of Defense, the Department

12   of State, the Department of the Interior, the United

13   States Agency for International Development. and

14   the elements of the intelligence community, respec-

15   tively.

16   (2) The companies awarded such contracts and

17   subcontracts.

18   (3) The total cost of such contracts.

19   (4) The total number of persons who have been

20   killed or wounded in performing work under such

21   contracts.

22   (5) A description of the military equipment and

23   safety equipment provided for the protection of con-

24   tractors under such contracts, and an assessment of

25   the adequacy of such equipment.

6

1  (6) The policies and procedures through which

2  the departments and agencies of the United States

3  Government instruct and inform contractors under

4  such contracts of the applicability of law to their ac-

5  tivities under such contracts, including the laws of

6  the United States, Iraq, and Afghanistan, and other

7  applicable laws.

8  (7) The policies and procedures through which

9  the departments and agencies of the United States

10  Government monitor contractors under such con-

11  tracts on their adherence to applicable law, including

12  the laws of the United States, Iraq, and Afghani-

13  stan.

14  (8) The laws, if any, determined to have been

15  broken in the performance of such contracts, includ-

16  ing laws of the United States, Iraq, and Afghani-

17  stan, and other applicable laws.

18  (9) A description of the disciplinary actions

19  that have been taken against persons performing

20  work under such contracts by the contractor con-

21  cerned, the United States Government, or the Gov-

22  ernment of Iraq or the Government of Afghanistan.

23  (b) ELEMENTS OF THE INTELLIGENCE COMMUNITY

24 DEFINED.—In this section, the term "elements of the in-

25 telligence community" means the elements of the intel-

7

1   ligence community specified in or designated under section

2   3(4) of the National Security Act of 1947 (50 U.S.C.

3   401a(4)).

4   **SEC. 4. DEPARTMENT OF DEFENSE REPORT ON STRATEGY**

5                   **FOR AND APPROPRIATENESS OF ACTIVITIES**

6                   **OF CONTRACTORS UNDER DEPARTMENT OF**

7                   **DEFENSE CONTRACTS IN IRAQ, AFGHANI-**

8                   **STAN, AND THE GLOBAL WAR ON TERROR.**

9       (a) REPORT REQUIRED.—Not later than 180 days

10  after the date of the enactment of this Act, the Secretary

11  of Defense shall submit to Congress a report setting forth

12  the strategy of the Department of Defense for the use of,

13  and a description of the activities being carried out by,

14  contractors and subcontractors in support of Department

15  missions in Iraq, Afghanistan, and the Global War on Ter-

16  ror, including its strategy for ensuring that such contracts

17  do not—

18          (1) have private companies and their employees

19      performing inherently governmental functions, emer-

20      gency essential activities, or mission critical activi-

21      ties;

22          (2) place contractors in supervisory roles over

23      United States Government personnel; or

24          (3) threaten the safety of contractor personnel

25      or United States Government personnel.

8

1      (b) EMERGENCY ESSENTIAL ACTIVITIES OR MISSION

2  CRITICAL ACTIVITIES DEFINED.—In this section, the

3  term "emergency essential activities or mission critical ac-

4  tivities" means any activities as follows:

5          (1) Activities for which continued performance

6      is considered essential to support combat systems

7      and operational activities.

8          (2) Activities whose delay, absence, or failure of

9      performance would significantly affect the broader

10      success or failure of a military operation.

11 SEC. 5. REQUIREMENTS RELATED TO PERSONNEL PER-

12                FORMING PRIVATE SECURITY FUNCTIONS

13                UNDER FEDERAL CONTRACTS DURING CON-

14                TINGENCY OPERATIONS.

15      (a) ACCOUNTABILITY FOR PERSONNEL PERFORMING

16  PRIVATE SECURITY FUNCTIONS UNDER FEDERAL CON-

17  TRACTS DURING CONTINGENCY OPERATIONS.—

18          (1) PROVISION OF CERTAIN INFORMATION

19      ABOUT PERSONNEL PERFORMING PRIVATE SECURITY

20      FUNCTIONS.—Each covered contract shall require

21      the contractor to provide to the contracting officer

22      for the contract, not later than 5 days after the

23      award of the contract, the following information re-

24      garding private security functions to be performed

25      under the contract:

9

1        (A) The approximate number of persons to

2     be used to perform the private security func-

3     tions.

4        (B) A description of the process used to

5     hire such persons, including the method by

6     which and the extent to which background

7     checks regarding such persons are conducted.

8        (C) A description of how such persons are

9     trained to carry out tasks specified under the

10    contract relating to such functions.

11       (D) A description of each category of activ-

12    ity relating to such functions required by the

13    contract.

14    (2) UPDATES OF INFORMATION.—The informa-

15    tion provided under paragraph (1) shall be updated

16    by the contractor during contract performance as

17    necessary.

18    (3) SAFEGUARDING INFORMATION.—The head

19    of each agency awarding a covered contract shall

20    take such actions as are necessary to protect any in-

21    formation provided under paragraph (1) that is a

22    trade secret, or commercial or financial information,

23    from disclosure to persons outside the Government.

24    (4) ACCOUNTING.—Each covered contract shall

25    include the following requirements:

10

(A) Upon award of the contract, the contractor shall provide to the contracting officer cost estimates of salary, benefits, insurance, materials, logistics, travel, administrative costs, and other costs of carrying out private security functions under the contract.

(B) Before contract closeout (other than closeout of a firm, fixed price contract), the contractor shall provide to the contracting officer a report on the actual costs of carrying out private security functions under the contract, in the same categories as provided under subparagraph (A).

(5) QUARTERLY REPORTS ON STAFFING.—Each covered contract shall require the contractor to submit to the contracting officer on a quarterly basis a report on the number of personnel performing private security functions under such contract during the preceding 90 days and on the location or locations in which such personnel performed such functions.

(6) OVERSIGHT.—Before a covered contract is awarded, the head of the agency awarding the contract shall ensure that sufficient resources are available to enable contracting officers of the agency to

11

1 perform oversight of the performance of private se-
2 curity functions under the contract, including over-
3 sight inspections of facilities and operations.

4 (7) WAIVER AUTHORITY.—

5 (A) WAIVER.—The head of the agency
6 awarding a covered contract may waive a re-
7 quirement of this subsection with respect to a
8 contract in an emergency or exceptional situa-
9 tion, as determined by the head of the agency.
10 Any such waiver shall be limited to the require-
11 ments that are impossible or impracticable to
12 implement because of the emergency or excep-
13 tional situation.

14 (B) REPORT.—Commencing 180 days
15 after the date of the enactment of this Act, and
16 continuing every 90 days thereafter, each head
17 of an agency who has, during the preceding 90
18 days, waived a requirement under this sub-
19 section with respect to a covered contract shall
20 submit to the committees of Congress referred
21 to in subparagraph (C) a report that—

22 (i) describes each such waiver by the
23 head of the agency, including the contract
24 involved and the emergency or exceptional
25 situation that justified such waiver; and

12

    (ii) contains a plan for bringing each such contract into compliance with the waived requirements as soon as possible or an explanation of why such waiver needs to be permanent.

  (C) COMMITTEES OF CONGRESS.—The committees of Congress referred to in this subparagraph are the following:

    (i) The Committees on Appropriations, Armed Services, Oversight and Government Reform, and Foreign Affairs of the House of Representatives.

    (ii) The Committees on Appropriations, Armed Services, Homeland Security and Governmental Affairs, and Foreign Relations of the Senate.

(b) REPORTS REQUIRED.—

  (1) IN GENERAL.—During a contingency operation, the head of each agency with any covered contracts in effect shall submit to Congress reports on such contracts in accordance with this subsection.

  (2) MATTERS COVERED.—Each report required by paragraph (1) shall include the following information:

13

1        (A) Total number of covered contracts

2    awarded by the agency with respect to the con-

3    tingency operation.

4        (B) The total number of contracting offi-

5    cers overseeing the covered contracts reported

6    under subparagraph (A).

7        (C) The most current information available

8    under subsection (a)(5) with respect to each

9    covered contract.

10        (D) The number of covered contracts

11    awarded since the last report.

12        (E) The total number of contract per-

13    sonnel working on the covered contracts re-

14    ported under subparagraph (D).

15        (F) The total value of awards for covered

16    contracts reported under subparagraph (D).

17        (G) A detailed catalogue of activities per-

18    formed under covered contracts reported under

19    subparagraph (D).

20    (3) DEADLINES.—The head of an agency shall

21    submit an initial report as required by paragraph

22    (1) within 90 days after first awarding a covered

23    contract, and shall issue additional reports there-

24    after every 90 days.

14

1        (4) COMMITTEES.—The report required by
2     paragraph (1) shall be submitted to the Committees
3     on Appropriations and Armed Services of the House
4     of Representatives and the Senate.

5        (5) FORM.—The report required by paragraph
6     (1) shall be submitted in unclassified form, but may
7     include a classified annex.

8  **SEC. 6. IMPROVED COORDINATION BETWEEN THE ARMED**
9            **FORCES AND CONTRACTORS PERFORMING**
10           **PRIVATE SECURITY FUNCTIONS IN CONTIN-**
11           **GENCY OPERATIONS.**

12     (a) RULES OF ENGAGEMENT.—

13        (1) REQUIREMENT TO ISSUE.—Not later than
14     15 days after the date on which a contingency oper-
15     ation is initiated, the Chairman of the Joint Chiefs
16     of Staff shall issue rules of engagement regarding
17     the circumstances under which force may be used by
18     contract personnel performing private security func-
19     tions within the area covered by the contingency op-
20     eration and the types of force authorized. Each cov-
21     ered contract shall require contract personnel to ad-
22     here to the rules of engagement issued under this
23     subsection.

24        (2) NOTIFICATION.—The commander of the
25     combatant command whose area of responsibility in-

15

1  cludes the theater of operations of a contingency op-
2  eration shall communicate the rules of engagement
3  for the contingency operation to contract personnel
4  in accordance with subsection (c).

5      (3) EXCEPTIONS AND SPECIAL RULES.—As ap-
6  propriate, the Chairman of the Joint Chiefs of Staff
7  may provide exceptions or special rules in the rules
8  of engagement for specific contractors.

