# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CYNTHIA PARLIN, Individually, and in her     :
Capacities as Surviving Spouse of Samuel Parlin,     :
And As Executrix of the Estate of Samuel Parlin,     :
Deceased,     :
                                 :      C. A. No. 1:08-cv-00107-UNA

    Plaintiffs,     :

                                 :      Jury of 12 Demanded
    v.     :

DYNCORP INTERNATIONAL INC., *et al.*,     :
                                 :

    Defendants.     :

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE

SMITH, KATZENSTEIN & FURLOW LLP

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell
Yoora Pak
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, DC 20005
(202) 626-7660
(202) 628-3606 (facsimile)

   /s/   *Robert K. Beste*    .
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
(302) 652-8400
(302) 652-8405 (facsimile)
rbeste@skfdelaware.com

*Attorneys for Defendants*
*DynCorp International Inc. and*
*DynCorp International LLC*

February 26, 2008

289215.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

NATURE AND STAGE OF THE PROCEEDING ..................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT ....................................................................................................................... 4

    A.    STANDARD OF REVIEW ................................................................................... 4

    B.    PLAINTIFF'S CLAIMS ARE NONJUSTICIABLE UNDER THE
        POLITICAL QUESTION DOCTRINE AND THUS THE CASE
        SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER
        JURISDICTION PURSUANT TO RULE 12(b)(1) ............................................ 5

        1.    The Political Question Doctrine Requires The Dismissal Of
            The Case Because Of Lack Of Jurisdiction ................................................. 5

        2.    A Resolution Of The Issues Raised In The Complaint Would
            Require This Court To Second-Guess The Initial Policy
            Determinations Made By The U.S. Military And The U.S.
            Department Of State And Intrude Into The Constitutionally
            Committed Authority Of The Political Branches To Determine
            Foreign Policy And Miliary Matters. ......................................................... 7

            a.    Matters involving foreign policy and military actions are
                constitutionally committed to the political branches ............................ 10

            b.    The Court would have to second guess military decisions
                regarding travel in or around Baghdad by IPLOs and
                executive decisions about the level of security to be
                provided to IPLOs to determine liability -- matters which
                are constitutionally committed to the political branches. ..................... 11

        3.    There Is A Lack Of Judicially Discoverable And Manageable
            Standards To Resolve The Issues Raised In The Complaint ..................... 16

             a.    The Complaint disregards the implications of the CIVPOL
                contract requirements regarding the standard of security for
                IPLOs and is silent on the standard to be applied by this
                Court in resolving the issues ................................................................ 16

            b.    The legislative and executive branches are providing
                greater oversight of civilian contractors in Iraq and have
                introduced measures to establish uniform standards for
                safety and security ................................................................................ 18

i

C.  VENUE IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IS IMPROPER AND THUS
THE CASE SHOULD BE DISMISSED FOR IMPROPER
VENUE PURSUANT TO RULE 12(b)(3), OR, IN THE
ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED
TO THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA
DIVISION, PURSUANT TO 28 U.S.C. § 1404(a) ........................................................20

1.  Venue Is Improper in This Judicial District and Thus the Case
Must Be Dismissed ..........................................................................................21

2.  In the Alternative, This Case Should Be Transferred to the
United States District Court for the Eastern District of Virginia,
Alexandria Division ........................................................................................23

CONCLUSION ....................................................................................................................27

289215.1

## TABLE OF AUTHORITIES

**Cases**

*Aktepe v. United States,*
    105 F.3d 1400 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998)........................................ 10

*Baker v. Carr,*
    369 U.S. 186 (1962)................................................................................................... 6, 16

*Bancoult v. McNamara,*
    445 F.3d 427 (D.C. Cir. 2006), *cert. denied*, 127 S. Ct. 1125 (2007) ................................ 10, 11

*C.R. Bard Inc. v. Guidant Corp.,*
    997 F. Supp. 556 (D. Del. 1998)................................................................................... 24

*Cottman Transmission Systems v. Martino,*
    36 F.3d 291 (3d Cir. 1994.................................................................................. 21, 22, 23

*Fisher v. Halliburton, Inc.,*
    454 F. Supp. 2d 637 (S.D. Tex. 2006) ........................................................................ 7, 11, 16

*FS Photo, Inc. v. Picturevision, Inc.,*
    48 F. Supp. 2d 442 (D. Del. 1999)........................................................................ 22, 23, 25

*Gross v. German Foundation Indus. Initiative,*
    456 F.3d 363 (3d Cir. 2006).................................................................................. 5, 6, 10

*In re: Intel Corp. Microprocessor Antitrust Litigation,*
    476 F. Supp. 2d 452 (D. Del. 2007)................................................................................. 5

*In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG Schering),*
    196 Fed. Appx. 93, 2006 WL 2162308 (3d Cir. Aug. 2, 2006).......................................... 6, 11

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986)....................................................................................................... 5

*Jumara v. State Farm Ins. Co.,*
    55 F.3d 873 (3d Cir. 1995)............................................................................................ 24

*Leroy v. Great Western United Corp.,*
    443 U.S. 173 (1979)...................................................................................................... 21

*Luftig v. McNamara,*
    373 F.2d 664 (D.C. Cir.) , *cert. denied*, 387 U.S. 945 (1967) ...................................... 11

*Padcom, Inc. v. Netmotion Wireless, Inc.*,
  2004 WL 1192641 (D. Del. May 24, 2004) ................................................ 23, 24, 25

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005), *cert. denied*,
  574 U.S. 1069 (2006) ....................................................................................... 10

*Smith v. Halliburton Co.*,
  2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) ........................... 7, 10, 13, 14, 15, 18

*Smith-Idol v. Halliburton*,
  2006 WL 2927685 (S.D. Tex. Oct. 11, 2006) ................................................... 6

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) ......................................................................................... 16

*Waste Distillation Tech., Inc. v. Pan Am. Resources, Inc.*,
  775 F. Supp. 759 (D. Del. 1991) ................................................................ 22, 25

*Whitaker v. Kellogg Brown & Root, Inc.*,
  444 F. Supp. 2d 1277 (M.D. Ga. 2006) ...................................................... 7, 8, 12

*Woodson v. Halliburton*,
  2006 WL 2796228 (S.D. Tex. Sept. 28, 2006) .................................................. 7

## Statutes

U.S. Const. art. I, § 8, cl. 1 .............................................................................. 10
U.S. Const. art. I, § 8, cl. 3 .............................................................................. 10
U.S. Const. art. I, § 8, cl. 10 ............................................................................ 10
U.S. Const. art. I, § 8, cl. 12 ............................................................................ 10
U.S. Const. art. I, § 8, cl. 13 ............................................................................ 10
U.S. Const. art. I, § 8, cl. 14 ............................................................................ 10
U.S. Const. art. II, § 2 ..................................................................................... 10
U.S. Const. art. II, § 2, cl. 1 ............................................................................ 11
28 U.S.C. § 1391(b) ......................................................................................... 21
28 U.S.C. § 1404(a) ............................................................................. 1, 2, 23, 27

iv

**Other Authorities**

Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues*, Order Code RL32419, at 1 (July 2007) ............................................................................................................12

Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong. (2007) ....................................................12, 20, 21

Transparency and Accountability in Security Contracting Act of 2007, H.R. 369, 100th Cong. (2007) ............................................................................................21

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ......................................... 1, 2, 21, 29
Federal Rule of Civil Procedure 12(b)(3) ............................................. 1, 2, 29

COME NOW, Defendants DynCorp International Inc. ("DI Inc.") and DynCorp International LLC ("DI LLC") [hereinafter collectively referred to "DynCorp"], by and though counsel, Smith, Katzenstein & Furlow LLP, and hereby move this Honorable Court for an Order pursuant to Rule 12(b)(1) and/or Rule 12(b)(3) of the Federal Rules of Civil Procedure dismissing the Complaint or, in the alternative, transferring venue to the U.S. District Court for the Eastern District of Virginia, Alexandria Division pursuant to 28 U.S.C. § 1404(a). As grounds for these Motions, DynCorp states as follows:

## NATURE AND STAGE OF THE PROCEEDING

On or about January 16, 2008, Plaintiff Cynthia Parlin, individually and in her capacities as surviving spouse and executrix of the estate of Samuel Parlin, Deceased, filed a Complaint in the Superior Court of the State of Delaware, In and For New Castle County, captioned *Parlin v. DynCorp International Inc., et al.*, Case No. 08C-01-136 FSS ("the Complaint"). In the Complaint, Mrs. Parlin alleges Survival and Wrongful Death Actions against DynCorp based upon the death of her husband, Samuel Parlin.

Pursuant to 28 U.S.C. §§ 1441 and 1442, DynCorp timely removed this matter to this Court on February 19, 2008.

## SUMMARY OF ARGUMENT

I.      This case should be dismissed for lack of subject matter jurisdiction pursuant to the political question doctrine because: (1) the resolution of the issues raised in this lawsuit are constitutionally committed to and depend upon initial policy determinations by the other branches of government; and/or (2) there is a lack of judicially discoverable and manageable standards by which this Court could evaluate the liability issues presented, *e.g.*, the adequacy of security provided to Mr. Parlin and whether the conditions in or around Baghdad, Iraq allowed

for travel.  Thus, the case must be dismissed for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

II.    This case should be dismissed for improper venue under Rule 12(b)(3) because none of the events or actions underlying this lawsuit occurred in Delaware.  In the alternative, this case should be transferred to the United States District Court for the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1404(a), because that Court is the proper forum for adjudicating Mrs. Parlin's claims.

## FACTUAL BACKGROUND

This action arises out of the death of Samuel Parlin on January 16, 2006.   Complaint, ¶ 1.  At the time of his death, Mr. Parlin was working as an International Police Liaison Officer ("IPLO") in support of the U.S. Department of State's Civilian Police ("CIVPOL") mission in Iraq.  *Id.*  Mr. Parlin was stationed at Baghdad International Airport and the Baghdad Police Academy.  *Id.*, ¶¶ 1, 28.  He died as a result of injuries that he sustained from a roadside Improvised Explosive Devise ("IED") while traveling in Baghdad.  *Id.*, ¶¶ 1, 29, 38.

In her Complaint, Mrs. Parlin alleges that DynCorp contracted with the U.S. Department of State to provide various services in support of the State Department's CIVPOL mission in Iraq.  Specifically, it is alleged that DynCorp was contractually required "to recruit, select, equip, and deploy civilian police officers in support of a CIVPOL mission to help the government of Iraq develop a modern, indigenous police force to maintain peace and stability."  Complaint, ¶ 6. As alleged in the Complaint, "the CIVPOL contracts included requirements provided by the Department of State for defendants to follow as they recruited, selected, equipped, and deployed civilian police officers from the United States."  Complaint, ¶ 14.  The contracts "also included provisions relating to employee safety, including, but not limited to, requirements that the

289215.1

general contractor and any subcontractors maintain a minimal standard of security described by the contract, and requirements that such contractors take all steps to ensure the safety of IPLOs." Complaint, ¶ 16. Notably, Mrs. Parlin does not allege that DynCorp breached its CIVPOL contract with the U.S. Department of State or that it failed to comply with any of the contractual requirements in the CIVPOL contract regarding the equipment to be provided to IPLOs, the minimal standard of security described in the contract, or the contractual requirement that contractors take all steps to ensure the safety of IPLOs. *See* Complaint, *passim*.

It is alleged that DynCorp and unidentified defendants Does 1 through 10 subcontracted with DynCorp International FZ-LLC ("DI-FZ") "to hire personnel and provide service in support of the CIVPOL contract." Complaint, ¶ 8. Mr. Parlin was allegedly employed by DI-FZ at all times relevant to this lawsuit. Complaint, ¶ 9.

Mrs. Parlin alleges that DI-FZ properly secured coverage for Mr. Parlin under the Defense Base Act ("DBA"), 42 U.S.C. § 1651. Complaint, ¶ 10. Therefore, it is alleged that DynCorp does not have "the immunities of an employer under the DBA or [the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 904(a)]." Complaint, ¶ 11. This legal conclusion is stated in conclusory fashion as a factual statement.

