## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CYNTHIA PARLIN, Individually, and in her      :
Capacities as Surviving Spouse of Samuel Parlin,    :
And As Executrix of the Estate of Samuel Parlin,    :
Deceased,      :       C. A. No. 1:08-107 JJF
     :
     Plaintiffs,      :
     :       Jury of 12 Demanded
     v.      :
     :
DYNCORP INTERNATIONAL INC., *et al.*,      :
     :
     Defendants.      :

## DEFENDANTS' OPPOSITION
## TO PLAINTIFFS' MOTION FOR REMAND

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell
Yoora Pak
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, DC 20005
(202) 626-7660
(202) 628-3606 (facsimile)

Robert K. Beste, III (No. 3931)
SMITH, KATZENSTEIN & FURLOW LLP
Post Office Box 410
Wilmington, Delaware 19899
(302) 652-8400
(302) 652-8405 (facsimile)
rkb@skfdelaware.com

*Attorneys for Defendants,*
*DynCorp International Inc. and*
*DynCorp International LLC*

April 21, 2008

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT ........................................................................ 2

STATEMENT OF FACTS ............................................................................ 3

ARGUMENT ......................................................................................... 5

I.    DEFENDANTS PROPERLY REMOVED THIS ACTION BASED
UPON THIS COURT'S FEDERAL QUESTION JURISDICTION
BECAUSE PLAINTIFFS' STATE LAW CLAIMS IMPLICATE
UNIQUE AND SIGNIFICANT FEDERAL INTERESTS ............................. 5

    A.  Federal "arising under" jurisdiction exists over state law claims that
implicate significant federal interests ........................................... 5

    B.  Federal question jurisdiction is proper in this case because plaintiffs'
state law claims depend upon the construction and application of
federal statutes, a significant federal interest ................................. 7

    C.  This Court's exercise of its federal question jurisdiction over
plaintiffs' state law claims will not upset the balance of responsibilities
between the federal and state courts ............................................. 9

    D.  Federal question jurisdiction is appropriate because of the unique and
significant federal interests at stake in this lawsuit ......................... 10

    E.  Plaintiffs have not demonstrated that federal question jurisdiction is
not proper in this case ............................................................ 11

II.   DEFENDANTS PROPERLY REMOVED THIS CASE UNDER THE
FEDERAL OFFICER REMOVAL STATUTE ......................................... 13

    A.  Standard Of Review Under 28 U.S.C. § 1442(a)(1) ......................... 13

    B.  Government Contractors May Remove Cases Under Section 1442(a)(1) ....... 15

    C.  Defendants Properly Removed This Action Under the *Feidt* Test ............ 16

        1.  Defendants are "persons" within the meaning of Section
1442(a)(1) ...................................................................... 17

        2.  Plaintiffs' claims are based on Defendants' conduct "acting under"
federal office .................................................................. 17

        3.  Defendants have established colorable federal defenses ................... 19

            (a) Government contractor defense ........................................ 19
            (b) Political question doctrine ............................................. 21
            (c) Defense Base Act ....................................................... 23

        4.  Defendants have established a causal relationship between the
alleged wrongful acts and their official acts ............................... 27

CONCLUSION ....................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Adorno v. Correctional Services Corp.*,
   312 F. Supp. 2d 505 (S.D.N.Y. 2004)..................................................................20

*Arizona v. Manypenny*,
   451 U.S. 232 (1981)......................................................................................14

*Baker v. Carr*,
   369 U.S. 186 (1962)..........................................................................21, 22, 23

*Berven v. Fluor Corp.*,
   171 F. Supp. 89 (S.D.N.Y. 1959) ...............................................................24

*Billizon v. Conoco, Inc.*,
   993 F.2d 104 (5th Cir. 1993) ......................................................................25

*Carley v. Wheeled Coach*,
   991 F.3d 1117 (3d Cir. 1993)......................................................................19

*Feidt v. Owens Corning Fiberglas Corp.*,
   153 F.3d 124 (3d Cir. 1998)..............................................................1, 13, 16

*Fisher v. Halliburton, Inc.*,
   454 F. Supp. 2d 637 (S.D. Tex. 2006) ..................................................22, 23

*Flying Tigers Lines, Inc. v. Landy*,
   370 F.2d 46 (9th Cir. 1966) ........................................................................24

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Manuf.*,
   545 U.S. 308 (2005)..............................................1, 2, 5, 6, 7, 8, 12, 13

*Gross v. German Foundation Indus. Initiative*,
   456 F.3d 363 (3d Cir. 2006)..................................................................21, 22

*Hopkins v. Walker*,
   244 U.S. 486 (1917)........................................................................................6

*In re World Trade Center Disaster Site Litig.*,
   2006 U.S. Dist. LEXIS 75020 (S.D.N.Y. Oct. 17, 2006) ..........................20

*In re: Blackwater Security Consulting, LLC,*
   460 F.3d 576 (4th Cir. 2007), *cert. denied*
   *sub nom. Blackwater Security Consulting,*
   *LLC v. Nordan,* __ U.S. __, 127 S. Ct. 1381 (2007)................................................ 12

*In re: Jean Fowler,*
   2006 Bankr. LEXIS 2117 (D. Del. Sept. 11, 2006) ..................................................... 17

*In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG Schering),*
   196 Fed. Appx. 93, 2006 WL 2162308 (3d Cir. Aug. 2, 2006)................................... 22

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
   478 U.S. 221 (1986)................................................................................................... 21

*Jefferson County v. Acker,*
   527 U.S. 423 (1999)....................................................................................... 15, 16, 27

*Kos Pharm., Inc. v. Andrx Corp.,*
   369 F.3d 700 (3d Cir. 2004)...................................................................................... 17

*Lane v. Halliburton,*
   2006 U.S. Dist. LEXIS 63948 (S.D. Tex. Sept. 7, 2006) ..................................... 15, 19

*Malesko v. Correctional Services Corp.,*
   229 F.3d 374 (2d Cir. 2000), *rev'd on other grounds,* 534 U.S. 61 (2001)............................ 19

*Malsch v. Vertex Aerospace, LLC,*
   361 F. Supp. 2d 583 (S.D. Miss. 2005)...................................................................... 15

*McMahon v. Presidential Airways, Inc.,*
   410 F. Supp. 2d 1189 (M.D. Fla. 2006)............................................................... 15, 21

*Megill v. Worthington Pump, Inc.,*
   1999 U.S. Dist. LEXIS 4433 (D. Del. Mar. 26, 1999) ......................................... 14, 16, 17, 21

*Mesa v. California,*
   489 U.S. 121 (1989).......................................................................................... 14, 15, 16

*New Jersey Dep't of Environ. Prot. v. Dixo Co.,*
   2006 U.S. Dist. LEXIS 68288 (D.N.J. Sept. 22, 2006) ............................................. 15

*New Jersey Dep't of Environ. Prot. v. Exxon Mobil Corp.,*
   381 F. Supp. 2d 398 (D.N.J. 2005) ........................................................................... 15

*Pack v. AC and S, Inc.,*
   838 F. Supp. 1099 (D. Md. 1993).......................................................................... 15, 27

*Peter v. Hess Oil V.I. Corp.*,
   903 F.2d 935 (3d Cir. 1990)........................................................... 7, 24, 25

*Pulley v. Peter Kiewit Son's Co.*,
   223 F.2d 191 (7th Cir. 1955) ............................................................... 24

*Regional Medical Transport, Inc. v. Highmark, Inc.*,
   2008 U.S. Dist. LEXIS 27381 (E.D. Pa. Apr. 3, 2008) ..................... 18, 27

*Ross v. DynCorp*,
   362 F. Supp. 2d 344 (D.D.C. 2005) ...................................................... 24

*Smith v. Halliburton Co.*,
   2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) ....................................... 22

*Smith v. Kansas City Title & Trust Co.*,
   255 U.S. 180 (1921)................................................................................. 6

*Smith-Idol v. Halliburton*,
   2006 WL 2927685 (S.D. Tex. Oct. 11, 2006)........................................ 22

*Sparks v. Wyeth Lab., Inc.*,
   431 F. Supp. 411 (W.D. Okla. 1977) ..................................................... 24

*Sun Buick, Inc. v. Saab Cars USA, Inc.*,
   26 F.3d 1259 (3d Cir. 1994).................................................................. 14

*Tennessee v. Davis*,
   100 U.S. 257 (1880).............................................................................. 14

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004).............................................................................. 23

*Virden v. Altria Group, Inc.*,
   304 F. Supp. 2d 832 (N.D. W. Va. 2004) .............................................. 15

*West v. Kerr-McGee Corp.*,
   765 F.2d 526 (5th Cir. 1985) ................................................................ 25

*Whitaker v. Kellogg Brown & Root, Inc.*,
   444 F. Supp. 2d 1277 (M.D. Ga. 2006) ................................................. 23

*White v. Bethlehem Steel Corp.*,
   222 F.3d 146 (4th Cir. 2000) ................................................................ 25

*Willingham v. Morgan,*
395 U.S. 402 (1969)................................................................................ 13, 14, 15, 16, 17, 27

*Woodson v. Halliburton,*
2006 WL 2796228 (S.D. Tex. Sept. 28, 2006) .......................................................... 22

## Statutes

28 U.S.C. § 1441 ............................................................................................... 1, 2, 28

28 U.S.C. § 1442(a)(1)................................................... 1, 2, 3, 13, 15, 16, 17, 18, 28

Defense Base Act,
42 U.S.C. §§ 1651 *et seq.*.......................................... 1, 4, 7, 12, 23, 24, 25, 27

Longshore and Harbor Workers' Compensation Act,
33 U.S.C. §§ 901 *et seq.*.................................................. 1, 4, 12, 23, 24, 26

## Other Authorities

Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues,* Order Code RL32419, at 11 (July 2007)............................................ 8

MEJA Expansion and Enforcement Act of 2007,
H.R. 2740, 100th Cong., § 2 (2007)................................................................. 9

Security Contractor Accountability Act of 2007,
S. 2147, 110th Cong., § 2 (2007)................................................................... 9

Transparency and Accountability in Military and Security Contracting Act of 2007,
S. 674, 100th Cong., § 6 (2007)..................................................................... 9

Transparency and Accountability in Security Contracting Act of 2007,
H.R. 369, 100th Cong., § 3 (2007).................................................................. 9

Defendants DynCorp International Inc. and DynCorp International LLC [hereinafter collectively referred to as "Defendants" or "DynCorp"], by and through their attorneys, Smith, Katzenstein & Furlow LLP, properly removed this matter to this Honorable Court pursuant to 28 U.S.C. § 1441 (federal question removal) and 28 U.S.C. § 1442(a)(1) (federal officer removal).

As set forth in the Notice of Removal, this Court has federal question jurisdiction under *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Manuf.*, 545 U.S. 308, 312 (2005), because Plaintiffs' state law claims (namely, whether she can bring tort claims against a "borrowed employer") implicate unique and significant federal issues and interests, including the interpretation and application of the Defense Base Act ("DBA") and the Longshore and Harbor Workers' Compensation Act ("LHWCA").

In addition, federal court jurisdiction is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Pursuant to the four-part test articulated in *Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998), Defendants have properly pled in their Notice of Removal that: (1) they are "persons"; (2) they are acting under color of and pursuant to the direction of a federal officer; (3) they are able to assert a colorable federal defense, and (4) there is a causal connection between the acts performed under color of office and the acts forming the basis of this lawsuit.  Thus, this Court should deny plaintiffs' Motion for Remand.

## NATURE AND STAGE OF PROCEEDINGS

On or about January 16, 2008, Plaintiff Cynthia Parlin, individually and in her capacities as surviving spouse of Samuel Parlin and executrix of the estate of Samuel Parlin, Deceased, filed a Complaint in the Superior Court of the State of Delaware In and For New Castle County, captioned *Parlin v. DynCorp International, Inc., et al.*, Case No. 08C-01-136 FSS ("the

1

Complaints"). In the Complaint, Plaintiff alleges Survival and Wrongful Death Actions against Defendants.

Defendants properly removed the action to this Honorable Court on February 19, 2008, based upon 28 U.S.C. §§ 1441 and 1442(a)(1). On February 26, 2008, Defendants timely filed a Motion To Dismiss Or, In The Alternative, Motion To Transfer Venue, based on lack of subject matter jurisdiction under the political question doctrine and improper venue. *See* Document Nos. 3 and 4. Plaintiffs filed an Opposition on March 14, 2008 (Document No. 8), and Defendants filed their reply brief on March 27, 2008 (Document No. 11).

On March 20, 2008, plaintiffs filed their Motion for Remand (Document Nos. 9 and 10). By stipulation, plaintiffs consented to an extension of time for Defendants to file a response to their Motion for Remand to April 21, 2008. *See* Document No. 12.

## SUMMARY OF ARGUMENT

Defendants properly removed this action based upon 28 U.S.C. §§ 1441 and 1442(a)(1). Removal based upon federal question jurisdiction was proper in this case because plaintiffs' state law claims implicate significant federal issues and interests. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Manuf.*, 545 U.S. 308, 312 (2005). To that end, the viability of Plaintiffs' claims rest upon significant federal issues, including the interpretation, construction and application of two federal statutes, the DBA and the LHWCA -- *i.e.*, does the exclusivity provision of the DBA preclude tort claims against a borrowed employer, like DynCorp? In addition, the significance of the federal interest in this case is undeniable -- Mr. Parlin was a federal government contractor employee who was employed to perform crucial services in furtherance of a United States foreign policy initiative in Iraq, where the United States military oversees security issues. Significant federal interest is also demonstrated by the actions being

2

taken by the legislative and executive branches of the federal government to address issues of accountability, protection and liability of private contractors. Notably absent from this case is any significant state interest,[1] particularly because plaintiffs are not citizens or residents of Delaware and none of the events underlying plaintiffs' claims occurred in Delaware.

Second, federal officer removal pursuant to 28 U.S.C. § 1442(a)(1) was proper in this case because (1) DynCorp, as a government contractor, is a person acting under an officer of the United States, (2) plaintiffs' allegations are based upon DynCorp's act while under contract with the United States, (3) DynCorp will raise colorable federal defenses to plaintiffs' claims, and (4) there is a causal connection between plaintiffs' claims and DynCorp's actions performed under color of federal office.

