# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CYNTHIA PARLIN, Individually, and in her          :
Capacities as Surviving Spouse of Samuel Parlin,   :
And As Executrix of the Estate of Samuel Parlin,   :
Deceased,                                          :       C. A. No. 1:08-107 JJF
                                                   :
    Plaintiffs,                         :
                                                   :       Jury of 12 Demanded
    v.                                  :
                                                   :
DYNCORP INTERNATIONAL INC., *et al.*,              :
                                                   :
    Defendants.                         :

## DEFENDANTS' RESPONSE TO
## TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

*Of Counsel*:                                    Robert K. Beste, III (No. 3931)
Robert B. Wallace                                SMITH, KATZENSTEIN & FURLOW LLP
Kevin P. Farrell                                 Post Office Box 410
Yoora Pak                                        Wilmington, Delaware 19899
WILSON, ELSER, MOSKOWITZ,                        (302) 652-8400
EDELMAN & DICKER LLP                             (302) 652-8405 (facsimile)
The Colorado Building                            rbeste@skfdelaware.com
1341 G Street, N.W., 5th Floor
Washington, DC 20005                             *Attorneys for Defendants,*
(202) 626-7660                                   *DynCorp International Inc. and*
(202) 628-3606 (facsimile)                       *DynCorp International LLC*

June 17, 2008

Defendants DynCorp International Inc. and DynCorp International LLC (hereinafter collectively referred to as "DynCorp") respectfully submit the following response to Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss (D.I. 16). As set forth below, and for the reasons articulated in DynCorp's Motion to Dismiss and its Opening Brief (D.I. 3 & 4) and Reply (D.I. 11), the issues raised in Plaintiffs' Complaint implicate political questions that preclude judicial review. To that end, the recent decision by the Court of Appeals for the Fifth Circuit in *Lane v. Halliburton*, 2008 U.S. App. LEXIS 11401, at *46 (5th Cir.), does not undermine all support for DynCorp's argument in favor of dismissal based upon the political question doctrine. To the contrary, the Fifth Circuit's decision specifically distinguished the case that DynCorp draws the closest analogy in support of dismissal of this case. In addition, because the recent decision by the Court of Appeals for the Fifth Circuit did not in any way address whether a case should be remanded to a state court for lack of federal jurisdiction, the Fifth Circuit's decision does not support Plaintiffs' Motion for Remand.

**I.    DYNCORP HAS NEVER REFUSED, AND IS NOT OBLIGATED, TO PROVIDE A COPY OF THE IRAQ CIVPOL CONTRACT AT THIS STAGE OF THE LITIGATION**

At this stage of the litigation, DynCorp is not obligated nor required to provide a copy of the Iraq CIVPOL contract. Instead of relying on matters outside of the Complaint itself, DynCorp moved to dismiss Plaintiffs' Complaint based upon their own allegations because they plainly raise issues implicating political questions that preclude judicial review. *See* DynCorp's Motion to Dismiss (D.I. 4) at 4-20. Nonetheless, DynCorp is attaching the relevant Statement of Work from its Iraq CIVPOL contract, which expressly provides that the International Police Liaison Officers, like Samuel Parlin, were under the operational command of the Civilian Police Assistance Training Team (CPATT), which is under the command of U.S. Central Command,

1

the U.S. military entity overseeing coalition efforts in Iraq.[1]  *See* Ex. 1.  The U.S. military's control, direction, and supervision of the IPLOs, like Mr. Parlin, through CPATT, corroborates DynCorp's assertion of immunity under the government contractor defense and reinforces the nonjustiability of the issues raised in this lawsuit, which DynCorp raised as colorable federal defenses in support of the removal of this case under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  *See* DynCorp's Opposition to Plaintiffs' Motion for Remand (D.I 13) at 13-28.

## II.    CASE LAW CONTINUES TO SUPPORT THE DISMISSAL OF PLAINTIFFS' CLAIMS UNDER THE POLITICAL QUESTION DOCTRINE

The Fifth Circuit's decision in *Lane v. Halliburton*, 2008 U.S. App. LEXIS 11401 (5th Cir.), did not overturn all case law supporting DynCorp's position that the claims raised in this case implicate political questions, thereby rendering the claims nonjusticiable.    To that end, Plaintiffs' Supplemental Memorandum inaccurately represents the reach of the Fifth Circuit's decision in *Lane v. Halliburton*.

---

[1] It is appropriate to consider the totality of the circumstances with respect to Mr. Parlin's employment in Iraq.  As acknowledged by the U.S. Supreme Court, "[c]ivilian employees ... play an integral role in military activities." *United States v. Johnson*, 481 U.S. 681, 691 n.11 (1987).  To that end, Mr. Parlin was in Iraq under the operational control of the U.S. military as part of a large contingent of civilian force multipliers.  While he was in Iraq performing his employment duties under the control of the U.S. military, he was traveling in Baghdad.  He died as a result of injuries that he sustained while he was engaged in an activity incident to his employment and his survivors have received, and continue to receive, monetary compensation for his death under the Defense Base Act  The U.S. Court of Appeals for the Third Circuit has taken this approach in similar circumstances involving military service personnel.  *See, e.g., Ruggiero v. United States*, 162 Fed. Appx. 140 (3d Cir. 2006) (affirming dismissal of a negligence action against the United States because the decedent's "military service was the but-for cause of his presence in the [military] dorm on the night of his death"); *Richards v. United States*, 176 F.3d 652, 656 (3d Cir. 1999) (affirming dismissal of negligence claims against the United States because the decedent's "relationship with the military -- i.e., the fact that he worked on the Army base and was leaving his duty station [for a nonmilitary purpose] -- is the reason he was traveling on Kentucky Highway 1628 at the time of the accident" and that he "was not simply driving on a public road as a member of the general public").  On the other hand, rather than consider the totality of circumstances regarding Mr. Parlin's employment, plaintiffs' approach in this case is to separate each act taken by Mr. Parlin to determine if he was acting under the control of the U.S. military or DynCorp when he took the specific act.  This approach is not workable because it gives no consideration for the undisputed fact that Mr. Parlin was in Baghdad only because of his status as an IPLO under U.S. military control.  Which entity was directing his movements at the exact moment of his injury is irrelevant because but for his employment as an IPLO, he would not have been in Baghdad.