9      (b) HIRING, TRAINING, AND EQUIPMENT STAND-
10  ARDS RELATING TO PRIVATE SECURITY CONTRACTORS.—

11      (1) REGULATIONS.—Not later than 30 days
12  after the date on which a contingency operation is
13  initiated, the head of each agency awarding a cov-
14  ered contract shall prescribe in regulations minimum
15  standards (appropriate for the agency) for contract
16  personnel performing private security functions with-
17  in the area covered by the contingency operation, in-
18  cluding minimum training and certification stand-
19  ards. The standards may vary based on the duties
20  of personnel, but must address criminal records, se-
21  curity clearance requirements, and other issues that
22  the head of the agency determines may lead to secu-
23  rity or performance concerns.

24      (2) GUIDANCE FOR EQUIPMENT.—The head of
25  each agency awarding a covered contract shall issue

16

1    guidance (appropriate for the agency) on equipment

2    used for private security functions under covered

3    contracts with the agency, including appropriate uni-

4    forms and levels of body armor and equipment

5    armor, and a recommended list of re-armorers and

6    weapons and armor manufacturers for complying

7    with such guidelines.

8        (3) CONSULTATION WITH SECRETARY OF DE-

9    FENSE.—The head of each agency shall consult with

10   the Secretary of Defense in developing regulations

11   and guidance under this subsection.

12   (c) IMPROVED COORDINATION AND COMMUNICATION

13 BETWEEN THE ARMED FORCES AND CONTRACTORS PER-

14 FORMING PRIVATE SECURITY FUNCTIONS.—

15       (1) DESIGNATION OF THEATER SECURITY CON-

16   TRACT COORDINATING OFFICER.—For each contin-

17   gency operation in which contract personnel per-

18   forming private security functions are active, the

19   Chairman of the Joint Chiefs of Staff shall des-

20   ignate a member of the Armed Forces or civilian

21   employee of the Department to act as the coordi-

22   nating officer on security contracts in the theater of

23   operations of such contingency operation. The indi-

24   vidual so designated shall be known as the "Theater

17

1    Security Contract Coordinating Officer" for the the-
2    ater of operations of such contingency operation.

3    (2) RESPONSIBILITIES OF THEATER SECURITY
4    CONTRACT COORDINATING OFFICER.—The Theater
5    Security Contract Coordinating Officer for a theater
6    of operations of a contingency operation shall, for
7    such theater of operations—

8        (A) establish regulations providing for reli-
9        able lines of communications between contract
10       personnel performing private security functions
11       and the Armed Forces;

12       (B) maintain a current database on the
13       contract personnel performing such functions,
14       including their employing contractors, nationali-
15       ties, backgrounds, and training, and the nature
16       of their activities;

17       (C) communicate the rules of engagement
18       established under subsection (a) to contractors
19       and contract personnel performing such func-
20       tions;

21       (D) take any actions authorized by the
22       Chairman of the Joint Chiefs of Staff for pur-
23       poses of this subsection to ensure the compli-
24       ance of contractors in the theater of operations
25       with the requirements of paragraph (3);

18

1          (E) communicate other critical informa-
2     tion, including guidance on Department of De-
3     fense responsibilities for force protection of con-
4     tract personnel and guidance on equipment, to
5     contractors and contract personnel; and

6          (F) as appropriate, communicate up-to-
7     date information about the security environ-
8     ment that may be relevant to contract per-
9     sonnel.

10    (3) REQUIREMENTS FOR CONTRACTORS RELAT-
11    ING TO THEATER SECURITY CONTRACT COORDI-
12    NATING OFFICER.—Each contractor in a theater of
13    operations of a contingency operation shall be re-
14    quired to—

15          (A) register with the Theater Security
16     Contract Coordinating Officer for the theater of
17     operations and keep the Officer currently in-
18     formed on the number, nationality, background,
19     and training of the contract personnel assigned
20     to perform private security functions under a
21     covered contract;

22          (B) report any incidents in which contract
23     personnel performing such functions use force
24     or are attacked by hostile forces;

19

1           (C) report to the Theater Security Con-
2       tract Coordinating Officer any casualties suf-
3       fered by covered contract personnel;
4           (D) communicate to the Theater Security
5       Contract Coordinating Officer, in accordance
6       with the regulations issued under paragraph
7       (2)(A), tactical information, such as informa-
8       tion on the movement of contractor personnel
9       performing such functions into and out of a
10      battle space; and
11          (E) communicate to the Theater Security
12      Contract Coordinating Officer relevant informa-
13      tion, including intelligence, reports of hostile ac-
14      tivity, or information relevant to military plan-
15      ning.

16 SEC. 7. LEGAL STATUS OF CONTRACT PERSONNEL.

17      (a)    CLARIFICATION    OF    MILITARY
18  EXTRATERRITORIAL JURISDICTION ACT.—

19          (1) INCLUSION OF CONTRACTORS.—Subsection
20      (a) of section 3261 of title 18, United States Code,
21      is amended—

22          (A) by striking "or" at the end of para-
23      graph (1);

24          (B) by striking the comma at the end of
25      paragraph (2) and inserting "; or"; and

20

1        (C) by inserting after paragraph (2) the

2        following:

3        "(3) while employed under a contract (or sub-

4    contract at any tier) awarded by any department or

5    agency of the United States Government, where the

6    work under such contract is carried out in a region

7    outside the United States in which the Armed

8    Forces are conducting a contingency operation,".

9        (2) DEFINITION.—Section 3267 of title 18,

10   United States Code, is amended by adding at the

11   end the following:

12       "(5) The term 'contingency operation' has the

13   meaning given that term in section 101(a)(13) of

14   title 10.".

15   (b) SENSE OF CONGRESS ON INVESTIGATION AND

16  PROSECUTION OF ABUSES BY PRIVATE SECURITY CON-

17  TRACTORS AND OTHERS.—It is the sense of Congress

18  that—

19       (1) if there is probable cause to believe that an

20   individual assigned to perform private security func-

21   tions under a covered contract, any other contractor

22   personnel, or any contractor has violated section

23   3261(a) of title 18, United States Code, except in

24   situations in which the individual is prosecuted

25   under chapter 47 of title 10, United States Code

21

1    (the Uniform Code of Military Justice), or under

2    other law, the Department of Defense should use the

3    authority provided in section 3262 of title 18,

4    United States Code, to arrest and detain such indi-

5    vidual. personnel, or contractor and transfer such in-

6    dividual, personnel, or contractor to civilian authori-

7    ties for prosecution; and

8        (2) the Secretary of Defense should issue guid-

9    ance, as soon as possible after the date of the enact-

10   ment of this Act, on how the amendment made by

11   section 552 of the John Warner National Defense

12   Authorization Act of 2007 (Public Law 109–364;

13   120 Stat. 2217) to section 802(a)(10) of title 10,

14   United States Code (article 2(a)(10) of the Uniform

15   Code of Military Justice), will be implemented.

16   (c) DEPARTMENT OF JUSTICE INSPECTOR GENERAL

17   REPORT.—

18       (1) REPORT REQUIRED.—Not later than 30

19   days after the date of the enactment of this Act, the

20   Inspector General of the Department of Justice shall

21   submit to Congress a report.

22       (2) CONTENT OF REPORT.—The report shall in-

23   clude—

24           (A) a description of the status of Depart-

25       ment of Justice investigations of abuses alleged

22

1    to have been committed by contract personnel

2    performing private security functions, other

3    contract personnel, or contractors under cov-

4    ered contracts, which shall include—

5        (i) the number of complaints received

6    by the Department of Justice;

7        (ii) the number of investigations into

8    complaints opened by the Department of

9    Justice;

10       (iii) the number of criminal cases

11   opened by the Department of Justice; and

12       (iv) the number and result of criminal

13   cases closed by the Department of Justice;

14   and

15   (B) findings and recommendations about

16   the capacity and effectiveness of the Depart-

17   ment of Justice in prosecuting misconduct by

18   such contract personnel.

19   (3) FORM.—The report shall be submitted in

20   unclassified form, but may include a classified

21   annex.

22   **SEC. 8. FEDERAL BUREAU OF INVESTIGATION INVESTIGA-**

23              **TIVE UNIT FOR CONTINGENCY OPERATIONS.**

24   (a) ESTABLISHMENT OF THEATER INVESTIGATIVE

25   UNIT.—For each theater of operations established in con-

23

1    nection with a contingency operation in which contract

2    personnel are carrying out work under a covered contract,

3    the Federal Bureau of Investigation shall establish a The-

4    ater Investigative Unit, which shall be responsible for in-

5    vestigating allegations of criminal misconduct under sec-

6    tion 3261 of title 18, United States Code, by contract per-

7    sonnel.

8        (b) RESPONSIBILITIES OF THEATER INVESTIGATIVE

9    UNIT.—The Theater Investigative Unit established for a

10   theater of operations shall—

11       (1) investigate reports that raise reasonable

12   suspicion of criminal misconduct by contract per-

13   sonnel;

14       (2) investigate reports of fatalities resulting

15   from the use of force by contract personnel; and

16       (3) upon conclusion of an investigation of al-

17   leged criminal misconduct, refer the case to the At-

18   torney General of the United States for further ac-

19   tion, as appropriate in the discretion of the Attorney

20   General.

21       (c) RESPONSIBILITIES OF FEDERAL BUREAU OF IN-

22   VESTIGATION.—

23       (1) RESOURCES.—The Federal Bureau of In-

24   vestigation shall ensure that each Theater Investiga-

24

1    tive Unit has adequate resources and personnel to
2    carry out its responsibilities.

3        (2) NOTIFICATION.—The Federal Bureau of In-
4    vestigation shall notify Congress whenever a Theater
5    Investigative Unit is established or terminated under
6    this section.

7        (d) RESPONSIBILITIES OF OTHER FEDERAL AGEN-
8    CIES.—An agency operating in a theater of operations in
9    which a Theater Investigative Unit is established shall co-
10   operate with and support the activities of the Theater In-
11   vestigative Unit. Any investigation carried out by the In-
12   spector General of an agency shall be coordinated with the
13   activities of the unit as appropriate.