It is alleged, without any specifics or support, that DynCorp presented cost proposals to the U.S. Department of State "for security purchases and personnel below what they knew or should have known would be required for adequate security." Complaint, ¶ 21. It is further alleged that "such misrepresentation regarding security purchases and personnel was intentionally made to induce the [U.S.] Department of State to award defendants DYNCORP, DI LLC, and DOES the CIVPOL contracts on defendants' mistaken belief the DBA would shield them and their subcontractor from liability for any harm which resulted from intentionally

3

providing inadequate security and/or directing individuals such as Samuel Parlin to perform dangerous acts, such as travel through Baghdad." Complaint, ¶ 22.

It is alleged that DynCorp supplied Mr. Parlin with "inadequate resources and personnel," including allegedly obsolete, old, illegal or "otherwise dangerous weapons." Complaint, ¶ 23. DynCorp is also alleged to have "maintained a culture of indifference to the security of IPLOs and other individuals" and "frequently under-equipped and under-manned the 'SHARK' teams charged with travel security." Complaint, ¶¶ 24-25.

Mrs. Parlin alleges that "travel through any area of Baghdad was extremely dangerous," that "[a]ll persons affiliated with the United States in any fashion faced a high risk of attack any time they traveled through Baghdad," that "Defendants routinely failed to evaluate thoroughly the risk/benefit of proposed travel throughout Iraq," and that "Defendants routinely ordered travel even when wholly unrelated to mission success." Complaint, ¶¶ 26-27.

Mr. Parlin was allegedly on his way to a job interview when he was killed. Complaint, ¶ 31. It is alleged that Mr. Parlin, who had already voluntarily served two one-year terms in Iraq, had applied for another job. *Id.*, ¶ 29.

It is alleged that after Mr. Parlin's death, "U.S. Army Maj. Gen. Joseph Peterson, who commanded all police training in Iraq, determined Defendants' management and security practices were so inadequate that the Army needed to intervene directly to ensure the safety of IPLOs in the future." Complaint, ¶ 39.

## ARGUMENT

### A.   STANDARD OF REVIEW

When the Court reviews a facial challenge to its subject matter jurisdiction pursuant to a Rule 12(b)(1) motion to dismiss, "the Court must accept all factual allegations in the complaint

289215.1

as true and draw all reasonable inferences in favor of the plaintiff. The Court's inquiry under Rule 12(b)(1) is limited to the allegations in the complaint, the documents referenced in or attached to the complaint, and matters in the public record." *In re: Intel Corp. Microprocessor Antitrust Litigation*, 476 F. Supp. 2d 452, 455 (D. Del. 2007). The Court's subject matter jurisdiction can be raised at any time during the course of the case or *sua sponte* by the Court. *Id.* "Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of persuasion to establish that subject matter jurisdiction exists." *Id.* (citation omitted).

**B.**    **PLAINTIFF'S CLAIMS ARE NONJUSTICIABLE UNDER THE POLITICAL QUESTION DOCTRINE AND THUS THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(b)(1)**

This Court lacks subject matter jurisdiction under the political question doctrine because the issues raised in this lawsuit -- whether DynCorp provided adequate security and protective measures to Mr. Parlin and whether the conditions in or around Baghdad, Iraq allowed for travel -- implicate matters (1) that are constitutionally committed to the other branches of the government and which cannot be decided without an initial policy determination by the legislative and executive branches and (2) for which there is a lack of judicially discoverable and manageable standards. Accordingly, this case should be dismissed with prejudice.

**1.**    **The Political Question Doctrine Requires The Dismissal Of The Case Because Of Lack Of Jurisdiction**

As held by the Court of Appeals for the Third Circuit, "'[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'" *Gross v. German Foundation Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

5

289215.1

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court articulated six factors to be considered in determining the presence or absence of a nonjusticiable political question:

    (1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

    (2)    a lack of judicially discoverable and manageable standards for resolving it; or

    (3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

    (4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

    (5)    an unusual need for unquestioning adherence to a political decision already made; or

    (6)    the potential for embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, *cited and quoted by Gross*, 456 F.3d at 377; *In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG Schering)*, 196 Fed. Appx. 93, 2006 WL 2162308 (3d Cir. Aug. 2, 2006) (dismissing survivor's claim against foundation created to compensate survivors of the Holocaust based on the political question doctrine because judicial review would express a lack of respect for the Executive Branch and its longstanding foreign policy interest in resolving Nazi-era claims through intergovernmental negotiations).

"A finding of any one of the six factors indicates the presence of a political question." *Gross*, 456 F.3d at 377. Recent lawsuits brought by or on behalf of civilian contractors injured or killed in Iraq have been dismissed based upon lack of jurisdiction because of a political question. *See Smith-Idol v. Halliburton*, 2006 WL 2927685 (S.D. Tex. Oct. 11, 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving the deaths and injuries suffered by contractors who were driving in a convoy in an area

6

in Iraq known to be subject to enemy attacks and artillery fire); *Fisher v. Halliburton, Inc.*, 454 F. Supp. 2d 637 (S.D. Tex. 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving the deaths and injuries suffered by contractors who were driving in a convoy in an area of Iraq known to be subject to enemy attacks and artillery fire); *Woodson v. Halliburton*, 2006 WL 2796228 (S.D. Tex. Sept. 28, 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine after concluding that decisions about the adequacy of protection while traveling in Iraq "could not be divided into discrete parts attributable to the [contractors] and the Army"); *Smith v. Halliburton Co.*, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving death of contractor by a suicide bomb attack on a military based in Iraq); *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving a soldier's death allegedly caused by acts of a government contractor's employee). As demonstrated below, similar considerations in this case also warrant dismissal for lack of jurisdiction because of a political question.

>   2.  **A Resolution Of The Issues Raised In The Complaint Would Require This Court To Second-Guess The Initial Policy Determinations Made By The U.S. Military And The U.S. Department Of State And Intrude Into The Constitutionally Committed Authority Of The Political Branches To Determine Foreign Policy And Miliary Matters.**

This lawsuit must be dismissed for lack of subject matter jurisdiction because a resolution of the issues raised in this lawsuit clearly (1) involve policy determinations for which the legislative and executive branches have primary responsibility and (2) intrude into the constitutionally committed authority of the other branches with respect to military actions and foreign policy.

289215.1

This case is not a "'garden variety road wreck.'"  *Whitaker*, 444 F. Supp. 2d at 1282.
This lawsuit arises from the death of Mr. Parlin by a roadside IED while he was traveling in or
around Baghdad at a time when, as alleged in the Complaint, "[a]ll persons affiliated with the
United States in any fashion faced a high risk of attack any time they traveled through Baghdad."
Complaint, ¶ 26.  Without dispute, Mrs. Parlin recognizes the extremely dangerous conditions in
which her husband worked while he was in Iraq.  Complaint, ¶¶ 26, 27, 29.

At the time of his death, Mr. Parlin was working as an International Police Liaison
Officer (IPLO) and training the Iraqi police in support of the U.S. Department of State's
CIVPOL mission.  Complaint, ¶¶ 1-2.  The U.S. Department of State regards CIVPOL as a "vital
tool of U.S. foreign policy" and "decisions to deploy U.S. CIVPOL are made at the highest
levels of the federal government based on consultations among the White House, Department of
State, Department of Defense, and other agencies."  *See* Ex. 1 (a description of CIVPOL as
posted by the U.S. Department of State on its website).  In Iraq, the United States' CIVPOL
mission works in conjunction with the Government of Iraq and U.S. Central Command's
Civilian Police Assistance Training Team (CPATT) to "professionaliz[e] civil law enforcement
institutions and the Iraqi Police Service ...."  Ex. 1.

Mrs. Parlin concedes, by her own admission, that the U.S. Army "commanded all police
training in Iraq ...."  Complaint, ¶ 39.  She further concedes that the U.S. Army had control and
authority to intervene and modify DynCorp's "management and security practices."  *Id.*  Based
upon Mrs. Parlin's own admissions, it is reasonable to infer that the U.S. military had oversight
over travel security and coordination of IPLOs in Iraq.  It is also reasonable to infer based upon
the allegations in the Complaint that the U.S. military properly secured and permitted travel in

8

and around Baghdad when Mr. Parlin was killed by a roadside IED -- one of the critical liability issues in this case.

Mrs. Parlin's allegations also question the integrity of the U.S. Department of State's decision to approve the terms of and award a CIVPOL contract to DynCorp. She alleges that the U.S. Department of State negotiated and was induced to enter into a contract with DynCorp based on a cost proposal "for security purchases and personnel below what they knew or should have known would be required for adequate security." Complaint, ¶ 21-22. As alleged in the Complaint, "the CIVPOL contracts included requirements provided by the Department of State for defendants to follow as they recruited, selected, equipped, and deployed civilian police officers from the United States." Complaint, ¶ 14. The contracts with the State Department "also included provisions relating to employee safety, including, but not limited to, requirements that the general contractor and any subcontractors maintain a minimal standard of security described by the contract, and requirements that such contractors take all steps to ensure the safety of IPLOs." Complaint, ¶ 16. Because the State Department approved and executed the CIVPOL contract, it is evident that, as a matter of policy, the State Department determined that the contract requirements regarding safety were appropriate and acceptable -- the other critical liability issue in this case.

By bringing this lawsuit, Mrs. Parlin is essentially asking this Court to second-guess the policy determinations made by the U.S. military and U.S. Department of State. If this Court were to conclude, as Mrs. Parlin alleges, that Mr. Parlin should not have been traveling, the Court would have to substitute its judgment for the judgment of the U.S. military, which permitted such travel. Moreover, if this Court were to conclude, as Mrs. Parlin alleges, that Mr. Parlin was not provided with adequate security, the Court would have to substitute its judgment

289215.1

for that of the State Department, which approved the security protection provisions in the

CIVPOL contract and which was provided by DynCorp.[1]  Because of the political questions

raised by her allegations and implications, the Court does not have jurisdiction to review these

issues.

> **a.  Matters involving foreign policy and military actions are constitutionally committed to the political branches**

As recognized by the courts, "[m]atters intimately related to foreign policy and national

security are rarely proper subjects for judicial intervention." *Bancoult v. McNamara*, 445 F.3d

427, 433 (D.C. Cir. 2006), *cert. denied*, 127 S. Ct. 1125 (2007).  In addition, it is well settled that

"'the political branches of government are accorded a particularly high degree of deference in the

area of military affairs.'"  *Smith v. Halliburton Co.*, 2006 WL 2521326, at *6 (quoting *Aktepe v.*

*United States*, 105 F.3d 1400, 1403 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998)).

Unquestionably, matters involving military decisions and foreign policy[2] are

constitutionally committed to the political branches of our federal government and often become

intertwined:

---

[1] As previously noted, there is no allegation in the Complaint that DynCorp was in breach of any of its contractual obligations to the State Department under CIVPOL.

[2] The constitutional commitment of foreign policy to the Executive and Legislative Branches can be found in Article I, Section 8, Clause 1 ("the Congress shall have the Power To . . . provide for the Common Defence"), Clause 3 ("To regulate commerce with foreign nations"), and Clause 10 ("To define and punish Piracies and Felonies committed on the High Seas and Offenses against the Law of Nations"), among others. U.S. Const. art. I, § 8, cls. 1, 3, and 10.  Moreover, Article II, Section 2, of the U.S. Constitution vests the President with authority to conduct foreign affairs, stating that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, . . . [and] appoint Ambassadors, other public Ministers and Consuls." U.S. Const. art. II, § 2; *Bancoult*, 445 F.3d at 433-434 (citing *Schneider v. Kissinger*, 412 F.3d 190, 194-195 (D.C. Cir. 2005), *cert. denied*, 574 U.S. 1069 (2006)).  *Accord Gross*, 456 F.3d at 387 (holding that "even though the Executive's powers in foreign affairs do not enjoy any textual detail within the Constitution itself, in foreign affairs the President has a degree of independent authority to act" (citations and quotations omitted)).