## STATEMENT OF FACTS

This action arises out of the death of Samuel Parlin, who died on or about January 16, 2006, as a result of injuries sustained from an Improvised Explosive Devise ("IED") while traveling in Baghdad, Iraq. Complaints, ¶ 1. It is further alleged that Mr. Parlin was working as an International Police Liaison Officer ("IPLO") at Baghdad International Airport and the Baghdad Police Academy in support of the United States Department of State Civilian Police ("CIVPOL") mission in Iraq. *Id.*

As alleged in the Complaint, Defendants contracted with the U.S. Department of State "to provide services, including to recruit, select, equip, and deploy civilian police officers in support of a CIVPOL mission to help the government of Iraq develop a modern, indigenous police force to maintain peace and stability." Complaints, ¶ 6. It is further alleged that Defendants and Does

---

[1] While DynCorp recognizes that it is incorporated in the state of Delaware, the issues raised in this case are not related in any way to DynCorp's corporate governance or other corporation-related issue. Thus, the state's interest is, at best, minimal in this case.

1 through 10 subcontracted with DynCorp International FZ-LLC ("DI-FZ") "to hire personnel and provide service in support of the CIVPOL contract." Complaints, ¶ 8.

Plaintiffs alleges that Mr. Parlin was employed at all times relevant by DI-FZ. Complaints, ¶ 9. She also alleges, in conclusory fashion without any legal citation, that DI-FZ properly secured coverage for Mr. Parlin under the Defense Base Act ("DBA"), 42 U.S.C. § 1651, and that therefore, Defendants do not have "the immunities of an employer under the DBA or [the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 904(a)]." Complaints, ¶¶ 10-11.

The Complaint contains unsupported allegations regarding the federal contracting process. To that end, plaintiffs allege that Defendants presented cost proposals to the U.S. Department of State "for security purchases and personnel below what they knew or should have known would be required for adequate security." Complaints, ¶ 21. She further asserts a legal conclusion as a factual assertion, contending that "such misrepresentation regarding security purchases and personnel was intentionally made to induce the [U.S.] Department of State to award defendants DYNCORP, DI LLC, and DOES the CIVPOL contracts on defendants' mistaken belief the DBA would shield them and their subcontractor from liability for any harm which resulted from intentionally providing inadequate security and/or directing individuals such as Samuel Parlin to perform dangerous acts, such as travel through Baghdad." Complaints, ¶ 22.

In addition, Plaintiffs assert that Defendants directed Mr. Parlin's movements within Iraq and that Defendants' actions, not the actions of DI-FZ (Mr. Parlin's employer), caused or contributed to his death. In that regard, plaintiffs allege that Defendants supplied Mr. Parlin with "inadequate resources and personnel," "maintained a culture of indifference to the security of IPLOs and other individuals," and "frequently under-equipped and under-manned the 'SHARK'

teams charged with travel security." Complaints, ¶¶ 23-24. It is alleged that "travel through any area of Baghdad was extremely dangerous," that "Defendants routinely failed to evaluate thoroughly the risk/benefit of proposed travel throughout Iraq," and that "Defendants routinely ordered travel even when wholly unrelated to mission success." Complaints, ¶¶ 26-27.

Finally, the Complaint establishes federal military dominion over the circumstances giving rise to Mr. Parlin's death. To that end, the Complaint alleges that after Mr. Parlin's death, the U.S. Army investigated Defendants' management and security practices and that the U.S. Army "intervene[d] directly to ensure the safety of IPLOs in the future." Complaints, ¶ 39.

## ARGUMENT

I.    **DEFENDANTS PROPERLY REMOVED THIS ACTION BASED UPON THIS COURT'S FEDERAL QUESTION JURISDICTION BECAUSE PLAINTIFFS' STATE LAW CLAIMS IMPLICATE UNIQUE AND SIGNIFICANT FEDERAL INTERESTS**

Based upon almost 100 years of precedent, Defendants also properly removed this case pursuant to this Court's federal question jurisdiction under 28 U.S.C. § 1441 because plaintiffs' state law claims implicate significant, and unique, federal issues and interests, including the interpretation of federal statutes as well as a review of the federal procurement process, the federal government's requirements for government contractors, expenditures of federal taxpayer monies, military oversight of contracts and the dangers facing contractors while working in hostile conditions in Iraq. *See* Notice of Removal at 4-9; *Grable & Sons Metals Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).

### A.    **Federal "arising under" jurisdiction exists over state law claims that implicate significant federal interests**

In *Grable*, the state law claim of quiet title depended on the interpretation of the notice statute in the federal tax law. 545 U.S. at 311. In allowing the removal of this state law claim to federal court, the Supreme Court was reminded that "[t]here is ... another longstanding, if less

5

frequently encountered, variety of federal 'arising under' jurisdiction, this Court having recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Id.* at 312 (citing *Hopkins v. Walker*, 244 U.S. 486, 490-491 (1917)). The Supreme Court continued:

> This doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues.

*Grable*, 545 U.S. at 312 (citing ALI, Study of the Division of Jurisdiction Between State and Federal Courts 164-166 (1968)). The Supreme Court went on to reiterate its previous holding that "a state-law claim could give rise to federal-question jurisdiction so long as it 'appears from the [complaint] that the right to relief depends upon the construction or application of [federal law].'" *Grable*, 545 U.S. 313 (quoting *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921)).

To determine whether federal jurisdiction over a state action is appropriate, courts must evaluate whether "federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Grable*, 545 U.S. at 313-314. Thus, the pertinent inquiry is: "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. Based upon this test, the Supreme Court in *Grable* held that there was federal jurisdiction because the meaning of a federal statute was "actually in dispute" and the "meaning of a federal tax provision is an important issue of federal law that sensibly belongs in a federal court." *Id.* at 314-315. To that end, the Supreme Court noted that the federal

government "has a strong interest in the prompt and certain collection of delinquent taxes." *Id.* at 315 (citations and quotations omitted).

**B.** **Federal question jurisdiction is proper in this case because plaintiffs' state law claims depend upon the construction and application of federal statutes, a significant federal interest**

*Grable* controls the outcome of this case rather than being distinguishable, as Plaintiffs mistakenly allege (*see* Motion for Remand at 11). First, there is a significant federal issue in actual dispute that goes to the very heart of Plaintiffs' ability to bring their lawsuit -- namely, is DynCorp immune from tort liability under the exclusivity of remedies provision of the Defense Base Act ("DBA"), 42 U.S.C. §§ 1651 *et seq.*, as the borrowed employer? Well settled case law applying the "borrowed employee" doctrine to the exclusive remedy provision of the LHWCA establishes that a general contractor (such as DynCorp), as the "borrowing employer," is immune from tort liability. *See Peter v. Hess Oil V.I. Corp.*, 903 F.2d 935, 938-943 (3d Cir. 1990) (applying the exclusive remedy provision to entities other than the direct employer in certain circumstances under the "borrowed employee" doctrine). Plaintiffs, on the other hand, argue that the exclusivity of remedies provision of the DBA only insulates Mr. Parlin's direct employer, DI-FZ, from tort claims and that DynCorp, as the general contractor, is not likewise immune, even though DynCorp controlled and directed Mr. Parlin's work.

While the "borrowed employee" doctrine has not yet been applied under the DBA, because the DBA extends the provisions of the LHWCA's provision to contractors who are injured or killed while working on government contracts abroad, it is natural and reasonable to apply the "borrowed employee" doctrine to the exclusivity provisions of the DBA. Thus, this Court will have to interpret and apply the DBA and, to some extent, the LHWCA, to determine whether Plaintiffs have any basis for bringing their claims against the borrowing employer. Accordingly, because the viability of plaintiffs' state law claims is wholly dependent on the

construction, interpretation and application of the DBA and/or the LHWCA in light of the "borrowed employee" doctrine, the federal interest in this case (the interpretation and application of federal statutes) will be of paramount importance.

In addition, other international, federal or foreign law may be applicable to Plaintiffs' claims and/or Defendants' conduct in Iraq.[2] *See* Congressional Research Service, *Private Security Contractors in Iraq: Background, Legal Status, and Other Issues*, Order Code RL32419, at 11 (July 2007). Unfortunately, there is no clear guidance as to the legal authority applicable to civil lawsuits for personal injuries for private contractors working for the United States Government in Iraq. However, in light of the recent promulgation of federal criminal liability standards for private contractors in Iraq, it is reasonable to conclude that federal standards should likewise govern civil liability. To that end, as demonstrated below, there have been recent federal efforts to promulgate standards to address the issues raised in this lawsuit, which signify that federal (which may include treaties and/or other international conventions), rather than state, law should be applied to this case.

---

[2] In footnote 3 of their Motion for Remand, plaintiffs, relying on *Baragona v. Kuwait Gulf Link Transp. Co.*, 2007 U.S. Dist. LEXIS 81804 (N.D. Ga. Nov. 5, 2007), erroneously assert that the principle of *lex loci delicti* "counsels in favor of state, not federal, jurisdiction" and that "*lex loci delicti* requires the Court first evaluate state tort law." *Baragona*, however, does not support plaintiffs' assertion. First, the federal district court in *Baragona* had already determined jurisdiction in another proceeding and the court's jurisdiction was not addressed in the opinion. *See Baragona*, *passim*. Second, the principle of *lexi loci delicti* is not a jurisdictional analysis. It is a conflict of law analysis. *Baragona*, 2007 U.S. Dist. LEXIS at *2. Thus, that state law may be applicable does not counsel in favor of state court jurisdiction, as plaintiffs contend. Lastly, in *Baragona*, the federal district court concluded that Iraqi law applied to the plaintiffs' claims and proceeded to rule on the merits of the claims based upon Iraqi law. *Baragona*, 2007 U.S. Dist. LEXIS at *3.

C.    **This Court's exercise of its federal question jurisdiction over plaintiffs' state law claims will not upset the balance of responsibilities between the federal and state courts**

Consistent with the holding in *Grable*, exercising federal jurisdiction over plaintiffs' state law claims would not disturb the balance of federal and state judicial responsibilities. *Grable*, 545 U.S. at 314. Based upon recent federal legislative activity, it is apparent that Congress is attempting to establish federal standards to address precisely the issues raised in this lawsuit (namely, allegations of negligence based upon alleged improper or inadequate provision of security and protection). To that end, a number of bills have been recently introduced by congressional members to establish federal standards and oversight of contractors in Iraq and other locations. *See* Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong., § 6 (2007)[3]; Transparency and Accountability in Security Contracting Act of 2007, H.R. 369, 100th Cong., § 3 (2007). *See also* MEJA Expansion and Enforcement Act of 2007, H.R. 2740, 100th Cong., § 2 (2007) (proposing to extend the Military Extraterritorial Jurisdiction Act to contractors employed abroad to hold them criminally liable for certain acts); Security Contractor Accountability Act of 2007, S. 2147, 110th Cong., § 2 (2007) (same).

Because this Court would have original jurisdiction if claims were brought under these soon-to-be enacted federal laws, this Court's exercise of federal question jurisdiction now over state law claims that will require this Court to judicially establish standards regarding the adequacy of safety and protection (the subject matter of pending federal legislative efforts) is

---

[3] Senator Obama's bill specifically provides: "The head of each agency awarding a covered contract shall issue guidance (appropriate for the agency) on equipment used for private security functions under covered contracts with the agency, including appropriate uniforms and levels of body armor and equipment armor, and a recommended list of re-armorers and weapons and armor manufacturers for complying with such guidelines." Transparency and Accountability in Military and Security Contracting Act of 2007, S. 674, 100th Cong. § 6(b)(2) (2007). Section 6(c)(2)(F) of Senator Obama's bill provides that the Theater Security Contract Coordinating Officer must, among other things, "as appropriate, communicate up-to-date information about the security environment that may be relevant to contractor personnel." *Id.* at § 6(c)(2)(F).

entirely appropriate. The federal courts should now be, because they will be, the proper forum for Plaintiffs' claims.

**D.      Federal question jurisdiction is appropriate because of the unique and significant federal interests at stake in this lawsuit.**

There are more than just federal legal issues at stake in this lawsuit. Plaintiffs' allegations in the Complaint raise other very significant federal issues. For example, like the federal government's strong interest in collecting delinquent taxes in *Grable*, there can be no question that the federal government would have equally strong interests in the integrity of the federal procurement process, which Plaintiffs claim is flawed and allegedly manipulated by Defendants (*see* Complaints, ¶¶ 19-22); the level of protection and security provided to private contractors working in Iraq, which Plaintiffs assert is allegedly insufficient based upon the State Department's minimum requirements (*see* Complaints, ¶¶ 1, 13-25); expenditures of federal taxpayer money on contractors by the U.S. Government (*see* Complaints, ¶¶1, 5, 13-18); U.S. Military oversight over private contractors (*see* Complaints, ¶¶ 1, 27, 39); and the dangerous conditions in Iraq, where the United States (as opposed to a single state, such as Delaware) has a prominent and leading presence (*see* Complaints, ¶¶ 26-27, 30, 32, 37, 38).

The last two federal issues have resulted in a collaboration between the U.S. Departments of Defense and State to develop laws and promulgate regulations addressing some or all of the issues raised in this Complaints, as well as their agency oversight and deployment of private contractors. In a "Memorandum of Agreement (MOA) between the Department of Defense and the Department of State on USG Private Security Contractors"[4] that was executed on December 5, 2007 (a copy of which is attached hereto as Exhibit 1), the U.S. Departments of Defense and State agreed to "jointly develop, implement, and follow core standards, policies, and procedures

---

[4] A copy of this MOA can be found at http://www.defenselink.mil/pubs/pdfs/Signed%20MOA%20Dec%205% 202007.pdf.

for the accountability, oversight, and discipline of [private security contractors]," which will include a "clear legal basis for holding [U.S. Government] private security contractors accountable under U[.]S[.] law." *See* Exhibit 1 at 1. This MOA indicates that the two federal executive agencies will develop and implement federal standards in Iraq covering their private security contractors regarding unity of effort, rules for the use of force, authority to process and carry firearms, movement coordination and control, serious incident response and investigation, contract management and language, and legal accountability (under U.S. law). *See* Exhibit 1, Annex A. If there is a clear legal basis for determining liability here, then it clearly implicates the same federal interests the U.S. Departments of Defense and State are evaluating as part of the MOA.

**E.**     **Plaintiffs have not demonstrated that federal question jurisdiction is not proper in this case**

Instead of challenging the grounds of removal stated in the Notice of Removal, Plaintiffs devote the majority of their Motion for Remand discussing points never raised by Defendants in its removal. *See* Motion for Remand at 9-14. Plaintiffs assert that Defendants "may in fact be 'sand-bagging' their Notice of Removal with the intent of later raising a 'complete preemption' argument" or a "'government contractor' argument." *Id.* at 9, 12. Plaintiffs, however, have not established how potential arguments (which Defendants did not raise and thus, which has not been properly briefed at this point of the litigation) justify remanding this proceeding to the state court.