In *Lane*, the Fifth Circuit consolidated the appeals of three district court decisions --
*Fisher v. Halliburton*, 454 F. Supp. 2d 637 (S.D. Tex. 2006), *Lane v. Halliburton*, 2006 U.S.
Dist. LEXIS 63948 (S.D. Tex.), and *Smith-Idol v. Halliburton*, 2006 U.S. Dist. LEXIS 75574
(S.D. Tex.).[2] Without considering the merits of the tort claims raised in these three cases, the
Fifth Circuit reversed the district court's dismissal of these cases to allow the parties to proceed
with discovery. *See Lane*, 2008 U.S. App. LEXIS 11401, at *34-46. In doing so, the Fifth
Circuit expressly recognized that "[i]t is conceivable that further development of the facts on
remand will again send this case toward the political question barrier" and that "[p]ermitting this
matter to proceed now does not preclude the possibility that the district court will again need to
decide whether a political question inextricably arises in this suit." *Lane*, 2008 U.S. App. LEXIS
11401, at *48-49.

In reaching its conclusion, the Fifth Circuit did not hold that the political question
doctrine never applied to suits brought against a government contractor. To the contrary, the
Fifth Circuit specifically recognized that the district courts properly applied the political question
doctrine to foreclose judicial resolution of tort claims against contractors in other cases, such as
*Smith v. Halliburton Co.*, 2006 WL 2521326 (S.D. Tex.) (dismissing complaint for lack of
jurisdiction based on the political question doctrine in case involving death of contractor by a
suicide bomb attack on a military based in Iraq), and *Whitaker v. Kellogg Brown & Root, Inc.*,
444 F. Supp. 2d 1277 (M.D. Ga. 2006) (dismissing complaint for lack of jurisdiction based on
the political question doctrine in case involving a soldier's death allegedly caused by acts of a
government contractor's employee) -- both of which were cited by DynCorp in its Motion to
Dismiss. *See Lane*, 2008 U.S. App. LEXIS 11401, at *46; DynCorp Motion to Dismiss at 7. In

---

[2] In support of its argument, DynCorp only cited two of these three cases -- *Smith-Idol* and *Fisher* -- in a string cite
that also contains three other cases (which have not been overturned) supporting DynCorp's position that Plaintiffs'
claims are nonjusticiable. *See* DynCorp Motion to Dismiss at 6-7.

fact, DynCorp drew the closest analogy with *Smith v. Halliburton*, one of the cases that the Fifth Circuit exemplified for its proper application of the political question doctrine. *See Lane v. Halliburton*, 2008 U.S. App. LEXIS 11401, at *46; DynCorp Motion to Dismiss at 13-15. *See also Woodson v. Halliburton*, 2006 WL 2796228 (S.D. Tex.) (dismissing complaint for lack of jurisdiction based on the political question doctrine after concluding that decisions about the adequacy of protection while traveling in Iraq "could not be divided into discrete parts attributable to the [contractors] and the Army"). Thus, contrary to Plaintiffs' conclusion that no precedent exists to support DynCorp's assertion that the claims in this case should be dismissed as nonjusticiable, the Fifth Circuit's decision highlights the appropriateness of dismissal in this case.

## III.   THE FIFTH CIRCUIT'S DECISION DOES NOT SUPPORT PLAINTIFFS' MOTION FOR REMAND

As set forth in DynCorp's Notice of Removal (D.I. 1) and its Opposition to Plaintiffs' Motion for Remand (D.I. 13), this Court has federal question jurisdiction because Plaintiffs' state law claims implicate unique and significant federal interests. *See* Notice of Removal at 3-9; DynCorp's Opposition to Plaintiffs' Motion for Remand at 5-12. In addition, federal jurisdiction is proper because this Court should decide the federal questions raised in this lawsuit, including the interpretation and application of the Defense Base Act and the government contractor defense, which the parties have addressed in their Opposition and Reply briefs. Because this Court should decide the federal questions in the first instance instead of a state court, remand would not be proper. Finally, DynCorp properly removed this case under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See* Notice of Removal at 9-12; DynCorp's Opposition to Plaintiffs' Motion for Remand at 13-27. The Fifth Circuit's decision in *Lane* was not decided on any grounds concerning the district court's federal question jurisdiction or the federal officer

removal statute. Thus, to the extent Plaintiffs' conclusory statement appears to rely on *Lane* in support of their Motion for Remand (*see* Supplemental Memorandum at 2), Plaintiffs have misstated the significance of the Fifth Circuit's conclusions.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in DynCorp's Motion to Dismiss, the claims raised in this case are nonjusticiable and should be dismissed under the political question doctrine. In addition, Plaintiffs' Motion for Remand should be denied because this Court has federal question jurisdiction and DynCorp properly removed this case under the federal officer removal statute, as set forth in DynCorp's Notice of Removal and Opposition to Plaintiffs' Motion for Remand.

SMITH, KATZENSTEIN & FURLOW LLP

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell
Yoora Pak
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, DC 20005
(202) 626-7660
(202) 628-3606 (facsimile)

  /s/  *Robert K. Beste*             .
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
(302) 652-8400
(302) 652-8405 (facsimile)
rbeste@skfdelaware.com

*Attorneys for Defendants,*
*DynCorp International Inc. and*
*DynCorp International LLC*

June 17, 2008

# EXHIBIT 1

SOW - IRAQ 4/17-7/16/04

I. The contractor shall maintain current levels of operations as specified in previous statements of work, and be prepared to increase from 500 to 750 the number of International Police Advisors (IPA) if necessary

II. Purchase of additional armored vehicles to meet changing security conditions.

III. Construction of Specialized Police Training Facility at Adnan Palace in Baghdad, Iraq

**Background**

In order to support Coalition Provisional Authority (CPA) police training programs for the Iraq Police Service (IPS), it is necessary to maintain uninterrupted operations for support of INL programs in Iraq. This also includes the potential requirement to increase the number of IPA deployed, and to procure and deliver up to 147 additional armored vehicles. There is also requirement to construct a specialized police training facility at a site known as the Adnan Palace near the green zone in Baghdad, Iraq. In addition, there is a requirement for a container camp at the same site to provide accommodation and support for international trainers and staff.

**International Police Liaison Officers (IPLO)** - Recruit, select, train, equip and support in the field 500 IPLO personnel who will be under the operational control of the Civilian Police Advisory Training Team (CPATT) charged with the mission to establish an Iraqi Police Service (IPS) organization responsible for law enforcement functions throughout Iraq. IPLO personnel will perform field training and related duties as a follow-on to a basic skills program delivered in academies in Iraq and Jordan. IPLOs are currently scheduled to deploy to Baghdad (police academy, Ministry of Interior, operations and administration, compliance, airport), Tikrit, Basrah, Ramadi, Mosul, and Babylon.