14   **SEC. 9. DEFINITIONS.**

15       In sections 5 through 8 of this Act:

16       (1) COVERED CONTRACT.—The term "covered
17   contract" means—

18            (A) a prime contract awarded by an agen-
19        cy, if the work to be performed under the con-
20        tract includes private security functions;

21            (B) a subcontract at any tier under any
22        prime contract awarded by an agency, if the
23        work to be performed under the subcontract in-
24        cludes private security functions; or

25

1          (C) a task order issued under a task or de-
2      livery order contract entered into by an agency,
3      if the work to be performed under the task
4      order includes private security functions.
5      (2) PRIVATE SECURITY FUNCTIONS.—The term
6  "private security functions", with respect to activi-
7  ties carried out under a covered contract in a the-
8  ater in which the United States is engaged in a con-
9  tingency operation, means any activity as follows:
10          (A) Any activity for which personnel are
11      allowed to carry weapons in the performance of
12      the contract.
13          (B) The performance of—
14              (i) military logistics for operations;
15              (ii) maintenance or arming of weap-
16          ons systems;
17              (iii) interrogation of prisoners;
18              (iv) convoy security;
19              (v) guarding vital facilities and per-
20          sonnel;
21              (vi) tactical security work; or
22              (vii) local force training.
23          (C) Any other activity in support of the
24      contingency operation, as determined by the
25      Theater Security Contract Coordinating Officer

26

1         for the theater of operations of the contingency

2         operation as designated under section 6(c)(1).

3       (3) AGENCY.—The term "agency" has the

4  meaning given the term "Executive agency" in sec-

5  tion 105 of title 5, United States Code.

6       (4) CONTINGENCY OPERATION.—The term

7  "contingency operation" has the meaning given the

8  term section 101(13) of title 10, United States

9  Code.

10      (5) CONTRACTOR.—The term "contractor"

11  means an entity performing a covered contract (in-

12  cluding a subcontract at any tier).

13      (6) CONTRACT PERSONNEL.—The term "con-

14  tract personnel" means persons assigned by a con-

15  tractor (including a subcontractor at any tier) to

16  perform work under a covered contract.

17 **SEC. 10. EFFECTIVE DATE.**

18    (a) APPLICABILITY.—The provisions of this Act shall

19 apply to the following:

20      (1) All covered contracts and all covered con-

21  tract personnel in which the work under the contract

22  is carried out in a theater in which the United

23  States is currently conducting contingency oper-

24  ations.

27

1        (2) In the event that the United States begins

2    new contingency operations, all covered contracts

3    and all covered contract personnel in which the work

4    under the contract is carried out in a theater in

5    which the United States is conducting such contin-

6    gency operations.

7        (b) IMMEDIATE EFFECTIVENESS.—The provisions of

8    this Act shall enter into effect immediately upon the enact-

9    ment of this Act.

10        (c) IMPLEMENTATION.—With respect to covered con-

11    tracts and covered contract personnel discussed in sub-

12    section (a)(1), the United States Government shall have

13    90 days following the enactment of this Act to ensure com-

14    pliance with the provisions of this Act.

○

# EXHIBIT E

I

110TH CONGRESS
1ST SESSION

# H. R. 369

To require accountability for personnel performing private security functions
under Federal contracts, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 10, 2007

Mr. PRICE of North Carolina (for himself, Mr. SPRATT, Mr. WAXMAN, Ms.
SCHAKOWSKY, Mr. SHAYS, Mr. CONYERS, Mr. SNYDER, Mr. COOPER, Mr.
WEXLER, Mr. BURTON of Indiana, Mr. BLUMENAUER, Ms. McCOLLUM
of Minnesota, Mr. ETHERIDGE, Mr. MILLER of North Carolina, Mr.
FARR, Mr. VAN HOLLEN, Mr. DEFAZIO, Mr. HONDA, Ms. JACKSON-LEE
of Texas, and Mr. HOLT) introduced the following bill; which was re-
ferred to the Committee on Armed Services, and in addition to the Com-
mittee on the Judiciary, for a period to be subsequently determined by
the Speaker, in each case for consideration of such provisions as fall with-
in the jurisdiction of the committee concerned

---

# A BILL

To require accountability for personnel performing private
security functions under Federal contracts, and for other
purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4        (a) SHORT TITLE.—This Act may be cited as the

5    "Transparency and Accountability in Security Contracting

6    Act of 2007".

2

1    (b) TABLE OF CONTENTS.—The table of contents for

2    this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Requirements related to personnel performing private security functions under Federal contracts during contingency operations.
Sec. 3. Requirements for improving coordination between the United States Armed Forces and contractors performing private security functions in contingency operations.
Sec. 4. Legal status of contract personnel.
Sec. 5. Federal Bureau of Investigation investigative unit for contingency operations.
Sec. 6. Government Accountability Office analysis of cost effectiveness of private security contracting.
Sec. 7. Definitions.
Sec. 8. Effective date.

3    **SEC. 2. REQUIREMENTS RELATED TO PERSONNEL PER-**

4    **FORMING PRIVATE SECURITY FUNCTIONS**

5    **UNDER FEDERAL CONTRACTS DURING CON-**

6    **TINGENCY OPERATIONS.**

7    (a) ACCOUNTABILITY REQUIREMENTS FOR PER-

8    SONNEL PERFORMING PRIVATE SECURITY FUNCTIONS

9    UNDER FEDERAL CONTRACTS OR SUBCONTRACTS DUR-

10    ING CONTINGENCY OPERATIONS.—

11        (1) REQUIREMENT TO PROVIDE CERTAIN IN-

12    FORMATION ABOUT PERSONNEL PERFORMING PRI-

13    VATE SECURITY FUNCTIONS.—Each covered contract

14    shall require the contractor to provide to the con-

15    tracting officer for the contract, not later than 5

16    days after award of the contract, the following infor-

17    mation regarding private security functions to be

18    performed under the contract:

3

1          (A) The approximate number of persons to

2      be used to perform the private security func-

3      tions.

4          (B) A description of the process used to

5      hire such persons, including the method by

6      which and the extent to which background

7      checks regarding such persons are conducted.

8          (C) A description of how such persons are

9      trained to carry out tasks specified under the

10     contract relating to such functions.

11         (D) A description of each category of activ-

12     ity relating to such functions required by the

13     contract.

14     (2) UPDATES OF INFORMATION.—The informa-

15     tion provided under paragraph (1) shall be updated

16     by the contractor during contract performance as

17     necessary.

18     (3) SAFEGUARDING INFORMATION.—The head

19     of each agency awarding a covered contract shall

20     take such actions as are necessary to protect any in-

21     formation provided under paragraph (1) that is a

22     trade secret, or commercial or financial information,

23     from disclosure to persons outside the Government.

24     (4) ACCOUNTING.—Each covered contract shall

25     include the following requirements:

4

1          (A) Upon award of the contract, the con-
2     tractor shall provide cost estimates of salary,
3     benefits, insurance, materials, logistics, travel,
4     administrative costs, and other costs of carrying
5     out private security functions under the con-
6     tract.

7          (B) Before contract closeout (other than
8     closeout of a firm, fixed price contract), the
9     contractor shall provide a report on the actual
10    costs of carrying out private security functions
11    under the contract, in the same categories as
12    provided under subparagraph (A).

13    (5) OVERSIGHT.—Before a covered contract is
14    awarded, the head of the agency awarding the con-
15    tract shall ensure that sufficient resources are avail-
16    able to enable contracting officers of the agency to
17    perform oversight of the performance of the con-
18    tract, including oversight inspections of facilities and
19    operations.

20    (6) WAIVER AUTHORITY.—

21          (A) WAIVER.—The head of the agency
22    awarding a covered contract may waive a re-
23    quirement of this section with respect to a con-
24    tract in an emergency or exceptional situation,
25    as determined by the head of the agency. Any

5

1    such waiver shall be limited to the requirements

2    that are impossible or impracticable to imple-

3    ment because of the emergency or exceptional

4    situation.

5        (B) REPORT.—In any case in which the

6    head of an agency waives a requirement under

7    this section with respect to a contract, the

8    agency head shall prepare a report that—

9            (i) describes the contract, the waiver,

10        and the emergency or exceptional situation

11        that justified the waiver; and

12            (ii) contains a plan for bringing the

13        contract into compliance with the waived

14        requirements as soon as possible or an ex-

15        planation of why the waiver needs to be

16        permanent.

17        (C) SUBMISSION OF REPORT.—The report

18    required by subparagraph (B) shall be sub-

19    mitted, within 30 days after the date of the

20    waiver, to—

21            (i) the Committees on Appropriations,

22        Armed Services, Oversight and Govern-

23        ment Reform, and Foreign Affairs of the

24        House of Representatives; and

6

1          (ii) the Committees on Appropria-
2          tions, Armed Services, Homeland Security
3          and Governmental Affairs, and Foreign
4          Relations of the Senate.
5    (c) REPORT REQUIRED.—
6          (1) IN GENERAL.—During a contingency oper-
7    ation, the head of each agency with any covered con-
8    tracts in effect shall submit to Congress reports on
9    the contracts in accordance with this subsection.
10         (2) MATTERS COVERED.—The report required
11   by paragraph (1) shall include the following informa-
12   tion:
13         (A) Total number of covered contracts
14         awarded by the agency with respect to the con-
15         tingency operation.
16         (B) The total number of contracting offi-
17         cers overseeing the covered contracts reported
18         in subparagraph (A).
19         (C) Number of covered contracts awarded
20         since the last report.
21         (D) Total number of contract personnel
22         working on the covered contracts reported in
23         subparagraph (C).
24         (E) Total amount of awards for covered
25         contracts reported in subparagraph (C).

7

1           (F) Catalogue of activities performed
2       under covered contracts reported in subpara-
3       graph (C).

4           (3) DEADLINES.—The head of an agency shall
5       submit an initial report as required by paragraph
6       (1) within 90 days after first awarding a covered
7       contract, and shall issue additional reports every 90
8       days.

9           (4) COMMITTEES.—The report required by
10      paragraph (1) shall be submitted to the Committees
11      on Appropriations and Armed Services of the House
12      of Representatives and the Senate.

13          (5) FORMAT.—The report required by para-
14      graph (1) shall be submitted in unclassified format,
15      but may include a classified annex as necessary.