289215.1

The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch.  U.S. Const. art. II, § 2, cl. 1.  Additionally, the Constitution gives the power "[t]o raise and support Armies ... provide and support a Navy [and to] make Rules for the Government Regulation of the land and naval Forces" to Congress.  *Id.* at § 8, cls. 12-14.  "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense."  ...  Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. ...  "Not only does resolution of [foreign policy] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand [a] single-voiced statement of the Government's views."

*Fisher v. Halliburton*, 454 F. Supp. 2d at 640 (case citations omitted).  *See also In re: Nazi Era Cases*, 196 Fed. Appx. at 99 (stating that "we are mindful of the Supreme Court's emphasis on preserving the capacity of the President to speak for the Nation with one voice in dealing with other governments . . . .") (citations and quotations omitted).  "Thus, 'the fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matter are plainly the exclusive province of Congress and the Executive.'"  *Bancoult*, 445 F.3d at 433 (quoting *Luftig v. McNamara*, 373 F.2d 664, 665-666 (D.C. Cir.), *cert. denied*, 387 U.S. 945 (1967) (per curiam)).  Accordingly, "courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence." *Fisher*, 454 F. Supp. 2d at 641.

      b.     **The Court would have to second guess military decisions regarding travel in or around Baghdad by IPLOs and executive decisions about the level of security to be provided to IPLOs to determine liability -- matters which are constitutionally committed to the political branches.**

To further a vital foreign policy initiative, the U.S. Department of State contracted with

11

DynCorp to recruit civilian law enforcement personnel[3] for its CIVPOL mission in Iraq,[4] which

includes training the Iraqi Police Service in conjunction with the Government of Iraq[5] and U.S.

Central Command's CPATT. *See* Complaint, ¶ 13; Ex. 4. This interaction between the U.S.

Government's foreign policy initiatives and U.S. military operations in Iraq underscores the

difficulty of judicially reviewing the issues raised in this lawsuit. Given the interplay between

the military powers and foreign policy in Iraq, resolving issues regarding the adequacy of

security measures provided to civilian contractors and acceptable travel conditions for civilian

contractors in Iraq may require the Court to assess the "wisdom of the [government's] strategic

and tactical decisions" to use civilian contractors to carry out such a vital foreign policy,

especially in countries that involve hostile military operations. *Whitaker*, 444 F. Supp. 2d at

1282 (holding that such evaluation is a "classic political question over which this County has no

---

[3] The unprecedented use of civilian contractors to compliment and supplement the U.S. armed forces in Iraq has recently garnered intense scrutiny from the legislative and executive branches. In that regard, it has been observed that "the United States is relying heavily, apparently for the first time in an unstable environment, on private firms to supply a wide variety of security services. Especially given a shortage of U.S. troops, private security contractors are widely viewed as vital to U.S. efforts to stabilize and reconstruct Iraq." Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues*, Order Code RL32419, at 1 (July 2007) [hereinafter referred to as "CRS Report"]. It has also been observed that "United States Government agencies … are increasingly relying on private contractors to perform duties, including the provision of security and other traditionally military and governmental functions, in Iraq … and other contingency operations." *See* Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong., § 2(1) (2007). Thus, it is accepted that the U.S. Government has determined that, as a matter of policy, the use of civilian contractors in military operation zones, such as Iraq, is appropriate and even necessary.

[4] By contracting with CIVPOL, DynCorp furthers and implements U.S. foreign policy in some of the most dangerous and hostile places in this world. IPLOs such as Mr. Parlin are sent abroad to dangerous locations such as Iraq, Afghanistan, and Kosovo to provide police training, most times in conjunction with a U.S. or international military presence. *See* Ex. 1.

[5] There are no allegations in the Complaint about the nature of the relationship between the United States and Iraq with respect to the CIVPOL mission in Iraq. To the extent that there might be a contractual or treaty agreement regarding CIVPOL's presence in Iraq, this further demonstrates the nonjusticability of the questions raised in this case.

12

jurisdiction"). In other words, this Court may have to second-guess the policy determinations made by the U.S. Government regarding the adequacy of security measures provided to civilian contractors and acceptable travel conditions for civilian contractors in Iraq.

To that end, it is clear that the issues in this case could not be resolved without undermining "an initial policy determination of a kind clearly for nonjudicial discretion." *Smith*, 2006 WL 2521326, at *6. For instance, in *Smith v. Halliburton*, a food service contractor was killed when a suicide bomber walked into the dining facility at Forward Operating Base in Mosul, Iraq, and set off explosives. *Id.* at *1. The contractor's family sued the government contractor, alleging, *inter alia*, that the contractor did not provide adequate security to the dining facility and failed to take adequate precautions to make the dining facility safe from attacks. *Id.* The key issue in that case was who had responsibility for security at the dining facility. *Id.* at *2. After limited discovery, overwhelming evidence was presented which demonstrated that the U.S. military was responsible for security. *Id.* at *3-4.

The Court in *Smith* recognized that political questions are raised when an injury to a contractor occurs while performing functions subject to the military's orders and regulations. *Id.* at *5. The court determined that:

> Even if [the contractors] had some responsibility for implementing force protection measures promulgated by the miliary, the court would still be called upon to examine the military's decision-making in many respects, including determining whether the military gathered adequate intelligence regarding the threat of terror attacks, whether it conveyed this threat to defendants, how the military planned for and implemented base access measures, and whether the implementation of force protection measures was reasonable when measured against the risk assessment level.

*Id.* at *5. The court in *Smith* further realized that:

> Allowing this action to proceed would require the court to substitute its judgment on military decision-making for that of the branches of government entrusted with this task. To determine whether the force protection in place was adequate[,] the

intelligence gathering, risk assessment, and security measures implemented by the
military at FOB Marez would have to be examined. Because the suicide bomber
managed to enter the base, the court would also have to examine base perimeter
security.

*Id.* at *6. The court determined that a judicial determination about the adequacy of safety and

protective measures would "intrude into critical areas reserved to the Legislative and Executive

Branches of government by the Constitution," that there was a lack of judicially discoverable and

manageable standards to resolve these issues, and that the issues could not be resolved without

an initial policy determination "of a kind clearly not appropriate for judicial determination." *Id.*

at *6 Thus, the court in *Smith* dismissed the action in its entirety.

The issues raised in this case are very similar to the issues raised in *Smith*. Mrs. Parlin

alleges that inadequate safety and security measures caused her husband's death. Complaint, ¶¶

22-25. She also alleges that he should not have been traveling in or around Baghdad.

Complaint, ¶¶ 26-27, 37. DynCorp did not solely control these decisions. As conceded in the

Complaint, the U.S. military "commanded all police training in Iraq" and had oversight over

IPLO "management and security practices." Complaint, ¶ 39.[6] In addition, as acknowledged in

the Complaint, there are contractual requirements specifying the kind of safety gear to be

provided to IPLOs like Mr. Parlin. Complaint, ¶¶ 14, 16.

To make a judicial determination about the adequate level of security and whether Mr.

Parlin should or should not have been traveling in or around Baghdad, this Court would have to

examine a multitude of strategic foreign policy and military decisions regarding the presence of

civilian contractors in Iraq. To determine that travel by IPLOs should not have been allowed, as

alleged in the Complaint, the Court would have to second guess the U.S. military's decisions

---

[6] It should also be noted that there is no allegation in the Complaint that DynCorp was
responsible for securing the roads in and around Baghdad and ridding the roads being traveled by
IPLOs of all dangers, such as IEDs, suicide bombers, grenades, or rockets, among others.

289215.1

about allowing civilian contractors to travel in or around Baghdad and the military's efforts to secure hostile areas to allow for safe travel by civilian contractors. In addition, the Court may undermine the State Department's approval of safety requirements (as provided in the CIVPOL contract, *see* Complaint, ¶ 14, 16) if the Court reviewed and concluded that Mr. Parlin was not adequately provided with proper safety gear. The Court may also raise questions about the propriety of the U.S. Government's decisions to deploy civilian contractors to train the national police force in conjunction with the U.S. military and foreign governments in countries with hostile military operations. By resolving these issues, the Court would be "substitute[ing] its judgment for that of the [government] on the issue of whether adequate ... protection measures were in place." *Smith*, 2006 WL 2521326, at *6. As recognized by courts, "[p]olicy determination involving ... protection measures in a hostile area of Iraq are clearly not appropriate for judicial review." *Id.* at *6.

In summary, this Court's review and assessment of whether DynCorp provided adequate security and protective measures to Mr. Parlin and whether the conditions in or around Baghdad, Iraq allowed for travel would intrude upon the legislative and executive branches' military and foreign policy powers. The issues raised in this case are not justiciable because the Court's resolution of the claims necessarily implicate matters that are constitutionally committed to the discretion of the legislative and executive branches of our government and because any resolution would depend on the policy determinations by the other branches regarding oversight, management and administration of the growing use of contractors in hostile military operation zones. Accordingly, the Court should dismiss the entire Complaint based upon lack of subject matter jurisdiction pursuant to the political question doctrine.

**3.      There Is A Lack Of Judicially Discoverable And Manageable Standards To Resolve The Issues Raised In The Complaint**

Dismissal under the second *Baker* factor is warranted here because there is a lack of judicially discoverable and manageable standards to resolve the issues in this case. As recognized by the courts, "'[o]ne of the most obvious limitations [on the court] is that judicial action must be governed by standard, by rule.'" *Fisher*, 454 F. Supp. 2d at 641-642 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004)) (emphasis in original).

**a.      The Complaint disregards the implications of the CIVPOL contract requirements regarding the standard of security for IPLOs and is silent on the standard to be applied by this Court in resolving the issues**

In this case, Mrs. Parlin alleges that DynCorp:

a.      Failed to provide basic security to IPLOs;

b.      Failed to purchase, maintain, and make available adequate weaponry, armor, vehicles, and other supplies for their subcontractors' employees;

c.      Failed to establish and/or abide by a (sic) reasonable precautions to minimize the travel of individuals and to ensure their safety during such travel;

d.      Unreasonably ordered Samuel Parlin to travel across Baghdad to attend an interview that could have been conducted remotely;

e.      Unreasonably ordered Samuel Parlin to enter into extreme danger to "interview" for a position that had already been filled; and

f.      Failed to provide adequate security for Samuel Parlin as he traveled through Baghdad, including failing to provide adequate weaponry, armor, and/or personnel.

Complaint, ¶ 40.

Mrs. Parlin makes these allegations without regard to the U.S. Department of State's contractual requirements. As alleged in the Complaint, the CIVPOL contractor requires a minimal standard of security and requires contractors to "take all steps necessary to ensure the safety of IPLOs." Complaint, ¶¶ 14, 16. Nowhere in the Complaint does she allege that

16

DynCorp did not comply with its contractual obligations or that it breached its contract with the U.S. Department of State. *See* Complaint, *passim*. Rather, she contends, without any substantiation, that DynCorp deliberately presented "a cost for security purchases and personnel below what they knew or should have known would be required for adequate safety" that the State Department accepted, which DynCorp denies. *Id.* She does not, however, provide any guidance as to the level "required for adequate safety."