Moreover, Plaintiffs' attempt to distinguish *Grable* from this case must fail. Plaintiff's claims are not "independent of federal law" as they claim, but rather, Plaintiffs' right to any relief is wholly dependent on the construction, interpretation and application of the DBA, the LHWCA and the "borrowed employee" doctrine.

11

Finally, *In re: Blackwater Security Consulting, LLC*, 460 F.3d 576 (4th Cir. 2007), *cert. denied sub nom. Blackwater Security Consulting, LLC v. Nordan*, __ U.S. __, 127 S. Ct. 1381 (2007), does not support Plaintiffs' position. *In re: Blackwater* involved the contractor's attempt to appeal a district court's remand order, which is not reviewable pursuant to 28 U.S.C. § 1447(d), except under certain conditions. 460 F.3d at 582. The Fourth Circuit Court of Appeals concluded that none of the limited exceptions applied, declined to issue a writ of mandamus, and dismissed the appeal. *Id.* at 582-595. Thus, the Fourth Circuit did not "uphold[] the District Court's remand," but rather, concluded that it did not have jurisdiction to consider an appeal of the decision and thus, dismissed the appeal without evaluating the correctness of the district court's remand order.

In short, Plaintiffs' state law claims are predicated upon the construction, interpretation and application of a federal statute (*i.e.*, whether DynCorp is immune from liability as a "borrowed employer" under the DBA, as applied under the LHWCA) and implicate several other issues of unique and significant federal interest (including but not limited to the federal procurement process, federal requirements for contractor employee safety and protective standards, the federal government's reliance on government contractors, and military oversight of contractors in Iraq). In addition, Congress intends federal courts to adjudicate these types of issues (as evidenced by the federal legislation). Accordingly, this Court can properly exercise federal question jurisdiction over Plaintiffs' state law claims in accordance with *Grable*, assuming justiciability. Thus, removal of this matter based upon this Court's federal question jurisdiction was proper and Plaintiffs' Motion for Remand should be denied.

## II.   DEFENDANTS PROPERLY REMOVED THIS CASE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

In addition to properly removing this case based upon this Court's federal question jurisdiction, Defendants properly removed this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Pursuant to the four-part test articulated in *Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998), Defendants have properly pled in their Notice of Removal that: (1) they are "persons"; (2) they are acting under color of and pursuant to the direction of a federal officer; (3) they are able to assert a colorable federal defense, and (4) there is a causal connection between the acts performed under color of office and the acts forming the basis of this lawsuit.  Accordingly, Plaintiffs' motion for remand must be denied.

### A.   Standard Of Review Under 28 U.S.C. § 1442(a)(1)

The federal officer removal statute provides in pertinent part:

> A civil action . . . commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1)   The United States or any agency thereof or any officer (**or any person acting under that officer**) of the United States or of agency thereof, sued in an official or individual capacity for any act under color of such office  . . . .

28 U.S.C. § 1442(a)(1) (emphasis added).  This provision is not to be construed narrowly. *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (holding that Section 1442(a)(1) is "not 'narrow' or 'limited'").  Instead, as recognized by the Third Circuit Court of Appeals and this District Court, it must be broadly construed.  *Megill v. Worthington Pump, Inc.*, 1999 U.S. Dist. LEXIS 4433, at *5-6 (D. Del. Mar. 26, 1999) (citing *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)); *see Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (holding that "the right of removal is absolute for conduct performed under color of federal office, and . . .

13

the policy favoring removal should not be frustrated by a narrow, grudging interpretation of §

1442(a)(1)"). The Supreme Court stated that this provision is, "[a]t the very least, . . . broad

enough to cover all cases where federal officers can raise a colorable defense arising out of their

duty to enforce federal law." *Willingham*, 395 U.S. at 407 (stating that "[t]his policy should not

be frustrated by a narrow, grudging interpretation of § 1442(a)(1)").

The purpose of the federal officer removal statute "is not hard to discern." *Id.* at 406. As

recognized by the Supreme Court over 125 years ago, the United States Government:

> can act only through its officers and agents . . . . If, when thus
> acting, and within the scope of their authority, those officers can be
> . . . brought to trial in a State court, for an alleged offence against
> the law of the State, yet warranted by the Federal authority they
> possess, and if the general government is powerless to interfere at
> once for their protections, -- if their protection must be left to the
> action of the State court, -- the operations of the general
> government may at any time be arrested at the will of one of its
> members.

*Id.* (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)). Without question, one of the

primary purposes of the federal officer removal statute is to have federal defenses litigated in

federal courts. *Id.* at 407. To that end, it is "impossible that the Constitution should so weaken

the Federal Government as to prevent it from protecting itself against unfriendly state [laws]

which 'may affix penalties to acts done under the immediate direction of the national

government, and in obedience to its laws [or] may deny the authority conferred by those laws.'"

*Mesa v. California*, 489 U.S. 121, 127 (1989) (quoting *Tennessee*, 100 U.S. at 263).

Accordingly, because federal jurisdiction rests on the "very basic" federal interest of enforcing

federal law through federal officials, "the right of removal under § 1442(a)(1) is made absolute

whenever a suit in a state court is for any act 'under color' of federal office, regardless of

whether the suit could originally have been brought in a federal court." *Willingham*, 395 U.S. at 406 (citations omitted).

Finally, it is well established that Section 1442(a) creates an exception to the well-pleaded complaint rule because it predicates removal based on the existence of a colorable federal defense. *Mesa*, 489 U.S. at 139 (holding that removal under 28 U.S.C. § 1442(a) "must be predicated upon averment of a federal defense"). Thus, a case "may be removed despite the nonfederal cast of the complaint." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (holding that "the federal question element is met if the defense depends on federal law").

**B.      Government Contractors May Remove Cases Under Section 1442(a)(1)**

As the language of Section 1442(a)(1) clearly states, a private party, such as a government contractor, may remove an action under this statutory provision. *New Jersey Dep't of Environ. Prot. v. Dixo Co.*, 2006 U.S. Dist. LEXIS 68288, at *5 (D.N.J. Sept. 22, 2006) (holding same and citing *New Jersey Dep't of Environ. Prot. v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398 (D.N.J. 2005)). *See also Lane v. Halliburton*, 2006 U.S. Dist. LEXIS 63948 (S.D. Tex. Sept. 7, 2006) (denying motion to remand in case brought against a government contractor who removed the case to federal district court based on Section 1442(a)); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189 (M.D. Fla. 2006) (same); *Malsch v. Vertex Aerospace, LLC*, 361 F. Supp. 2d 583 (S.D. Miss. 2005) (same); *Virden v. Altria Group, Inc.*, 304 F. Supp. 2d 832, 845 (N.D. W. Va. 2004) (same); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993) (same).

C.    **Defendants Properly Removed This Action Under the *Feidt* Test**

To establish removal jurisdiction under Section 1442(a)(1), the Third Circuit Court of

Appeals, relying on *Mesa* and *Willingham*, set forth the following four criteria:

(1)    The defendant must establish that it is a "person" within the meaning of the statute;

(2)    The defendant must establish that the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office;

(3)    The defendant must establish that it can raise a colorable federal defense; and

(4)    The defendant must establish a causal nexus between the plaintiff's claims and the conduct performed under color of federal office.

*Feidt*, 153 F.3d at 127; *Megill*, 1999 U.S. Dist. LEXIS 4433 at *6. The Court of Appeals did not

otherwise analyze how these criteria should be applied because it determined that it was

precluded from reviewing the District Court's remand decision pursuant to 28 U.S.C. § 1447(d).

*Feidt*, 153 F.3d at 127.

The Supreme Court, however, has admonished that federal officers, and thus entities

acting under such officers, "need not win his case before he can have it removed." *Willingham*,

395 U.S. at 407; *Jefferson County*, 527 U.S. at 431. "[O]ne of the most important reasons for

removal is to have the validity of the defense of official immunity tried in a federal court. . . .

Congress has decided that federal officers, and indeed the Federal Government itself, require the

protection of a federal forum." *Willingham*, 395 U.S. at 407. Thus, Defendants are not required

to establish "an airtight case on the merits in order to show the required causal connection."

*Jefferson County*, 527 U.S. at 432 (holding that such a high threshold would defeat the purpose

of the removal statute and accepting the "theory of the case" as an "adequate threshold showing

that the suit is for an act under color of office") (quotations and citations omitted).   As long as

Defendants have "sufficiently put in issue the questions of official justification and immunity[,]

the validity of their defenses should be determined in the federal courts." *Willingham*, 395 U.S.

at 409 (holding that "[t]his is exactly what the removal statute was designed to accomplish").

### 1.     Defendants are "persons" within the meaning of Section 1442(a)(1)

As recognized by this Court in *Megill*, a corporation is a "person" within the meaning of

Section 1442(a)(1).   1999 U.S. Dist. LEXIS 4433 at * 6.   Plaintiffs do not dispute that DynCorp

is a "person" within the meaning of Section 1442(a)(1).   Accordingly, Defendants have satisfied

the first criterion.

### 2.     Plaintiffs' claims are based on Defendants' conduct "acting under" federal office

At the outset, it should be noted that this case is not about a simple government contract.

Rather, Defendants directly implement and perform the tasks to fulfill the goals of this important

U.S. foreign policy.   As explained by the Department of State, CIVPOL deployments are "part of

the U.S. Government's mission to support the emergence of stable democracies . . . ."   *See*

Exhibit 2 (print-out of CIVPOL Home Page and other pages from U.S. Department of State's

website) at 2.[5]   CIVPOL missions "have become an integral component of what were originally

military peacekeeping operations," and "help[ ] to ensure that peace and stability can be

sustained even after international peacekeepers depart."   *Id.*   As the lead agency to coordinate,

implement and supervise U.S. participation in CIVPOL in, the U.S. Department of State is

authorized "to use contractor support to assist in its duties . . . ."   Exhibit 3 (Presidential Decision

---

[5]  Defendants respectfully request that the Court take judicial notice of the U.S. Department of State's official pronouncements regarding the CIVPOL program as officially posted on the Department of State's website at www.state.gov. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir. 2004) (taking judicial notice of Patent and Trademark Office records available on-line); *In re: Jean Fowler*, 2006 Bankr. LEXIS 2117, at *5 n.2 (D. Del. Sept. 11, 2006) (taking judicial notice of IRS publications available on IRS's website).

Directive 71) at 3. Under this authority, the State Department contracts with DynCorp to act on behalf of the United States in carrying out CIVPOL missions. *See* Exhibit 2 at 3. Thus, DynCorp was acting under a federal officer at the time of the events underlying the allegations in this case.

DynCorp's status as a CIVPOL contractor is very similar to that of a Medicare Part B carrier, which is also a private contractor. *See Regional Medical Transport, Inc. v. Highmark, Inc.*, 2008 U.S. Dist. LEXIS 27381, at *3 (E.D. Pa. Apr. 3, 2008). As explained in this case, the Secretary of Health and Human Services has delegated the responsibility of administering the Medicare program to the Centers for Medicaid and Medicare Services ("CMS"). *Id.* at *3. CMS then delegates the administration of the benefits under Part B of the Medicare Act "through contracts with private insurance contractors." *Id.* Because of this arrangement (which is similar to the administration of CIVPOL through private contracts), courts have "consistently recognized that suits against Medicare contractors are suit against individuals operating under the direction of a federal officer because the Secretary is the real party in interest." *Id.* (quotation and citation omitted). In concluding that removal by the contractor under Section 1442(a)(1) was proper, the Eastern District of Pennsylvania considered the contractor's "role in administering the Medicare program and the complexity of the federal regulations under which they operated . . . ." *Id.* at 16.

Similarly, in this case, CIVPOL is administered and implemented through private contracts, including with DynCorp. As alleged in the Complaint, Defendants entered into contractual agreements with the U.S. Department of State that "included requirements provided by the Department of State for defendants to follow as they recruited, selected, equipped, and deployed civilian police officers from the United States" and "included provisions relating to employee safety, including, but not limited to, requirements that the general contractor and any

subcontractors maintain a minimal standard of security described by the contract, and requirement that such contractors take all steps necessary to ensure the safety of IPLOs." Complaints, ¶¶ 15-16. Because DynCorp discharges a foreign policy initiative on behalf of the State Department, it was acting under a federal officer in Iraq.

### 3.    Defendants have established colorable federal defenses

Defendants raised three federally-based defenses in their Notice of Removal: (1) the government contractor defense established by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504-505 (1988); (2) the political question doctrine, which was fully briefed in Defendants' Motion to Dismiss or, in the Alternative, Motion to Transfer Venue, which is hereby incorporated by reference; and (3) the Defense Base Act, 42 U.S.C. § 1651. Notably, "[o]nly one colorable defense is needed to meet this prong of the [Feidt] test." *Lane*, 2006 U.S. Dist. LEXIS 63948 at *11.

### (a)    Government contractor defense

While neither the Third Circuit Court of Appeals nor this District Court has applied the *Boyle* three-part test to nonmilitary service contracts, Defendants submit that the government contractor defense applies in this case. The Third Circuit Court of Appeals has acknowledged that "the federal interest in a performance contract . . . [is] essentially the same as the federal interests in procurement contracts" and that the defense is available to contractors who are "compelled by a contract to perform an obligation for the United States." *Carley v. Wheeled Coach,* 991 F.3d 1117, 1120 (3d Cir. 1993) (holding that the government contractor defense applies to nonmilitary procurement contracts); *see Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003) (applying the *Boyle* government contractor defense to service maintenance contracts); *Malesko v. Correctional Services Corp.*, 229 F.3d 374, 381-382 (2d Cir.

2000), *rev'd on other grounds*, 534 U.S. 61 (2001) (stating in dicta that "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense"); *In re World Trade Center Disaster Site Litig.*, 2006 U.S. Dist. LEXIS 75020 (S.D.N.Y. Oct. 17, 2006) (holding that "the immunity traditionally afforded to the federal government for actions taken in furtherance of its government functions" has been extended to "private entities hired to facilitate the government in the implementation of its programs and goals"); *Adorno v. Correctional Services Corp.*, 312 F. Supp. 2d 505, 521-522  (S.D.N.Y. 2004) (assuming applicability of the government contractor defense to a nonmilitary service contract); *Richland-Lexington Airport Dist. v. Atlas Prop., Inc.*, 854 F. Supp. 400 (D.S.C. 1994).