The proposal includes identifying up to 20 senior advisors and 605 'regular' qualified liaison officers. This, combined with personnel already deployed, may exceed funding made available, particularly with regard to sustainability. This is a cost reimbursement CLIN that satisfies the requirement to deploy 500 personnel and be prepared to deploy an additional 125 personnel (on the way to a possible target of 750-1,000 personnel) during the period of performance. At this point, the requirement stands at 500 personnel; however, this may change as operational requirements continue to develop.

**Field Support** - Dyncorp is responsible for comprehensive field support, including housing, food, medical assistance, security (upgrades to facilities and approximately 800 Iraqi security personnel via sub-contracts), communications/IT, vehicles & maintenance, weapons (9MM & M4) and ammunition for IPLO. Please note that while Dyncorp provides support for police trainers, prison advisors, and justice sector experts deployed through the Department of Justice, International Criminal Investigative Assistance Program (ICITAP) and the Overseas

Prosecutorial Development Assistance and Training (OPDAT), funds are provided by separate actions and are not included in this proposal. This proposal also provides for deployment and support for 93 US and 48 third-country (22) and Iraqi (26) support personnel under fixed price and time & material CLINs.

Housing currently provided in Baghdad in two hotels, the Baghdad Hotel and Al Sadeer hotel is expected to remain in place for the current period of performance. The proposal also satisfies there requirement to maintain the approximately 220 SUVs in country, continue to process acquisition of approximately 52 level 6 vehicles, and proceed to procure and additional 147 level 6 armored vehicles. Dyncorp will also provide vehicle maintenance and support in Iraq.

**Construction** - Dyncorp should also proceed to procure through the competitive process to identify sub-contractors to renovate and clean up the Adnon palace and compound. The palace building will be utilized as classroom space for specialized police training and office space for up to CPA Ministry of Interior advisors. In addition, the existing power plant, heating and electrical systems require replacement and/or overhaul. In addition, a self-contained camp for 1,040 people will provide space for all trainers and advisors to relocate from the hotels to the Adnon compound. Outside Baghdad, Dycorp is required to install and/or construct additional container camps to house and support IPLO personnel, including a 64-person camp in Tikrit, and up to 4 such camps in locations yet to be identified.

The contractor shall be prepared to, at a minimum, carry out the work described in the attached "STATEMENT OF WORK FOR ADNAN PALACE". In addition, the contractor shall be prepared to provide operation and maintenance services.

**Liquidaded Penalties**

In order to ensure due diligence and compliance, a penalty of ███████ in liquidated damages per calendar day per site until capacity is established by the contractor and accepted by the USG after July 16, 2004.

This shall not apply to the armored car requirement in the event manufacturing capacities cannot meet the demand, and that the contractor has held consultations no later than June 1 with the Contracting Officer or Contracting Officer Representative to seek relief from this requirement.

## IRAQ JUSTICE SUPPORT

**BACKGROUND**

Since April 2003, the Department of State, Bureau for International Narcotics and Law Enforcement Affairs (INL) has been supporting reconstruction efforts in Iraq. Following the end of major combat operations in Iraq in May, INL coordinated with the Department of Justice, International Criminal Investigative Training Assistance Training Program (OPDAT), and Overseas Prosecutorial Development Assistance and Training (OPDAT) to conduct an international assessment of the conditions and needs of the Iraqi police, prisons and court sectors. This assessment was provided in support of the Department of Defense (DOD), Office of Reconstruction and Humanitarian Affairs (ORHA) which had overall responsibility for civilian assistance in Iraq. In June 2004, ORHA transitioned to the Coalition Provisional Authority (CPA). INL has continued to provide support for police, justice, and justice training and development to the CPA Ministry of Interior (MOI). Effective July 1, 2004, CPA is scheduled to transition authority to the Iraqi interim government. By July 1, 2004, many CPA functions and personnel will transition to a new US Consulate. In addition, coalition military forces will transition from an occupying force. The precise organizational structure, authorities, support and reporting relationships will be provided to the Contractor as soon as they are finalized.

Based on the assessments, it is estimated that the Iraqi justice system will need extensive rebuilding and assistance. As part of larger assistance efforts, the U.S. will contribute up to 12 judicial and criminal justice experts to train, advise and mentor Iraqi counterparts.

INL support to the CPA for justice assistance currently includes providing all field support for the up to 12 U.S. judicial and criminal justice experts that will be provided through funding to OPDAT. All such personnel are under the operational control of the CPA which determines duty assignments. The largest concentration of these personnel will be in Baghdad, but significant numbers are expected to be deployed throughout Iraq.

## 1. STATEMENT OF WORK

### PRE-DEPLOYMENT PREPARATION

The Contractor will provide pre-deployment logistical support in coordination with OPDAT for all justice personnel to be deployed to Iraq. This support shall include, but not be limited to, providing full uniform; issuing standard personal gear; issuing weapons; and providing familiarization firing of weapons. The issuing process shall be structured so as to require the physical presence of correctional personnel at a designed processing point for no more than one (1) working day. A lunch meal will be provided during this time. The types of uniforms, equipment and weapons shall be determined by INL and OPDAT.

The contractor shall provide a site for processing within a two-hour driving range of Washington D.C., and will be prepared to coordinate directly with OPDAT for scheduling

personnel into the processing site. The contractor shall also be prepared to deliver back ordered items to individual personnel prior to departure, or as soon as possible after arrival in Iraq, if necessary and unavoidable. In addition, the contractor shall be prepared to establish a temporary processing site in the event justice personnel cannot be accommodated in the Washington, D.C. area. For example, the contractor may be required to coordinate with a CONUS Replacement Center (CRC) as directed by INL in order to process justice personnel and issue all necessary equipment. It may be necessary for the contractor to support all transportation, logistical, and administrative requirements for delivering uniforms, equipment, etc. to the CRC and the contractor shall be responsible to coordinate closely with the appropriate military units.

<u>IN-COUNTRY SUPPORT</u>

The Contractor will provide in-country and off-site administrative, technical, logistical and any unanticipated services necessary to support the justice assistance program and personnel. The Contractor will maintain local offices and personnel in Iraq sufficient to provide comprehensive security, logistical and administrative support to correctional personnel, taking into consideration the wide variety of operational circumstances such as extreme weather conditions, rudimentary infrastructure and security requirements due to political and civil unrest. This shall include, but not be limited to, provision of routine and emergency medical support, facilities to promote morale, welfare and recreation, facilitating communication with immediate family members in the U.S., equipment repair and replacement, and other support as directed by INL.