16  **SEC. 3. REQUIREMENTS FOR IMPROVING COORDINATION**
17      **BETWEEN   THE   UNITED   STATES   ARMED**
18      **FORCES  AND  CONTRACTORS  PERFORMING**
19      **PRIVATE  SECURITY  FUNCTIONS  IN  CONTIN-**
20      **GENCY OPERATIONS.**

21  (a) RULES OF ENGAGEMENT.—

22          (1) REQUIREMENT TO ISSUE.—Not later than
23      15 days after the date when a contingency operation
24      is initiated, the Chairman of the Joint Chiefs of
25      Staff shall issue rules of engagement regarding the

8

1    circumstances under which force may be used by

2    contract personnel performing private security func-

3    tions within the area covered by the contingency op-

4    eration and the types of force authorized. Each cov-

5    ered contract shall require contract personnel to ad-

6    here to the rules of engagement issued under this

7    subsection.

8        (2) NOTIFICATION.—The commander of the

9    combatant command whose area of responsibility in-

10   cludes the contingency operation shall communicate

11   the rules of engagement to contract personnel in ac-

12   cordance with subsection (c).

13       (3) EXCEPTIONS AND SPECIAL RULES.—As ap-

14   propriate, the Chairman of the Joint Chiefs of Staff

15   may provide exceptions or special rules in the rules

16   of engagement for specific contractors.

17   (b) HIRING, TRAINING, AND EQUIPMENT STAND-

18   ARDS RELATING TO PRIVATE SECURITY CONTRACTORS.—

19       (1) REGULATIONS.—Not later than 30 days

20   after the initiation of a contingency operation, the

21   head of each agency awarding a covered contract

22   shall prescribe in regulations minimum standards

23   (appropriate for the agency) for contract personnel,

24   including minimum training and certification stand-

25   ards. The standards may vary based on the duties

9

1    of personnel, but must address criminal records, se-
2    curity clearance requirements, and other issues that
3    the head of the agency determines may lead to secu-
4    rity or performance concerns.

5    (2) GUIDANCE FOR EQUIPMENT.—The head of
6    each agency awarding a covered contract shall issue
7    guidance (appropriate for the agency) on equipment
8    used for private security functions under covered
9    contracts with the agency, including appropriate uni-
10   forms and levels of body armor and equipment
11   armor, and a recommended list of re-armorers and
12   weapons and armor manufacturers for complying
13   with such guidelines.

14   (3) CONSULTATION WITH SECRETARY OF DE-
15   FENSE.—The head of each agency shall consult with
16   the Secretary of Defense in developing regulations
17   and guidance under this subsection.

18   (c) IMPROVED COORDINATION AND COMMUNICATION
19   BETWEEN U.S. ARMED FORCES AND CONTRACTORS PER-
20   FORMING PRIVATE SECURITY FUNCTIONS.—

21   (1) ESTABLISHMENT OF A THEATER SECURITY
22   CONTRACT COORDINATING OFFICER.—For each con-
23   tingency operation in which contract personnel are
24   active, the Chairman of the Joint Chiefs of Staff

10

1    shall designate a Theater Security Contract Coordi-
2    nating Officer.

3        (2) RESPONSIBILITIES OF THEATER SECURITY
4    CONTRACT COORDINATING OFFICER.—The Theater
5    Security Contract Coordinating Officer shall—

6            (A) establish regulations providing for reli-
7        able lines of communications between contract
8        personnel and U.S. Armed Forces;

9            (B) maintain a current database of the
10        number of contract personnel and the nature of
11        their activities;

12            (C) communicate the rules of engagement,
13        established under subsection (a), to contractors
14        and contract personnel;

15            (D) communicate other critical informa-
16        tion, including guidance on Department of De-
17        fense responsibilities for force protection of con-
18        tract personnel and guidance on equipment, to
19        contractors and contract personnel; and

20            (E) as appropriate, communicate up-to-
21        date information about the security environ-
22        ment that may be relevant to contract per-
23        sonnel.

24        (3) REQUIREMENTS FOR CONTRACTORS RELAT-
25    ING TO THE THEATER SECURITY CONTRACT COORDI-

11

1    NATING OFFICER.—Contractors shall be required

2    to—

3        (A) register with the designated Theater

4    Security Contract Coordinating Officer for the

5    theater in which the covered contract is per-

6    formed, and to report to the Officer the number

7    of personnel assigned to perform the covered

8    contract;

9        (B) report any incidents in which contract

10    personnel use force or are attacked by hostile

11    forces;

12        (C) report to the Theater Security Con-

13    tract Coordinating Officer any casualties suf-

14    fered by covered contract personnel;

15        (D) communicate to the Theater Security

16    Contract Coordinating Officer, in accordance

17    with the regulations issued under paragraph

18    (2)(A), tactical information, such as informa-

19    tion on the movement of contractor personnel

20    into and out of a battle space; and

21        (E) communicate to the Theater Security

22    Contract Coordinating Officer relevant informa-

23    tion, including intelligence, reports of hostile ac-

24    tivity, or information relevant to military plan-

25    ning.

12

1    **SEC. 4. LEGAL STATUS OF CONTRACT PERSONNEL.**

2    (a) CLARIFICATION OF THE MILITARY

3    EXTRATERRITORIAL JURISDICTION ACT.—

4        (1) INCLUSION OF CONTRACTORS.—Subsection

5    (a) of section 3261 of title 18, United States Code,

6    is amended—

7            (A) by striking "or" at the end of para-

8        graph (1);

9            (B) by striking the comma at the end of

10        paragraph (2) and inserting "; or"; and

11            (C) by inserting after paragraph (2) the

12        following:

13        "(3) while employed under a contract (or sub-

14    contract at any tier) awarded by any department or

15    agency of the United States Government, where the

16    work under such contract is carried out in a region

17    outside the United States in which the Armed

18    Forces are conducting a contingency operation.".

19        (2) DEFINITION.—Section 3267 of title 18,

20    United States Code, is amended by adding at the

21    end the following:

22        "(5) The term 'contingency operation' has the

23    meaning given that term in section 101(a)(13) of

24    title 10.".

13

1    (b) SENSE OF CONGRESS REGARDING INVESTIGA-
2    TION AND PROSECUTION OF ABUSES BY PRIVATE SECU-
3    RITY CONTRACTORS.—It is the sense of Congress that—

4        (1) if there is probable cause to believe that an
5    individual assigned to perform work under a covered
6    contract has violated section 3261(a) of title 18, ex-
7    cept in situations in which the individual is pros-
8    ecuted under the Uniform Code of Military Justice
9    or under other law, the Department of Defense
10    should use the authority provided in section 3262 of
11    title 18, United States Code, to arrest and detain
12    that individual and transfer that individual to civil-
13    ian authorities for prosecution; and

14        (2) the Secretary of Defense should issue guid-
15    ance, as soon as possible after the date of the enact-
16    ment of this Act, on how the amendment made by
17    section 552 of the John Warner National Defense
18    Authorization Act of 2007 (Public Law 109–364;
19    120 Stat. 2217) to section 802(a)(10) of title 10,
20    United States Code (article 2(a)(10) of the Uniform
21    Code of Military Justice), will be implemented.

22    (c) DEPARTMENT OF JUSTICE INSPECTOR GENERAL
23    REPORT.—

24        (1) REPORT REQUIRED.—Not later than 30
25    days after the date of the enactment of this Act, the

14

1    Inspector General of the Department of Justice shall

2    submit to Congress a report.

3        (2) CONTENT OF REPORT.—The report shall in-

4    clude—

5            (A) a description of the status of Depart-

6        ment of Justice investigations of abuses alleged

7        to have been committed by contract personnel,

8        which shall include—

9                (i) the number of complaints received

10            by the Department of Justice;

11                (ii) the number of investigations into

12            complaints opened by the Department of

13            Justice;

14                (iii) the number of criminal cases

15            opened by the Department of Justice; and

16                (iv) the number and result of criminal

17            cases closed by the Department of Justice;

18            and

19            (B) findings and recommendations about

20        the capacity and effectiveness of the Depart-

21        ment of Justice in prosecuting misconduct by

22        contract personnel.

23        (3) FORMAT OF REPORT.—The report shall be

24    submitted in unclassified format, but may contain a

25    classified annex as appropriate.

15

1 **SEC. 5. FEDERAL BUREAU OF INVESTIGATION INVESTIGA-**

2 **TIVE UNIT FOR CONTINGENCY OPERATIONS.**

3     (a) ESTABLISHMENT OF THEATER INVESTIGATIVE

4 UNIT.—For each theater of operations established in con-

5 nection with a contingency operation in which contract

6 personnel are carrying out work under a covered contract,

7 the Federal Bureau of Investigation shall establish a The-

8 ater Investigative Unit, which shall be responsible for in-

9 vestigating allegations of criminal misconduct under sec-

10 tion 3261 of title 18, United States Code, by contract per-

11 sonnel.

12     (b) RESPONSIBILITIES OF THEATER INVESTIGATIVE

13 UNIT.—The Theater Investigative Unit established for a

14 theater of operations shall—

15         (1) investigate reports that raise reasonable

16     suspicion of criminal misconduct by contract per-

17     sonnel;

18         (2) investigate reports of fatalities resulting

19     from the use of force by contract personnel; and

20         (3) upon conclusion of an investigation of al-

21     leged criminal misconduct, refer the case to the At-

22     torney General of the United States for further ac-

23     tion, as appropriate in the discretion of the Attorney

24     General.

25     (c) RESPONSIBILITIES OF FEDERAL BUREAU OF IN-

26 VESTIGATION.—

16

1        (1) RESOURCES.—The Federal Bureau of In-
2    vestigation shall ensure that each Theater Investiga-
3    tive Unit has adequate resources and personnel to
4    carry out its responsibilities.

5        (2) NOTIFICATION.—The Federal Bureau of In-
6    vestigation shall notify Congress whenever a Theater
7    Investigative Unit is established or terminated in ac-
8    cordance with this section.

9    (d) RESPONSIBILITIES OF OTHER FEDERAL AGEN-
10   CIES.—An agency operating in a theater of operations in
11   which a Theater Investigative Unit is established shall co-
12   operate with and support the activities of the Theater In-
13   vestigative Unit. Any investigation carried out by the In-
14   spector General of an agency shall be coordinated with the
15   activities of the unit as appropriate.