Accordingly, to resolve these issues, the Court would have to undertake a comprehensive review of all CIVPOL activities and determine what constitutes an adequate level of "basic security" for contractor employees in Iraq. In doing so, the Court will be required to evaluate and possibly supersede or void the terms of the contract approved by the U.S. Department of State regarding the provision of certain safety and protective equipment to contract personnel if the Court determines that the contract specified level of protection is inadequate compared to its own assessment. The Court would also have to determine the kinds of weapons that should have been provided for adequate protection against IED, suicide bombings, artillery or other attacks in Iraq, how much armor should have been provided to protect against various kinds of attacks in Iraq, and what kind of vehicles should have been provided to contractor employees working and traveling in Iraq to protect against IED and other attacks in Iraq. In addition, to determine what constitutes "reasonable" travel safety precautions in Iraq in light of the ongoing hostilities in Iraq, the Court would have to assess all potential threats on Iraqi roads and bridges and determine under what conditions contractors should be permitted to travel. The Court may have to evaluate intelligence gathering from all sources, including the military, about potential threats and how warnings about potential threats are disseminated. The Court would then have to evaluate the effectiveness of any safety or security measures against threats that may arise while

17

traveling in Iraq and determine whether such measures would have been "reasonable." With all due respect, as acknowledged by some courts in other cases alleging tort liability by government contractors in Iraq, "[c]ourts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances." *Smith*, 2006 WL 2521326, at *6.

        **b.**      **<u>The legislative and executive branches are providing greater oversight of civilian contractors in Iraq and have introduced measures to establish uniform standards for safety and security</u>**

In efforts to provide greater oversight to the unprecedented number of civilian contractors in Iraq and other countries involved in hostilities, the legislative and executive branches have recently undertaken a number of steps to provide greater oversight and to establish more uniform standards applicable to contractors.

For example, the U.S. Departments of Defense and State entered in a "Memorandum of Agreement (MOA) between the Department of Defense and the Department of State on USG Private Security Contractors"[7] on December 5, 2007 (a copy of which is attached hereto as Exhibit 2). These two executive agencies have determined that they should coordinate efforts to "ensure that personnel working under contracts with other federal agencies or as subcontractors on [Department of State] or [Department of Defense] contracts are … covered by the policies and procedures developed under this MOA." Exhibit 2 at 2. To that end, the U.S. Departments of Defense and State agreed to develop federal laws and promulgate federal regulations addressing some or all of the issues raised in this Complaints, including unity of effort, rules for the use of force, authority to process and carry firearms, movement coordination and control, serious incident response and investigation, contract management and language, and legal accountability (under U.S. law). *See* Exhibit 2, Annex A. The MOA further provides that the

---

[7] A copy of this MOA can be found at
http://www.defenselink.mil/pubs/pdfs/Signed%20MOA%20Dec%205%202007.pdf.

289215.1

executive agencies will coordinate agency oversight and deployment of private security contractors, and have agreed to "jointly develop, implement, and follow core standards, policies, and procedures for the accountability, oversight, and discipline of [private security contractors]." *See* Exhibit 2 at 1.

In addition, a number of bills have recently been introduced to establish federal standards regarding the amount of protection to be required for contractors. For instance, on February 16, 2007, Senator Barack Obama (D-IL) introduced the Transparency and Accountability in Military and Security Contracting Act of 2007, which directs the Chairman of the Joint Chiefs of Staff to issues rules of engagement for contractor personnel and to establish hiring, training and equipment standards for private contractors. *See* Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong., § 2(1) (2007). Under this bill, agencies would be required to "issue guidance (appropriate for the agency) on equipment used for private security functions under covered contracts with the agency, including appropriate uniforms and levels of body armor and equipment armor, and a recommended list of re-armorers and weapons and armor manufacturers for complying with such guidelines." *See id.* at § 6(b)(2). This bill would also require coordination of communications between U.S. Armed Forces and contractor personnel, including, "as appropriate, communicate up-to-date information about the security environment that may be relevant to contractor personnel." *Id.* at § 6(c)(2)(F). A similar bill, sponsored by Representative David Price (D-NC), was introduced in the House of Representatives on January 10, 2007, and has been referred to the House Subcommittee on Crime, Terrorism, and Homeland Security. *See* Transparency and Accountability in Security Contracting Act of 2007, H.R. 369, 100th Cong., § 3 (2007).

In short, the only standards regarding security available at this time are found in the CIVPOL contract, and it requires DynCorp to provide a minimal level of security and take steps necessary to provide protection, which it did. *See* Complaint, ¶¶ 14, 16. Mrs. Parlin has not pointed to any other applicable standards and political efforts to implement more uniform standards for the protection of civilian contractors are only at the beginning stages. This lack of judicially manageable and discoverable standards highlights the difficulty, if not impossibility, of this Court's task to determine whether Mr. Parlin was provided with adequate security and protection when traveling in Baghdad. Accordingly, the Complaint should be dismissed in its entirety for lack of jurisdiction based upon the political question doctrine.

For all of the foregoing reasons, DynCorp respectfully submit that the claims raised by Mrs. Parlin in her Complaint are nonjusticiable under the political question doctrine and that this case should be dismissed in its entirety pursuant to Rule 12(b)(1) of the Federal Rules for lack of subject matter jurisdiction.

**C.    VENUE IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IS IMPROPER AND THUS THE CASE SHOULD BE DISMISSED FOR IMPROPER VENUE PURSUANT TO RULE 12(b)(3), OR, IN THE ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION, PURSUANT TO 28 U.S.C. § 1404(a)**

While DynCorp acknowledges that this lawsuit may be brought in this Court in light of DynCorp's incorporation or formation under the laws of the State of Delaware, DynCorp respectfully submits that this Court is not the proper forum for this lawsuit because none of the events or actions underlying this lawsuit occurred in Delaware. Accordingly, DynCorp submits that this case should be dismissed for improper venue.

289215.1

1.    **Venue Is Improper in This Judicial District and Thus the Case Must Be Dismissed**

As demonstrated below, this Court is not the most appropriate forum for adjudication of her claims because none of the events or omissions giving rise to Mrs. Parlin's claims in this lawsuit occurred in Delaware. Accordingly, this case should be dismissed for improper venue.

Venue in a civil action "not founded solely on diversity of citizenship may . . . be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, . . . or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b) (emphasis added). The intent of the venue statute, 28 U.S.C. § 1391, is to prevent improper forum shopping by a plaintiff. *See Leroy v. Great Western United Corp.*, 443 U.S. 173, 185 (1979) (holding that the venue statute was not intended by Congress "to give [to plaintiff] an unfettered choice among a host of different districts"). As acknowledged by the Court of Appeals for the Third Circuit, the venue statute favors the defendant in a venue dispute. *Cottman Transmission Systems v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). The statute requires that the facts upon which the plaintiff predicates venue to be substantial, and "is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Id.* Thus, "[e]vents or omissions that might only have some tangential connection with the dispute in litigation are not enough." *Id.*

The test for determining proper venue "is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim' . . . . Although the statute no longer requires a court to select the 'best' forum, . . . the weighing of 'substantial' may at times seem to take on that flavor." *Id.; St. Clair Intellectual Prop.*

21

*Consultants, Inc. v. Mirage Sys., Inc.*, 419 F. Supp. 2d 620, 623 (D. Del. 2006). For the following reasons, Mrs. Parlin cannot meet her burden of establishing that venue is proper in this Court.

DynCorp acknowledges that they are incorporated or formed under the laws of the State of Delaware and that this lawsuit may be filed in this Court. *See Waste Distillation Tech., Inc. v. Pan Am. Resources, Inc.*, 775 F. Supp. 759, 766 (D. Del. 1991) (holding that "corporate citizens of Delaware, both the corporation and its management, must anticipate the possibility of being hauled into court here"). However, this Court is not the proper forum for adjudication of Mrs. Parlin's claims because none of the events or omissions giving rise to her claims occurred in Delaware. *See Cottman*, 36 F.3d at 294; *FS Photo, Inc. v. Picturevision, Inc.*, 48 F. Supp. 2d 442, 449-450 (D. Del. 1999) (transferring case to Eastern District of Virginia even though defendant was Delaware corporation).

Mrs. Parlin resides in the State of Georgia -- not Delaware. Complaint, ¶ 2. Mr. Parlin was employed in Iraq -- not Delaware. Complaint, ¶¶ 1-2. Mr. Parlin was traveling on an Iraqi road when he sustained fatal injuries by an IED purported planted by Iraqi insurgents. Complaint, ¶¶ 1-2, 38. Mr. Parlin died in Iraq -- not Delaware. *Id.* Although the DynCorp defendants are incorporated or formed in Delaware, none of Mrs. Parlin's allegations relate to the corporate, financial, or tax issues relevant to the formation of the DynCorp defendants in Delaware. *See Complaint passim.* Moreover, at the time of the IED attack on the Iraqi road that killed Mr. Parlin, DynCorp had their principal places of business, as alleged in the Complaint, in Virginia or Texas -- not Delaware. Complaint, ¶¶ 3-4. As these facts clearly demonstrate, except for DynCorp's incorporation or formation in this state, Mrs. Parlin has not provided sufficient justification that this Court is the best forum for her claims.

289215.1

In short, because none of the events or omissions giving rise to Mrs. Parlin's claims in this lawsuit occurred in Delaware, this Court is not the most appropriate forum for adjudication of her claims. *See Cottman*, 36 F.3d at 295-296 (holding that venue is improper because the significant events and omissions in another state); *St. Clair*, 419 F. Supp. 2d at 623 (dismissing Complaint based on improper venue because there were "no events or omission that have transpired in Delaware that are relevant to determining" the issues presented). Consequently, DynCorp submits that the Complaint should be dismissed because of improper venue pursuant to Rule 12(b)(3) of the Federal Rules. *See FS Photo*, 48 F. Supp. 2d at 450 (noting that a transfer would not to "be in the interest of justice . . . if blatant forum shopping led the plaintiff not to bring the action in a proper district in the first instance" (citations and quotations omitted)).

2.  **In the Alternative, This Case Should Be Transferred to the United States District Court for the Eastern District of Virginia, Alexandria Division**

In the alternative, the private and public interests weigh in favor of transferring this case to the United States District Court for the Eastern District of Virginia, Alexandria Division.

A district court has the discretion "to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice." *Padcom, Inc. v. Netmotion Wireless, Inc.*, 2004 WL 1192641, at *7 (D. Del. May 24, 2004). A court may transfer a civil action to a more appropriate forum in accordance with 28 U.S.C. § 1404(a)[8] if two conditions are satisfied: (1) the action could have been brought in the transferee district; and (2) if the convenience of the parties and witnesses and the interests of justice would be best served in the transferee district. *C.R. Bard Inc. v. Guidant Corp.*, 997 F. Supp. 556, 561 (D. Del.

---

[8] 28 U.S.C. § 1404(a) provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

1998).   The moving party has the burden of establishing the need for transfer.  *Id.* (citations

omitted).

In determining whether an action should be transferred to another district, the reviewing

court must consider the three enumerated factors listed in Section 1404(a) -- convenience of the

parties, convenience of the witnesses, or interests of justice -- as well as "the private and public

interests protected by the language of § 1404(a)."  *Id.*  The private interests include:

> (1) Plaintiff's forum preference as manifested in the original choice;
>
> (2) Defendant's preference;
>
> (3) Whether the claim arose elsewhere;
>
> (4) The convenience of the parties as indicated by their relative physical and financial condition;
>
> (5) The convenience of the witnesses - but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and
>
> (6) Location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Padcom*, 2004 WL 1192641, at *7 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d

Cir. 1995)).  The public interests include:

> (1) The enforceability of the judgment;
>
> (2) Practical consideration that could make the trial easy, expeditious or inexpensive;
>
> (3) The relative administrative difficulty in the two fora resulting from court congestion;
>
> (4) The local interest in deciding local controversies at home;
>
> (5) The public policies of the fora; and
>
> (6) The familiarity of the trial judge with the applicable state law in diversity cases.