In *Boyle*, the United States Supreme Court held that tort liabilities arising out of the performance of a federal government contract and "the civil liability of federal officials for actions taken in the course of their duty" are areas of "uniquely federal interests" that are "so committed by the Constitution and laws of the United States to federal control that state law is pre-empted" and replaced by federal common law.   The "unique federal interest" at the heart of the government contractor defense, *Boyle*, 487 U.S. at 507, is obvious in this case.  Defendants were performing tasks pursuant to a contractual obligation in support of an international peacekeeping mission supported and mandated by the President of the United States and implemented by the U.S. Department of State.  Defendants were training the Iraqi police force, working with the Iraqi Ministry of the Interior, and participating in an international effort to establish a sustainable reform of the Iraqi police force.

Defendants are entitled to immunity with respect to the tort claim alleged in this case because: (1) the U.S. Government and/or the U.S. Armed Forces established the criteria for

20

equipping IPLOs and established a standard of security (*see* Complaints, ¶¶ 14, 16); (2) Defendants complied with the U.S. Government and/or the U.S. Armed Forces' requirements; and (3) Defendants were not aware of dangers posed by the criteria issued by the U.S. Government and/or U.S. Armed Forces for the provision of security.

In conclusion, Defendants have established a colorable federal defense based on the government contractor defense. *See Megill*, 1999 U.S. Dist. LEXIS 4433 at *8-12 (analyzing the government contractor defense as a colorable federal defense); *see also McMahon*, 410 F. Supp. 2d at 1197-1198 (holding that the government contractor defense was raised as a colorable federal defense).

### (b)    Political question doctrine

As demonstrated in Defendants' Motion to Dismiss Or, In The Alternative, Motion To Transfer Venue (which is hereby incorporated by reference), "'[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'" *Gross v. German Foundation Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court articulated six factors to be considered in determining the presence or absence of a nonjusticiable political question:

(1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

(2)    a lack of judicially discoverable and manageable standards for resolving it; or

(3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

(4)  the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

(5)  an unusual need for unquestioning adherence to a political decision already made; or

(6)  the potential for embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, *cited and quoted by Gross*, 456 F.3d at 377; *In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG Schering)*, 196 Fed. Appx. 93, 2006 WL 2162308 (3d Cir. Aug. 2, 2006) (dismissing survivor's claim against foundation created to compensate survivors of the Holocaust based on the political question doctrine because judicial review would express a lack of respect for the Executive Branch and its longstanding foreign policy interest in resolving Nazi-era claims through intergovernmental negotiations).

"A finding of any one of the six factors indicates the presence of a political question." *Gross*, 456 F.3d at 377. Recent lawsuits brought by or on behalf of civilian contractors injured or killed in Iraq have been dismissed based upon lack of jurisdiction because of a political question. *See Smith-Idol v. Halliburton*, 2006 WL 2927685 (S.D. Tex. Oct. 11, 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving the deaths and injuries suffered by contractors who were driving in a convoy in an area in Iraq known to be subject to enemy attacks and artillery fire); *Fisher v. Halliburton, Inc.*, 454 F. Supp. 2d 637 (S.D. Tex. 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving the deaths and injuries suffered by contractors who were driving in a convoy in an area of Iraq known to be subject to enemy attacks and artillery fire); *Woodson v. Halliburton*, 2006 WL 2796228 (S.D. Tex. Sept. 28, 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine after concluding that

22

decisions about the adequacy of protection while traveling in Iraq "could not be divided into discrete parts attributable to the [contractors] and the Army"); *Smith v. Halliburton Co.*, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving death of contractor by a suicide bomb attack on a military based in Iraq); *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) (dismissing complaint for lack of jurisdiction based on the political question doctrine in case involving a soldier's death allegedly caused by acts of a government contractor's employee). As demonstrated below, similar considerations in this case also warrant dismissal for lack of jurisdiction because of a political question.

As Defendants have established and fully briefed in their Motion to Dismiss, this lawsuit must be dismissed for lack of subject matter jurisdiction because a resolution of the issues raised in this lawsuit clearly (1) involve policy determinations for which the legislative and executive branches have primary responsibility and (2) intrude into the constitutionally committed authority of the other branches with respect to military actions and foreign policy. In addition, dismissal under the second *Baker* factor is warranted here because there is a lack of judicially discoverable and manageable standards to resolve the issues in this case. As recognized by the courts, "'[o]ne of the most obvious limitations [on the court] is that judicial action must be governed by standard, by rule.'" *Fisher*, 454 F. Supp. 2d at 641-642 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004)) (emphasis in original).

**(c)      Defense Base Act**

In addition, Defendants will assert a federal defense based upon two federal statutes -- the exclusivity of remedies as established by the DBA, 42 U.S.C. § 1651, *et seq.*, and the LHWCA, 33 U.S.C. §§ 901, *et seq.* To that end, Plaintiffs readily concede Mr. Parlin was covered by the

DBA while he were performing his work on the CIVPOL mission in Iraq.  *See* Complaint, ¶ 10.

Thus, whether DBA coverage is required and whether it has been properly provided are not

issues in this case.

The DBA, 33 U.S.C. § 1651, extends the provisions of the Longshore Harbor Worker's

Compensation Act ("LHWCA") to individuals who are injured or killed while working under a

U.S. government contract abroad.  *See* 33 U.S.C. § 1651(a).  In most cases, the DBA's exclusive

remedy provision, like the LHWCA's provision, is only applicable to the injured employee's

direct employer.  *See* 33 U.S.C. § 1651(c).  *See Ross v. DynCorp*, 362 F. Supp. 2d 344, 358

(D.D.C. 2005) (granting judgment as a matter of law on the ground that the LHWCA, pursuant to

the DBA, provided the exclusive remedies to plaintiffs who brought wrongful death and

survivorship actions based on the death of an employee working under a government contract in

Columbia, South America).  *See also Flying Tigers Lines, Inc. v. Landy*, 370 F.2d 46, 52 (9th Cir.

1966) (holding that the DBA evidenced Congress' intent that the LHWCA compensation scheme

is to be the employee's sole remedy); *Pulley v. Peter Kiewit Son's Co.*, 223 F.2d 191, 194 (7th

Cir. 1955) (holding that the remedies provided by the LHWCA were exclusive as long as the

employer complied with the mandates of the statute); *Sparks v. Wyeth Lab., Inc.*, 431 F. Supp.

411, 417 (W.D. Okla. 1977) (holding that the DBA "makes the exclusive remedy of an employee

of a covered government contractor against that contractor a compensation remedy under the

[LHWCA]"); *Berven v. Fluor Corp.*, 171 F. Supp. 89, 90 (S.D.N.Y. 1959) (dismissing complaint

based on exclusivity of LHWCA benefits pursuant to the DBA).

However, in interpreting and applying the exclusive remedy provision of the LHWCA,

courts, including the Third Circuit Court of Appeals, have recognized the "borrowed employee"

theory to apply that exclusive remedy provision to entities other than the direct employer in

certain circumstances. *Peter v. Hess Oil V.I. Corp.*, 903 F.2d 935, 938-943 (3d Cir. 1990). Thus, under the "borrowed employee" doctrine, a "borrowing employer" is immune from tort actions arising from injuries covered by the LHWCA. *See id.* at 953; *see also White v. Bethlehem Steel Corp.*, 222 F.3d 146 (4th Cir. 2000) (holding that as the borrowed servant, plaintiff's exclusive remedy was the Longshore Harbor Worker's Compensation Act and dismissing tort action against the borrowing employer); *Billizon v. Conoco, Inc.*, 993 F.2d 104 (5th Cir. 1993) (holding same). Because the DBA extends the provisions of the LHWCA's provision to contractors who are injured or killed while working on government contracts abroad, it is natural and reasonable to allow the "borrowed employee" doctrine to be applied in matters involving the DBA.

In applying the "borrowed employee" doctrine, the Third Circuit Court of Appeals focuses on two essential factors: (1) whether the borrowing employer was responsible for the borrowed employee's working conditions, and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his employment.[6] *Peter*, 903 F.2d at 942 & n.7. In *Peter*, the plaintiff was directly employed by Litwin Panamerican Corporation ("Litwin"). Litwin and Hess Oil had a contractual arrangement by which Litwin provided personnel to Hess Oil at Hess' refinery. Of the two categories of

---

[6] Other relevant factors in the "borrowed employee" analysis include:

1. Who has control over the employee and his work?
2. Whose work is being performed?
3. Was there an agreement between the original and the borrowing employer?
4. Did the employee acquiesce in the new work situation?
5. Did the original employer terminate his relationship with the employee?
6. Who furnished the tools and place for performance?
7. Was the new employment over a considerable length of time?
8. Who had the right to discharge the employee?
9. Who had the obligation to pay the employee?

*Peter*, 903 F. 2d at 942, n.7 (quoting *West v. Kerr-McGee Corp.*, 765 F.2d 526 (5th Cir. 1985)). A single factor is not determinative, but the courts will weigh some factors more heavily than the others.

employees provided by Litwin to Hess, the plaintiff was a "Type I" employee who was furnished to work under Hess' exclusive control and direction and for whose workmanship Litwin was not responsible. To that end, Hess Oil controlled the plaintiff's working conditions, directed and controlled the plaintiff's work, and provided the plaintiff with safety equipment and a safe working environment. The plaintiff worked on Hess' refinery from November 1984 through August 1985, at which time he was injured while performing the work of Hess. The plaintiff had acquiesced to working for Hess and Hess, via Litwin, paid his salary and LHWCA coverage. *Id.* at 942. Each of the elements set forth above in the *Peter* case are present in this case.

By her own allegations, Mrs. Parlin concedes that Mr. Parlin acquiesced to the risks of his employment (indeed, he was seeking to extend his employment in Iraq after completing 2 years of employment, *see* Complaint, ¶¶ 1, 29) and that DynCorp was responsible for Mr. Parlin's working conditions, including safety. *See* Complaint, *passim.* For instance, she alleges that DynCorp supplied Mr. Parlin with "inadequate resources and personnel," including allegedly obsolete, old, illegal or "otherwise dangerous weapons." Complaint, ¶ 23. DynCorp is also alleged to have "maintained a culture of indifference to the security of IPLOs and other individuals" and "frequently under-equipped and under-manned the 'SHARK' teams charged with travel security." Complaint, ¶¶ 24-25. Further, it is alleged that "Defendants routinely failed to evaluate thoroughly the risk/benefit of proposed travel throughout Iraq," and that "Defendants routinely ordered travel even when wholly unrelated to mission success." Complaint, ¶¶ 26-27.

Because the allegations in the Complaint illustrate Mr. Parlin's acquiescence and DynCorp's control over his working environment, DynCorp, as the borrowing employer, is

immune from any tort liability.[7]  Thus, Defendants have asserted a colorable federal defense based on the DBA, a federal statute.

**4.      Defendants have established a causal relationship between the alleged wrongful acts and their official acts**

Lastly, there is a causal connection between Plaintiff's claim and Defendant's actions performed under color of federal office.  As recognized by the courts in this Circuit, the requirement that the contractor be acting under federal office and that there be a causal connection between the conduct and the federal direction "tend to collapse into a single requirement . . . ."  *Regional Medical Transport*, 2008 U.S. Dist. LEXIS at *14 (citation and quotation omitted).  In this case, Defendants were implementing and administering the United States' CIVPOL mission in Iraq when Mr. Parlin was killed by an insurgent IED.  Accordingly, there is a causal connection.

In conclusion, Defendants have established and pleaded all four elements for removal under the federal officer removal statute.  Because Defendants have "sufficiently put in issue the questions of official justification and immunity[,] the validity of their defenses should be determined in the federal courts."  *Willingham*, 395 U.S. at 409 (holding that "[t]his is exactly what the removal statute was designed to accomplish").  *See also Jefferson County*, 527 U.S. at 432 (holding that "demanding an airtight case on the merits in order to show the required causal connection" would defeat the purpose of the removal statute and accepting the "theory of the case" as an "adequate threshold showing that the suit is for an act under color of office" (quotations and citations omitted)).  Accordingly, Plaintiffs' motion for remand must be dismissed.  *See Pack*, 838 F. Supp. at 1103 (holding that defendants have raised a colorable

---

[7] In the event that the Court determines that there is insufficient information in the pleadings at this time to evaluate the "borrowed employee" doctrine, DynCorp respectfully requests that the parties be permitted to engage in very limited discovery regarding only the jurisdictional issues raised in Defendant's Opposition to Plaintiffs' Motion for Remand.

federal defense for the purposes of § 1442(a)(1) removal and therefore, removal is appropriate

under §§ 1441 (a) and 1442(a)(1)).

## CONCLUSION

For all of the foregoing reasons, Defendants submit that they properly removed this case

pursuant to 28 U.S.C. §§ 1441 and 1442(a)(1).  Consequently, Defendants respectfully request

that this Court deny Plaintiffs' Motion for Remand.

SMITH, KATZENSTEIN & FURLOW LLP

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell                           ___/s/___*Robert K. Beste*_____.
Yoora Pak                                  Robert K. Beste, III (No. 3931)
WILSON, ELSER, MOSKOWITZ,                   Post Office Box 410
EDELMAN & DICKER LLP                        Wilmington, Delaware  19899
The Colorado Building                       (302) 652-8400
1341 G Street, N.W., 5th Floor              (302) 652-8405 (facsimile)
Washington, DC 20005                        rkb@skfdelaware.com
Telephone:    (202) 626-7660
Facsimile:    (202) 628-3606

*Attorneys for Defendants*
*DynCorp International Inc. and*
*DynCorp International LLC*

April 21, 2008

28

# EXHIBIT 1

## MEMORANDUM OF AGREEMENT (MOA) BETWEEN
## THE DEPARTMENT OF DEFENSE AND THE DEPARTMENT OF STATE
## ON USG PRIVATE SECURITY CONTRACTORS

### I. Purpose

The purpose of this MOA is to clearly define the authority and responsibility for the accountability and operations of USG Private Security Contractors (PSCs) in Iraq.

### II. Country Covered by this MOA

The country covered by this MOA is Iraq.

### III. Responsibility

A. Pursuant to 10 U.S.C. § 164 and 22 U.S.C. § 4802, the Secretary of Defense and the Combatant Commander (COCOM) are responsible for the security of all DOD elements and personnel under the operational control of the COCOM.