Justice experts may be deployed to any location in Iraq, and will require extensive field support. The level of this support may be as a supplement to, and/or in coordination with support provided by the CPA, military forces, or may be full and independent support. For the purpose of providing such field support, the contractor may be required to:

- Provide full field support such as, but not be limited to, providing secure housing, bottled water, food (up to 3 regular meals per day/7 days a week if conditions permit; box lunches, or military MRE's if conditions warrant), medical services, power generation, communications, access to computers, security, and MWR.
- Maintain continued operation (with current levels of operation being the minimum standard) facilities already established under this program for providing housing and support for U.S. personnel.
- Maintain capacity to acquire exclusive use of, and operate, additional facilities or buildings suitable for housing U.S. personnel engaged in Iraq justice assistance programs as directed by INL.
- Maintain the capacity to perform timely construction, repair, or refurbishment of facilities and buildings as may be needed to support justice personnel. This may include the requirement to:
  - Identify and lease buildings necessary to provide housing and/or office space.
  - Make needed renovations that meet minimum western standards, to include bedrooms, bathrooms, kitchen and other common areas, office space, and secure parking for vehicles.

- Supply furniture, access to potable water, maintain sanitation services, office equipment and supplies, power generation, and MWR items.
- Locally hire interpreters and related support personnel.
- Maintain the capacity to provide a full range of armed or unarmed security services in any mission area of operation, to include, security assessments, static guards, "hardening" of facilities, electronic surveillance of protected sites, or security procedures as may be required by the COR.
- The contractor may be required to construct secure compounds to house U.S. justice personnel, renovate or modify facilities under CPA control for similar purposes, and to provide all related operating and maintenance services necessary to enable justice assistance operations.
- The contractor will be required to provide and maintain in-country administrative support (equipment and clothing replacement/repair, mail service, MWR, etc.) for U.S. justice personnel.

The contractor may also be required, at the direction of the COR, to conduct site surveys of potential areas of operation for justice personnel to live and work in locations outside of Baghdad. Based on these surveys, the contractor could be directed by INL to extend support operations to areas in which U.S. justice will be required to live and work.

In support of U.S. justice personnel, the contractor may be required to:

- Procure in a timely manner up to 6 armored vehicles meeting specifications to be provided by INL.
- Any such procurement must comply with all U.S. legislated purchasing restrictions. For any vehicles provided in meeting this requirement, the contractor is responsible to meet all applicable requirements for import/export, insurance, and vehicle registration.
- Provide all transportation, including adequate drivers, to enable timely delivery to any designated point within Iraq.
- Maintain the capacity to provide fueling and timely service of all vehicles, including routine preventative maintenance, minor repairs, and major repairs or replacement.

In addition, the contractor may be required to provide escort or shuttle services in and around designated areas of operation to support justice personnel. This requirement may include:

- Providing armed personnel to accompany U.S. personnel within the same vehicle.
- Providing armed personnel in separate vehicles to act as convoy security.
- Providing vehicle shuttle services.

In coordination with the CPA and/or coalition military authorities, the contractor may be required to establish communications networks for use by and in support of justice assistance operations. This requirement may include:

- Procurement and maintenance of hand held, vehicle mounted, and base station 2-way radios which meet operational specifications for frequency and other operating standards, as provided by the COR.
- Establishment local, regional, or countrywide radio communication networks, to include erecting towers, using repeaters, or microwave relay systems.
- Procurement of satellite based telephones
- Procurement and of cellular telephones and services compatible with operating systems within Iraq and meeting specifications
- Maintaining the capacity for timely service, repair or replacement of all provided communications equipment.
- Maintaining the capacity to lease regular hard-wire telephone services where available.
- Procurement of laptop and/or desktop personal computers with software meeting specifications determined by INL for issue to individual U.S. personnel.
- Maintaining the capacity to service, repair or replace computers.
- Providing 24/7 Internet access via wireless or hard-wire connections, and/or establishment of local area networks.

## LIQUIDATED DAMAGES

1. Contractor acknowledges and agrees that INL may recover Liquidated Damages by deducting such damages from amounts payable to Contractor under the Contract Documents. It is understood and stipulated by the parties that:
   a. INL shall be damaged by failure of Contractor to meet its obligation to proved equipment, weapons, logistical support, and security services for all personnel during pre-deployment or in Iraq;
   b. it would be impracticable to fix the actual costs of resulting damages;
   c. any sums that would be payable under this section are in the nature of liquidated damages and not a penalty; and
   d. such payment represents a reasonable estimate of fair compensation for a portion of the losses that reasonably may be anticipated from such failure.

2. Because it is critical that personnel receive all necessary equipment, weapons, familiarization, logistical support and security services, in order to enable them to effectively operate in Iraq, liquidated damages will be assessed if the contractor is not able to provide the required equipment and services in a timely manner and with adequate capacity. Damages will be calculated at the rate of ██████ per person affected in the event performance failure on the part of the contractor to deliver equipment or related logistical and security support prevents effective program operations in the field.

SAQMPD05F1436

# IRAQ CRIMINAL JUSTICE DEVELOPMENT PROGRAM
## TASK ORDER

**Contract:**              S-LMAQM-04-C-0030
**Period of Performance:** October 23, 2004 - January 16, 2005

## 1.0 OBJECTIVE

The objective of this Task Order is to elicit a proposal from DynCorp to procure and deploy personnel, equipment and materiel, and provide ongoing services to implement and support the Iraq Criminal Justice Development Program as directed by the Bureau of International Narcotics and Law Enforcement of the U.S. State Department (INL), in support of MNSTC-I and INL in accordance with the requirements, terms and conditions contained herein.

## 2.0 BACKGROUND

### 2.1 Department of State, Bureau for International Narcotics and Law Enforcement Affairs (INL).

The Department of State, Bureau for International Narcotics and Law Enforcement Affairs (INL) has been engaged in efforts to reconstitute the Iraq Criminal Justice System since April 2003 and, as part of that work, is supporting the U.S. military to develop an effective civilian police capability. Additionally, INL is working to develop the prosecutorial, judicial and correctional systems in Iraq.

Since April 2003, DynCorp has provided field support, including security, for international personnel assigned to the program, ICITAP trainers, OPDAT advisors, selected-selected police advisors, as well as official visitors from Washington. As of July 15, 2004, the total number of US personnel (police trainers, IPLO, corrections advisors and justice advisors) being supported in Iraq by DynCorp is approximately 500. The total number of Contractor support and security personnel is approximately 1,100.