16   **SEC. 6. GOVERNMENT ACCOUNTABILITY OFFICE ANALYSIS**
17             **OF COST EFFECTIVENESS OF PRIVATE SECU-**
18             **RITY CONTRACTING.**

19   (a) STUDY REQUIRED.—The Comptroller General
20   shall conduct a study of the total costs to the Federal Gov-
21   ernment related to procuring security services through pri-
22   vate security contractors, including costs relating to com-
23   pensation, administration (including insurance and health
24   care), and equipment, in comparison to providing such se-

17

1  curity services using employees of the Federal Government

2  and members of the Armed Forces.

3      (b) SUBMISSION OF RESULTS.—The Comptroller

4  General shall submit to Congress a report detailing the

5  findings of the study required by subsection (a) and such

6  recommendations as the Comptroller General considers

7  appropriate within 270 days after the date of the enact-

8  ment of this Act.

9  **SEC. 7. DEFINITIONS.**

10      In this Act:

11          (1) COVERED CONTRACT.—The term "covered

12      contract" means—

13          (A) a prime contract awarded by an agen-

14      cy, if the work to be performed under the con-

15      tract includes private security functions;

16          (B) a subcontract at any tier under any

17      prime contract awarded by an agency, if the

18      work to be performed under the subcontract in-

19      cludes private security functions; or

20          (C) a task order issued under a task or de-

21      livery order contract entered into by an agency,

22      if the work to be performed under the task

23      order includes private security functions.

24          (2) PRIVATE SECURITY FUNCTIONS.—The term

25      "private security functions", with respect to activi-

18

1　ties carried out under a covered contract in a the-

2　ater in which the United States is engaged in a con-

3　tingency operation, means—

4　　　　(A) any activities for which personnel are

5　　　　allowed to carry weapons in the performance of

6　　　　the contract;

7　　　　(B) the performance of—

8　　　　　　(i) military logistics and maintenance;

9　　　　　　(ii) interrogation of prisoners;

10　　　　　　(iii) convoy security;

11　　　　　　(iv) guarding vital facilities and per-

12　　　　　sonnel;

13　　　　　　(v) tactical security work; or

14　　　　　　(vi) local force training; or

15　　　　(C) any other activity in support of the

16　　　　contingency operation, as determined by the

17　　　　Theater Security Contract Coordinating Officer.

18　　　(3) AGENCY.—The term "agency" has the

19　meaning given the term "Executive agency" in sec-

20　tion 105 of title 5, United States Code.

21　　　(4) CONTINGENCY OPERATION.—The term

22　"contingency operation" has the meaning given the

23　term section 101(13) of title 10, United States

24　Code.

19

1        (5) CONTRACTOR.—The term "contractor"

2    means an entity performing a covered contract.

3        (6) CONTRACT PERSONNEL.—The term "con-

4    tract personnel" means persons assigned by a con-

5    tractor (including subcontractors at any tier) to per-

6    form work under a covered contract.

7 **SEC. 8. EFFECTIVE DATE.**

8    (a) APPLICABILITY.—The provisions of this Act shall

9 apply to the following:

10        (1) All covered contracts and all covered con-

11    tract personnel in which the work under the contract

12    is carried out in a theater in which the United

13    States is currently conducting contingency oper-

14    ations.

15        (2) In the event that the United States begins

16    new contingency operations, all covered contracts

17    and all covered contract personnel in which the work

18    under the contract is carried out in a theater in

19    which the United States is conducting such contin-

20    gency operations.

21    (b) IMMEDIATE EFFECTIVENESS.—The provisions of

22 this Act shall enter into effect immediately upon the enact-

23 ment of this Act.

24    (c) IMPLEMENTATION.—With respect to covered con-

25 tracts and covered contract personnel discussed in sub-

20

1 section (a)(1), the United States Government shall have

2 90 days following the enactment of this Act to ensure com-

3 pliance with the provisions of this Act.

○

**EXHIBIT F**

Not Reported in F.Supp.2d    Page 1
Not Reported in F.Supp.2d, 2005 WL 2085544 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

**C**

Nauert v. Ace Properties and Cas. Ins. Co.
D.Colo.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
Charles Jason NAUERT, Plaintiff,
v.
ACE PROPERTY AND CASUALTY INSUR-
ANCE COMPANY; Esis, Inc., a Pennsylvania Cor-
poration, Defendants.
**No. 104CV02547WYDBNB.**

Aug. 27, 2005.

John Gregory Walta, J. Gregory Walta, PC, Color-
ado Springs, CO, for Plaintiff.
Brandon Roy Ceglian, Montgomery Kolodny Am-
atuzio & Dusbabek, LLP-Denver Colorado, Den-
ver, CO, for Defendants.

ORDER

DANIEL, J.

**\*1** THIS MATTER is before the Court on De-
fendants' Amended Consolidated Motion to Dis-
miss Plaintiff's Claims for Relief and to Strike Por-
tions of Plaintiff's Complaint ("Motion to Dis-
miss"), filed January 18, 2005, and Plaintiff's Re-
sponse, filed February 7, 2005. For the reasons set
forth below the Court GRANTS Defendants' Mo-
tion to Dismiss as to Plaintiff's first claim alleging
insurance bad faith and his second claim alleging
violations of the Colorado Consumer Protection
Act. The Court DENIES as moot Defendants' Mo-
tion to Dismiss to the extent it requests certain al-
legations of the Complaint be stricken as immateri-
al, impertinent and scandalous.

I. *BACKGROUND*

Plaintiff brings this action as a compensation
claimant under the Longshore and Harbor Workers'
Compensation Act, 33 U.S.C. § 901 *et seq.* (1988) (
"LHWCA"), and seeks to recover compensatory

and punitive damages against Defendants Ace
Property and Casualty Company ("ACE") and ES-
IS, Inc. (collectively "ACE") [FN1] arising out of
Defendants' alleged bad faith handling of Nauert's
federal workers' compensation claim. Pursuant to
allegations in his complaint, Plaintiff sustained a
work-related injury to his ankle and foot on Decem-
ber 13, 2003 while working at an American military
base in Kosovo when he stepped on a large rock.
Compl., at ¶ 2. He states he filed a prompt report
and was returned to Colorado on January 1, 2004
for medical treatment. *Id.,* ¶ 5. Plaintiff avers ACE
has at all relevant times contracted to provide work-
ers' compensation coverage for Plaintiff under the
LHWCA. Plaintiff also claims that despite verifica-
tion by ACE's doctors that he was disabled by an
on-the-job-injury, ACE denied Plaintiff's claim was
work-related, and refused to pay him disability pay-
ments or for his medical care.*Id.,* at ¶ 8. Nauert al-
leges Defendants' conduct caused him financial
hardship, loss of enjoyment of life, and impairment
of psychological and physical function. *Id.,* at ¶ 5.

> FN1. Defendant ESIS, Inc., ("ESIS") is
> wholly owned and controlled by ACE and
> serves as a third-party adjuster on ACE/
> CIGNA claims.

Plaintiff filed suit on October 29, 2004, assert-
ing an insurance bad faith claim and a claim that
ACE violated the Colorado Consumer Protection
Act, C.R.S. § 6-1-101, *et seq.,* by violating the Col-
orado Unfair Claims-Deceptive Practices Act,
C.R.S. § 10-3-1104(1). Defendants' Motion to Dis-
miss, filed Pursuant to Fed.R.Civ.P. 12(b)(1),
12(b)(6), 12(f) and 12(g), asserts Plaintiff's com-
plaint must be dismissed because his first claim is
preempted by the LHWCA, and Plaintiff lacks
standing to assert his second claim under the Color-
ado Consumer Protection Act. In the alternative,
Defendants request portions of Plaintiff's complaint
be stricken as immaterial, impertinent and scandal-
ous. I address the parties' arguments below.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2085544 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

## II. *LEGAL ANALYSIS*

### A. *Introduction*

When a party moves to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the attack can be either a facial attack to the allegations or a factual attack. *Osborn v. United States,* 918 F.2d 724, 729 n. 6 (10th Cir.1990). A facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. *Holt v. U.S.,* 46 F.3d 1000, 1002 (10th Cir.1995) (citing *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990)). In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. *Id.* Here, I find Defendants' Motion to Dismiss raises a facial attack, as this Court need not look beyond the allegations contained in the complaint. *Holt,* 46 F.3d at 1002. Accordingly, I find Defendants' 12(b)(1) motion to dismiss does not need to be converted into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion. *Id.*

**\*2** When evaluating a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court " 'must accept all the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff.'"*David v. City and County of Denver,* 101 F.3d 1344, 1352 (10th Cir.1996) (quoting *Gagan v. Norton,* 35 F.3d 1473, 1474 n. 1 (10th Cir.1994)). "A complaint may be dismissed pursuant to FED. R. CIV. P 12(b)(6) only 'if the plaintiff can prove no set of facts to support a claim for relief.'"*Id.* (quoting *Jojola v. Chavez,* 54 F.3d 488, 490 (10th Cir.1995)). Pursuant to the Federal Rules, if a court considers matters outside of the pleadings, a motion to dismiss pursuant to Rule 12(b)(6) should be treated as a motion for summary judgment. Here, Defendants attached numerous documents to their Motion to Dismiss, including a complaint and order in a related case. Similarly, Plaintiff referenced and attached to his response, ACE and ESIS website materials and affidavits from other lawyers. In ruling upon Defendants' Motion to Dismiss, I do not consider these outside matters submitted by the parties and, therefore, I do not find it necessary to treat their motion as one for summary judgment under Fed.R.Civ.P. 12(b).

### B. *Preemption by the Defense Base Act and the LHWCA*

I first address Defendants' argument that this court lacks subject matter jurisdiction to hear Plaintiff's insurance bad faith claim because it is preempted by the Defense Base Act ("DBA") and the LHWCA. Defendants argue this claim falls under the LHWCA because, as Plaintiff admits, the alleged injury occurred while Plaintiff was employed as a security guard at an American military base in Kosovo. Defendants further claim that because Plaintiff alleges injury at an overseas United States military base, his claim arises first under the DBA, 42 U.S.C. §§ 1651-54, which expressly incorporates the LHWCA as follows:

The DBA provides, "[e]xcept as herein modified, the provisions of the [LHWCA] ... shall apply in respect to injury or death of any employee engaged in any employment-at any military, air, or naval base acquired after January 1, 1940, by the United States from any foreign government; or upon any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States.