*Id.*

289215.1

In performing this analysis, the reviewing Court affords deference to the plaintiff's choice of forum "as long as a plaintiff has selected the forum for some legitimate reason." *Padcom*, 2004 WL 1192641, at *7 (citations omitted). Thus, the Court does "not blindly prefer the plaintiff's choice of forum." *Waste Distillation*, 775 F. Supp. at 764. Less deference is accorded a plaintiff's choice of forum "where the plaintiff has not brought suit on its 'home turf' because the interest in litigating in a convenient forum is reduced." *Id.*

The determination with respect to the first § 1404(a) factor involves a "mechanical analysis of subject matter and personal jurisdiction and proper venue." *Id.* at 762. This determination is limited to the facts and circumstances existing at the time of the filing of the lawsuit. *Id.* at 761. Defendants DynCorp International Inc. and DynCorp International LLC now have their principal place of business and/or conduct business in Virginia. *See* Ex. 2 (Declaration of H. Montgomery Hougen), ¶¶ 5-6. Thus, the DynCorp defendants do not contest that the Eastern District of Virginia would have personal jurisdiction over them. As for subject matter jurisdiction, DynCorp has removed the state court action to this federal District Court based on federal question jurisdiction as well as the federal officer removal statute. Thus, the Eastern District of Virginia would have the same subject matter jurisdiction as this Court.[9] *See FS Photo*, 48 F. Supp. 2d at 449 (transferring case from District of Delaware to the Eastern District of Virginia even though defendant was Delaware corporation). Thus, Plaintiffs could, and should, have brought this lawsuit in the Eastern District of Virginia.

With regard to the second prong of the venue transfer analysis, Mrs. Parlin's choice of forum in this case is not entitled to any deference because there is no legitimate or rational basis

---

[9] DynCorp's statement regarding subject matter jurisdiction is not a waiver of any of its challenges to subject matter jurisdiction, including whether the claims by Plaintiffs are justiciable under the political question doctrine.

for bringing this lawsuit in Delaware. As demonstrated above, Mrs. Parlin has not pled any facts establishing that any of the events or omissions giving rise to her claims occurred in Delaware. Moreover, because Mrs. Parlin resides in Georgia, she is not on her "home turf" and she cannot assert that litigating her case in this Court is more convenient than litigating this case in the Eastern District of Virginia.

The private interests and the convenience of the parties weigh in favor of transferring this action to the Eastern District of Virginia. DynCorp now has its principal place of business in Virginia and regularly conducts business in Virginia. In addition, to the extent that any actions or decisions relevant to Plaintiffs' liability allegations were made in the United States, they were most likely made in Virginia or Texas. Moreover, the Eastern District of Virginia is more convenient for government witnesses to the extent that any of the allegations involve the U.S. Departments of State and/or Defense, which are located in or nearby Washington, D.C. Thus, more of the necessary and relevant witnesses and documents will be found in or near Virginia -- while no such documents or witnesses will be found in Delaware.

The public interests and the interests of justice also weigh in favor of transferring this case to the Eastern District of Virginia. A judgment entered by the Eastern District of Virginia would be enforceable in any federal court. Key witnesses and documents will more likely be located in or near Virginia than in Delaware. There is no local interest in adjudicating this case in this Court because this is not a local controversy. Mrs. Parlin does not reside in Delaware and none of the events or omissions giving rise to Mrs. Parlin's claims occurred in Delaware. On the other hand, DynCorp has its principal places of business in Virginia and the government contract underlying these events with the U.S. Department of State has a much closer connection to Virginia than Delaware.

26

In short, both the private and public interests weigh heavily in favor of transferring this case to the Eastern District of Virginia. Consequently, DynCorp requests that this Court exercise its discretion pursuant to 28 U.S.C. § 1404(a) and transfer this case to the Eastern District of Virginia, Alexandria Division.

## CONCLUSION

In summary, for the foregoing reasons, DynCorp respectfully submits that this case should be dismissed in its entirety for lack of subject matter jurisdiction based on the political question doctrine under Rule 12(b)(1). In the alternative, DynCorp respectfully submits that this case should be dismissed in its entirety for improper venue under Rule 12(b)(3), or, in the alternative, that this case should be transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a).

SMITH, KATZENSTEIN & FURLOW LLP

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell
Yoora Pak
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, DC 20005
(202) 626-7660
(202) 628-3606 (facsimile)

/s/   *Robert K. Beste*             .
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
(302) 652-8400
(302) 652-8405 (facsimile)
rbeste@skfdelaware.com

*Attorneys for Defendants*
*DynCorp International Inc. and*
*DynCorp International LLC*

February 26, 2008

27

# EXHIBIT 1



U.S. DEPARTMENT *of* STATE

Fact Sheet
Bureau of International Narcotics and Law Enforcement Affairs
Washington, DC
July 12, 2007

## The United States and International Civilian Policing and the Rule of Law (CIV)

*[For more information on the CIVPOL program, please contact CIVPOL@state.gov]*

**Background**

A cornerstone of stable and democratic nations is a criminal justice system in which citizens show broad acceptance and voluntary compliance with the law. As part of the U.S. Government's mission to support the emergence of stable democracies, especially in areas which have suffered from many years of civil strife, we support programs to help institutionalize a sustainable criminal justice sector, instill public trust in the Rule of Law and protect human rights.

Our support, often in cooperation with other nations or international bodies, is designed to promote the following institutions:

- Civilian police/law enforcement that prevents, detects and investigates violations of criminal law to identify, apprehend and assist in the prosecution of persons suspected of such violations.
- Public prosecutors to review evidence gathered in a case, make determinations regarding the appropriateness of initiating a criminal prosecution and presenting cases to the courts for adjudication.
- Courts that administer cases, set initial adjudication of guilt or innocence and conduct appellate review of cases for final determinations of guilt or innocence.
- Prisons or correctional facilities, designed to incarcerate and reform those convicted of criminal offenses.

In many countries in which a stabilization and reconstruction mission is being mounted, previous armed conflict left the criminal justice system dysfunctional or even completely failed. In such cases, crime and public disorder are likely to increase, the government cannot provide efficient services, and the economy cannot flourish. Without a strong and functioning criminal justice system - prosecutors to prosecute arrested persons, courts to try them, and prisons to incarcerate them -the police may by default apply "street justice" as judge, jury and jailer while human and civil rights are ignored and violated.

The prompt restoration of public order by non-repressive means, with an approach that focuses on the police, courts and prisons, is an essential component of post-conflict stabilization.

**The CIVPOL Mission**

Civilian police (CIVPOL) from the United States and more than 50 other countries are deployed around the globe in support of international post-conflict stabilization and redevelopment operations. Their presence promotes peace and stability in areas recovering from conflict, and their efforts to reform and/or develop indigenous police forces into modern, democratically-oriented law enforcement services helps to ensure that peace and stability can be sustained even after international peacekeepers depart.

Many CIVPOL programs are sponsored by the United Nations (UN), but regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE), or coalitions of interested countries, sponsor others.

The UN launched its first CIVPOL mission in the Congo in 1960, but CIVPOL did not become a major component of peacekeeping operations until the end of the Cold War. Since then, police have become an integral component of what were originally military peacekeeping operations.

CIVPOL missions vary. In some missions, officers perform typical law enforcement functions (patrol, investigation, etc.) in the absence of effective and fair indigenous police forces. In others, CIVPOL may be responsible for rebuilding, monitoring, and/or advising local police as they make the transition to democratic policing. In this capacity, CIVPOL may be directly involved in the entry-level, supervisory and managerial training and organizational development activities for a host country's police.

**The United States and CIVPOL**

The United States participated in its first CIVPOL operation in 1994 in Haiti. The United States led the multinational military intervention to restore the elected government of Haiti and sponsored a 20-country International Police Monitor (IPM) mission to help provide public security, maintain the rule of law, and establish a new Haitian National Police Service. The IPM mission transitioned to the UN in March 1995.

CIVPOL have become a vital tool of U.S. foreign policy. Only 50 American police officers participated in the Haiti CIVPOL mission in 1994. Since then, more than 7,000 experienced U.S. law enforcement officers and experts have participated in CIVPOL missions in Bosnia-Herzegovina (1996-2002); the Eastern Slavonia region of Croatia (1996-2003); Jericho (2002); the Palestinian Authority (2003); Sierra Leone (2003-2004); East Timor (1999-2007); OSCE Headquarters in Vienna (2002-2004); Haiti (1996-2000; 2004-present); Kosovo (1999-present); Serbia & Montenegro (2001-present); Macedonia (2002-2004); Afghanistan (2002-present); Iraq (2003-present); Sudan (2005-present); and Liberia (2003-present). Today, more than 1,600 U.S. police are deployed along with their international counterparts.

This dramatic climb in U.S. participation in CIVPOL missions reflects the U.S. Government's recognition of the importance of criminal justice to restoring stability in post-conflict situations. While international military forces often are necessary to restore a secure environment following a major conflict, they generally are not, in themselves, sufficient for the long-term reestablishment of civil order where local institutions have broken down. CIVPOL not only assist international military forces in the short term by addressing and resolving civilian law enforcement issues, but also help develop the local democratic policing institutions that ultimately will be

responsible for integrating with the host country's criminal justice system (prosecutor, courts and correctional services) and providing law and order functions once the military and CIVPOL depart.

**CIVPOL Rule of Law Programs**

Initial missions focused almost exclusively upon indigenous civilian police and placed little, if any, emphasis on other aspects of the host country's criminal justice system. It soon became apparent that reform and developmental efforts were not as successful as they should have been, because other criminal justice components such as the prosecutors, courts and correctional organizations had not received commensurate support. Those elements needed reform or development assistance to function at a level equivalent to the police.

Accordingly, the CIVPOL Office within the Bureau of International Narcotics and Law Enforcement Affairs (INL) was re-titled Office of Civilian Police and Rule of Law (CIV) and charged with working with all criminal justice agencies in post-conflict environments rather than simply the civilian police. CIV now employs senior technical specialists in prosecutorial, judicial and correctional development as well as in the civilian police field. Wherever possible, CIV plans, develops and implements post-conflict reform or redevelopment programs that contain elements addressing each criminal justice system component to maintain equilibrium among all.

Decisions to deploy CIVPOL and/or Rule of Law programs in a specific mission are made at the highest levels of the federal government based on consultations among the White House, Department of State, and other agencies. The responsibility for managing U.S. CIVPOL, Rule of Law and related issues generally rests with the Department of State.

**The Mechanics of U.S. CIVPOL contributions**

Most other countries that provide police to CIVPOL programs have national police forces and related personnel mechanisms to deploy officers for overseas service. Because the United States does not maintain a national police force, we do not send formed police units. Our contribution relies on individual volunteers. To handle such a large task, the Department of State contracts with private companies who implement requirements provided by the Department of State to recruit, select, equip, and deploy active and recently retired law enforcement officers from across the country. After conducting a screening process, the companies contract with individual officers and deploy them to missions.

Subject matter experts in criminal prosecution, court administration, judicial adjudication, criminal appellate practice and correctional programs are also recruited, engaged and deployed by a contractor in response to a U.S. Government-identified and articulated requirement.

Following pre-deployment training in the U.S., criminal justice program personnel are sent to the mission area and are "seconded" to the UN (or other sponsoring organization – such as the OSCE). Within a mission, officers function under the operational control of the sponsoring organization, which also provides officers with an allowance to cover food, lodging, and incidental expenses. The contractors maintain offices in the mission areas to handle administrative and support issues, and assist with programs designed to improve quality of life.

Throughout the life of a mission, the Department of State provides funding and oversight for mission operations, manages U.S. policy on CIV operations and other related law enforcement and civilian security issues, provides bilateral assistance to local police forces, engages with the UN and other contributing countries on mission priorities and challenges, and keeps Congress, other U.S. Government agencies, and the White House informed of progress.

BACK TO TOP

U.S. DEPARTMENT of STATE

Fact Sheet
Bureau for International Narcotics and Law Enforcement Affairs
Washington, DC
January 31, 2008

# Civilian Police and Rule of Law Programs

### Afghanistan

The Bureau for International Narcotics and Law Enforcement Affairs (INL) supports maintenance and operation costs for seven INL Regional Training Centers (RTCs) in Kandahar, Konduz, Nangarhar, Paktya, Bamiyan, Herat and Balkh; a Central Training Center in Kabul for police; and a Forward Operating Base in Islam Qala. Support includes salary and all logistical support for more than 500 police training advisors and mentors deployed throughout Afghanistan and at the Ministry of Interior. The Bureau provides continued support for community policing initiatives, law enforcement, revenue-generation initiatives and the establishment of specialized police units such as the Family Response Unit and the Afghan National Civil Order Police.