B. Pursuant to 22 U.S.C. § 4802, the Secretary of State is responsible for developing and implementing policies and programs to provide for the security of U.S. Government personnel on official duty in country other than those under the command of an area military commander.

C. Pursuant to this MOA the Secretary of State and the Secretary of Defense have agreed that they will jointly develop, implement, and follow core standards, policies, and procedures for the accountability, oversight, and discipline of PSCs.

### IV. Standards

A. The Secretary of Defense and the Secretary of State shall jointly develop and implement core PSC standards which will include at a minimum:

- The management of USG PSC personnel.
- The coordination of USG PSC operations outside secure bases and U.S. diplomatic properties.
- A clear legal basis for holding USG private security contractors accountable under US law.
- Recognition of investigative jurisdictions and coordination for joint investigations where conduct of USG PSC personnel are to be investigated.

B. The COM and the COCOM shall make every effort to consult and coordinate responses to common threats.

### V. Implementation, Coordination, and Dispute Resolution



DEFENDANT'S
EXHIBIT

A. In Iraq, the COM and the COCOM, acting when appropriate through their designated representatives, shall serve as the primary delegates of the Secretary of State and the Secretary of Defense, respectively, for implementation and coordination under this MOA.

    1. The intent of this MOA is for the DOS and DOD to ensure that personnel working under contracts with other federal agencies or as subcontractors on DOS or DOD contracts are to be covered by the policies and procedures developed under this MOA. The DOD and DOS will identify those USG agencies and organizations and contractors having contractual arrangements for private security and ensure, to the maximum extent possible, that these agencies and their PSCs adhere to the core procedures and process required by this MOA.

    2. In the event that issues arise under this MOA that the COM and COCOM are unable to resolve, they shall promptly refer such issues to the Washington representatives designated by the Secretary of State and the Secretary of Defense for resolution.

B. The Secretary of State and the Secretary of Defense shall designate Washington representatives to meet as frequently as necessary, but no less often than quarterly, for the purpose of reviewing the implementation of this MOA.

    1. In the event that the Secretaries' Washington representatives are unable to resolve any such difference, or any other issue that may arise under this MOA, they shall promptly refer the matter to the Under Secretary of State for Management and the Deputy Under Secretary of Defense for Logistics and Material Readiness for resolution.

    2. In the event that any matter cannot be resolved under the procedures specified above, it shall be referred to the Secretary of State and the Secretary of Defense for resolution

## VI. Authorities

Nothing in this MOA shall otherwise affect the authorities of the Secretary of State, the Secretary of Defense, and the Chief of Mission or the COCOM.

## VII Other Agreements and Arrangements

All existing agreements and arrangements, however styled, between DOS and DOD shall remain in force to the extent that they do not conflict with the provisions of this MOA.

## VIII Annex:

    The Parties further agree to ANNEX A: Deliverables. These deliverables are to be jointly developed by U.S. Embassy Baghdad and Multi-National Force – Iraq (MNF-I), and can be modified in writing upon mutual agreement by MNF-I and U.S. Embassy Baghdad.

## IX. Implementation and Termination

To the extent this MOA (or the deliverables) developed hereunder are inconsistent with the MOA between DOS and DOD "*Regarding Physical Security, Equipment and Personal Protective Services,* dated 10 June 2004, this MOA shall govern. This MOA shall remain in force until terminated.

Signed:                                        Signed:


Deputy Secretary of State               Deputy Secretary of Defense

Date:   *12-5-07*                          Date:   *12-5-07*

## ANNEX A: DELIVERABLES

### I.    Executive Summary:

The following deliverables, jointly developed under the terms of this MOA by U.S. Embassy Baghdad and Multi-National Force – Iraq (MNF-I), are intended to improve coordination and accountability of their respective private security contractor operations in Iraq. These deliverables can be modified in writing upon mutual agreement by MNF-I and U.S. Embassy Baghdad.

### II.    Definitions

**Private Security Contractor (PSC):** A private company, and/or its personnel, that provides physical protection to or security for persons, places, buildings, facilities, supplies, or means of transportation.

**U.S. Embassy Baghdad PSC:** Refers to a Department of State (DOS)--affiliated PSC.

**MNF-I PSC:** Refers to a Department of Defense (DOD)--affiliated PSCs.

**Personal Security Detail (PSD):** A team of PSC personnel that provides physical protective services for the movement of protected persons and/or property.

**Battlespace:.** The Area of Operations assigned to the Commander, MNF-I by the Commander, US CENTCOM for the purpose of military operations. This currently includes the air, land, sea, and space contained within the borders of Iraq.

**MNC-I:** Multi-National Corps – Iraq. The action-arm of MNF-I. MNC-I is the operational headquarters for the battlespace.

**CF:** Coalition Forces. The forces of two or more nations working for a common action. All forces working with the Multi-National Force – Iraq are coalition forces.

**Serious incident:** Any incident involving the use of deadly force, the discharge of a weapon (other than in training), or that resulted in death, serious injury, and/or significant property damage.

**Coalition Operating Locations:** Locations under the effective control of either MNF-I or Chief of Mission (COM), including the International Zone, CF Forward Operating Bases, Regional Embassy Offices, etc.

**Contracting Officer:** Refers to contracting officers as well as contracting officer representatives where appropriate.

1

### III.  Unity of Effort:

U.S. Embassy Baghdad and MNF-I together have the responsibility to safeguard USG and Coalition Force (CF) personnel conducting official business throughout Iraq. U.S. Embassy Baghdad and MNF-I are committed to reducing the number and strategic impact of serious incidents involving PSCs by thorough and impartial investigations of these incidents, transparent information and intelligence sharing, close coordination of PSD operations, and joint engagement with the Government of Iraq (GOI).

### IV.  Rules for the use of Force:

All USG PSC operations in Iraq will abide by the following common principles on the Rules for the Use of Force (RUF). U.S. Embassy Baghdad and MNF-I specific policies may be more, but not less, restrictive than these common principles. A PSC can only implement policies more restrictive than these RUF with the approval of its contracting officer, as well as either MNF-I or U.S. Embassy Baghdad as appropriate.

#### Policy/Definitions

**a. Defense of Self or Others**. PSCs always retain the inherent right to exercise self-defense in response to a hostile act or demonstrated hostile intent. PSCs are permitted to use deadly force in defense of others when there is a reasonable belief of imminent risk of death or serious bodily harm. Details regarding this authorization will be provided by the appropriate USG agency, and within the terms and conditions governing the PSC's contractual relationship with that agency.

**b. Imminent Threat**. The determination of whether the danger of death or serious bodily harm is imminent will be based on an assessment of all facts and circumstances known to the PSC at the time (i.e. totality of the circumstances), and should not be assessed with the benefit of hindsight. Imminent does not necessarily mean immediate or instantaneous. Individuals with the capability to inflict death or serious bodily harm and who demonstrate intent to do so may be considered an imminent threat.

**c. Hostile Act.** An attack or other use of force against the PSC, or designated persons or property. It also includes force used directly to preclude or impede the mission and/or duties of the PSC.

**d. Hostile Intent.** The imminent threat of the use of force against the PSC, or designated persons or property. It also includes the threat of force to preclude or impede the mission and/or duties of the PSC.

2

**e. Assets Vital to National Security.** For the purposes of MNF-I PSC operations in Iraq, defined as President-designated non-DOD and/or DOD property, the actual theft or sabotage of which the President determines would seriously jeopardize the fulfillment of a national defense mission and would create an imminent threat of death or serious bodily harm. Examples may include, but are not limited to, designated restricted areas containing strategic operational assets, sensitive codes or special access programs.

**f. Inherently Dangerous Property.** For the purposes of MNF-I PSC operations in Iraq, property is considered inherently dangerous if, in the hands of an unauthorized individual, it would create an imminent threat of death or serious bodily harm. Examples may include, but are not limited to: portable missiles, rockets, arms, ammunition, explosives, and chemical agents. On-scene DOD commanders are authorized to classify property as inherently dangerous. PSCs are not authorized to make such designations.

**g. Mission essential and U.S. National Security Equipment/Property.** For the purposes of MNF-I PSC operations in Iraq, PSC personnel can be specifically authorized to protect designated mission essential or U.S. national security equipment/property with force, including deadly force. Details regarding this authorization will be provided by appropriate USG agency, and within the terms and conditions governing the PSC's contractual relationship with that agency.

## Procedures

### a. De-Escalation.

(1) Whenever time and circumstances permit, the threatening individual/force should be warned and given the opportunity to withdraw or cease threatening actions.

(2) U.S. Embassy Baghdad and MNF-I will work to establish common graduated force methods and procedures for use by PSCs, including common signaling devices to be used by all USG PSCs operating in Iraq. The goal is to ensure that the Iraqis have a common expectation with respect to the visual and aural warnings used by PSCs operating in Iraq. U.S. Embassy Baghdad and MNF-I will work to develop a strategic engagement plan for educating the populace on these signals.

### b. Use of Non-Deadly Force

(1) The use of force must be reasonable in intensity, duration and magnitude based on the totality of circumstances to counter the threat. If force is required, non-deadly force is authorized and may be used to control a situation and accomplish the mission, or to provide self-defense or in defense of the protected property, when doing so is reasonable under the circumstances.

(2) Agency-approved non-lethal weapons are authorized.

3

(3) Warnings shots may be authorized for DOD contractor personnel by the contracting officer, but only as part of their graduated force response and for no other purpose. Current DOS policies prohibit the use of warning shots by their PSCs.

**c. Use of Deadly Force.** Deadly force is authorized only under the following circumstances:

(1) Inherent Right of Self-Defense. Deadly force is authorized when a PSC reasonably believes that a person has committed a hostile act or demonstrated hostile intent and poses an imminent threat of death or serious bodily harm to the PSC.

(2) Defense of Others. Deadly force is authorized when a PSC reasonably believes that a person poses an imminent threat of death or serious bodily harm to the protectee(s) or other innocent persons in the vicinity.

(3) Assets Vital to National Security. For the purposes of MNF-I PSC operations in Iraq, deadly force is authorized when deadly force reasonably appears to be necessary to prevent the actual theft or sabotage of assets vital to national security. PSCs will be notified in their contract if they are employed to protect assets vital to national security.

(4) Inherently Dangerous Property. For the purposes of MNF-I PSC operations in Iraq, deadly force is authorized when deadly force reasonably appears to be necessary to prevent the actual theft or sabotage of inherently dangerous property. PSCs will be notified in their contract if they are employed to protect inherently dangerous property.

(5) If a PSC must fire a weapon as a means of deadly force, he/she must use only well-aimed shots with due regard for the safety of innocent bystander, and must immediately notify the appropriate operation center and request assistance as needed.

(6) PSC personnel, whether armed for personal protection or serving as contract security/PSC, shall not engage in offensive combat operations, alone or in conjunction with U.S., Coalition or host nation forces.

## V.    Authority to Possess and Carry Firearms:

U.S. Embassy Baghdad or MNF-I will grant PSCs authority to possess and carry firearms in accordance with their respective departmental policies. Additionally U.S. Embassy Baghdad and MNF-I will individually ensure that their respective PSCs maintain accurate inventories of weapons and ammunition.

The core standards for U.S. Embassy Baghdad or MNF-I authorizing personnel to possess and carry firearms are background checks, security clearances, training, qualifications,

4

and proficiency standards for individual assigned weapons.

**Background Checks**. The following sources can be used for accomplishing background checks: Interpol, FBI, Country of Origin Criminal Records, Country of Origin U.S. Embassy Information Request, CIA records, and /or any other records available.

**Security clearances**. Security clearance requirements will be established by the RSO or MNF-I based on the company or individual's position.

**Training.** Mandatory training for PSCs prior to operating in Iraq will include review of relevant USG and Iraqi laws, Rules for the Use of Force, Law of Armed Conflict, Graduated Force Procedures, and those relevant COM, CENTCOM, and/or MNF-I rules and regulations applicable to their contracts, as well as scenario-based training on a standard set of Use-of-Force vignettes kept up to date by MNF-I STRATOPS and RSO based on recent incidents and threat reporting. Refresher training will occur annually. PSCs are responsible for maintaining training documentation. A failure to maintain training qualifications will generally result in revocation of firearms authorization for the individual. Any PSC individual without firearms authorization will immediately surrender their weapon to the PSC and will remain unarmed until such time as they are retrained and the contracting officer determines that their training is sufficient.

**Qualifications.** Contractors will meet either the U.S. Army weapons qualification standards, or RSO standards, unless another standard of qualification is used that substantially meets the requirement and is agreed to in advance (e.g. for AK-47s). Ongoing weapons proficiency training will occur in accordance with the respective agency requirements and the PSC will maintain documentation records.

**Authorized Weapons and Ammunition Types**. All USG PSCs will only use those weapon types and ammunition specifically authorized by DOS or DOD as appropriate. U.S. Embassy Baghdad and MNF-I will notify each other of the specific weapon types and ammunition authorized for their respective PSC operations in Iraq, and will update each other with any changes to such authorizations. Any disagreements regarding weapons types and/or ammunition should be resolved between MNF-I and US Embassy Baghdad, if possible; if not, the issue will be forward to the Department of State and Department of Defense for final determination.

## VI.    **Movement Coordination and Control**:

All USG PSDs will coordinate their movements with either MNF-I or U.S. Embassy Baghdad operations centers.

In order to maximize CF support for USG PSD and helicopter operations and deconflict friendly forces, RSO Tactical Operations Center (TOC) and the Multi-National Corps Iraq

(MNC-I) Contractor Operations Cell (CONOC) will provide movement details (of both PSDs and helicopters) to MNC-I in advance of their respective movements outside of Coalition operating locations, to include time, route, destination, and convoy composition. Such notification should normally occur a minimum of 24 hours in advance or as soon as possible if short-notice missions are required.

MNC-I and RSO will exchange LNOs in their respective operation centers, will conduct planning using linked Command Post of the Future (CPOF) terminals, and will monitor all U.S. Embassy Baghdad PSD, MNF-I PSD, and CF movements outside Coalition operating locations real-time using shared electronic monitoring systems data. MNC-I will limit distribution of COM personnel movements, or other movements as designated by U.S. Embassy Baghdad, to only U.S. personnel with a need to know, and will coordinate with RSO to ensure such information is compartmentalized.