DynCorp was also utilized to rehabilitate the Adnon Palace and provide housing for 1,000 trainers and advisors, classroom space for delivering specialized training for 240 participants, offices for CPA Ministry of Interior advisors and support personnel, and a joint police operations center. ███████████████████



1

SAQMPD05F1436

## 2.2 Police.

The principal program for training new Iraq civilian police is an 8-week basic police skills program (delivered by IPTs), followed by on-the-job, field training (delivered by IPLOs). Due to the deterioration of the security situation in Iraq, the field training portion of police training program has not yet materialized, but is anticipated to grow gradually during the period of this Task Order.

Pursuant to National Security Presidential Decision 36, the responsibility for the continued development of Iraqi security forces (including the Iraq Police Service- IPS) has been assigned to the U.S. Department of Defense, Central Command (CENTCOM). LTG David Petraeus, Commander of Multi-National Security Training Command-Iraq (MNSTC-I) has been assigned to manage this effort. The organization specifically responsible for police development and training is the Civilian Police Advisory Training Team (CPATT), an organization commanded by MAJGEN (USA) Joseph Fil. U.S. personnel contributed to the police program and supported by DynCorp are under the day-to-day operational control of CPATT.

The IPS is an organizational unit of the Iraqi Ministry of Interior (MOI), an institution utilized by the former regime as a primary tool of public repression and control. While the special police and intelligence units within the MOI have been disbanded, it is important to re-establish basic police functions and develop modern institutional law enforcement and public service capabilities consistent with international principles of policing in a democracy and human rights.

MNSTC-I has conducted an Iraq-wide review of police requirements, including personnel strength and equipment needs. As a result of this review it was determined that the ultimate personnel strength of the IPS required to establish and maintain peace and security in Iraq is 135,000, plus approximately 10,000 personnel assigned to new special police units.

## 2.3 Justice (Prosecutors and Courts)

Iraq has traditionally employed a prosecutorial and adjudicative system similar to those found in France and throughout the Balkans. Commonly identified as a Civil Law System, it is one characterized as inquisitorial rather than accusatorial in nature, and speaks of "seeking justice" rather than merely assessing guilt or innocence of an accused party. In this type of system, courts have unusually broad powers to investigate suspected criminal conduct; determine if

2

SAQMPD05F1436

prosecution should/should not proceed; and adjudicate guilt or innocence. Under this structure, the role of the police can be easily marginalized and become little more than one focusing upon public order maintenance, traffic control and minor criminal activity.

As was the case in the police and corrections functions, soon after the conclusion of overt hostilities in Iraq, the U.S. departments of State and Justice mounted an assessment to determine the post-conflict state of the court system throughout the Country. The assessment revealed that prior to the toppling of Saddam's government, the courts were highly politicized and served as instruments of State-sponsored repression and terror. The courts were not configured as an independent branch of government and functioned under strict government control as part of the Ministry of Justice. Many of the judges dispensed only decisions that were acceptable to Saddam's regime. Finally, as was the case elsewhere, looters and vandals had destroyed virtually the entire court infrastructure and removed all furnishings and equipment. After the assessment, the then-governing authority in Iraq, the Coalition Provisional Authority (CPA) took several decisions with respect to the justice sector including:

- An independent court system was an important aspect of the overall development of a functional Iraqi justice system and would be a goal for those assigned to assist in the overall justice development effort;
- Those former judges who were identified as not having been part of the former regime's corrupt judicial apparatus were to be re-empowered and trained to sit as judges in the new system. The Judicial Review Committee was established for the purpose of reviewing and approving the bona fides of former judges to become part of the new system;
- Efforts would be made to train and mentor existing and newly-appointed judges in order to help them gain required knowledge, skills and abilities as quickly as possible;
- A central court in Baghdad would be established in Baghdad to head and adjudicate significant criminal cases involving organized crime, large-scale corruption and crimes against the CPA and its personnel;
- An anti-corruption effort would be mounted in the form of the Commission on Public Integrity (CPI). The three pillars of CPI are transparency, education and investigation.

In an effort to assist in implementing the foregoing decisions, the State and Justice departments deployed a team of legal experts to Baghdad. Using a never-before attempted approach, the Team employed a combination of law professors and defense attorneys to provide a six-week training course to a total of 175 judges

3

SAQMPD05F1436

(150 from Baghdad and 25 from outside Baghdad) out of a total of 866 judges throughout the Country. That training will be expanded as security conditions allow. The Team remains in Iraq to continue its work which includes the following priorities:

- Establishing "Rule of Law" liaison with the Iraq Court of Cassation (Supreme Court) to encourage the continued independence of the judiciary, respect for human rights and coordination with the executive ministries of the Iraq Interim Government;
- Maintaining daily liaison with the Central Criminal Court of Iraq to include assistance with complicated/unusual prosecutions involving terrorism, public corruption and attacks upon U.S. military personnel;
- Providing legal instruction and mentoring to police, correctional personnel and judicial investigator candidates to promote professionalism, encourage respect for human rights and effective enforcement;
- Classroom and seminar training sessions for judges an prosecutors, including IST judges, and follow-on advanced training for judges who have completed basic training sessions;
- Judicial mentoring and monitoring within the 16 Baghdad courts to include reinforcement and application of concepts raised in formal training sessions, supervision of Iraqi court monitors in each court, and to facilitate cooperation with other components of the justice system, including police and correctional personnel; and
- Deploy four legal experts to other regions of the Country to address the rule of law and judicial independence issues described above.

## 2.4 Corrections.

The former regime in Iraq maintained a vast system of various types of prisons, including an infamous maximum security prison and secret facilities used as killing machines, medium security prisons, and detention centers. Traditional treatment of detainees and prisoners in Iraq were not consistent with internationally recognized standards of human rights. Prison guards were encouraged and expected to mistreat, abuse, intimidate, and extort money and goods from inmates and their families. Guards were trained on-the-job.

A country's correctional system typically includes an amalgam of facilities and programs intended, in some cases, temporarily, and in others, permanently, to incarcerate individuals occupying a variety of statuses including persons who:

- Have just been arrested by police;
- Are awaiting trial after arraignment; and

4

D 00010

- Have been adjudicated guilty and sentenced to prison, etc.

Correctional facilities must be appropriate to house and feed a wide variety of persons including; juveniles; those in temporary detention; those who pose little risk of harm to the general public; and those who do and, therefore, require maximum security. To effectively operate these systems, trained personnel are required to manage and supervise staff and properly deal with those being incarcerated.