42 U.S.C. § 1651(a)(1)-(2).

Accordingly, Defendants assert exclusivity provisions within the DBA [FN2] and the LHWCA [FN3] preempt all state law claims against the "employer or insurer for damages arising out of a delay in payment or a failure to pay worker's compensation benefits."Mot., at 6.

FN2. (c) *Liability as exclusive.*"The liability of an employer ... under this chapter shall be exclusive and in place of all other liability of such employer, ... coming within the purview of this chapter under the

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 2085544 (D.Colo.)
(Cite as: Not Reported in F.Supp.2d)

workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into."42 U.S.C. § 1651(c).

FN3. (a) *Employer liability; failure of employer to secure payment of compensation.*"The liability of an employer prescribed in § 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, ... except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, ... may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death."33 U.S.C. § 905(a)

Plaintiff, on the other hand, argues the LHWCA's "straight-forward" exclusivity provision neither expressly preempts state law, nor presents an actual conflict with similar state workers' compensation regulations. Pl.'s Resp., at 3. Plaintiff further contends this Court should apply Colorado common law in determining whether ACE acted in bad faith when adjusting Nauert's claim, because the majority of facts occurred in Colorado, including his hiring, medical treatment, claims adjustment, and this lawsuit. Plaintiff avers that under Colorado common law, exclusivity provisions like the one found in the LHWCA, do not apply to bad faith claims adjusting where the injury and the damages claimed were not sustained within the scope of employment.[FN4] Accordingly, Plaintiff contends ACE's liability does not stem from his work-related injury, but arises from injuries caused by ACE outside the workplace and after employment ceased when ACE intentionally refused to pay for Plaintiff's medical treatment. Pl.'s Resp., at 4. Lastly, Plaintiff argues that even under the DBA and LHWCA, an insurance carrier who engages in bad faith claims adjusting can be held accountable in tort. *Martin v. Travelers Insurance Co.,* 497 F.2d

329 (1st Cir.1974) (insurance company may be sued in tort for "misdeeds committed in connection with payment of compensation under the [LHWCA]").

FN4. To support his claim that bad faith is a separate tort from those barred by workers' compensation exclusivity, Plaintiff cites to *Travelers Ins. Co. v. Savio,* 706 P.2d 1258 (Colo.1985), but erroneously quotes language that does not appear in that case. *See* Pl.'s Resp., at 4 (Plaintiff quotes the following language: "occurred after the compensable injury and the damages claimed were not sustained within the scope of employment.").

**\*3** Upon my review of the parties' arguments and of pertinent federal circuit law, I find the LHWCA preempts state law regarding actions for bad faith handling of LHWCA claims. Responding to Plaintiff's argument that there is no express federal preemptive decree, I find the plain language of the DBA provides otherwise. 42 U.S.C. § 1651(c) ("[t]he liability of an employer ... shall be exclusive and in place of all other liability of such employer, ... coming within the purview of this chapter under the workmen's compensation law of any State").[FN5] Plaintiff's claim that Colorado common law should apply because Nauert was hired in Colorado also runs counter to language within the same DBA provision, which plainly states, an employer's liability is exclusive "irrespective of the place where the contract of hire of any such employee may have been made or entered into."*Id.*

FN5. Plaintiff does not appear to deny Defendants' assertion that the DBA exclusivity clause governs in this case. *See generally, Kalama Services, Inc. v. Director, Office of Workers' Compensation,* 354 F.3d 1085, 1090 (9th Cir.2004) (noting the purpose of the DBA in extending LHWCA coverage, is to provide worker's compensation coverage for employees working outside the continental United States).

Moreover, I find the legislative history of the LHWCA and the DBA makes clear Congress' intent to preempt state law. The LHWCA was established in 1927, "as a uniform national program of workers compensation benefits for longshore and harbor workers which could not be constitutionally provided by the States."*Texas Employers' Ins. Ass'n v. Jackson,* 820 F.2d 1406, 1411-1412 (5th Cir.1987). The later established DBA, together with the LHWCA, provide a certain fixed recovery for employees injured on the job without regard to the employer's fault, but also "precludes the assertion of various common-law defenses that had frequently resulted in the denial of any recovery for disabled laborers."*Potomac Elec. Power Co. v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor,* 449 U.S. 268, 281, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980). Given this framework and the exclusivity language of the LHWCA, I find Congress intended to preempt potentially conflicting state law so as to preserve its apparent objective of providing "uniform protection" to employees injured on the job.[FN6] See *Atkinson v. Gates, McDonald & Co.,* 665 F.Supp. 516, 520 (S.D.Miss.1987).

> FN6. Accordingly, I find Plaintiff's reliance upon Colorado case law for the proposition that the LHWCA should not bar bad faith claims in this action is inappropriate. *See Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1264 (Colo.1985) (holding the Colorado Worker's Compensation Act did not bar a common law claim for bad faith).

I next address the issue of whether Plaintiff's bad faith claim lies within the purview of the LHWCA. Plaintiff avers an insurance company can be sued in tort under the LHWCA because the LHWCA's penalty provisions do not represent the exclusive remedy for bad faith claim adjusting. Pl.'s Resp., at 4-5. I disagree. The LHWCA by its terms contemplates nonpayment or delay in payment of benefits and provides claimants a remedy for such nonpayment in the form of a penalty. Section 914(f) of the LHWCA, for example, provides for broad pen-

alties against employers who delay in making payments, so that if compensation, payable under the terms of an award, is not paid within ten days, a twenty (20) percent penalty is added to the amount of compensation due. 33 U.S.C. § 914(f) (1988). The LHWCA also allows a successful claimant an award of attorney's fees and expenses. *Id.,* § 928. Most significantly, in 1984 Congress amended the LHWCA at 33 U.S.C. § 931 to enhance the criminal penalties for arbitrary withholdings from a misdemeanor to a felony, increasing the maximum fine to $10,000 and the maximum imprisonment to five years. *Barnard v. Zapata Haynie Corp.,* 975 F.2d 919, 921 (1st Cir.1992). As other Circuit Courts have acknowledged, I find the LHWCA's comprehensive remedial framework for nonpayment or delay in payment of benefits and the "conflict therewith which necessarily flows from any state penalty scheme respecting failure to pay LHWCA benefits which differs from the scheme of the LHWCA," convinces me that Plaintiff's state law claims are preempted. *Barnard,* 975 F.2d at 921 (citing *Atkinson v. Gates, McDonald & Co.,* 838 F.2d 808, 812 (5th Cir.1988)).

**\*4** The court in *Atkinson* further reasoned that the statutory penalty "inferentially, but nonetheless plainly, also provides that the penalty shall not be *any* different amount, and that liability for it shall not vary according to anything, such as good or bad faith ...".*Atkinson,* 838 F.2d at 812;*see also Hall v. C & P Tel. Co.,* 809 F.2d 924 (D.C.Cir.1987) (finding state tort claim based on employer's intentional refusal to make timely compensation payments preempted by exclusivity and late payment provisions of LHWCA); *Sample v. Johnson,* 771 F.2d 1335, 1347 (9th Cir.1985) (holding state wrongful refusal to pay claim barred by exclusivity and penalty provisions of LHWCA, *cert. denied,*475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986)); *Daley v. Aetna Casualty & Sur. Co.,* 61 Ohio App.3d 721, 573 N.E.2d 1128, 1130 (1988) (intent to preempt state actions for bad faith and intentional infliction of emotional distress based on employer's termination of benefits "is ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parent both from the pervasiveness of the federal regulation and the likelihood of conflicts between state and federal law.").

As for Plaintiff's claim *Martin v. Travelers Insurance Company,* 497 F.2d 329 (1st Cir.1974), "rejected the argument that the LHWCA's penalty provisions are the exclusive remedy for bad faith adjusting," I find the cases are distinguishable. Pl.'s Resp., at 5. The *Martin* court made clear,

"the crux of the complaint here is the insurer's callous stopping of payment without warning when it should have realized that acute harm might follow. A stop payment on a sizable compensation check which may have been deposited and drawn upon carries the obvious possibility of embarrassment and distress."

*Martin,* 497 F.2d at 331.

Unlike *Martin,* the facts in the case at bar relate solely to ACE's refusal to pay benefits. Despite Plaintiff's best efforts to convince the Court this case is similar to *Martin* because ACE's alleged conduct was "egregious" and because ACE "completely fabricated" its claim that Plaintiff's injuries were not work related, I find Defendants' actions, in the end, amount to nothing more than a refusal to make payments. Pl.'s Resp., at 6. Under such facts, I find *Martin* is not applicable and the LHWCA is Plaintiff's exclusive remedy against ACE. As Defendants aptly point out, other federal and circuit courts addressing the same issue have rejected *Martin,* or limited its holding to its unique facts. Indeed, even the First Circuit distinguished its 1974 holding, stating "we find *Martin* to be inapposite to the facts alleged here," which relate solely to a refusal to pay benefits. *Barnard,* 975 F.2d at 920-21. The court in *Atkinson* and *Sample* made similar findings. *See Atkinson,* 838 F.2d at 813 (limiting *Martin* to "a situation where the plaintiff's recovery would not depend on a determination that he was owed compensation under the LHWCA or that the defendant violated the LHWCA"); *Sample,* 771 F.2d at 1347 (distinguishing *Martin* from cases involving the "ordinary refusal

to pay" and limiting decision to "where a carrier deliberately stops payments already made, when it should have known that acute harm might follow").

**\*5** For all of the foregoing reasons, I find Plaintiff's first claim alleging insurance bad faith is preempted by the LHWCA and should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

C. *Standing to Assert a Claim Pursuant to the Colorado Consumer Protection Act*

In his second claim for relief, Nauert states ACE "committed deceptive trade practices" entitling Plaintiff to relief under the Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101, *et seq.,* by violating the following provisions of the Colorado Unfair Claims-Deceptive Practices Act ("UCDPA") set forth in C.R.S. § 10-3-1104(1)(h):

(II). Failing to acknowledge and act reasonably, promptly upon communications with respect to claims arising under insurance policies;

(VI). Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

(VII). Compelling insureds to institute litigation to recover amounts due under insurance policy by offering substantially less than the amounts ultimately recovered in the actions brought by the insured; or ...