Mentors are deployed to more than 24 provinces and engage with local Afghan police officials to develop skills and capacity to extend the rule of law throughout Afghanistan. Training advisors work with Afghan police instructors to provide basic, advanced and specialized training at the RTCs. The basic eight-week course addresses core skills and knowledge required for general policing functions. Advanced and specialized training courses including firearms, crowd control, literacy, computer skills, anti-corruption, and domestic violence are also implemented at the Regional Training Centers.

The Department of State, through INL, works with Afghan ministries to give a holistic reform framework. Through its police program, INL advises the Afghan Ministry of the Interior in its reform efforts, including a Pay and Rank Reform Initiative, which restructures, reorders and reforms the Ministry of Interior organizational and payroll systems. Rank reform has right-sized the Ministry by testing and vetting all senior officials; rank reform has been completed to the company level in the Afghan National Police (ANP). Pay reform has aligned salary scales with rank and responsibility, and recent developments in pay reform have provided for pay parity with the Afghan National Army at the lower ranks. To ensure that the ANP receive their salaries in full and on time, electronic funds transfers are being implemented and the ANP are being issued personal identification cards complete with biometric data, rank, and training as well as general identification details.

With the Department of State's assistance, the Afghan Government adopted a Constitution that respects human rights, the rights of women, and adheres to due process standards, and has enacted critical judicial legislation including the Interim Criminal Procedure Code, the Court Administration Law, and the Law of Prisons and Detention Centers. Afghanistan has also made progress in drafting and approving a national development strategy for the justice sector. INL's justice program has directly supported the Afghan Government for provincial justice assessments and conferences, conducted basic and specialized criminal justice and corrections training, provided basic equipment and supplies to justice institutions, and mentored Afghan defense counsels. The Bureau is helping to reorganize and reform the Attorney-General's Office and identify key areas to improve police-prosecutor coordination in preparation for coordinated training and mentoring.

The Bureau's staff provides technical and advisory support to Afghan justice personnel to improve effectiveness, operation, and coordination in the Ministry of Justice, Ministry of Interior, and the Attorney-General's office. The staff also conducts standardized training for justice personnel (including prosecutors and defense counsel) focusing on Afghan and international law, human rights, and criminal justice procedures, as well as mentoring Afghan justice personnel to improve investigations, police-prosecutor coordination, case management, trial advocacy and adjudication of criminal cases.

INL has also established a comprehensive corrections program providing basic and in-service corrections training; capacity-building through development of standard operating procedures and policies; and equipment and infrastructure support to improve conditions, management and operation of prison and detention facilities nationwide.

In addition, INL provides advisory services and technical support to the Ministry of Justice Prison Directorate to improve the capacity of the nationwide corrections system. INL conducts standardized corrections training in Kabul and key provinces, with an emphasis on human rights and corrections management and operations. INL provides equipment and infrastructure support to justice and corrections facilities near U.S.-funded police Regional Training Centers and courts in provincial locations and in major poppy growing and drug-trafficking regions. INL supports the development of legal, professional organizations and institutions, including the bar association and licensing organizations, as well as legal training and aid centers. INL supports specialized training and mentoring for judges, prosecutors, and investigators on issues such as counternarcotics, trafficking, corruption and prosecutorial investigations, as well as supporting a specialized, secure facility to contain offices and secure courtrooms for counternarcotics prosecutors and investigators, and Counternarcotics Tribunal judges. This facility will also contain a secure detention center for narcotics defendants.

INL has awarded a grant for a U.S./Afghan LLM and Certificate Program for Afghan law professors to help improve the education of legal professionals. The grant offers Afghan legal educators the opportunity to participate in an intensive, year-long LLM program, which provides them with exposure to western law-school teaching techniques, modern university life, emerging legal trends and doctrine, the U.S. judicial system and basic governing structures.

[See photos of programs in Afghanistan.]

### Haiti

INL funds the fifty U.S. police officers and three U.S. corrections officers who serve in the UN Stabilization Mission in Haiti, screening, training and advising the Haitian National Police (HNP), as well as training and assisting correctional officers. INL also provides infrastructure funding for HNP stations, prison and detention facilities, duty gear for new police recruits and in-service graduates, vehicles, motorcycles and communications equipment. In addition, INL helps support training, equipment and infrastructure development for the Haitian Stabilization Initiative (HSI), a U.S. government program that integrates security and development in Cite Soleil, one of the country's most volatile urban areas.

## Iraq

INL assists the Government of Iraq and U.S. Central Command's Civilian Police Assistance Training Team (CPATT) in professionalizing civil law enforcement institutions and the Iraqi Police Service to the point they can effectively maintain order in a manner that is consistent with international policing and human rights standards. To this end, we provide International Police Advisors and experts in civilian law enforcement to help advise, train, and mentor the Iraqi Police Service, Ministry of Interior, and Department of Border Enforcement. INL supports the Major Crimes Task Force, a U.S. government interagency task force that advises specially vetted Iraqi police on the investigation of high-profile crimes.

INL's Rule of Law Programs help the Government of Iraq establish a criminal justice system that is sufficiently effective and fair that Iraqi citizens will turn to it, rather than violent militias and other "alternative" forms of justice, to resolve disputes and seek justice. These programs include training of judges, judicial investigators and other court staff; the creation of a Judicial Protective Service modeled on the U.S. Marshals Service; the development of policies, procedures, and technology for tracking defendants through the criminal justice system; and legislative drafting assistance for laws pertaining to the judiciary and the criminal codes. In addition, INL and our interagency partners provide legal and rule of law advisors to Provincial Reconstruction Teams who help design and manage INL projects and who advise and mentor Iraqi justice officials.

INL's corrections development assistance helps the Iraqi Corrections Service (ICS) with developing its capacities to operate a rapidly expanding prison system in a safe, secure, and humane manner that conforms to internationally accepted standards for the treatment of prisoners. To accomplish this goal INL, in coordination with interagency partners, provides corrections advisors and trainers who deliver training and mentoring to the newly established Iraqi Corrections Service under the Ministry of Justice. We are also constructing/expanding prisons in conjunction with the U.S. Army Corps of Engineers to help house the growing number of prisoners being processed into the system.

INL also works to combat corruption in Iraq by providing advisors who train and mentor investigators of Iraq's Commission on Public Integrity, with efforts focusing on improving the investigators' skills in forensics and crime scene investigations. INL has also funded efforts to improve the Government of Iraq's auditing capabilities, and to automate government payroll systems to improve accountability and limit corruption.

## Kosovo

United Nations Security Council Resolution 1244 authorized UNMIK (United Nations Mission In Kosovo) in June 1999 at the end of the NATO bombing campaign. The mission includes an armed international police force, with nearly 2,000 officers from 49 countries, including more than 200 Americans. UNMIK police officers perform the full range of law enforcement functions in Kosovo, while simultaneously helping to develop and train the Kosovo Police Service (KPS) from the ground up. This support includes training and mentoring of specialized law enforcement techniques for special units of the KPS, as well as training in leadership and management for KPS officials.

UNMIK has been working towards eventually turning over full policing responsibilities to the KPS, which numbers approximately 7,300 trained officers from all ethnic groups in Kosovo. The EU is currently planning a follow-on EU Rule of Law Mission to commence in 2008. It will comprise 1,800 police officers, judges, and prosecutors, will continue this work, with the US planning to contribute 80-100 officers and 4-6 prosecutors and judges. In addition to the over 200 civilian police officers, the U.S. also currently provides approximately four police trainers to the Center for Public Safety Education and Development, which supports the Kosovo Police Academy. The KPS academy is an Executive Agency under the Provisional Institutions of Self-Government in the Ministry of Internal Affairs.

INL supports the Department of Justice Office of Overseas Prosecutorial Development Assistance and Training Program (OPDAT). OPDAT is engaged in a number of initiatives to assist the development of Kosovo's Public Prosecutors Office, the Kosovo Judicial Council, the Ministry of Justice, and the Law Faculty at the University of Pristina to strengthen and maintain the rule of law. INL also supports the Department of Justice International Criminal Investigative Training and Assistance Program (ICITAP), which provides a wide spectrum of support to the Ministry of Internal Affairs, Kosovo Police Service and other law enforcement institutions. This broad array of activity ensures the proper development of the criminal justice sector through mentoring, training and other technical assistance designed to promote effective investigation and prosecution of criminal activity.

INL also supports the Department of Justice International Criminal Investigative Training and Assistance Program (ICITAP), which provides a wide range of support to the Ministry of Internal Affairs (MOIA), Kosovo Police Service (KPS) and criminal justice system. This broad range of support assists in the development of all law enforcement institutions, to include the MOIA, Border and Immigration, and designing a Rule of Law Information Technology system which conforms to international norms and practices. A part of INL's support ensures that all criminal justice sector agencies receive not only adequate training and equipment to enable investigation, but professional mentoring to bring about appropriate resolution of criminal activity.

## Lebanon

INL manages a police reform program in Lebanon that aims to enhance the capabilities of the Lebanese Internal Security Forces (ISF) to enforce the rule of law in Lebanon, cement sovereign Lebanese government control over its territory and protect the Lebanese people. To help develop the ISF into a modern police force that operates in a democratic society, makes its own decisions and sets its own priorities, this program will provide ISF with essential law enforcement training, non-lethal equipment, installation of a communications network and refurbishment of academy and command and control facilities.

The training included in this program will consist of two elements – Basic Cadet and Basic Instructor courses. Basic Cadet training will teach policing principles and concepts, including democratic policing, patrolling, and anti-terrorism. The goal of basic training will be to familiarize new cadets with the roles they will play in a larger police force. The Instructor program will be designed to teach Lebanese police advisers how to develop their own curricula and programs to train police recruits. The program will put in place a mechanism to ensure Lebanese trainers are able to sustain the responsibility for training new ISF cadets in the future so that ISF training will not always require international assistance.

## Liberia

INL funds ten officers serving under the United Nations Mission to Liberia (UNMIL); these officers help vet and train members of the Liberian National Police Force (LNP) as well as police cadets, the Special Security Service and the Seaport Police. INL has donated communications and transportation equipment as well as uniforms to the LNP. Four of the contingent's senior advisory team (SAT) have been assigned as high level advisors to LNP Headquarters to assist with operations and administration.

INL provided four U.S. Law Enforcement Trainers in December 2007 to train up to 500 LNP officers and establish the new LNP Emergency Response Unit (ERU). This

program will provide training, equipment, communications and the construction of ERU facilities in close coordination with the UNMIL/UNPOL senior advisors. This program includes the development of standard operating procedures and policies, as well as providing management and leadership mentoring to ERU supervisors in the precepts of internationally recognized use of force, human rights and internal oversight.

INL provides robust support to Liberia's justice sector through its Justice Sector Support for Liberia (JSSL) Team, which arrived in Monrovia in January 2006. As of December 2007, the team consisted of seven prosecutors, one public defender, one criminal investigations advisor, one administrative advisor, and one civil engineer. The team provides one-on-one technical assistance to their Liberian counterparts and assesses equipment and infrastructure needs.

INL Ministry of Justice (MOJ) Logistics support is being provided to improve the overall functioning and effectiveness of MOJ Departments in need of office furniture and administrative equipment. The MOJ departments benefiting from this support include personnel, procurement, comptroller, legal counsel, public relations, internal auditing, and several county attorneys' offices. In addition, extensive renovations and repairs to courtrooms within the Temple of Justice (TOJ) are currently underway.

**Palestinian Authority**

INL is working with the U.S. Security Coordinator in Jerusalem to enhance the capabilities of the Palestinian Authority Security Forces in the West Bank. Our assistance is focused on providing basic, leadership, and refresher training for the National Security Forces and the Presidential Guard. We are also upgrading their training facilities and providing non-lethal equipment to support their operations. Another INL project involves working with the Palestinian Authority to develop a Strategic Planning Directorate in the Ministry of Interior to enhance the Ministry's long-term capacity for planning, oversight, and reform.