MNC-I will review all USG PSD movements and provide recommendations to the RSO TOC or CONOC, as appropriate, as to whether the movement should be altered or cancelled based on the threat levels along that route or disposition of Coalition Forces.

The RSO TOC and CONOC will generally honor MNC-I recommendations to alter or cancel missions. Any disagreements between MNC-I and U.S. Embassy Baghdad regarding PSD movements will be resolved by the DCS, MNF-I Strategic Operations (STRATOPS) and the DCM, U.S. Embassy Baghdad. Final movement authority for U.S. Embassy Baghdad rests with the COM.

If MNC-I battle space owners determine and articulate a substantial increase in the threat to USG PSDs during movements outside Coalition operating locations, such PSDs will comply with MNC-I recommendations to alter routes or abort missions.

MNC-I LNO will coordinate with RSO TOC and MNC-I on QRF, MEDEVAC, and/or Intelligence, Surveillance, and Reconnaissance (ISR) support as needed, as well as convoy closure reports.

As soon as possible after notification of USG PSD movements, and updating as needed, MNF-I will make RSO TOC and/or CONOC aware of any known checkpoints manned by CF or Iraqi Security Forces (ISF), as well as the proper near and far recognition procedures. USG PSDs will comply with all CF checkpoints and should avoid other checkpoints as possible. However, USG PSDs will be prepared to display appropriate audio and/or visual recognition procedures at CF or legitimate ISF checkpoints (i.e. verified in advance by MNF-I or during movement) should they be encountered.

U.S. Embassy Baghdad will liaise with MNF-I STRATOPS on PSC-related incidents and will be prepared to attend the STRATOPS evening battlefield update assessments at the request of MNF-I STRATOPS.

6

MNF-I and U.S. Embassy Baghdad will share all intelligence that may affect security operations.

## VII.    <u>Serious Incident Response & Investigation</u>:

To the maximum extent possible, MNF-I and the U.S. Embassy will closely coordinate the immediate response to any serious incident (as defined above) involving a USG PSC.

The U.S. Embassy Baghdad, through the RSO TOC, will notify MNC-I and MNF-I STRATOPS of any serious incident involving a PSC in its jurisdiction as soon as possible. CONOC will notify MNF-I and RSO of any serious incident involving a PSC in its jurisdiction as soon as possible. U.S. Embassy Baghdad and MNF-I will coordinate in the notification of the GOI as soon as possible after a serious incident occurs.

All USG PSCs involved in a serious incident will, to the extent permitted by the mission and the security situation, stop and render assistance as needed, including coordinating medical assistance, requesting support, and/or providing claim forms/information.

Should MNC-I respond to an incident involving a USG PSC, every attempt should be made to establish radio communication in order for situational awareness to be enhanced prior to QRF arrival at the scene. Upon MNC-I QRF arrival and with a positive and verified handoff (radio or visual), the MNC-I QRF element will assume command of the scene with the primary purpose being the safe extraction of the USG PSC.

In coordination with RSO where appropriate, MNC-I will take the lead on the immediate securing of a scene where a serious incident occurred, to the extent the security situation permits, in order to start identifying any injuries, fatalities, and property damage, and to preserve the ability to collect evidence.

RSO will request support from MNF-I STRATOPS for CF support to revisit the scene of a serious incident in order to conduct an investigation. MNF-I STRATOPS will coordinate with MNC-I, which will in turn facilitate the movement request with the closest battle space owner.

MNC-I will assist U.S. Embassy Baghdad in seeking Iraqi personnel who were witnesses to facilitate investigations and evidence collection. Additionally, CF personnel will assist U.S. Embassy Baghdad as requested with their distribution of timely and appropriate condolence payments. Such payments will be based on Iraqi cultural norms and will not be viewed as an admission of guilt.

U.S. Embassy Baghdad will have the lead responsibility for investigating a serious incident involving a U.S. Embassy Baghdad PSC, and MNF-I will have the lead responsibility for investigating a serious incident involving an MNF-I PSC. The entity conducting the investigation can request investigative assistance or relevant information from the other entity, which will be provided or shared to the greatest extent possible. While one entity is conducting

7

an investigation into a serious incident within its jurisdiction, the other entity will not deliberately take any action that may prejudice, impede, or negatively impact that investigation (e.g., interviewing witnesses or collecting evidence) without the consent of the lead investigating entity.

Where either U.S. Embassy Baghdad or MNF-I, based on a legitimate interest in a serious incident within the other's jurisdiction, requests that a joint investigation be conducted into the incident, the investigation will be conducted jointly by RSO and the relevant military criminal investigative authority. The lead for such an investigation will be determined in accordance with the above paragraph or by mutual agreement.

MNF-I STRATOPS will serve as the focal point for CF inquiries into RSO-related, serious incidents. Individual CF units will not call directly to the RSO TOC except to coordinate actions with the CF LNOs.

U.S. Embassy Baghdad and MNF-I will engage in transparent sharing of information with each other during the course of an investigation, to the extent that it will not compromise the investigation or potential criminal prosecution, and in consultation with a prosecutorial authority where one is involved. U.S. Embassy Baghdad and MNF-I will coordinate in the sharing of information regarding any serious incident with the GOI, and will follow a consistent approach to public affairs associated with any serious incident.

MNF-I and RSO will coordinate in advance regarding the arrest or detention of any PSC personnel in accordance with proper arrest authority, except in exigent circumstances, in which case notification will occur as soon as possible.

U.S. Embassy Baghdad and MNF-I will share results of their investigations in order to develop lessons learned and improve tactics, techniques, and procedures used by PSCs. The RSO and MNF-I STRATOPS Chief, Contractor Policy and Oversight Division, shall co-chair a Joint Incident Review Board on a quarterly basis to determine trends, and make recommendations for improvements in PSC operations. Other invitees could include representatives from DOD and DOS PSCs, and Major Subordinate Commands. Minutes of the board will be forwarded to DCS, MNF-I STRATOPS and DCM, U.S. Embassy Baghdad for their review and action as required.

MNF-I and U.S. Embassy Baghdad should jointly engage the GOI in discussions related to PSC operations.


## VIII.   Contract Management & Language:

DOD and DOS will work towards developing a mutually agreeable common database (such as DoD's SPOT) for the purpose of increasing PSC accountability and visibility.

8

DOS and DOD will ensure that their respective PSC contracts and subcontracts contain common language, through contract modifications if necessary, implementing relevant provisions of this MOA, including but not limited to RUF, communication systems, incident response and reporting, authorized weapons and ammunition, and penalties for violations of MNF-I and/or U.S. Embassy Baghdad policies and procedures.

Respective DOS and DOD contracting officers will reconcile contract language interpretation of Department of State Acquisition Regulations (DoSAR) and Defense Federal Acquisition Regulations (DFAR) through the current Federal Acquisition Regulations.

## IX. Legal Accountability:

U.S. Embassy Baghdad and MNF-I will not tolerate misconduct by their respective PSCs and will enforce contractual obligations. Where there is evidence of criminal misconduct, U.S. Embassy Baghdad and MNF-I will make referrals to the appropriate prosecutorial authority.

DOD and DOS will continue to work together to expedite the enactment of legislation to establish a clear legal basis for holding USG PSCs in Iraq accountable under U.S. law.

# EXHIBIT 2



## International Civilian Police Program (CivPol)

In addition to its anti-narcotics and anti-crime programs, the Bureau of International Narcotics and Law Enforcement Affairs recruits U.S. police officers from all over the country to participate in international civilian police activities and local police development programs in countries around the world.

Civilian police officers from over 50 countries are deployed around the globe in support of international peacekeeping operations. CIVPOL programs most often are sponsored by the United Nations but also can be sponsored by regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE). The U.S. participated in its first CIVPOL mission in 1994 in Haiti. Today, more than 700 U.S. police officers are contributing to public safety in areas recovering from conflict.

Recruitment information for International Police Programs can be found at these websites:

- www.civilianpolice.com
- www.PoliceMission.com
- www.paecivpol.com

For more information about the CIVPOL program, please see the State Department fact sheet on international civilian police.

### Highlights

**American CIVPOL Officer Pinned with the Police Commissioner's Rank**



American CIVPOL Officer and UNMIK (United Nations Interim Administration Mission in Kosovo) Police Commissioner, Larry Wilson, was pinned with the Police Commissioner's rank by Chief of Mission Tina Kaidanow. Photo

**Medal Day Parade for the Ghana Contingent**



Ted Schnack, U.S. Civilian Police Officer in UNMIK (United Nations Interim Administration Mission in Kosovo), attends the medal day parade for the Ghana contingent in Kosovo. Photos

**Civilian Police (CIVPOL) Programs Around the World**



Fact sheet outlines CIVPOL programs in different countries. Full Text | Photos from Afghanistan; Sudan.

**What's New | Frequent Questions | Contact Us | Email this Page | Subject Index | Search**
The Office of Electronic Information, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
**About state.gov | Privacy Notice | FOIA | Copyright Information | Other U.S. Government Information**





DEFENDANT'S EXHIBIT 2



Fact Sheet
Bureau of International Narcotics and Law Enforcement Affairs
Washington, DC
July 12, 2007

# The United States and International Civilian Policing and the Rule of Law (CIV)

*[For more information on the CIVPOL program, please contact CIVPOL@state.gov]*

## Background

A cornerstone of stable and democratic nations is a criminal justice system in which citizens show broad acceptance and voluntary compliance with the law. As part of the U.S. Government's mission to support the emergence of stable democracies, especially in areas which have suffered from many years of civil strife, we support programs to help institutionalize a sustainable criminal justice sector, instill public trust in the Rule of Law and protect human rights.

Our support, often in cooperation with other nations or international bodies, is designed to promote the following institutions:

- Civilian police/law enforcement that prevents, detects and investigates violations of criminal law to identify, apprehend and assist in the prosecution of persons suspected of such violations.
- Public prosecutors to review evidence gathered in a case, make determinations regarding the appropriateness of initiating a criminal prosecution and presenting cases to the courts for adjudication.
- Courts that administer cases, set initial adjudication of guilt or innocence and conduct appellate review of cases for final determinations of guilt or innocence.
- Prisons or correctional facilities, designed to incarcerate and reform those convicted of criminal offenses.

In many countries in which a stabilization and reconstruction mission is being mounted, previous armed conflict left the criminal justice system dysfunctional or even completely failed. In such cases, crime and public disorder are likely to increase, the government cannot provide efficient services, and the economy cannot flourish. Without a strong and functioning criminal justice system - prosecutors to prosecute arrested persons, courts to try them, and prisons to incarcerate them -the police may by default apply "street justice" as judge, jury and jailer while human and civil rights are ignored and violated.

The prompt restoration of public order by non-repressive means, with an approach that focuses on the police, courts and prisons, is an essential component of post-conflict stabilization.

## The CIVPOL Mission

Civilian police (CIVPOL) from the United States and more than 50 other countries are deployed around the globe in support of international post-conflict stabilization and redevelopment operations. Their presence promotes peace and stability in areas recovering from conflict, and their efforts to reform and/or develop indigenous police forces into modern, democratically-oriented law enforcement services helps to ensure that peace and stability can be sustained even after international peacekeepers depart.

Many CIVPOL programs are sponsored by the United Nations (UN), but regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE), or coalitions of interested countries, sponsor others.

The UN launched its first CIVPOL mission in the Congo in 1960, but CIVPOL did not become a major component of peacekeeping operations until the end of the Cold War. Since then, police have become an integral component of what were originally military peacekeeping operations.

CIVPOL missions vary. In some missions, officers perform typical law enforcement functions (patrol, investigation, etc.) in the absence of effective and fair indigenous police forces. In others, CIVPOL may be responsible for rebuilding, monitoring, and/or advising local police as they make the transition to democratic policing. In this capacity, CIVPOL may be directly involved in the entry-level, supervisory and managerial training and organizational development activities for a host country's police.

## The United States and CIVPOL

The United States participated in its first CIVPOL operation in 1994 in Haiti. The United States led the multinational military intervention to restore the elected government of Haiti and sponsored a 20-country International Police Monitor (IPM) mission to help provide public security, maintain the rule of law, and establish a new Haitian National Police Service. The IPM mission transitioned to the UN in March 1995.

CIVPOL have become a vital tool of U.S. foreign policy. Only 50 American police officers participated in the Haiti CIVPOL mission in 1994. Since then, more than 7,000 experienced U.S. law enforcement officers and experts have participated in CIVPOL missions in Bosnia-Herzegovina (1996-2002); the Eastern Slavonia region of Croatia (1996-2003); Jericho (2002); the Palestinian Authority (2003); Sierra Leone (2003-2004); East Timor (1999-2007); OSCE Headquarters in Vienna (2002-2004); Haiti (1996-2000; 2004-present); Kosovo (1999-present); Serbia & Montenegro (2001-present); Macedonia (2002-2004); Afghanistan (2002-present); Iraq (2003-present); Sudan (2005-present); and Liberia (2003-present). Today, more than 1,600 U.S. police are deployed along with their international counterparts.

This dramatic climb in U.S. participation in CIVPOL missions reflects the U.S. Government's recognition of the importance of criminal justice to restoring stability in post-conflict situations. While international military forces often are necessary to restore a secure environment following a major conflict, they generally are not, in themselves, sufficient for the long-term reestablishment of civil order where local institutions have broken down. CIVPOL not only assist international military forces in the short term by addressing and resolving civilian law enforcement issues, but also help develop the local democratic policing institutions that ultimately will be

responsible for integrating with the host country's criminal justice system (prosecutor, courts and correctional services) and providing law and order functions once the military and CIVPOL depart.

## CIVPOL Rule of Law Programs

Initial missions focused almost exclusively upon indigenous civilian police and placed little, if any, emphasis on other aspects of the host country's criminal justice system. It soon became apparent that reform and developmental efforts were not as successful as they should have been, because other criminal justice components such as the prosecutors, courts and correctional organizations had not received commensurate support. Those elements needed reform or development assistance to function at a level equivalent to the police.

Accordingly, the CIVPOL Office within the Bureau of International Narcotics and Law Enforcement Affairs (INL) was re-titled Office of Civilian Police and Rule of Law (CIV) and charged with working with all criminal justice agencies in post-conflict environments rather than simply the civilian police. CIV now employs senior technical specialists in prosecutorial, judicial and correctional development as well as in the civilian police field. Wherever possible, CIV plans, develops and implements post-conflict reform or redevelopment programs that contain elements addressing each criminal justice system component to maintain equilibrium among all.