Several decisions were taken by the CPA, the former governing entity in Iraq in connection with the corrections function within the Criminal Justice System. CPA decided that:
- The Iraq corrections function would be consolidated within the new Iraq Ministry of Justice (MOJ) and under the cognizance of the senior MOJ advisor;
- A new Iraq Corrections Service (ICS) would be constituted employing newly employed and trained personnel;
- The U.S. departments of State and Justice would identify and deploy a team of 107 qualified correctional experts to assist in the development of all aspects of the new ICS. That team deployed to Baghdad in September 2003 and has been working to achieve that goal ever since.

The U.S. corrections experts have worked to:
- Collaborate with the U.S. Army Corps of Engineers to rehabilitate the Abu Ghraib prison so that the facility may serve as a maximum security prison;
- Identify, train and mentor the staffs of several prisons within and close to Baghdad including those known as Abu Ghraib, Isktbaret, Kadamiya, Karkh and Rusafa. The mentoring, evaluation and periodic replacement of correctional staff members continues; and
- Develop a new 7-week Basic Correctional Skills training program. The first class of 200 cadets began training on 31 July 2003 at the new Academy located at the Rusafa Complex.

## 2.5 Program Implementation and Support Mechanisms.

INL utilizes two primary implementation and support mechanisms: a contract with DynCorp, and interagency agreements with other agencies of the United States Government.

- The contract with DynCorp is in place to recruit, select, train, equip, and provide field support in Iraq for International Police Liaison Officers (IPLOs). The contract is also used to provide field support for police, justice and corrections personnel provided pursuant to interagency agreements including up to 360 police trainers, 2 justice advisors, 107 corrections advisors, and specialized trainers.

- USG interagency agreements with Department of Justice, International Criminal Investigative Training Assistance Program (ICITAP), Overseas Prosecutorial Development And Training (OPDAT), FBI, DEA, Department of Homeland Security (DHS), and other agencies, provide funds to pay salaries, travel expenses (air fare, per diem where appropriate), and classroom-related equipment.

## 3.0 KEY RELATIONSHIPS

IPLO and police trainer personnel deployed to Iraq are seconded to CPATT and work under the operational control of that Organization. IPLOs remain the administrative responsibility of DynCorp, however, with respect to life and field support and all employment-related issues. CPATT determines the day-to-day work assignments of all IPLO personnel, including deployments and assignments outside Baghdad in locations that may not yet be identified. While in its role as principal organization responsible for Iraq police development CPATT may, on occasion, articulate program needs, the Contractor shall not respond to any purported tasking from CPATT or anyone other than the Contracting Officer or Contracting Officer's Representative (COR). Justice and corrections personnel coordinate with U.S. military officials but do not have the same relationship with the military as do persons assigned to the police program.

## 4.0 DELIVERABLES

### 4.1 Support for the Program and Personnel in Baghdad.

The Contractor is required to provide field support (lodging, food, fixed-site security, weapons, ballistic armor, and ballistic helmets) for the following personnel assigned to the Iraq police development program in Baghdad:

- Up to 500 IPLOs who have previously been or will, during the period of this Task Order, be recruited, selected, trained, and equipped by the

SAQMPD05F1436

Contractor, some of whom will be transiting Baghdad to field posts and some of whom will be assigned to Baghdad;

- Up to 12 justice advisors who have either been deployed by the U.S. Department of Justice, OPDAT or the Contractor;
- Up to 259 police trainers who have either been deployed by the U.S. Department of Justice, ICITAP or the Contractor;
- Up to 107 corrections advisors who have been deployed by the U.S. Department of Justice, ICITAP;
- A rotating population of up to 50 US and international trainers on TDY to Baghdad for the purpose of delivering specialized and advanced police training;
- Up to 50 U.S. federal law enforcement trainers deployed to deliver specialized and advanced police training; and
- INL-approved visitors from the Department of State and Department of Justice. This requirement should not exceed 4-6 people at any given time and should be required on an intermittent basis.

The following specifically describes existing support capacity which the Contractor is required to sustain during the period of this task order:

- Accommodations and foods service at the Baghdad (157 rooms) and Al Sadeer hotels (278 rooms). The Contractor is responsible for leasing the hotels and all available functional services, including parking, kitchen/food service buffet for breakfast, lunch and dinner, internet connections for each floor, security operations room, internal and external security. The estimated population to be served at the two hotels is provided below:
  - o 25 US contractor support personnel
  - o 40 US security personnel
  - o 18 US K9 personnel and 16 bomb dogs
  - o 75 Foreign National PSD personnel
  - o Up to 259 DOJ/ICITAP police trainers assigned to or transiting Baghdad to academy assignments
  - o Up to 500 IPLO personnel assigned to or transiting Baghdad to forward operating bases
  - o 12 US Sub-contractor IT personnel (WWNS)
  - o 2 US Sub-Contractor security personnel

- Maintenance, Petroleum/Oil/Lubricants (POL) and fuel for 256 armored and 220 unarmored SUVs, including Chevrolet Tahoes, Chevrolet Trail Blazers, Nissan Patrols, GMC Yukon, and Chevrolet Suburbans;

D 00013

SAQMPD05F1436

- Procurement of 1,000 threat level IV ballistic armored vests;
- Procurement and delivery of fifty (50) Class 9, fully armored vehicles (FAVs) to be equipped with global positioning systems and HF communications, to Baghdad as directed by the INL COR;
- Maintenance & repair of 923 laptop computers and associated hardware;
- Maintenance and repair of communications equipment including:
    - 1,050 UHF hand-held Motorola GP360 radios in-country;
    - 400 encryption boards for GP360 radios;
    - 4 VHF base stations;
    - 16 UHF base stations;
    - 12 Codan HF base stations;
    - 420 cell phones;
    - 400 GPS hand-held tracking devices;
    - 595 Thuraya satellite telephone kits;
    - 400 Codan HF mobile radios;
    - 20 VoIp telephones;
    - 9, 36' Mobile communications masts;
    - 2 Normadix USG II gateways;
    - 9 UHF repeaters;
    - 8 VHF repeaters;
    - 8 VHF repeater antennas; and
    - 4 VSAT connections for Internet.
- Maintenance, repair, inventory and assignment of 2,400 M4 rifles and 2,400 9MM Beretta handguns;
- Sufficient ammunition for the M4 rifles and 9MM handguns for training and operational purposes; and
- Capacity to provide emergency medical support and address individual reactions to the stress produced in an active war zone.