(XIV). Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts and applicable law for denial of the claim....

Compl., at 5.

Defendants assert these allegations fail to state a claim under the CCPA because they fail to allege that ACE engaged in a deceptive trade practice as enumerated in the CCPA, and fail to allege that the conduct had a significant public impact, as required by Colorado case law. Thus, Defendants contest the first and third elements of the test for CCPA applicability as set forth in *Hall v. Walter,* 969 P.2d 224, 235 (Colo.1998) ("[t]o prove a private cause of ac-

tion under the CCPA, a plaintiff must show: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury).

The *Hall* court stated the first step in proving a CCPA claim "requires the plaintiff to establish conduct by the defendant that constitutes a deceptive trade practice."*Hall,* 969 P.2d at 224, 234. The Colorado supreme court specifically referenced § 6-1-105 as "identifying and defining deceptive trade practices."*Id.* at 234.Here, I find Plaintiff's conclusory statement, ACE "committed deceptive trade practices" because he violated provisions of the UCDPA does not meet his burden, as none of the UCDPA provisions which were allegedly violated by Defendants appears in § 6-1-105. I further find no language in the CCPA providing that a UCDPA violation constitutes a *per se* violation of the CCPA. *See Coors v. Security Life of Denver Insurance Company,* 91 P.3d 393, 401 (Colo.App.2003). Moreover, Plaintiff does not inform the Court, even after he was given the opportunity to do so in his opposition to Plaintiff's Motion, how the UCDPA violations might implicate or resemble any of the deceptive trade practices identified in § 6-1-105. Instead, Plaintiff merely copies the language contained in claim two of his complaint into his response and avers he "has gone to great lengths to satisfy the four-part test spelled out in *Coors v. Security Life of Denver Ins.,Co.,* 91 P.3d 393, 398 (Colo.App.2003) and *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142 (Colo.2003)...".[FN7] Resp., at 8. Lastly, to the extent Plaintiff relies upon *Showpiece Homes Corp. v. Assurance Co. of America,* 38 P.3d 47, 52 (Colo.2001), to support his contention he may look outside § 6-1-105 for a deceptive trade practice, I find such argument is without merit. *See Coors,* 91

P.3d at 401 (finding "*Showpiece Homes* did not hold that other conduct not enumerated in § 6-1-105 may constitute a deceptive trade practice under the CCPA").

> FN7. Although Plaintiff asserts the test enunciated in *Coors* and *Rhino Linings* only has four parts, I find it is the same five-part test stated by the *Hall* court, which requires a showing by the Plaintiff that "the defendant engaged in an unfair or deceptive trade practice."*See Coors,* 91 P.3d at 398;*Rhino Linigns USA, Inc.,* 62 P.3d at 146-47.

**\*6** In addition to showing defendant engaged in an unfair or deceptive trade practice identified in § 6-1-105, Plaintiff must also satisfy the third *Hall* element by demonstrating ACE's alleged conduct "significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property."*Hall,* 969 P.2d at 235. The Colorado supreme court outlined the relevant considerations to determine whether a challenged practice significantly impacts the public within the context of a CCPA claim. These considerations include (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future. *Martinez v. Lewis,* 969 P.2d 213, 222 (Colo.1998).

Here, even assuming *arguendo* Nauert could demonstrate ACE, his employer and the purchaser of the insurance, was a relatively unsophisticated consumer to the transaction, I find Nauert does not allege a significant impact upon the public from the alleged deceptive practices. Rather, the only alleged impact is on Nauert, who claims ACE wrongfully denied his claim on the basis it was not work-related. Pl.'s Compl., at 3. As such, I find the alleged wrong is private in nature and does not affect the public. *See Rhino Linigns USA, Inc. v. Rocky*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2085544 (D.Colo.)
**(Cite as: Not Reported in F.Supp.2d)**

*Mountain Rhino Lining, Inc.,* 62 P.3d 142 (Colo.2003) (" 'the [CCPA] is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong.' ") (internal citation omitted).

As to Plaintiff's assertion he has "buttressed the allegation of his complaint" by submitting portions of the ACE and ESIS websites and various affidavits, attached as Exhibits A through F to Plaintiff's response, I find I do not need to consider such exhibits, as they do not demonstrate the required significant public impact. At most, the affidavits of other lawyers who have been involved with lawsuits involving ACE would only demonstrate there are other instances where ACE has denied claims. As set forth in *Rhino Linings,* and *Coors, supra,* such evidence does not demonstrate a significant public impact required to establish a CCPA claim. *See Rhino Linings USA, Inc.,* 62 P.3d at 150 (no record to justify a finding of significant public impact where three of some 550 dealers were potentially affected by the alleged practice); *Coors,* 91 P.3d at 399 (overcharging on insurance premiums to 200 of 20,000 customers did not rise to the level of broad public impact).

Lastly, I find Plaintiff's reliance upon *Showpiece Homes* for the proposition that a claimant under the CCPA need not make a showing of public impact, is misplaced. *Coors* makes clear "the holding in *Showpiece Homes* is limited to the conclusion that insurance companies and insurance transactions will be covered by the CCPA if the requirements of *Hall* are met."*Coors,* 91 P.3d at 401.

**\*7** Having found Plaintiff's second claim fails to establish two necessary elements for a private cause of action under the CCPA, I find this claim should be dismissed for failure to state a claim upon which relief can be granted.Fed.R.Civ.P. 12(b)(6)

III. *CONCLUSION*

For the foregoing reasons, it is

ORDERED that Defendants' Amended Consolidated Motion to Dismiss Plaintiff's Claims for Relief and to Strike Portions of Plaintiff's Complaint, filed January 18, 2005, is GRANTED IN PART AND DENIED IN PART. It is GRANTED to the extent it requests Plaintiff's first and second claims for relief be dismissed and DENIED AS MOOT to the extent it requests certain allegations in Plaintiff's Complaint be stricken. It is

FURTHER ORDERED this case is dismissed.

D.Colo.,2005.
Nauert v. Ace Properties and Cas. Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 2085544 (D.Colo.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 1999 WL 191565 (D.Del.)
**(Cite as: 1999 WL 191565 (D.Del.))**

C

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
David E. MEGILL and Jenny Lee W. Megill, his
wife, Plaintiffs,
v.
WORTHINGTON PUMP, INC., et al., Defendants.
**No. CIV. A. 98-76-SLR.**

March 26, 1999.
Robert Jacobs, Esquire, Vincent J.X. Hedrick, II,
Esquire, of Jacobs & Crumplar, Wilmington,
Delaware, attorneys for plaintiffs.

Christian J. Singewald, Esquire, of White & Willi-
ams, Wilmington, Delaware, attorneys for defend-
ant Worthington Pump, Inc.

MEMORANDUM OPINION
ROBINSON, District J.

I. INTRODUCTION

**\*1** Plaintiffs David E. Megill and Jenny Lee W.
Megill brought suit against numerous defendants in
the Superior Court of the State of Delaware in and
for New Castle County. In their complaint, it is al-
leged that plaintiff David E. Megill was exposed to
asbestos and asbestos-containing products and that
plaintiffs were injured thereby. The complaint con-
tains allegations that Worthington Pump, Inc.
("Worthington") and other defendants were

> at all times pertinent directly or indirectly en-
> gaged in the mining, manufacturing, distribution,
> sales, licensing, leasing, installation, removal or
> use of asbestos and asbestos-containing products.
> They were also engaged in the development,
> manufacture, distribution, sales, licensing or leas-
> ing of equipment procedures and/or technology
> necessary to mine, manufacture, sell, distribute,
> install, remove and the use of asbestos and asbes-
> tos-containing products.

(D.I.2, Ex. A, 8) Plaintiffs further allege that

> [t]he defendants were negligent in conducting the

above activities in that despite the fact that the
defendants knew or should have known that as-
bestos exposure could result in serious injury,
disease and/or death they:

(a) Failed to substitute, suggest, promote or re-
quire the substitution of materials other than as-
bestos;

(b) Failed to adequately warn all the potential
victims of asbestos including the plaintiff as well
as other users, bystanders, household members
and members of the general public of the risks of
asbestos;

(c) Failed to adequately test, research and invest-
igate asbestos and/or its effects prior to sale, as to
use, and/or exposure of the plaintiff and others
similarly situated;

(d) Failed to adequately package, distribute and
use asbestos in a manner which would minimize
the escape of asbestos fibers therefore adding to
the exposure of the plaintiff and others similarly
situated;

(e) Failed to take adequate steps to remedy the
above failure, including but not limited to recall
of asbestos and asbestos products, to conduct re-
search as to how to cure or minimize asbestos in-
juries, to distribute asbestos so as to render it safe
or safely remove the asbestos now in place.

(D.I.2, Ex. A, 13)

Through preliminary discovery, defendant Wor-
thington determined that plaintiff David Megill was
exposed to its products while working on board
United States Navy vessels. Based on this informa-
tion, Worthington filed a notice of removal in Feb-
ruary 1998 pursuant to 28 U.S.C. § 1442(a)(1),
which provides in relevant part that

> [a] civil action ... commenced in a State court
> against any of the following may be removed by
> them to the district court of the United States for
> the district and division embracing the place
> wherein it is pending:

> (1) The United States or any agency thereof or
> any officer (or any person acting under that of-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 191565 (D.Del.)
**(Cite as: 1999 WL 191565 (D.Del.))**

ficer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office ....

**\*2** Plaintiffs responded thereto by filing a motion to remand. Following limited discovery, briefing was completed.

For the reasons stated below, plaintiffs' motion to remand (D.I.5) shall be granted.

## II. FACTS

The relevant facts of record are not in dispute. Defendant Worthington supplied various pumps to the U.S. Navy for use on naval vessels. As averred by John P. McAdams,

all Navy combat vessel equipment, including Worthington pumps, were built according to U.S. Navy and Military specifications under the supervision of Naval officers and civilian employees. Such equipment was approved for installation aboard these vessels exclusively by the Navy and its designated officers and employees.