**Sudan**

INL provides assistance in Sudan to develop a secure and stable environment for the upcoming elections and referendum. INL assistance in Sudan provides a contingent of 15 police, judicial and corrections officers within the UN Mission in Sudan in order to facilitate comprehensive criminal justice sector development activities to the benefit of Southern Sudan and the Comprehensive Peace Agreement.

[See photos of programs in Sudan.]

🔝 BACK TO TOP

# EXHIBIT 2

## MEMORANDUM OF AGREEMENT (MOA) BETWEEN THE DEPARTMENT OF DEFENSE AND THE DEPARTMENT OF STATE ON USG PRIVATE SECURITY CONTRACTORS

### I. Purpose

The purpose of this MOA is to clearly define the authority and responsibility for the accountability and operations of USG Private Security Contractors (PSCs) in Iraq.

### II. Country Covered by this MOA

The country covered by this MOA is Iraq.

### III. Responsibility

A. Pursuant to 10 U.S.C. § 164 and 22 U.S.C. § 4802, the Secretary of Defense and the Combatant Commander (COCOM) are responsible for the security of all DOD elements and personnel under the operational control of the COCOM.

B. Pursuant to 22 U.S.C. § 4802, the Secretary of State is responsible for developing and implementing policies and programs to provide for the security of U.S. Government personnel on official duty in country other than those under the command of an area military commander.

C. Pursuant to this MOA the Secretary of State and the Secretary of Defense have agreed that they will jointly develop, implement, and follow core standards, policies, and procedures for the accountability, oversight, and discipline of PSCs.

### IV. Standards

A. The Secretary of Defense and the Secretary of State shall jointly develop and implement core PSC standards which will include at a minimum:

- The management of USG PSC personnel.
- The coordination of USG PSC operations outside secure bases and U.S. diplomatic properties.
- A clear legal basis for holding USG private security contractors accountable under US law.
- Recognition of investigative jurisdictions and coordination for joint investigations where conduct of USG PSC personnel are to be investigated.

B. The COM and the COCOM shall make every effort to consult and coordinate responses to common threats.

### V. Implementation, Coordination, and Dispute Resolution

A. In Iraq, the COM and the COCOM, acting when appropriate through their designated representatives, shall serve as the primary delegates of the Secretary of State and the Secretary of Defense, respectively, for implementation and coordination under this MOA.

    1. The intent of this MOA is for the DOS and DOD to ensure that personnel working under contracts with other federal agencies or as subcontractors on DOS or DOD contracts are to be covered by the policies and procedures developed under this MOA. The DOD and DOS will identify those USG agencies and organizations and contractors having contractual arrangements for private security and ensure, to the maximum extent possible, that these agencies and their PSCs adhere to the core procedures and process required by this MOA.

    2. In the event that issues arise under this MOA that the COM and COCOM are unable to resolve, they shall promptly refer such issues to the Washington representatives designated by the Secretary of State and the Secretary of Defense for resolution.

B. The Secretary of State and the Secretary of Defense shall designate Washington representatives to meet as frequently as necessary, but no less often than quarterly, for the purpose of reviewing the implementation of this MOA.

    1. In the event that the Secretaries' Washington representatives are unable to resolve any such difference, or any other issue that may arise under this MOA, they shall promptly refer the matter to the Under Secretary of State for Management and the Deputy Under Secretary of Defense for Logistics and Material Readiness for resolution.

    2. In the event that any matter cannot be resolved under the procedures specified above, it shall be referred to the Secretary of State and the Secretary of Defense for resolution

## VI. Authorities

Nothing in this MOA shall otherwise affect the authorities of the Secretary of State, the Secretary of Defense, and the Chief of Mission or the COCOM.

## VII Other Agreements and Arrangements

All existing agreements and arrangements, however styled, between DOS and DOD shall remain in force to the extent that they do not conflict with the provisions of this MOA.

## VIII Annex:

    The Parties further agree to ANNEX A: Deliverables. These deliverables are to be jointly developed by U.S. Embassy Baghdad and Multi-National Force – Iraq (MNF-I), and can be modified in writing upon mutual agreement by MNF-I and U.S. Embassy Baghdad.

## IX. Implementation and Termination

To the extent this MOA (or the deliverables) developed hereunder are inconsistent with the MOA between DOS and DOD "*Regarding Physical Security, Equipment and Personal Protective Services,* dated 10 June 2004, this MOA shall govern. This MOA shall remain in force until terminated.

Signed:                                        Signed:


Deputy Secretary of State              Deputy Secretary of Defense

Date:  *12-5-07*                       Date:  *12-5-07*

## ANNEX A: DELIVERABLES

**I.**    <u>**Executive Summary:**</u>

The following deliverables, jointly developed under the terms of this MOA by U.S. Embassy Baghdad and Multi-National Force – Iraq (MNF-I), are intended to improve coordination and accountability of their respective private security contractor operations in Iraq. These deliverables can be modified in writing upon mutual agreement by MNF-I and U.S. Embassy Baghdad.

**II.**    <u>**Definitions**</u>

**Private Security Contractor (PSC):** A private company, and/or its personnel, that provides physical protection to or security for persons, places, buildings, facilities, supplies, or means of transportation.

**U.S. Embassy Baghdad PSC**: Refers to a Department of State (DOS)--affiliated PSC.

**MNF-I PSC**: Refers to a Department of Defense (DOD)--affiliated PSCs.

**Personal Security Detail (PSD)**: A team of PSC personnel that provides physical protective services for the movement of protected persons and/or property.

**Battlespace:.** The Area of Operations assigned to the Commander, MNF-I by the Commander, US CENTCOM for the purpose of military operations. This currently includes the air, land, sea, and space contained within the borders of Iraq.

**MNC-I:**  Multi-National Corps – Iraq. The action-arm of MNF-I.  MNC-I is the operational headquarters for the battlespace.

**CF**:  Coalition Forces.  The forces of two or more nations working for a common action. All forces working with the Multi-National Force – Iraq are coalition forces.

**Serious incident**: Any incident involving the use of deadly force, the discharge of a weapon (other than in training), or that resulted in death, serious injury, and/or significant property damage.

**Coalition Operating Locations**: Locations under the effective control of either MNF-I or Chief of Mission (COM), including the International Zone, CF Forward Operating Bases, Regional Embassy Offices, etc.

**Contracting Officer**: Refers to contracting officers as well as contracting officer representatives where appropriate.

1

**III.    Unity of Effort:**

U.S. Embassy Baghdad and MNF-I together have the responsibility to safeguard USG and Coalition Force (CF) personnel conducting official business throughout Iraq. U.S. Embassy Baghdad and MNF-I are committed to reducing the number and strategic impact of serious incidents involving PSCs by thorough and impartial investigations of these incidents, transparent information and intelligence sharing, close coordination of PSD operations, and joint engagement with the Government of Iraq (GOI).

**IV.    Rules for the use of Force:**

All USG PSC operations in Iraq will abide by the following common principles on the Rules for the Use of Force (RUF). U.S. Embassy Baghdad and MNF-I specific policies may be more, but not less, restrictive than these common principles. A PSC can only implement policies more restrictive than these RUF with the approval of its contracting officer, as well as either MNF-I or U.S. Embassy Baghdad as appropriate.

**Policy/Definitions**

**a. Defense of Self or Others**. PSCs always retain the inherent right to exercise self-defense in response to a hostile act or demonstrated hostile intent. PSCs are permitted to use deadly force in defense of others when there is a reasonable belief of imminent risk of death or serious bodily harm. Details regarding this authorization will be provided by the appropriate USG agency, and within the terms and conditions governing the PSC's contractual relationship with that agency.

**b. Imminent Threat**. The determination of whether the danger of death or serious bodily harm is imminent will be based on an assessment of all facts and circumstances known to the PSC at the time (i.e. totality of the circumstances), and should not be assessed with the benefit of hindsight. Imminent does not necessarily mean immediate or instantaneous. Individuals with the capability to inflict death or serious bodily harm and who demonstrate intent to do so may be considered an imminent threat.

**c. Hostile Act.** An attack or other use of force against the PSC, or designated persons or property. It also includes force used directly to preclude or impede the mission and/or duties of the PSC.

**d. Hostile Intent.** The imminent threat of the use of force against the PSC, or designated persons or property. It also includes the threat of force to preclude or impede the mission and/or duties of the PSC.

2

**e. Assets Vital to National Security.** For the purposes of MNF-I PSC operations in Iraq, defined as President-designated non-DOD and/or DOD property, the actual theft or sabotage of which the President determines would seriously jeopardize the fulfillment of a national defense mission and would create an imminent threat of death or serious bodily harm. Examples may include, but are not limited to, designated restricted areas containing strategic operational assets, sensitive codes or special access programs.

**f. Inherently Dangerous Property.** For the purposes of MNF-I PSC operations in Iraq, property is considered inherently dangerous if, in the hands of an unauthorized individual, it would create an imminent threat of death or serious bodily harm. Examples may include, but are not limited to: portable missiles, rockets, arms, ammunition, explosives, and chemical agents. On-scene DOD commanders are authorized to classify property as inherently dangerous. PSCs are not authorized to make such designations.

**g. Mission essential and U.S. National Security Equipment/Property.** For the purposes of MNF-I PSC operations in Iraq, PSC personnel can be specifically authorized to protect designated mission essential or U.S. national security equipment/property with force, including deadly force. Details regarding this authorization will be provided by appropriate USG agency, and within the terms and conditions governing the PSC's contractual relationship with that agency.

## Procedures

**a. De-Escalation.**

(1) Whenever time and circumstances permit, the threatening individual/force should be warned and given the opportunity to withdraw or cease threatening actions.

(2) U.S. Embassy Baghdad and MNF-I will work to establish common graduated force methods and procedures for use by PSCs, including common signaling devices to be used by all USG PSCs operating in Iraq. The goal is to ensure that the Iraqis have a common expectation with respect to the visual and aural warnings used by PSCs operating in Iraq. U.S. Embassy Baghdad and MNF-I will work to develop a strategic engagement plan for educating the populace on these signals.

**b. Use of Non-Deadly Force**

(1) The use of force must be reasonable in intensity, duration and magnitude based on the totality of circumstances to counter the threat. If force is required, non-deadly force is authorized and may be used to control a situation and accomplish the mission, or to provide self-defense or in defense of the protected property, when doing so is reasonable under the circumstances.

(2) Agency-approved non-lethal weapons are authorized.

3

(3) Warnings shots may be authorized for DOD contractor personnel by the contracting officer, but only as part of their graduated force response and for no other purpose. Current DOS policies prohibit the use of warning shots by their PSCs.

**c. Use of Deadly Force.** Deadly force is authorized only under the following circumstances:

(1) Inherent Right of Self-Defense. Deadly force is authorized when a PSC reasonably believes that a person has committed a hostile act or demonstrated hostile intent and poses an imminent threat of death or serious bodily harm to the PSC.

(2) Defense of Others. Deadly force is authorized when a PSC reasonably believes that a person poses an imminent threat of death or serious bodily harm to the protectee(s) or other innocent persons in the vicinity.

(3) Assets Vital to National Security. For the purposes of MNF-I PSC operations in Iraq, deadly force is authorized when deadly force reasonably appears to be necessary to prevent the actual theft or sabotage of assets vital to national security. PSCs will be notified in their contract if they are employed to protect assets vital to national security.

(4) Inherently Dangerous Property. For the purposes of MNF-I PSC operations in Iraq, deadly force is authorized when deadly force reasonably appears to be necessary to prevent the actual theft or sabotage of inherently dangerous property. PSCs will be notified in their contract if they are employed to protect inherently dangerous property.

(5) If a PSC must fire a weapon as a means of deadly force, he/she must use only well-aimed shots with due regard for the safety of innocent bystander, and must immediately notify the appropriate operation center and request assistance as needed.