Decisions to deploy CIVPOL and/or Rule of Law programs in a specific mission are made at the highest levels of the federal government based on consultations among the White House, Department of State, and other agencies. The responsibility for managing U.S. CIVPOL, Rule of Law and related issues generally rests with the Department of State.

## The Mechanics of U.S. CIVPOL contributions

Most other countries that provide police to CIVPOL programs have national police forces and related personnel mechanisms to deploy officers for overseas service. Because the United States does not maintain a national police force, we do not send formed police units. Our contribution relies on individual volunteers. To handle such a large task, the Department of State contracts with private companies who implement requirements provided by the Department of State to recruit, select, equip, and deploy active and recently retired law enforcement officers from across the country. After conducting a screening process, the companies contract with individual officers and deploy them to missions.

Subject matter experts in criminal prosecution, court administration, judicial adjudication, criminal appellate practice and correctional programs are also recruited, engaged and deployed by a contractor in response to a U.S. Government-identified and articulated requirement.

Following pre-deployment training in the U.S., criminal justice program personnel are sent to the mission area and are "seconded" to the UN (or other sponsoring organization – such as the OSCE). Within a mission, officers function under the operational control of the sponsoring organization, which also provides officers with an allowance to cover food, lodging, and incidental expenses. The contractors maintain offices in the mission areas to handle administrative and support issues, and assist with programs designed to improve quality of life.

Throughout the life of a mission, the Department of State provides funding and oversight for mission operations, manages U.S. policy on CIV operations and other related law enforcement and civilian security issues, provides bilateral assistance to local police forces, engages with the UN and other contributing countries on mission priorities and challenges, and keeps Congress, other U.S. Government agencies, and the White House informed of progress.

 BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.

# EXHIBIT 3

 **PDD-71**

24 February 2000

## Text: The Clinton Administration White Paper on Peace Operations

(On rebuilding effective foreign criminal justice systems) (5510)

The Clinton Administration's WHITE PAPER on PDD-71 dealing with
"Strengthening Criminal Justice Systems in Support of Peace
Operations" states that "the intent of PDD 71 is that the Executive
Branch of the U.S. Government improve its capacities to participate in
rebuilding effective foreign criminal justice systems by implementing
the directives described in this white paper.

"Furthermore," the white paper says, "together with U.S. allies, the
Executive Branch shall seek to improve the capacities of other
organizations to participate in these activities.

"By enhancing U.S. capabilities and helping others to do the same,"
the white paper says, "the U.S. will be better prepared to advance its
national interests when those interests require the reestablishment of
a criminal justice system overseas."

Following is the State Department text:

(begin text)

WHITE PAPER

The Clinton Administration's Policy on Strengthening Criminal Justice
Systems in Support of Peace Operations

February 2000

Contemporary peace operations and other complex contingencies, though
aimed at mitigating military conflict, often confront considerable
civil disorder, violence, and crime. Time and again, we have seen that
as military conflict ends (and armies demobilize), a security vacuum
develops that indigenous law enforcement organizations cannot fill, at
least initially. These institutions usually have been destroyed,
rendered ineffective by the conflict or corruption, or become part of
the conflict due to partisan behavior. In Somalia, for example, the
police simply left their posts in 1991 when a new government failed to
emerge after the Siad Barre government was deposed. In Haiti and
Bosnia, the police were involved in the conflict and consequently were
viewed as biased combatants rather than public servants by large
segments of the population. Even before the conflict arose, the public
safety forces in Haiti, as in many areas where peace operations are
conducted, were the primary instrument for state-sponsored repression
of the citizens.

The phenomenon of nonexistent, inept, or partisan police forces is not
unique to peace operations. Similar problems occurred following the
U.S. interventions in Grenada and Panama during the 1980s.
Furthermore, in all these situations the other aspects of the


DEFENDANT'S EXHIBIT 3

indigenous criminal justice system, the judicial system, the penal system, and the law code, were in disarray and needed substantial reform.

Effective indigenous law enforcement and criminal justice systems are necessary for a society to achieve and maintain durable peace. Therefore, helping to reestablish an indigenous criminal justice system is often, and appropriately, a fundamental aspect of a successful peace operation or other complex contingency operation. The experience of the U.S. Government and the international community has demonstrated the difficulty and complexity of this task. In spite of the difficulties that have been faced, our experience also demonstrates that participating in both bilateral and multilateral efforts to reconstitute indigenous criminal justice systems, promoting public safety in the short term and developing responsive criminal justice institutions over the long term, can successfully and economically support American interests.

In addition to helping bring peace operations to successful completion, an effective and just criminal justice system in countries emerging from conflict serves other very important U.S. interests. In particular, it helps to deter the presence of criminals who seek to base their operations in areas where they can operate without fear of arrest and prosecution. Such wrongdoers often include organizers of terrorism, illicit drug and arms trafficking, and international criminal syndicates.

Intent

The intent of PDD 71 is that the Executive Branch of the U.S. Government improve its capacities to participate in rebuilding effective foreign criminal justice systems by implementing the directives described in this white paper. Furthermore, together with U.S. allies the Executive Branch shall seek to improve the capacities of other organizations to participate in these activities. By enhancing U.S. capabilities and helping others to do the same, the U.S. will be better prepared to advance its national interests when those interests require the reestablishment of a criminal justice system overseas.

Scope of the PDD

PDD 71 is the third in a series of PDDs designed to promote U.S. interests by improving our ability to effectively manage or resolve inter and intra-state conflict. The other two documents, PDD-25, U.S. Policy on Reforming Multilateral Peace Operations and PDD-56, Managing Complex Contingency Operations, and this new directive should be applied together. This directive amplifies guidance given in PDD-25 concerning police and judicial dimensions of peace operations.

PDD 71 applies to U.S. Government processes dealing with peace operations and other complex contingency operations as defined in PDDs 25 and 56 respectively. The Peacekeeping Core Group (PCG) as described in PDD-25, under the review of the Deputies Committee, shall remain the primary interagency policy development body for peace operations, including the issues related to public safety and criminal justice addressed in this directive. Further, when an Executive Committee (ExCom) as described in PDD-56 is established, it shall be the primary interagency mechanism to conduct political-military planning and to coordinate the day-to-day management of U.S. participation in a

specific operation.

This white paper is organized in four sections: improving U.S. Government organization and capabilities, improving capabilities of other organizations, activities at the operational level, and general policy guidance.

Improving U.S. Government Organization and Capacities

Create a Lead Agency: The State Department shall create an office, or modify an existing one, to assume lead agency responsibility for the full spectrum of issues related to U.S. Government involvement in the reform of criminal justice systems during peace operations and complex contingencies. This office shall be responsible for policy development, all aspects of provision and oversight of U.S. CIVPOL to field operations, development and implementation of training and technical assistance plans and programs for foreign police forces, and priority setting and coordination among other U.S. activities relating to the criminal justice system, among other tasks. Consolidation of these functions within the agency that has primary responsibility for foreign policy will enable the U.S. Government to be more responsive by clarifying responsibilities among the Departments of State, Justice, and Defense and the U.S. Agency for International Development (USAID).

When the integrated planning processes described in PDD-56 are used, the lead agency shall normally lead development of the portions of the political-military (pol-mil) plan dealing with public safety and restoration of the criminal justice system. When related issues fall under the purview of another part of the Government, such as reform of the judicial system, which has traditionally been accomplished by USAID and the Department of Justice, the lead agency shall normally organize and lead an interagency working group of the various governmental organizations to coordinate and prepare products for the pol-mil plan. When the lead agency is developing policies and long-range plans for future programs and contingencies, it shall involve the Department of Justice and other interested agencies.

At the request of the Peacekeeping Core Group (PCG) or ExComm, the lead agency shall be responsible for developing and providing pol-mil planning advice and liaison on public safety and criminal justice issues in peace operations and complex contingencies to other organizations and countries.

At the request of the PCG or ExComm, the lead agency shall organize and lead an interagency criminal justice assessment team for a specific operation. The purpose of such a team shall be to gather information and facilitate development of a comprehensive plan for reform. Assessment teams could also be used to help develop benchmarks, measure progress against those benchmarks, and develop advice for mid-course corrections. An assessment team will normally be composed of a full range of criminal justice experts from throughout the U.S. Government, including persons from the Department of Justice, USAID, and federal law enforcement agencies. The Departments of State, Defense, Justice, Treasury, Transportation, Agriculture, Interior, and any law enforcement agencies under their auspices shall be prepared to participate in these assessment teams as needed.

It is appropriate for the lead agency to use contractor support to assist in its duties when cost effective, reasonable, and consistent

with laws and regulations. Furthermore, the other Departments and Agencies shall consider providing various types of support to the lead agency, including seconding personnel to serve in the responsible office.

Since our efforts to help rebuild foreign criminal justice systems are usually a multiyear activity, the lead agency and other responsible agencies shall seek adequate, designated funding in subsequent years of a particular operation until our foreign policy goals are accomplished. Further, the Secretary of State and the Director of the Office of Management and Budget shall work together to ensure that programs conducted by or through the lead agent are funded at a level that reflects the high priority I give to these activities.

Enhance U.S. Government Capacity to Provide CIVPOL to Field Operations: Since 1994, which marked the initiation of the operation in Haiti, the United States has steadily increased its contributions of civilian police officers to peace operations. In 1996, the U.S. contribution was 154 officers in an average month; in 1997 the average was 275. By the end of 1999, the U.S. had more than 600 CIVPOL deployed. These contributions have been to operations in Haiti, the Former Yugoslavia, and East Timor. It will be in the U.S. interest to continue to participate in and support CIVPOL activities. As always, future decisions on U.S. involvement in CIVPOL activities will be coordinated on a case-by-case basis through the Peacekeeping Core Group, as described in PDD-25.

The current process used by our Government to recruit, prepare, train, and deploy civilian police officers to CIVPOL operations is not adequate. The lead agency shall place special emphasis on making immediate improvements. Improvements should focus, in part, on improving the speed with which the U.S. is able to provide personnel for specific CIVPOL operations and enabling the U.S. to participate in UN Standby Arrangements with CIVPOL. The lead agency also should develop mechanisms to improve the discipline and accountability of U.S. CIVPOL officers deployed in UN missions, to include the possibility of a more formal affiliation with the lead agency. The lead agency shall identify any new legislative authorities that would be necessary to implement such improvements. Another broad area for improvement relates to the recruitment and preparation of U.S. CIVPOL. In this regard, the lead agency, or another agency operating under its supervision, must develop training programs for U.S. CIVPOL that incorporate all aspects of service in a CIVPOL field operation. To further enhance the law enforcement expertise of the lead agency, the U.S. Secret Service and the U.S. Park Police shall consider providing, if requested, an individual with appropriate law enforcement and technical expertise to the lead agency to serve within the office responsible for the management of U.S. CIVPOL contributions.

The lead agency shall specify funds within its budget submissions to cover the costs related to the provision of U.S. CIVPOL to field operations, including reimbursement to the state and municipal law enforcement agencies for their participation and seek any additional implementing legislation, if necessary. Necessary reimbursement procedures shall be negotiated between the federal government and the law enforcement agencies. Given the organization of the U.S. law enforcement system, the majority of U.S. CIVPOL will likely come from state and municipal law enforcement agencies. Members of the federal law enforcement agencies should also be available for CIVPOL service on a voluntary basis similar to municipal officers, or via another

appropriate method.

Enhance U.S. Government Capacity to Provide Training and Developmental Assistance to Foreign Police Forces: The U.S. Government should enhance its capability to train and develop foreign police forces during peace operations and other complex contingencies. The agencies involved in implementation must work from a common set of goals and must receive adequate institutional support, especially at the headquarters-level. Furthermore, they must devise programs that include mechanisms to ensure that human rights issues receive adequate attention and oversight.

To carry this out, the Secretary of State and the Attorney General, within four months of the signing of PDD 71, shall prepare a plan to implement this guidance and present it to the President through the Assistant to the President for National Security Affairs. In the plan, the Attorney General should specifically address measures by the Department of Justice which are necessary to broaden and strengthen ICITAP's capacity to engage in long-range planning to support the policy and planning development work of the lead agency, as well as ICITAP's capacity to both provide training and coordinate with CIVPOL activities in support of peace operations and other complex contingencies.

Create an Interagency Partnership in Judicial, Penal, and Legal Code Developmental Assistance: In the increasingly global world, U.S. national security and other interests are inescapably linked to the effectiveness of foreign criminal justice systems. When such systems break down or are destroyed, the damage is felt in a variety of ways, ranging from economic interests, to humanitarian concerns, to the physical safety of American citizens. We must therefore continue to expand and improve cooperation and development activities with other countries, especially those emerging from periods of instability where havens of criminal impunity might otherwise develop.

To respond rapidly and effectively to emerging contingencies, the Secretary of State will call upon relevant departments and agencies to participate in operations pertaining to urgent and immediate interventions in the criminal justice sector. The Department of State, as lead agency, will harmonize and assure rapid response assistance, training and other necessary support to strengthen judicial and penal systems and legal code reform during complex contingencies and in their aftermath.

The Attorney General and the Administrator of the U.S. Agency for International Development shall establish a partnership that will include subordinate offices, including ICITAP, OPDAT, and the USAID's Center for Democracy and Governance, to improve the capability of the U.S. Government to develop and assure delivery of rapid response assistance. Working through the Center for Democracy and Governance, these offices will conduct contingency planning and develop emergency assistance programs, relying on analyses of ongoing and past assistance programs and resulting lessons learned to guide future actions. The Center will draw upon the expertise of USAID's Office of Transition Initiatives as well as the expert resources available within other departments and agencies as necessary.

During the planning and execution of peace operations and complex contingencies, the Center for Democracy and Governance shall coordinate its developmental assistance activities with the lead

agency, which will retain overall responsibility for planning, overseeing, and coordinating U.S. actions to rebuild the criminal justice sector. Programs must be developed that enable the U.S. to respond quickly to help establish rudimentary judicial and penal capacity during peace operations and complex contingencies. These programs must at the same time lead to sustainable, credible, and legitimate state institutions necessary for long-term stability. Therefore, they should be implemented in the context of a broader criminal justice reform strategy.

The Secretary of State, the Attorney General, the USAID Administrator, and the Director for the Office of Management and Budget shall work together to ensure this initiative receives authority and funding that is commensurate with the high priority that I place on it. The operating costs of the Center shall continue to be borne by USAID while costs of DOJ's participation in the Center's contingency planning and program development shall be borne by the Department of Justice. The field operations conducted through it should normally be funded from foreign assistance appropriations and other sources as appropriate. None of these funds shall be used by other USAID or USG elements for judicial, penal, or legal code developmental assistance unless coordinated through the Center.