## 4.2 Support for Program and Personnel Outside of Baghdad.

**4.2.1 International Police Liaison Advisors.** Some IPLO personnel are being deployed outside if the City of Baghdad to support the police program. The current deployment plan calls for deployment of IPLOs as follows:

| Location | Number of IPLOs |
| --- | --- |
| Tikrit | 86 |
| Mosul | 20 |
| Ramadi | 51 |

8

D 00014

- Babylon    44
- Basrah     23
- Baghdad    95

The Contractor may be required to establish, operate and maintain up to six (6) regional container camps as depicted above, and up to ten (10) sub-regional container camps, including provision of life support, communications, IT, office supplies, access to medical support, transport and security (which may include 24/7 security for housing and/or protective details during ground movements during daylight hours). Security, housing, life support, food/water, medical support, communications and transport may be provided by coalition military units, depending upon the security situation and military operational priorities. The size and capacity of the sub-regional camps will be determined by CPATT.

Upon receipt of such a requirement from CPATT, the Contractor shall provide a written Construction and Support Plan, including budget, drawings and project description in narrative form to the COR within twenty (20) days of being informed by CPATT of the location and capacity of an intended site for an IPLO regional container or sub-regional container camp site. Once the Construction and Support Plan is approved by the COR, the Contractor will provide the required container(s) and associated materials and complete all construction so as to make the site fully habitable by the designated number of persons within forty-five (45) days from receipt by the Contractor of written notice to proceed from the INL COR.

**4.2.2 Police Trainers.** IPTs are being assigned to ten (10) training sites throughout Iraq as follows:

| Location | Number of IPTs |
| --- | --- |
| Baghdad | 76 |
| Adnon | 48 |
| Hillah | 25 |
| Al Kut | 15 |
| Najaf | 7 |
| Basrah | 8 |
| Kirkuk | 12 |
| Sulaymaniyah | 20 |
| Irbil | 8 |
| Mosul | 15 |

D 00015

SAQMPD05F1436

The Contractor may be required to establish, operate and maintain one or more container camps for IPTs as depicted above, including provision of life support, communications, IT, office supplies, access to medical support, transport and security (which may include 24/7 security for housing and/or protective details during ground movements during daylight hours). Security, housing, life support, food/water, medical support, communications and transport may be provided by coalition military units or the Contractor, depending upon the security situation and military operational priorities. The size and capacity of the camp(s) will be determined by CPATT and approved by the INL COR.

Upon receipt of a requirement for container camp construction from CPATT, the Contractor shall ensure that the COP is immediately provided with a copy of the requirement and shall provide a written Construction and Support Plan, including budget, drawings and project description in narrative form to the COR within twenty (20) days of being informed by CPATT of the location and capacity of an intended site for an IPT regional container camp site. Once the Construction and Support Plan is approved by the COR, the Contractor will provide the required container(s) and associated materials and complete all construction so as to make the site fully habitable by the designated number of persons within forty-five (45) days from receipt by the Contractor of written notice to proceed from the INL COR.

## 4.3 Contractor Personnel

**4.3.1 Program Management, Support and Security Personnel.** The Contractor shall provide in-country and off-site administrative, technical, logistical and any unanticipated services necessary to support the program and personnel deployed in Iraq. Equipment shall include at a minimum the listing in section C.3.3.1 of the Contract. Upon approval by the INL program manager and CO, and/or COR, it shall include additional equipment not currently anticipated. Unanticipated or unspecified requirements requested by the COR will be authorized as cost-reimbursement items that will not exceed $500,000 during this period of performance. The Contractor shall provide assistance as requested by the INL Office Director, Embassy Baghdad, and to INL officers traveling to Iraq.

**4.3.2 Program Implementation Personnel – IPLOs.** The IPLO contingent will approximate 500 personnel as directed by the COR. The contingent will include a broad range of law enforcement experts and specialists, pursuant to the listing in Section C of the Contract. The mix of experts and

D 00016

specialists shall be in general accordance with the percentages noted in Section C of the Contract, although this may be subject to change based on the needs of the mission. The total shall also include a sufficient number of individuals with supervisory and command experience to meet the needs of the mission.

Due to the high and constant level of threat posed to all international and Iraqi counterparts working in Iraq, the market for personnel is extraordinarily competitive. The persistently dangerous security environment depicted in the news media throughout the US and world has an adverse affect of personnel recruitment and attrition. Even prior to deployment, attrition exceeded 40% for a recent class brought together to pre-deployment preparation and training. This, combined with higher rates of pay offered by all competitors in Iraq, has resulted in an INL decision to move IPLO personnel to CLIN 0009 from CLIN 0020 to increase the hourly rate. This decision also reflects the supervisory nature of their positions in support of the new Iraqi Police Service.

**4.3.3. Administrative Requirements.** The Contractor shall maintain local offices and personnel in Iraq sufficient to provide comprehensive logistical and administrative support to the IPLO, police training and criminal justice program, especially officers in the field, taking into consideration the wide variety of operational circumstances such as extreme weather conditions, rudimentary infrastructure and political and civil unrest that is potentially violent and dangerous. This shall include, but not be limited to, provision of routine and emergency medical support, facilities to promote morale, welfare and recreation, facilitating communication with immediate family members in the U.S., equipment repair and replacement, and any other support approved by the State Department.

The Contractor shall conform to preliminary requirements, and provide pre-training support, pre-deployment training support and deployment support as described below.

**Preliminary Requirements.** In preparation for the procurement, training and deployment of persons to Iraq, the Contractor shall develop and/or procure and provide:
- A comprehensive personnel system, personnel records, personnel and equipment inventories and other databases as necessary to support the program and officers;
- A compensation and benefits package for officers basing labor cost estimates on an average workweek of up to, but not to exceed, 72 hours per week. The Contractor should understand that CPATT determines the work

11

SAQMPD05F1436

schedules of officers and these vary depending upon the assignments. In some cases officers will work 6 days a week with one day off; other schedules are also possible;
- A job performance appraisal system with a minimum of two reporting periods per year upon which to base extension and rehiring decisions, available to the State Department for review upon request.
- A system to accurately track the number of hours officers are working and provide biweekly reports to the State Department;
- A facility suitable to provide pre-deployment training and processing for IPLO candidates which shall accommodate mixed-sex classes. The training site shall be located within a two-hour driving range during normal driving conditions of an international airport with direct flights to major cities in Europe. If the training site is in the Washington, D.C. region, the Contractor shall include an educational and historical tour of Washington, D.C. The State Department shall have access as necessary to the training site between training sessions and at a minimum from 7:00 AM to 10:00 PM during training sessions;
- Secure space at the training site for the storage of training material and weapons for the interval between training periods. A dedicated classroom with appropriate audio/visual capacity and equipment capable of comfortably accommodating up to 175 people in a set-up that provides space for note taking and completion of written forms;
- Sufficient, qualified personnel and equipment for the training and as approved by the INL COR; and
- Documentation requested by State Department with respect to training, e.g., lesson plans.