(D.I.2, Ex. G, 13) According to the military specifications included in the record, asbestos was specifically mentioned twice: 1) paragraph 3.2.8 provides that "[a]ll packing and gaskets shall be in accordance with Drawing B-153" which, in turn, specifies "asbestos metallic cloth, sheet" and "asbestos metallic cloth, gasket;" and 2) paragraph 3.3.9.14 provides that "[p]ump casing joints shall be made up using compressed asbestos sheet gaskets." (*See, e.g.,* D.I. 2, Ex. D to Ex. F and Ex. A to Ex. G) The court has discerned no evidence that the specifications address the issues of product research (aside from quality assurance and performance testing), packaging, labels, and warnings as they relate to asbestos. Similarly, there is no evidence of record that Worthington's commercial products (which comport with commercial specifications) in any way deviated from the products sold to the Navy (which comported with military specifications). (D.I. 44 at 38-39, 115, 124)

## III. ANALYSIS

As noted above, defendant Worthington has removed this litigation from state to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Consequently, it is Worthington's burden to demonstrate that subject matter jurisdiction exists and that removal was proper. *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990). In this regard, the Third Circuit apparently has drawn a distinction between the removal provisions of [section] 1441, which " 'are to be strictly construed against removal and all doubts should be resolved in favor of remand," ' *id.* (quoting *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987)), and the provisions of the federal officer removal statute, which are to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc.,* 26 F.3d 1259, 1262 (3d Cir.1994). To establish removal jurisdiction under § 1442(a), a defendant such as Worthington must establish that:

(1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

**\*3** *Feidt v. Owens Corning Fiberglas Corp.,* 153 F.3d 124, 127 (3d Cir.1998). *See Mesa v. California,* 489 U.S. 121, 129 (1989).

With respect to the first of the above requirements, the court finds that, as a corporation, defendant Worthington is a "person" within the meaning of the federal officer removal statute. *See Good v. Armstrong World Indus., Inc.,* 914 F.Supp. 1125, 1127-28 (E.D.Pa.1996).

The second factor has been described as requiring "a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations." *Id.* at 1128. In *Good,* as in the case at bar, the removing defendant offered evidence that it "manufactured and supplied the equipment pursuant

to strict direction and control of the United States Navy/Department of the Navy" through "contract documents, design and construction drawings, written specifications, and personal oversight of Westinghouse's work by Naval officers and by civilian employees of the U.S. Navy." *Id.* at 1128-29. Recognizing that "the United States Navy and many individuals employed by the Navy worked with Westinghouse," the court in *Good* nevertheless concluded that Westinghouse had not demonstrated "that the Secretary of the Navy or any other federal officer directly controlled and supervised the work of Westinghouse." *Id.* The court in *Good* further found that none of the documents relied on by Westinghouse even mentioned asbestos, bolstering the court's conclusion in that case that no federal officer had "specified the use of asbestos in the design and manufacture" of the Westinghouse products at issue. *Id.* at 1130.

Following the Third Circuit's mandate to broadly construe the federal officer removal statute, the court finds that Worthington has "set forth the substance of the regulations and specifications" which required "the use of asbestos in the design and manufacture" of its pumps supplied to the Navy. *Id.* at 1130. Under these circumstances, the court concludes that defendant has adequately demonstrated that it acted "pursuant to an officer's direct orders or comprehensive and detailed regulations." *Id.* at 1128.

The third factor requires a removing defendant to show that there is a colorable federal defense to a plaintiff's claims. Defendant Worthington asserts the federal common law government contractor defense, as enunciated by the Supreme Court in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988). [FN1] The Supreme Court, in deciding when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect, held in *Boyle* that

> FN1. The record contains no evidence that the pumps sold by Worthington to the U.S.

Navy were different from those pumps sold commercially. Because the Third Circuit in *Carley v. Wheeled Coach,* 991 F.2d 1117 (3d Cir.1993), concluded that the government contractor defense should be available to all contractors who are "compelled by a contract to perform an obligation for the United States," even where a nonmilitary product is at issue, *id.* at 1120, the *Boyle* analysis is still appropriate.

[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated--*i.e.,* they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

**\*4** *Id.* at 512.

The *Boyle* analysis has been applied in failure to warn cases, such as the one at bar. *See e.g., In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806 (9th Cir.1992); *In re Joint E. & S. Dist. New York Asbestos Litig.,* 897 F.2d 626 (2d Cir.1990). Indeed, the determination of whether defendant has demonstrated a colorable defense under *Boyle* collapses into the analysis required for determining whether defendant has shown a causal connection between plaintiffs' claims and the conduct performed under color of a federal office.

The Supreme Court in *Boyle* held that the govern-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 191565 (D.Del.)
**(Cite as: 1999 WL 191565 (D.Del.))**

ment contractor defense pre-empts state tort law when "the state-imposed duty of care that is the asserted basis of the contractor's liability ... is precisely contrary to the duty imposed by the Government contract...." *Boyle,* 487 U.S. at 509 (emphasis added). As recognized by the courts above, in order to establish that *Boyle* displaces any state law duty to warn, defendant

> must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law. Moreover, it seems clear to us that *Boyle* 's requirement of government approval of "reasonably precise specifications" mandates that the federal duties be imposed upon the contractor. The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, ... and thus that the Government itself "dictated" the content of the warnings meant to accompany the product.

*In Re Joint E. & S. Dist. New York Asbestos Lit.,* 897 F.2d at 630. In *In Re New York,* as well as in *In Re Hawaii,* the respective courts found that the government in no way had prohibited the contractors from placing warnings on their asbestos-containing products. Both courts concluded that "[t]here thus existed no conflict between [the contractors'] state law duty to provide adequate warnings to the users of their [products] and the [product design] conditions imposed on them pursuant to the agreements they had entered into with the Government." *In Re Hawaii,* 960 F.2d at 812. To put the point differently, a crucial element of both the *Boyle* defense and the removal requirements is missing if the contractor fails to establish a causal connection between the conduct being supervised by the federal officer/government and the conduct deemed offensive in the plaintiff's complaint.

In the case at bar, plaintiffs assert liability based on the following conduct: 1) failure to substitute other materials for asbestos; 2) failure to warn; 3) failure to adequately research the dangers of asbestos; 4) failure to adequately package, distribute and use asbestos; and 5) failure to remedy the above failures.

Worthington has not established that the U.S. Navy prohibited it from substituting materials or otherwise changing the specifications, so long as protocol was followed. (D.I. 44 at 25-32, 41-6) Likewise, there is no evidence of record that the U.S. Navy prohibited defendant from, or otherwise directed defendant in, issuing warnings or researching and effecting product safety. Under these circumstances, the court concludes that there is no causal connection between plaintiffs' claims and the conduct performed under color of a federal office; thus, there is no colorable federal defense.

IV. CONCLUSION

**\*5** For the reasons stated, plaintiffs' motion to remand is granted.

An order shall issue.

Not Reported in F.Supp.2d, 1999 WL 191565 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CYNTHIA PARLIN, Individually, and in her    :
Capacities as Surviving Spouse of Samuel Parlin,    :
And As Executrix of the Estate of Samuel Parlin,    :
Deceased,    :      Civil Action No.
                                    :
      Plaintiffs,    :
                                      :
      v.    :      Jury of 12 Demanded
                                      :
DYNCORP INTERNATIONAL, INC., *et al.*,    :
                                      :
      Defendants.    :

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 19, 2008, I caused a copy of the foregoing Civil Cover Sheet, Notice of Removal, Corporate Disclosure Statement, and this Certificate of Service to the following by hand delivery:

> Nelli Mullen Walsh
> Ben T. Castle
> Young Conaway Stargatt & Taylor, LLP
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801

SMITH, KATZENSTEIN & FURLOW LLP

   */s/ Robert K. Beste*
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
(302) 652-8400
(302) 652-8405 (facsimile)
rkb@skfdelaware.com

*Attorneys for defendants,
DynCorp International, Inc.
DynCorp International, LLC*

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974 is required for the use of the Clerk of the Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Plaintiff Cynthia Parlin, individually and in her capacities as surviving spouse of Samuel Parlin and executrix of the estate of Samuel Parlin, Deceased

## DEFENDANTS

DYNCORP INTERNATIONAL, INCORPORATED, a Delaware Corporation, Parent of the co-defendant DYNCORP entities, formerly known as DI Acquisition Corp.; DYNCORP INTERNATIONAL LLC; a Delaware Limited Liability Corporation; and DOE ENTITIES 1-10,

(b) County of Residence of First Listed Plaintiff    Chatham County, GA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Fairfax County, VA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION
OF THE TRACT OF LAND INVOLVED.

(c) Attorneys (Firm Name, Address, and Telephone Number)

Nelli Mullen Walsh, Ben T. Castle, Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391  (302) 571-6603

Attorneys (If Known)

Robert K. Beste, Smith, Katzenstein & Furlow LLP, The Corporate Plaza, 800 Delaware Avenue, Wilmington, DE 19899, (302) 652-8400

## II. BASIS OF JURISDICTION (Place an "✓" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

**X** 3 Federal Question
(U.S Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties In Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "✓" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place Of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "✓" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander |  | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | **X** 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other |  | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property |  | ☐ 550 Civil Rights |  |  |  |
|  |  | ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN    (PLACE AN "✓" IN ONE BOX ONLY)

☐ 1 Original Proceeding

**X** 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

Appeal to District Judge from
☐ 7 Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)    Removal pursuant to 28 U.S.C. §§ 1441 and 1442

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐    UNDER F.R.C.P. 23

DEMAND $100,000

CHECK YES only if demanded in complaint:

JURY DEMAND:    **X** Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE    February 19, 2008

SIGNATURE OF ATTORNEY OF RECORD    /s/ Robert K. Beste (ID No. 3931)

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

{08038\NTS\10038622.DOC}

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.        (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U. S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U. S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place a "✓" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place a "✓" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below-, federal question actions take precedence over diversity cases.)

**III. Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place a "✓" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place a "✓" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U. S. C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII. Requested in Complaint.** Class Action. Place a "✓" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.