(6) PSC personnel, whether armed for personal protection or serving as contract security/PSC, shall not engage in offensive combat operations, alone or in conjunction with U.S., Coalition or host nation forces.

## V.    Authority to Possess and Carry Firearms:

U.S. Embassy Baghdad or MNF-I will grant PSCs authority to possess and carry firearms in accordance with their respective departmental policies. Additionally U.S. Embassy Baghdad and MNF-I will individually ensure that their respective PSCs maintain accurate inventories of weapons and ammunition.

The core standards for U.S. Embassy Baghdad or MNF-I authorizing personnel to possess and carry firearms are background checks, security clearances, training, qualifications,

4

and proficiency standards for individual assigned weapons.

**Background Checks**. The following sources can be used for accomplishing background checks: Interpol, FBI, Country of Origin Criminal Records, Country of Origin U.S. Embassy Information Request, CIA records, and /or any other records available.

**Security clearances**. Security clearance requirements will be established by the RSO or MNF-I based on the company or individual's position.

**Training.** Mandatory training for PSCs prior to operating in Iraq will include review of relevant USG and Iraqi laws, Rules for the Use of Force, Law of Armed Conflict, Graduated Force Procedures, and those relevant COM, CENTCOM, and/or MNF-I rules and regulations applicable to their contracts, as well as scenario-based training on a standard set of Use-of-Force vignettes kept up to date by MNF-I STRATOPS and RSO based on recent incidents and threat reporting. Refresher training will occur annually. PSCs are responsible for maintaining training documentation. A failure to maintain training qualifications will generally result in revocation of firearms authorization for the individual. Any PSC individual without firearms authorization will immediately surrender their weapon to the PSC and will remain unarmed until such time as they are retrained and the contracting officer determines that their training is sufficient.

**Qualifications.** Contractors will meet either the U.S. Army weapons qualification standards, or RSO standards, unless another standard of qualification is used that substantially meets the requirement and is agreed to in advance (e.g. for AK-47s). Ongoing weapons proficiency training will occur in accordance with the respective agency requirements and the PSC will maintain documentation records.

**Authorized Weapons and Ammunition Types**. All USG PSCs will only use those weapon types and ammunition specifically authorized by DOS or DOD as appropriate. U.S. Embassy Baghdad and MNF-I will notify each other of the specific weapon types and ammunition authorized for their respective PSC operations in Iraq, and will update each other with any changes to such authorizations. Any disagreements regarding weapons types and/or ammunition should be resolved between MNF-I and US Embassy Baghdad, if possible; if not, the issue will be forward to the Department of State and Department of Defense for final determination.

## VI.     Movement Coordination and Control:

All USG PSDs will coordinate their movements with either MNF-I or U.S. Embassy Baghdad operations centers.

In order to maximize CF support for USG PSD and helicopter operations and deconflict friendly forces, RSO Tactical Operations Center (TOC) and the Multi-National Corps Iraq

(MNC-I) Contractor Operations Cell (CONOC) will provide movement details (of both PSDs and helicopters) to MNC-I in advance of their respective movements outside of Coalition operating locations, to include time, route, destination, and convoy composition. Such notification should normally occur a minimum of 24 hours in advance or as soon as possible if short-notice missions are required.

MNC-I and RSO will exchange LNOs in their respective operation centers, will conduct planning using linked Command Post of the Future (CPOF) terminals, and will monitor all U.S. Embassy Baghdad PSD, MNF-I PSD, and CF movements outside Coalition operating locations real-time using shared electronic monitoring systems data. MNC-I will limit distribution of COM personnel movements, or other movements as designated by U.S. Embassy Baghdad, to only U.S. personnel with a need to know, and will coordinate with RSO to ensure such information is compartmentalized.

MNC-I will review all USG PSD movements and provide recommendations to the RSO TOC or CONOC, as appropriate, as to whether the movement should be altered or cancelled based on the threat levels along that route or disposition of Coalition Forces.

The RSO TOC and CONOC will generally honor MNC-I recommendations to alter or cancel missions. Any disagreements between MNC-I and U.S. Embassy Baghdad regarding PSD movements will be resolved by the DCS, MNF-I Strategic Operations (STRATOPS) and the DCM, U.S. Embassy Baghdad. Final movement authority for U.S. Embassy Baghdad rests with the COM.

If MNC-I battle space owners determine and articulate a substantial increase in the threat to USG PSDs during movements outside Coalition operating locations, such PSDs will comply with MNC-I recommendations to alter routes or abort missions.

MNC-I LNO will coordinate with RSO TOC and MNC-I on QRF, MEDEVAC, and/or Intelligence, Surveillance, and Reconnaissance (ISR) support as needed, as well as convoy closure reports.

As soon as possible after notification of USG PSD movements, and updating as needed, MNF-I will make RSO TOC and/or CONOC aware of any known checkpoints manned by CF or Iraqi Security Forces (ISF), as well as the proper near and far recognition procedures. USG PSDs will comply with all CF checkpoints and should avoid other checkpoints as possible. However, USG PSDs will be prepared to display appropriate audio and/or visual recognition procedures at CF or legitimate ISF checkpoints (i.e. verified in advance by MNF-I or during movement) should they be encountered.

U.S. Embassy Baghdad will liaise with MNF-I STRATOPS on PSC-related incidents and will be prepared to attend the STRATOPS evening battlefield update assessments at the request of MNF-I STRATOPS.

6

MNF-I and U.S. Embassy Baghdad will share all intelligence that may affect security operations.

## VII.    Serious Incident Response & Investigation:

To the maximum extent possible, MNF-I and the U.S. Embassy will closely coordinate the immediate response to any serious incident (as defined above) involving a USG PSC.

The U.S. Embassy Baghdad, through the RSO TOC, will notify MNC-I and MNF-I STRATOPS of any serious incident involving a PSC in its jurisdiction as soon as possible. CONOC will notify MNF-I and RSO of any serious incident involving a PSC in its jurisdiction as soon as possible. U.S. Embassy Baghdad and MNF-I will coordinate in the notification of the GOI as soon as possible after a serious incident occurs.

All USG PSCs involved in a serious incident will, to the extent permitted by the mission and the security situation, stop and render assistance as needed, including coordinating medical assistance, requesting support, and/or providing claim forms/information.

Should MNC-I respond to an incident involving a USG PSC, every attempt should be made to establish radio communication in order for situational awareness to be enhanced prior to QRF arrival at the scene. Upon MNC-I QRF arrival and with a positive and verified handoff (radio or visual), the MNC-I QRF element will assume command of the scene with the primary purpose being the safe extraction of the USG PSC.

In coordination with RSO where appropriate, MNC-I will take the lead on the immediate securing of a scene where a serious incident occurred, to the extent the security situation permits, in order to start identifying any injuries, fatalities, and property damage, and to preserve the ability to collect evidence.

RSO will request support from MNF-I STRATOPS for CF support to revisit the scene of a serious incident in order to conduct an investigation. MNF-I STRATOPS will coordinate with MNC-I, which will in turn facilitate the movement request with the closest battle space owner.

MNC-I will assist U.S. Embassy Baghdad in seeking Iraqi personnel who were witnesses to facilitate investigations and evidence collection. Additionally, CF personnel will assist U.S. Embassy Baghdad as requested with their distribution of timely and appropriate condolence payments. Such payments will be based on Iraqi cultural norms and will not be viewed as an admission of guilt.

U.S. Embassy Baghdad will have the lead responsibility for investigating a serious incident involving a U.S. Embassy Baghdad PSC, and MNF-I will have the lead responsibility for investigating a serious incident involving an MNF-I PSC. The entity conducting the investigation can request investigative assistance or relevant information from the other entity, which will be provided or shared to the greatest extent possible. While one entity is conducting

7

an investigation into a serious incident within its jurisdiction, the other entity will not deliberately take any action that may prejudice, impede, or negatively impact that investigation (e.g., interviewing witnesses or collecting evidence) without the consent of the lead investigating entity.

Where either U.S. Embassy Baghdad or MNF-I, based on a legitimate interest in a serious incident within the other's jurisdiction, requests that a joint investigation be conducted into the incident, the investigation will be conducted jointly by RSO and the relevant military criminal investigative authority. The lead for such an investigation will be determined in accordance with the above paragraph or by mutual agreement.

MNF-I STRATOPS will serve as the focal point for CF inquiries into RSO-related, serious incidents. Individual CF units will not call directly to the RSO TOC except to coordinate actions with the CF LNOs.

U.S. Embassy Baghdad and MNF-I will engage in transparent sharing of information with each other during the course of an investigation, to the extent that it will not compromise the investigation or potential criminal prosecution, and in consultation with a prosecutorial authority where one is involved. U.S. Embassy Baghdad and MNF-I will coordinate in the sharing of information regarding any serious incident with the GOI, and will follow a consistent approach to public affairs associated with any serious incident.

MNF-I and RSO will coordinate in advance regarding the arrest or detention of any PSC personnel in accordance with proper arrest authority, except in exigent circumstances, in which case notification will occur as soon as possible.

U.S. Embassy Baghdad and MNF-I will share results of their investigations in order to develop lessons learned and improve tactics, techniques, and procedures used by PSCs. The RSO and MNF-I STRATOPS Chief, Contractor Policy and Oversight Division, shall co-chair a Joint Incident Review Board on a quarterly basis to determine trends, and make recommendations for improvements in PSC operations. Other invitees could include representatives from DOD and DOS PSCs, and Major Subordinate Commands. Minutes of the board will be forwarded to DCS, MNF-I STRATOPS and DCM, U.S. Embassy Baghdad for their review and action as required.

MNF-I and U.S. Embassy Baghdad should jointly engage the GOI in discussions related to PSC operations.


## VIII.  <u>Contract Management & Language</u>:

DOD and DOS will work towards developing a mutually agreeable common database (such as DoD's SPOT) for the purpose of increasing PSC accountability and visibility.

8

DOS and DOD will ensure that their respective PSC contracts and subcontracts contain common language, through contract modifications if necessary, implementing relevant provisions of this MOA, including but not limited to RUF, communication systems, incident response and reporting, authorized weapons and ammunition, and penalties for violations of MNF-I and/or U.S. Embassy Baghdad policies and procedures.

Respective DOS and DOD contracting officers will reconcile contract language interpretation of Department of State Acquisition Regulations (DoSAR) and Defense Federal Acquisition Regulations (DFAR) through the current Federal Acquisition Regulations.

## IX. Legal Accountability:

U.S. Embassy Baghdad and MNF-I will not tolerate misconduct by their respective PSCs and will enforce contractual obligations. Where there is evidence of criminal misconduct, U.S. Embassy Baghdad and MNF-I will make referrals to the appropriate prosecutorial authority.

DOD and DOS will continue to work together to expedite the enactment of legislation to establish a clear legal basis for holding USG PSCs in Iraq accountable under U.S. law.

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **PARLIN,** | ) |
| *Plaintiff,* | ) **C. A. No. 1:08-cv-00107-UNA** |
| | ) |
| | ) |
| v. | ) |
| | ) |
| **DYNCORP INTERNATIONAL INC.** *et al.,* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## DECLARATION OF H. MONTGOMERY HOUGEN

1.      I, H. Montgomery Hougen, certify that I am over the age of 18 years and have personal knowledge of the matters set forth herein.

2.      I am competent to testify to the matters set forth herein.

3.      I am the Assistant Corporate Secretary of DynCorp International Inc. and the Vice President, Secretary and Deputy General Counsel of DynCorp International LLC.

4.      In my position, I am familiar with the corporate structure and principal places of business of the DynCorp International entities reference above.

5.      DynCorp International LLC is a Delaware limited liability corporation. Its principal place of business is in Falls Church, Virginia.

6.      DynCorp International Inc. is a Delaware corporation. Its principal place of business is in Falls Church, Virginia.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on February 2008.

H. Montgomery Hougen

290150.1