Improving the Capacities of Other Organizations and Countries

Despite the critical importance of U.S. enhancements in these areas, U.S. Government capabilities should not become the international community's instrument of first resort whenever CIVPOL-related requirements arise. Many other countries and organizations have similar interests and responsibilities and should share the burden of these activities. Therefore, the U.S. Government shall seek to enhance the capacities of non-U.S. entities including those of other countries, international organizations, and non-governmental organizations. Furthermore, the U.S. Government shall seek to build and sustain the will of other countries and organizations to be involved in this type of activity and develop mechanisms for greater cooperation and coordination.

The UN is the international body with the most extensive experience and dedicated mechanisms focused on peace operations. Indeed, until the recent advent of the police role for the OSCE in Eastern Slovenia and Kosovo, the UN had been the only international or regional organization to mount a significant CIVPOL operation. Among international organizations, the U.S. Government shall focus its reform efforts for CIVPOL activities on the UN, just as we did for general peacekeeping reforms following PDD-25. At the same time, the United States shall continue to support efforts to improve regional organizations' peace operations capabilities, including those related to criminal justice systems. In particular, the U.S. will work to further develop the capacities of the OSCE to conduct these operations.

Because we can only advocate, rather than direct, specific policies and processes of international organizations, PDD 71 outlines general policy objectives. During the implementation phase, specific proposals and a strategy for achieving them shall be developed. To facilitate these policy objectives, the State Department shall seek like-minded states and organizations to serve as partners in our efforts to improve the capacities of the UN and other regional organizations.

Within the UN Secretariat staff, greater emphasis should be placed on matters related to the criminal justice system during peace operations. The current staff devoted to CIVPOL matters in DPKO is insufficient to accomplish the planning, coordination, and conduct of these operations. The United States shall advocate that DPKO strengthen its capabilities by installing an appropriate, senior-rank individual, with appropriate staff support, to oversee criminal justice matters. The United States will consider providing individuals with criminal justice expertise to serve within DPKO. Furthermore, criminal justice functions should be fully integrated with other peacekeeping functions in DPKO. Adequate planning capacity within DPKO should account for CIVPOL requirements, including a criminal justice element, before a new operation is initiated or a mandate renewed. Criminal justice planners should be integrated into UN assessment teams that deploy to sites of potential peacekeeping operations and CIVPOL capabilities of more member states should be entered into the UN Standby Arrangements system. The Standby Arrangements system enables the international community to respond more quickly to crises through rosters of pre-identified, screened and trained police experts from around the world who can be deployed on very short notice. Finally, other organizations or UN specified agencies should develop means to take over the longer-term aspects of criminal justice development once the peacekeeping phase of a complex contingency is completed and peace-building activities have begun.

The U.S. Government will advocate that UN missions make use of a suitable mix of military and paramilitary forces to accomplish the assigned tasks of any new peace operation. Constabulary forces, that is, paramilitary forces that train for and conduct a law enforcement function in their home countries, should be deployed by the UN in appropriate circumstances. Such forces bring specialized skills, such as crowd control capabilities, that are not common to traditional military or civilian police organizations. These forces are most effective when deployed as units rather than individuals. Generally, constabulary and other paramilitary units should be placed under the operational control of the military force commander, like the Multinational Support Units (MSU) that have been part of the military forces in Bosnia and Kosovo. In some circumstances, it may be appropriate to place a constabulary-type force under the operational control of the UN police commissioner. When under the operational control of the military force commander, and when feasible and allowable under existing statutes, these elements should receive logistic, intelligence, and other types of support in the same manner as the regular military units.

The lead agency shall develop methods to provide specialized training to foreign civilian police and foreign gendarme or constabulary forces in order to enhance their preparedness for service in peace operations and other complex contingencies. The lead agency shall seek new legislative authorities, if required, and adequate funding to allow such activity. This new capacity will provide the U.S. Government a means to improve the overall performance of CIVPOL operations, by enhancing the quality of CIVPOL participants. The training should include standard operating procedures for field operations, which may need to be developed in concert with other countries, the United Nations, and other international organizations. Given the high priority the President places on human rights issues and risks involved in training foreign police forces, the U.S. will ensure appropriate mechanisms to guarantee that human rights issues are fully considered.

Improving Activities at the Operational Level

U.S. experiences in recent operations have shown that a number of operational level activities related to rebuilding the indigenous criminal justice system can be improved. The aim should be to have an indigenous public security and law enforcement network with trained, certified, and equipped police -- all of which are firmly embedded in a system of legitimate and credible justice sector institutions. A key measure of progress would be to assess the extent to which a self-sufficient and impartial law enforcement system is being established.

Enhance CIVPOL Headquarters Capacities: Currently, operational-level headquarters capacities for CIVPOL are generally deficient. If field activities are to be improved, this shortfall must be corrected. Ideally, the CIVPOL component should be capable of operating independently, since CIVPOL will not always be deployed with military forces, as was the case at the end of the Haiti operation. Headquarters capacity becomes even more important if the CIVPOL component is controlling some sort of special security unit or a constabulary force. At a minimum, the headquarters should have the ability to conduct current operations, plan future operations, collect and assess field information, and manage its logistical support. The headquarters element should also have the ability to conduct liaison with elements of the host state and the other components of the peacekeeping force as well as other actors involved in rebuilding the criminal justice system.

Where appropriate, the CIVPOL headquarters should be capable of assuming responsibility to coordinate and oversee the overall reform process for the criminal justice sector. As more outside agencies become involved with this sector, the importance of coordination increases. The CIVPOL operational headquarters should incorporate a coordination mechanism akin to the Civil Military Operations Center (CMOC) used by the military and civilian agencies to synchronize their activities. When the United States is participating in a peace operation involving CIVPOL, but is not leading it, the PCG shall give special consideration to contributing qualified U.S. personnel to the operation to serve in the planning and coordination roles of the CIVPOL headquarters. Enhance Coordination and Synchronization: Just as CIVPOL and other peacekeeping functions should be coordinated at the strategic level, they must also be coordinated fully at the operational level. The United States Government shall advocate that military peacekeepers and CIVPOL shall, as feasible, coordinate activities to ensure maximum support of the overall objectives of the operation. Past operations have been successful by colocating headquarters, or colocating with the CMOC, or developing other effective liaison processes, to allow sharing of information on planning and execution processes. In addition, in every recent peace operation involving CIVPOL, the conduct of joint and/or parallel patrols consisting of indigenous police, CIVPOL monitors, and military peacekeepers has proven valuable in maintaining public safety and raising the effectiveness of the indigenous police. The first source for CIVPOL communications and logistic support should be from commercial sources; however, since the military component of a peacekeeping operation is more likely to have effective communication systems, logistic support systems, and intelligence or information structures throughout the area of operations, the military commander should consider providing the CIVPOL component access to and mutual

use of these capabilities when feasible and allowable by law and when it will not interfere with execution of the mission of the military component. Independent CIVPOL support systems should be developed as soon as possible to minimize the dependency on military systems and allow full withdrawal of military forces as soon as the military mission is completed.

In some instances, military support to the CIVPOL component has proven essential to successful accomplishment of the overall mission. Such support might take the form of technical assistance resident in the civil affairs, psychological operations, military intelligence, or military police elements of armed forces. At the same time, we must avoid situations in which the CIVPOL component is completely dependent upon the military peacekeeping component. Such military support may not always be feasible, or allowable under existing statutes, and the military-unique aspects of the mission will likely be completed prior to the public safety related tasks. Any U.S. military equipment, services or supplies should normally be provided to CIVPOL on a reimbursable basis.

Enhance CIVPOL Competence: The United States will advocate that whichever organization is organizing a particular peace operation, be it the UN or a regional grouping like the OAU or the OSCE, a military alliance such as NATO, or a lead state, will develop specific job descriptions and other standards for the various individual experts required in an operation, e.g., police monitor and mentor, police operations planner, penal system advisor, judicial system advisor, etc. The United States will urge that the organizing body abide by the highest standards for recruitment and have the authority to dismiss CIVPOL that fail to perform adequately. The U.S. lead agency will prepare template job descriptions and other standards that would speed the process of recruiting a CIVPOL force and share them with potential CIVPOL organizing bodies.

Training and preparedness of individuals and units being supplied to coalition peace operations should remain a national responsibility. However, international organizations or other organizing bodies may need to supplement national training from time to time. The U.S. lead agency shall maintain the capacity to provide tailored training packages to U.S. and international CIVPOL when requested by the organizing body or the contributing state and when appropriate U.S. funding or appropriate reimbursement is available.

General Policy Guidance

Constabulary Activities: As already described, in some cases indigenous police forces are unable to provide adequate public safety when peacekeepers arrive. In these cases, outside agencies may need to assist in ensuring basic public safety until this function can be accomplished effectively by newly strengthened indigenous police. Generally, outsiders should not be tasked to conduct law enforcement as there are significant complications to using outsiders to enforce the law of the country in crisis, with which outsiders may not be familiar. Furthermore, ultimate responsibility to conduct law enforcement should not be taken away from local police forces as this may breed dependency. Rather, outsiders may be given responsibility to carry out a more narrow range of activities to create and maintain a reasonable measure of public safety. Such tasks may include actions to regulate movements which may be necessary for the cause of safety; intervene to stop civil violence, such as vigilante lynchings or other

violent public crimes; stop and deter widespread or organized looting, vandalism, riots, or other mob-type action; and disperse unruly or violent public demonstrations and civil disturbances, among other tasks. For the purposes of PDD 71, this general category of tasks shall be termed constabulary activities.

Military or paramilitary forces are best suited to accomplish constabulary tasks. International civilian police officers (CIVPOL) as they have been traditionally deployed to peace operations do not have the unit cohesion, training, or equipment to conduct constabulary functions. Generally, the United States shall prefer that constabulary functions, when they are necessary, be conducted by a paramilitary force such as exists in many other countries. However, suitable partners may not always be available, or a short lag time may occur before a civilian, paramilitary force becomes operational in a specific situation. Therefore, U.S. military forces shall maintain the capability to support constabulary functions abroad, and if necessary carry out constabulary functions under limited conditions for a limited period of time. For example, in Haiti, in operation UPHOLD DEMOCRACY, the U.S. military contingent temporarily conducted constabulary functions and other law enforcement-like activities until civilian organizations were able to conduct these tasks. Maintaining a constabulary capability in no way obligates the U.S. military to conduct these tasks in any particular operation or to develop specialized constabulary units dedicated to this mission. As always, specific missions and tasks of any U.S. military elements serving in peace operations will be developed and approved by the National Command Authority.

Executive Authority: Generally, the U.S. Government shall advocate that CIVPOL not be given responsibility to enforce local law (executive authority) -- the responsibility for local law enforcement will remain with the indigenous police forces. In some instances, it may be appropriate to give monitors the authority (if not the responsibility) in their mandate to respond to local crimes when indigenous police are unable to take action. This authority may include the right to use detention and deadly force, for example, in an instance where there is a risk of death or serious bodily harm. In these situations, which place them at greater risk, CIVPOL officers should be given sufficient discretion over whether or not to exercise their authority. Where CIVPOL officers are granted such authority, their activities must be thoroughly coordinated with the military force commander to avoid the potential for conflict between elements of the overall peace operation force.

In some exceptional circumstances, such as those in Kosovo and East Timor where the international community is responsible for administration of a territory, CIVPOL might appropriately be tasked with full law enforcement responsibility and authority.

Protection of CIVPOL: CIVPOL, as other peacekeepers, have the right to self-defense. Appropriate measures therefore must be taken to ensure that monitors are adequately protected. In many cases, the prestige and respect imbued to monitors because of their affiliation with the overall peacekeeping operation provides sufficient safety. In the instances where monitors have been at risk, they were able to call upon the military component of the operation for support. Recently, in Haiti, this type of support was transferred from the military component of the operation to a civilian, paramilitary unit. Generally, this method of protecting CIVPOL monitors has worked well.

However, in some instances, this method may be insufficient. In these cases, the United States shall consider advocating that the CIVPOL monitors be armed in order to facilitate their self-defense. The U.S. will generally not consider sidearms alone to constitute adequate defense for the monitors, as they often will be significantly "outarmed" by the civilian population and, in particular, criminals and other rogue elements. We must recognize that if CIVPOL monitors are armed, their training and preparation needs will increase. Nonetheless, in addition to increasing the personal security of CIVPOL, experience in Haiti suggests that, in some situations, an armed CIVPOL monitor is better able to mentor indigenous police if by being armed they are allowed to be present in the dangerous situations indigenous police face. Obviously, in those situations where CIVPOL are tasked to conduct law enforcement, they must be armed appropriately.

The Role and Limits of Military Support: Actions related to criminal justice are primarily civilian in character: military forces are not police officers. U.S. armed forces do not normally have inherent law enforcement authority overseas. Furthermore, using military forces for law enforcement tasks over an extended period may send inappropriate signals to civil authorities and the local population, may place U.S. forces in situations for which they have not been thoroughly trained, and may detract from other purposes of the military forces. We should use democratic civilian policing models as the basis for rebuilding and training indigenous police forces, and that is what we hope to build in recovering societies. Nonetheless, the military component of a peace operation does have a vital role to play in the overall recovery of criminal justice capacities. Unless basic public safety is provided, the civilian organizations will be unable to conduct their tasks. If public safety is not maintained, the social fabric will not be ready for the assistance to be provided by the civilian agencies. In addition to the task of contributing to public safety, there are a number of supporting tasks that the military can conduct to hasten the progress of the civilian agencies dealing with criminal justice, as described above in the section on operational level improvements.

U.S. military personnel shall not provide formal training to foreign criminal justice systems unless authorized under existing authorities. However, this does not restrict U.S. military personnel from interacting with or conducting joint operational activities with elements belonging to the indigenous criminal justice system. In accordance with laws and regulations, the U.S. military may provide training and assistance to host state security elements that are part of the host state's defense establishment. Furthermore, DOD shall, if appropriately directed and on a case-by-case basis under appropriate legal authorities, provide assistance and support to the agencies providing training and developmental assistance to foreign police forces. Such assistance and support may include, inter alia, logistics, communications, transportation, and selected technical expertise.

(end text)

(Distributed by the Office of International Information Programs, U.S. Department of State. Web site: usinfo.state.gov)