**Pre-Training Support.** The Contractor will be responsible for screening all IPLO applicants before they report for pre-deployment training which shall include, but not be limited to:
- Generation and maintenance of comprehensive records for all candidates for employment in the Iraq Police Development Program containing all relevant documents and materials with respect to the individual's application, screening, testing, training, employment (including without limitation payroll, performance evaluations, disciplinary, assignment records, etc.) and deployment
- Ensuring that officers have the requisite law enforcement experience. The eligibility requirements for persons to be deployed to the Iraq Police Development Program as IPLOs shall include a period of nine (9) years in a candidate's last full service law enforcement employment;

12

D 00018

SAQMPD05F1436

- Conducting background investigations to ensure that candidates conform with all Department of State, Bureau of Diplomatic Security background criteria including work history, criminal history, and credit requirements;
- Administering physical examinations to ensure that candidates conform with medical condition criteria;
- Secure required security clearances as necessary; and
- Perform all other pre-screening as required by INL or CPATT.

It is essential that all of the foregoing screening shall be completed prior to the start of the pre-deployment training session described below.

**Pre-Deployment Training Support.**  Pre-deployment training support shall include, but not be limited to the following actions and tasks to be taken by the Contractor:

- Designate one point of contact to coordinate all training-related issues with the State Department and that person will have decision-making authority;
- Provide on-site and headquarters contract program management;
- Lodging and transportation arrangements and per diem for pre-deployment training;
- Appropriate medical screening, testing, immunizations and vaccinations (Tetanus, Hepatitis A and B, Meningococal, Poliomyelitis, Pneumonococal, MMR, Varix, TB/PPD, Influenza, and Typhoid);
- Psychological assessment;
- Physical fitness and agility testing;
- Mission-appropriate training and coursework as determined by the State Department to include:
    o Defensive tactics training;
    o Weapons (9MM Beretta handgun, M4 rifles) and vehicle training and qualification;
    o Teamwork/leadership training;
- Issuance of field clothing and equipment;
- Delivery of meals at the training facility as needed;
- Private office space and equipment that includes high-speed internet access for a minimum of two State Department officials during training periods, all to be conducted concurrently on site at the training facility;

**Deployment Support.**  Deployment support shall include:

- Timely provision of all necessary records and documentation for each IPLO;
- Transportation to the airport and assistance with equipment and baggage;

13

D 00019

- Facilitation of transportation to the U.S. Army's Continental Replacement Center (CRC) located at Ft. Bliss, Texas or elsewhere and Iraq in coordination with the US military as necessary through Kuwait City, Kuwait, Amman, Jordan, or as otherwise specified; and
- Transportation and temporary lodging upon arrival in any of the preceding interim points and Iraq.

**4.4 Space Allocation Tracking System** - The Contractor shall propose to procure and implement a computerized system (using existing commercial software) to track personnel billeting assignments and locations, including the Baghdad Hotel, and Al Sadeer Hotel, Adnon palace, Tikrit, Forward Operating Bases (FOB) and other locations identified by CPATT and authorized by the INL program manager and the COR.

**4.5 Personal Security Detail (PSD)** - Due to the unstable security situation in Iraq, movement between operational sites has become increasingly dangerous for persons working in the INL Iraq Criminal Justice Development Program. Additionally, the U.S. Department of Justice, a partner federal agency, has required that all of its personnel deployed to Iraq be accompanied by personal security details, and travel in a fully armored vehicles. To meet this requirement, the contractor must procure, equip, train and deploy seven, eight-person, personal security details (PSD) to Iraq with sufficient managerial, administrative, and logistical support personnel to fully and effectively operate in country. The principal mission of these teams will be to accompany and protect police trainers, international police liaison officers, justice development personnel, and correctional trainers/technical advisors as they travel to and operate throughout the Baghdad area and, then as security conditions permit, elsewhere in Iraq. The services of these professionals will be required until such time as intra-country travel becomes acceptably safe.

**4.6 Adnon Palace Training Complex – Food Service**

With respect to the Adnon Palace Training Complex, the Contractor is required to provide the following:
- Sufficient equipment, supplies, and personnel to establish an on-site food preparation and service capacity for both traditional Iraqi and western style food service for up to 600 people per meal (the specific number and mixture of both Western and Iraqi style meals to be based on weekly headcounts), seven days a week, for a period of ninety (90) days from the effective date of this Task Order; and

SAQMPD05F1436

- No less than 1200 750-ML bottles of potable water weekly (one pallet); and
- And minor maintenance/repair and custodial services for the existing tent community at the Adnon Palace.

## 5.0 REPORTS

The Contractor shall provide reports in accordance with Section F of the contract. Reports shall cover all aspects of the Criminal Justice Development Program. Specifically, weekly situation reports documenting in-country support to include vehicle status and usage, security and resource protection, IPLO assignments and activities and lodging use/occupancy.

Additionally, monthly financial reports shall be provided on the Criminal Justice Development Program to include all amounts obligated, expended, billed and total balances during the preceding month. All financial reports shall be prepared in a manner which facilitates separate tracking and accounting of Program costs for police, justice (prosecutors and judiciary) and corrections to the extent practicable. Program support costs (including O&M for the hotels, vehicle procurement and maintenance, weapons and ammunition procurement and maintenance, etc.) shall be aggregated and apportioned to one of the preceding three functional areas on the basis of percentages derived from the average monthly number of personnel assigned to each function divided by the total number of operational personnel assigned to the Iraq Criminal Justice Development Program including:

- Police personnel including both IPLOs and IPTs;
- Justice including OPDAT and other justice sector contractors supported by DynCorp, if any: and
- Corrections advisors

The Contractor shall provide the INL program manager, no less than once per week, a list and/or summary of inventory, including vehicles, communications equipment, weapons & ammunition, clothing stocks, computers and associated IT equipment, telephones, ballistic vests, personnel in-country by organization and location, meals served, and training pipeline. As well, as numbers of personnel and where they are located.

## 6. 0 PERIOD OF PERFORMANCE

The period of performance of this Task Order shall be October 23, 2004 - January 16, 2006.

15

D 00021